**UNITED STATES DISTRIC COURT**

**FOR THE DISTRIC OF OREGON**

**PORTLAND DIVISION**

|  | $84,000 total |
|---|---|
| 503-608-7611 | **JUDGEMENT,** |
| **DAMAGES** | **CASE 3:24-cv-1702-AR** |
| **Plaintiff (P)** | |
| v. | |
| Julia Annette White (D) | |
| 21408 SE 37th St. | |
| Sammamish, WA 98075 | |
| Defendant | |
| Tamera Davis (D2) | |
| of 775 Elm St in Mt. Angel, | |
| Oregon | |
| Defendant 2. | |
| David Smith(D3) | |
| david@au | |
| todamageexperts.com | |
| Defendant 3. | |
| James Shipley, D4 | |
| OSB 964279, | |
| jtshipley@lygoshipley.com, | |
| 2233 NE 47th Ave. Portland, | |
| OR 97213, 503-493-8383. | |
| Defendant D | |

Defendant Legal Counsel (DLC)
James Shipley, OSB 964279,
jtshipley@lygoshipley.com,
2233 NE 47th Ave. Portland,

25

1      **I N D E X**

2

1  OR 97213, 503-493-8383.

2

3

4                    <u>**TABLE OF AUTHORITIES**</u>

5

6  1) 18 U.S.C. § 1001 False Statements, Concealment.6

7  2) 18 U.S.C. 1621 Perjury……………………………………………30

8  3) 18 USC 3 accessory after the fact……………………………………….5

9  4) 14 CFR § 47.11 - Evidence of ownership……………………………3

10 5) US Copyright law 17.17…………………………………………………………….3

11 6)  22–451 June 28th, 2024 Federal Case number 22–451 in Loper

12 Bright Enterprises v. Raimondo and Relentless, Inc. v. Department of

13 Commerce that all courts shall no longer function as administrative law

14 courts. https://www.supremecourt.gov/opinions/23pdf/22-451_7m58.pdf

15 6

16

17 7)     Judges Code of Conduct, Canons 2 and 3;

18 https://www.uscourts.gov/judges-judgeships/code-conduct-united-

19 states-

20 judges........................................................................................................

21 4

22

23 8) Oregon Supreme Court Opinion in 366OR49 2019 Marriage of

24 Staveland and Fisher – Division of Marital

25 Assets…………………………….9

26

27 9) Marriage of Grove, 280 Or. 341, modified on denial of reh'g,

28 …………2

29 10) Marriage of Cullen, 223 Or. App. 183

30 (2008)………………..…………2

31 11) Marriage of Kunze, (2004), Kunze and Kunze 337 Or. 122.

25

1                                        **I N D E X**

  2

12) ORS 107.093 C. …………………………………………………..2

13) ORS 107.105 (1)(d)(C). …………………………………………..6

14) ORS 803.010…………………………………………………….2

15) ORS 161.155. ……………………………………………………1.

16) ORS 161.885…………………………………………………...1

17) ORS 34.080.37) 18 U.S. Code § 4 - Misprision of felony: "Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both."…………………………2

18) 28 U.S. Code § 4101 The term "defamation" means any action or other proceeding for defamation, libel, slander, or similar claim alleging that forms of speech are false, have caused damage to reputation or emotional distress, have presented any person in a false light, or have resulted in criticism, dishonor, or condemnation of any person…………………………6

19) Oregon UTCR 5.100 rules for service of court documents……………..9

25

1                                   **I N D E X**

  2

1    20) Federal Rule 8 a 1-
2    3…………………………………………………………1

3

4    21) Pagtalunan v. Galaza, 291 F.3d 639, 642 (9th Cir. 2002):
5    Pagtalunan
6    as Pro Se made numerous mistakes in filing his complaint resulting
7    in the case being dismissed. However, upon appeal, the higher Court
8    ruled that the lower Court was in error because they did not give
9    allowance for Pagtalunan's lack of legal training…………………………1

10

11   Plaintiff likewise lacks formal legal training and respectfully requests the

12

13   same allowance the higher court said 21) Pagtalunan should have

14

15   received.

16

17   Plaintiff is advised by a team of 3 professionals, also pro se volunteer.

18

19   One is a 40-Year Retired, Federal Attorney, expert in the application of

20

21   Federal and Case law, environmental law in particular. Another is an

22

25

1                          I N D E X

2

1   investigative journalist, providing legal research and document editing.

2

3   The 9th Circuit Court of Appeals is currently reviewing 4 cases filed by

4   this

5

6   team for possible removal of judges in violation of 6) 12) 13) 14) and

7

8   37).

9

10  Docket # 24-5735, 24-5275, 24-5811 and 24-5735

11

12  Exhibit one is the Transcripts for 21DR02783 which the trial which is

13  illegal

14

15  administrative law.

16

17  Exhibit One

18  IN THE CIRCUIT COURT OF THE STATE OF OREGON
19                          FOR THE COUNTY OF WASHINGTON

25

1                                    **I N D E X**

2

Julia Annette White                 ,          Docket No.        21 DR 02783
3                                               Appeal Case No.        A179571

4

5

6

7                                Respondent      .
                          VOLUME    1
1                              Petitioner,

2            v.                                Hillsboro, Oregon

3            David Charles White,

1                                    **I N D E X**

2

1
2       18
3
4       19
5
6       20
7
8       21                           Transcription Service:  CourtScripts, LLC
9                                          Jennifer Muir, CET-1149
10      22                           PO Box 123
11                                       Philomath OR 97370
12      23                           (541)207-7412
13                                       jmuirtranscriber@gmail.com
14      24
15              Proceedings recorded by electronic sound recording; transcript produced by transcription
16              service.
17                                    **W I T N E S S**

25

1                                    **I N D E X**

2

|   PETITIONER   | Direct | Cross | Redirect | Recross |     |
|---|---|---|---|---|---|
| Dave Smith | 39 | | 59 | 90 | 91 |
| Tammy Davis | 141 | | 161 | 173 | |
| Brian White | 177 | | 192 | 206 | |
| Sean Psaradelis Tammy Davis | 216 | | 221 | | |
| Laura Bramwell Brian White | 223 | 224 | 225 | 236 | |
| David White | | | | | |
| Julia White | 233 | | | | |
| | 237 | | | | |
| | 339 | | 392 | 411 | |

|   RESPONDENT   | Direct | Cross | Redirect | Recross |     |
|---|---|---|---|---|---|
| Christine Knutson Julia White | | | | | |
| Brian White | 101 | | 119 | | |
| David White | 413 | | 417 417 417 | | |
| Leland Jossy | 419 | | | | |
| | 426 | | 450 | 460 | |
| | 461 | | 466 | | |
| | | | 450 | 460 | |
| | | | 466 | | |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

25

# I N D E X

| Exhibit | Offered | Admitted |
|---|---|---|
| | 55 | 55 |
| | 366 | 366 |
| | 188 | 188 |
| | 362 | 362 |
| | 36 4 | 364 |
| | 367 | 367 |
| | 367 | 368 |
| | 241 | 241 |
| | 246 | 246 |
| | 258 | 259 |
| | 25 9 | 259 |
| | 264 | 264 |
| | 265 | 265 |
| | 49 | 49 |
| | 51 | 51 |
| | 220 | 221 |
| | 277 | 277 |
| | 281 | 281 |
| | 227 | 227 |
| | 379 | 379 |
| | 244 | 245 |
| | 244 | 245 |
| | 371 | 372 |

# E X H I B I T

PETITIONER

4 Vehicle Value Reports
5 GEICO Information
7 Photo
9 Photo
10 Photo
11 TD Ameritrade
12 Social Security Benefits
15 2020 Tax Return
16 Respondent's USD
17 Residential Loan Application  18 Ally Bank Accounts
19 Ally Retirement Statement
21 Webpage For Climate Change Truth
26 Voicemail
27 Voicemail
31 Home Estimates
32-33 Declaration, Federal Complaint
34 Keybank Statements
35, 36, 38 Text Messages
39 Petitioner's Food Stamp Decision
42 Preliminary Tax Return
43 Tax Refund Check
44 Petitioner's USD

| Exhibit | Offered | Admitted |
|---|---|---|
| | | 481 |
| | | 481 |

RESPONDENT

17 136 Auto Appraisal Reports — 481

1                                    I N D E X

2

1           138 Auto Appraisal Reports                        481
2     18
3
4     19
5
6     20

7     21

8     22

9     23

10    24

11                          G E N E R A L

12
13              February 4, 2022 Court Trial                                5
14    3    Respondent's motion to dismiss contempt  23
15              Motion Approved                                             32
16    4    March 29, 2022 Court Trial 129
17                  July 25, 2022 Court Trial                              213
18    5    July 26, 2022 Court Trial      391
19              Petitioner rests                                          412
20    6    Petitioner's Closing Argument      482
21                  Respondent's Closing Argument                         492
22    7    Petitioner's Final Closing Argument        499
23
24    8
25

25

1                                    I N D E X

          2

1    9

2

3    10

4

5    11

6

7    12

8

9    13

10

11   14

12   15

13   16

14   17

15   18

16   19

17   20

18   21

19   22

20   23

21   24

          25

February 4, 2022                                              Pretrial discussion  12

1

2

***************************

February 4, 2022

3                        TRANSCRIPT OF COURT TRIAL

THE HONORABLE D. CHARLES BAILEY

4                          CIRCUIT COURT JUDGE.

5    APPEARANCES:

6    For the Petitioner:              Attorney at Law

By:  James T. Shipley

7                                     Portland, OR 97321

8    For the Respondent:             Attorney at Law

By:  Vincent J. Bernabei

9                                     Beaverton, OR 97008

10                       ***************************

11                       (9:06 a.m.)

12                       THE COURT:  This is the matter of Julia

13                       White, the petitioner, and David White, the respondent,

14                       21DR02783.  Time and place set for trial regarding

15                       dissolution of the marriage.  We have Mr. Shipley here

16                       on behalf of Ms. White.  And we have Mr. Bernabei on 17 behalf

of Mr. White.

18                       And anything we need to take up before

19                       we begin with the hearing itself?

20                       MR. SHIPLEY:  Yes, Your Honor.

25

February 4, 2022                                        Pretrial discussion  13

1

2

21            Yesterday afternoon I submitted a motion in limine

22            regarding excluding evidence pertaining, you know,

23            the -- the -- pertaining to an unequal distribution

24            regarding the family home and -- and what Ms. White got and

              Mr. White got relative to an agreement, and the

limited judgment that was entered, which in our opinion, that would have stated it.  I

don't know if 3 the Court got my -- my motion.

4            THE COURT:  I did not get your motion.

5            MR. SHIPLEY:  Okay.

6            MR. BERNABEI:  Yeah.

7            MR. SHIPLEY:  I can present that now.

8            THE COURT:  Not going to do any good.

9            Just tell me what you've got orally.

10           MR. SHIPLEY:  Okay.

11           THE COURT:  I read your trial

12           memorandum.  You mentioned it in your trial memorandum.

13           MR. SHIPLEY:  Correct.  Does the Court

14           want to read it, or I -- should I just read it?

15           THE COURT:  Nope.

16           MR. SHIPLEY:  Okay.  All right.  Going

25

February 4, 2022                                    Pretrial discussion  14

1

2

17          forward here, it says come from -- the petitioner moves

18          the Court for an order prohibiting respondent from

19          introducing in trial any and all evidence relating to

20          the division of equity in the family home, and

21          prohibiting testimony or argument in contradiction of

22          the terms of the Court's August 18th limited judgment,

23          respondent's trial memorandum, and the UTCR 8.010, just

24          filed that the Court argues that the proposed distribution of

             assets and liabilities is not equitable because wife is receiving

             more than her fair share of the family home.

3           As already known to the Court, the

4           family home located in Washington County was originally 5 to be

             sold.

6           The Court fashioned an order giving wife

7           exclusive possession of the residence and placed her in

8           charge of getting it sold; at the eleventh hour husband

9           offered to buy out wife's interest.  It was a

10          negotiated settlement for 285,000.  This figure was

11          purely arbitrary in many regards.  It's just a

12          settlement number just like two people.  Husband has

25

1

2

13              paid his own home loan, paid off wife, and received 14 sole title of

the property.

15              And as part of the broader pendente lite

16              action as stipulated limited judgment was entered by

17              the Court on August 18th, and on page 2 of the limited

18              judgment entitled "Equalizing Property Award" -- 19

THE COURT:  Mr. Shipley, I think I

20              understand what you're asking.

21              Mr. Bernabei, is there any issue

22              with -- you guys have reached a decision, a resolution,

23              regarding the house.  And it shouldn't be part of the

24              hearing here today regarding the assets and distribution thereof.

MR. BERNABEI:  Your Honor, I don't think

that was our stipulation.  Here's what we want to do, 3 and -- and, I think, I'm going

to break down their 4 motion into two parts.

5              The first is evidence relating to the

6              division of equity in the family home.  Clearly, that's 7 relevant,

you know -- Pearson (phonetic) from 1990 and

8  many other cases since -- have all said when evaluating

25

1

2

9      a spousal support award case, you -- the Court 10 isn't -- is not just entitled but is

required to look

11                              at the overall financial circumstances of the parties.

12                              So -- so on that point, we feel that it

13                              may just be a "form over substance" argument by

14                              petitioner here, but they didn't even include the fact

15                              that petitioner received $285,000 in their statement of

16                              assets.  It sounds from his first point that they just

17                              want you to sort of take it off the board and not

18                              consider that as a resource.

19                              I would point out that one of the issues

20                              before the Court is Mr. White's motion to modify the

21                              temporary order of support.  And -- and even under ORS

22                              107.105(1)(d), the property division, and -- and under 23 (1)(f),

                                the spousal support -- under maintenance,

24 spousal support -- one of the things that the Court is required to consider are the resources of

   each party.

   And then 107.135, which is the modification statute, it's pretty much the same thing.  It

   just says "all"

3    resources rather than "the" resources.  So on that

25

1

2

4   point, I think that clearly  --

5   THE COURT:  Here's what I want to make

6   sure I understand where you guys are both coming from

7   then.  The Court should consider the 285,000 from your

8   position as part of the assets that are available in

9   this particular -- and essentially, they're asking for 10 spousal support as a resource for

spouse support or why 11 she shouldn't have spousal support.

12                              But at the same time, the Court could

13                              also say that $285,000 was not an appropriate

14                              equalizing value of the home, and in fact, she should

15                              get more of that value of the home.  Is that something

16                              that's still on the table then?  Because you guys

17                              didn't -- that's part -- not part of your actual 18 agreement that

                                you guys reached?

19                              MR. BERNABEI:  Well, I'm not sure I

20                              understood that.  I heard it.

21                              THE COURT:  So, right.

22                              MR. BERNABEI:  I'm sorry.

23                              THE COURT:  So here's what I'm saying is

24                              if you're saying, "Look, Court."

25

1

2

They're saying -- here's what I

understood they're saying.  If it's more than that, then I've -- and maybe you guys are

both saying two 3 different things, and I actually somewhat agree with 4 both of you.

5          I hear them saying, "Look, Judge, as far

6          as the $285,000 go, we agreed that this was -- even

7          though the house may have been worth more than that or

8          less than that -- we agree $285,000 was the

9          equalization regarding the house."

10          So the equalization of the house is off.

11          You're saying, "We get that.  We all agree on that.

12          But the $285,000 is something for you to consider as

13          far as resources and assets to her, no different than

14          I'm going to consider the other half of what the house 15 is

             worth as an asset in consideration to him."

16          In the end, it becomes a wash.  Because

17          to some degree, I have to accept that the parties said

18          this is the amount that we believe is a proper

19          equalization of this home.  If it's higher or lower, 20 doesn't

             matter.  This is what we all sort of said when

21          it came to the house.

25

MR. SHIPLEY:  Right.

THE COURT:  So even if I consider the

fact that she's got $285,000, I have to consider the fact that he

has an asset worth $660,000, $560,000.

MR. BERNABEI:  Yeah, 570.

THE COURT:  570, write that down.

That's why I became a lawyer.  Right.

So, in the end, it becomes a wash in

that regard.  Unless -- this is where I put it back to

you -- the Court was to say, "Look, this is a 40-year

marriage.  He was certainly the breadwinner of the

family.  She was the one that stayed home.  And in

order for me -- because of lack of other assets and

stuff here -- that probably wasn't a right amount.  And

what I would like to do is take the asset, the house, 12 and give

her more of the chunk of the value of the

house as a way of equalizing this asset because she's

not going to have the ability to earn in the future, 15 whereas he may."

And that's where I -- that's what I'm

saying.  If you guys have an agreement that this is

1

2

18                      what you want me to do but you're saying you didn't,

19                      now I'm stuck in the position of, okay, what if I

20                      believe that actually she should have gotten -- and a 21 good way

                        to do this because spousal support may be more

22                      appropriate.

23                      MR. BERNABEI:  Right.

24                      THE COURT:  400,000 is what she

should've got.  And so he owes her now a hundred

                         and -- okay, I don't do math.  He owes more money.

Right.  Well, then, is that still on the table for the 3 Court to consider here or not?  And I

think you guys

4                       are saying –- I think your agreement was no.

5                       MR. BERNABEI:  I agree.

6                       THE COURT:  Okay.  So it can't be both,

7                       is my point.  So that I think you guys are kind of

8                       saying the same thing, but just not realizing you're

9                       saying the same thing.  I understood, and that's why I

10                      took Mr. Shipley saying, "Look, Judge, we made an

11                      agreement on the house that this is the values we're

12                      going to give.  We don't know, we don't care, we didn't

25

1

2

13          have any real estate appraiser or whatever.  We just

14          sort of said here's what we think is right for the 15 house.  So

that's out.  You don't even consider that 16 anymore.

17          Because she has the same -- yeah, she

18          may have that cash, but that's because she now can put

19          that into a new home or do something of that nature,

20          right?

21          MR. BERNABEI:  Right.

22          THE COURT:  He also has that amount.

23          And he's already chosen to keep it within the house.

24          But it's the same.  So it doesn't help the Court go one way or

another except if the Court were to say 40-year marriage, spousal

support's appropriate.  Right.  You see.  You get where I'm coming

from?

3      MR. BERNABEI:  I -- I do.

4      THE COURT:  I'm not so sure it's in your

5      client's best interest to have it on the table for the

6      Court to consider.

7      MR. BERNABEI:  Well --

8      THE COURT:  The house -- because if I

25

February 4, 2022                                            Pretrial discussion  22

1

2

9     have to consider the 285,000, I also have to consider 10 the house that he has.

11                              MR. BERNABEI:  And –- and I agree with

12                              you, Your Honor.

13                              THE COURT:  Okay.

14                              MR. BERNABEI:  And -- and our agreement

15                              is pretty clear.  It's a $570,000 asset.

16                              THE COURT:  It sounds like it's not

17                              pretty clear because you guys aren't agreeing on what

18                              it was --
19                              MR. BERNABEI:  Well, well, again --

20                              THE COURT:  -- what you guys already

21     agreed to.

22                              MR. BERNABEI:  -- on the point –-

23     there's two points in the motion in limine as I read

24     it.  One is introducing at trial any evidence relating to the division of equity.  We, for the reasons

       stated -- I disagree with that.  We're allowed to present evidence that they have

       divided this home 3 $285,000 equity to each.

4                              THE COURT:  Well, the question is then

5                              if you're allowed to, where's the relevance in that in

6                              the consideration of how you guys have decided to split
25

1

2

7          the asset.  In other words, how is it relevant to what

8          the Court now has to decide?  And that's where I kind 9 of get -–

          that's where I kind of (indiscernible).  If

10    it is, and you're saying that that's not the agreement,

11    then I think it's not just the $285,000 that becomes 12 something for the Court to

      consider.

13          It also is the house that he has and the

14          value of the house that he has, if it turns out the

15          house was, you know, an appraisal was something that

16          you guys didn't think about, maybe the house given the

17          market right now is a $700,000 home.  And she got the

18          short end of the stick.  And so how's the Court 19 consider that?

20          Does the Court consider that in the

21          sense of the trailers and the vehicles that are now out

22          there and the other Roth IRA that's out there?  And

23          using that as an equalization to give to wife in this

24          situation.  I'm not so sure it's necessarily in your client's best

          interest for the Court to have that on

      the table to consider.  Does that --

25

1

2

                    MR. BERNABEI:  The only reason we want 3 the Court to -- essentially, the purpose of our

4    introduction of the agreement and including it in our

5    statement of assets is this goes from, you know, an

6    over $800,000 asset case down to, perhaps a, you know,

7    high $200,000 asset case, if we just take it off the

8    board entirely.  And I think that's important for the 9 Court, especially in, you know, a divorce where the

10   parties are in the latter stages of their life.  This

11   is something that would be relevant for the Court to

12   see what they have as far as these resources and assets 13 available post-divorce for the rest of their life.

14                    THE COURT:  I don't disagree with you in

15                    the sense that there could be some relevance as to what

16                    assets are available or what the size of this –- 17 the -- what's a better way to put it? -- the lifestyle

18   that they all lived during the time of the marriage for

19   purposes of the Court to consider the spousal support.  20 All right.
21                    MR. BERNABEI:  Okay.

22                    THE COURT:  I can get that.  But I think
23   if the Court gets into -- and if you all want to take a

25

1

2

24    look at your agreement -- and I have to decide specifically on your agreement what I think you did,

then I do think it becomes problematic because the question is do I now consider -– because you guys have

3     said, and this is what I understood the agreement

4     was  -- is we're agreeing that this is the equalization

5     of the home.  This is what he should get because he 6 wants to buy her out of the home.  And he's going to

7     keep the home.  And he believes $285,000 is reasonable.

8     And she agrees that $285,000 out of that is a 9 reasonable amount to buy her out of the house.

10                         MR. BERNABEI:  Right.

11                         THE COURT:  House is done.  Right, as

12                         far as evaluation goes, you guys have agreed to that.

13                         And then what the Court is left with is to decide, in

14                         this particular case, is the personal property.  And

15                         I'll tell you guys in a second how we're going to deal

16                         with that part.  And the -- really, the IRAs, the

17                         vehicles, and the spousal support.  And including

18                         whether or not the Court should modify the temporary

25

February 4, 2022                                        Pretrial discussion  26

1

2

19          spousal support that Judge Fun entered into that your

20          client appears not to have paid in the last two or 21 three

            months.

22          So I get that.  I'm going to give you

23          guys a short synopsis of what we're going to do on the

24          property.  Each of your clients has done a list that they believe

            the properties are.  You guys are going to share it amongst

            yourselves.  And then we're going to have a silent auction.  We're

            going to decide what is 3 important and how important it is to

            them.  And then

4      they're going to present it to the Court, and I'll do

5      an equalization judgment.  It will be that simple.

6      If they –- if somebody thinks

7      something's valued because the other person wants it,

8      so I'm going to put $10,000 on that, well, you put

9      $10,000 on it.  You're going to be paying them, the 10 other side, $10,000.  Because they

may only put a 11 dollar.  So you guys are going to -- does that make

12          sense?

13          MR. BERNABEI:  Not quite.

14          THE COURT:  So you guys are going

25

1

2

15           to -- you're going to list out -- and I know there's

16           still a little bit of issue as to some of the things

17           that bought or what husband believes wife took.  You

18           guys can put that on that list, and I'll compare it,

19           you know.  You guys will compare lists out here

20           whenever.  And the values of those items.

21           And then they're going to have a silent

22           auction.  And this is going to be -- I'll take a look

23           at it, what you think the value of that is.  And you

24           guys are then going to send those to me from each of your

             clients, and I'll go through, and I'll say here's

the equalization.  This person wants these items.  They won the bids, and here's the

amount that they're going 3 to be paying in order to keep those items.  And my --

4            MR. BERNABEI:  Your Honor.

5            THE COURT:  -- in what I've learned in

6            that, it's funny how little value the folks believe

7            there actually worth once --

8            MR. BERNABEI:  Right.

9            THE COURT:  -- it's all said and done.

10           MR. BERNABEI:  We actually have a

25

1

2

11          personal property appraiser schedule.  But, Your Honor,

12          one of the issues is there's -- there's apparently

13          missing items.  Husband says wife took them from the

14          house.  She says no.  And so --

15          THE COURT:  I'll do a factual.  Wait.

16          You can present the evidence.  And I'll determine if I

17          think that they are or are not missing, and then I'll

18          put them on the list.  And if she says she doesn't have

19          them, then she'll get credited as far as having to pay 20 for those.

21          MR. SHIPLEY:  So you -- basically, our

22          clients need to say this is the stuff they want and 23 what they

            think they're willing to pay for it.

24                    THE COURT:  Yup.  And that's a silent

                      auction.  I don't want them to say it out loud.  But I

            want it to be in secret.  And, the courts going to determine if there's any of those items

            that your 3 client thinks she took that she said she didn't.  Court

4           will determine if those should be placed on that list.

5           Other than that, there should be some

6           items they all agree that they still each sort of have.

7           MR. BERNABEI:  And there are.

25

February 4, 2022                                      Pretrial discussion  29

1

2

8    THE COURT:  Right?  And we're just going

9    to put those -- make that list, and each of your 10 clients is going to say, here's what I'm

willing to pay 11 for that.  Right.

12                          And if they, for example, your client

13                          said $100, Mr. Shipley's client said $50, your client

14                          wins, and he's going to owe her 100 bucks.  Right.  And 15 it's

going to kind of go right on down that list.  And 16 so we'll see

how valuable they really think these items

17                          are.  How much they're really willing to pay for them.

18                          So if he puts a dollar on it, the other

19                          person puts no-bid, they get it for a buck.  That make

20                          sense?  And I appreciate we'll have some items that the

21                          Court will determine.  Yep, they should be included on

22                          that list.  All right.  And if wife, if those are

23                          included on the list, and the wife says she doesn't

24                          have them anymore, you're going to have to pay for them.

                              MR. BERNABEI:  And we do –- we each have

lists.  I believe they're -- they're very similar as to 3 the items.  Who gets what is where

the issue is?  And 4 then, like I said, we've got these missing items.

5                          THE COURT:  You're just going to put

25

1

2

6          them all on the list, and we'll look them over from

7          them.

8          MR. BERNABEI:  Okay.

9          THE COURT:  Yep.  So really, what I'm

10          hoping to use our time this morning on, and I think the

11          answer -- Mr. Shipley's original question regarding the 12 home.

           The Court will consider the evidence in the

13          sense of here's what the overall state was, here's what

14          their lifestyle was throughout the life of the 40-year

15          marriage for those purposes.

16          As far as a determination of an

17          equalization value, the Court's going to find that the 18 parties

           already reached that agreement.  The parties

19  already indicated that from your client's perspective,

20  it was worth it to him to keep the value of the house

21  by paying her 285.  From her perspective, it was this

22  is enough for me out of this house to allow him to 23 continue to keep the house and the

    security mortgage

24 and to go forward.  That that is already equalized.

           In other words, I won't consider that in

25

February 4, 2022                                        Pretrial discussion  31

1

2

the sense of, you know, that was too little, too much, or whatever, and then we're going

to offset it with

3    some of the other assets that are out there.  So we're

4    going to be left with the two IRAs.  I think each of

5    them had an IRA if I remember right.  There was four or

6    five vehicles, including the trailer.  And I think that 7 was it.

8                         MR. SHIPLEY:  Your Honor, we have -- I

9                         have an expert witness regarding the –-

10                        THE COURT:  Dave?

11                        MR. SHIPLEY:  Dave Smith.

12                        THE COURT:  Yeah.

13                        MR. SHIPLEY:  So I would like to be able

14                        to proceed with him so I could -- because he's "on the

15                        clock" so to speak.

16                        THE COURT:  Sure.

17                        MR. BERNABEI:  If we could –- if we

18                        could call him --

19                        THE COURT:  Yeah.  All witnesses -- I'll

20                        let everybody know that I have a policy of if you have

21                        a potential to be a witness in this case, you do need

25

1

2

22                    to go outside and hang out outside (indiscernible) of

23                    the trial itself.  So, if you're a potential witness,

24                    go head on outside for us.  Dave, you can stay because you're

                      probably going to be our first witness.  So hang

out for a bit with us.

                    MR. SHIPLEY:  Okay.  So should we do the 3 personal property, or can I

call Mr. Smith?

4                    THE COURT:  No, we'll do Mr. Smith and

5                    get the values of the items first and so we can get him 6 out of

                     here.

7    MR. SHIPLEY:  Okay.  So do the personal 8 property.  All right.

9                    THE COURT:  Anything else as far as

10                   preliminary matters we need to take up before we get 11 going

                     with the trial itself?

12                   MR. SHIPLEY:  Your Honor, we do have

13                   these pending contempt matters.  So there's -- there's

14                   some evidence, even though today's the dissolution.  In 15

                     regards to Mr. Smith, there's some voicemails that Mr.

16 White left Mr. Smith that I want -- that I believe are 17 relevant.

25

1

2

18          THE COURT:  Is there any objection to

19    including all the information, including -- I assumed

20    you wanted to do the same thing as far as your request

21    to modify Judge Fun's spousal support.  Does it make

22    sense that we just do –- people present all the 23 information at

the same time versus (indiscernible) 24 each of our hearings?

        MR. BERNABEI:  If were -- if we do the contempt hearings and

consolidate with this, is that what you're –-

3          THE COURT:  Yes.  Yes.

4          MR. BERNABEI:  Yes.  I don't have any

5    problem with that.  If we do that, though, we do have

6    a -- a response that we believe justifies dismissal of

7    petitioner's motion for contempt.  I can go through

8    that very quickly but -–

9          THE COURT:  Yeah.  I just figured you

10    could present the same time they're going to present

11    the information of why they believe your client's in

12    contempt.  You're going to present me information on 13 why it's

either not a willful violation or it's just

14    not in contempt.

25

1

2

15          MR. BERNABEI:  Yeah.  I -- with

16          theirs -- I don't think we could get to that

17          state -- they've got a deficient statement --

18          THE COURT:  The form itself is?

19          MR. BERNABEI:  Right.  They didn't get a

20          sworn statement, and they didn't comply with the UTCR

21          as far as the --

22          THE COURT:  That's fair.  That would 23 just be a legal argument.

24          MR. BERNABEI:  Now, I did file a

response, and I can, you know, quickly summarize what

-- what those are.  But -- but I think that dispenses with substantive evidence on wife's

contempt claim.

3          So the first -- the first issue on the

4          contempt is -- if you -- if you just want me to dive 5 into it.  The -

-- let me pull it up here.

6 MR. SHIPLEY:  Is there a written motion 7 regarding this?

8 MR. BERNABEI:  No.  It's a response to 9 the contempt.

10          MR. SHIPLEY:  Okay.  I didn't prepare it

11          legally for the contempt.  I just was -- Your Honor, I

25

February 4, 2022                                    Pretrial discussion  35

1

2

12          was talking and discussing in terms of presentation of 13

            evidence.

14               THE COURT:  I understand, but if -- 15               MR. SHIPLEY:

That's fine.  I'm just --

16               THE COURT:  -- contempt wasn't properly

17          or procedurally proper, then there's no sense in having

18          evidence on it.

19               MR. SHIPLEY:  Right.

20               MR. BERNABEI:  I'm looking to see what

21          my -- where my response is in my pleading log.  Give me 22 one

            moment, Your Honor.  Let's see.

23               THE COURT:  It's funny you should say

24          that because I'm looking through them, and I

            don't  remember seeing one.

                         MR. SHIPLEY:  The Court -- I think this

Court had signed the show cause regarding

3 the -- regarding the --

25

1

2

4                    MR. BERNABEI:  Oh, I know what happened.

5    Okay.

6                    THE COURT:  There was the pendente lite

7    order --

8                    MR. BERNABEI:  No, so what happened is

9    in -- so wife filed a contempt motion on September 22,

10   and the -- then, you know, general basis were violation

11   of a no contact order and failing to pay temporary

12   spousal support.  What -- in -- in the response, what

13   we have presented is the -- and this was

14   filed --  looks like December 2, 2021 -- the statement

15   in support of the motion for contempt --

16   THE COURT:  I got to tell you.  I don't 17 have anything filed on September.

18                    MR. BERNABEI:  I think what happened is 19 it's filed in the contempt

case.

20                    MR. SHIPLEY:  The contempt cases are

21                    filed, like, if you're on the --

22                    THE COURT:  Yeah.  Yeah.

23                    MR. SHIPLEY:  You've got to go through

24                    the criminal side.

25

1

2

THE COURT:  I hate that.  But --

MR. BERNABEI:  That's why --

THE COURT:  -- usually they make sure it 3 gets filed in both.

4                    MR. BERNABEI:  Yeah, and I'm not -- I -- 5                    THE

COURT:  It's not in the DR case.

6                              MR. BERNABEI:  Unfortunately, all I'm

7                              looking at is my, you know, hardcopy pleading log.  I

8                              didn't find this in the divorce case.  What I found it

9                              in was the contempt case 21CN04559.  But clearly,

10                             there's no doubt that the statement in support of the

11                             motion for contempt is not an affidavit.  It's not a

12                             declaration.  It's just signed and dated.  That for a

13                             contempt action, which is a statutory action, must be

14                             strictly complied with.  That's -- that's a fatal

15                             error.

16                             There is some hearsay in there.  I don't

17                             think -- that's more for if we get to the hearing.  But

18                             the other point is the -– at the time that this motion

19                             was filed on September 22, roughly two weeks before

20                             that the wife had filed a satisfaction of judgment

25

1

2

21          acknowledging that she had received spousal support.

22          So when this was filed, the support had been paid in 23 full, she

actually, you know, knew that.  She signed a 24 satisfaction of

judgment.

               The third issue that -- before we even

get into the, you know, the merits of other cases under the Uniform Trial Court Rules

19.020 -- when you're 3 looking for remedial contempt, you have to state

4          whether the party seeks a sanction of confinement.

5          It's required.  They didn't do it.  And  --

6          THE COURT:  Isn't the fatality of not

7          doing that just means they can't seek that later on?

8          MR. BERNABEI:  I'm sorry?

9          THE COURT:  Isn't the fatality of that

10         is just they cannot seek a confinement later on?  In

11         other words, the purpose of saying whether or not

12         you're going to be seeking contempt is for the Court to

13         determine whether -- and the person to understand there

14         may be a potential consequence if you're found in

15         contempt.  But if they do not state that you are going

16         to find them and put them in jail, then the Court has

25

1

2

17                        no authority to put them in jail because they weren't

18                        on notice of that in the first place.  They didn't have 19 notice.  Isn't
that the fatality of not placing that in 20 there?

21                        MR. BERNABEI:  Well, that would be one

22    –- one -–

23                        THE COURT:  Because the Court can always

24 use fines and/or certainly define something just until they're in -- a remedial contempt until

they're in compliance with the Court's actions, Court's order?

                        MR. BERNABEI:  Well, the whole purpose 3 of the contempt order to
show cause is to, you know,

4 give the accused the advanced notice, opportunity to 5 prepare, and be heard.

6    THE COURT:  And I understand what the

7    consequences are but don't.  I'm with you, but if the -

8    – and I'd have to take a look at it.  There's a case

9    with a statute.  My understanding of if you fail to put 10 in there that you're seeking
confinement, all that

11                        means is the Court cannot then later confine the person

12                        for failure to not comply with the Court's order.  The

13                        Court is still left with the opportunity to fashion

14                        other types of possible sanctions that are -– and

15                        remedies available to the Court -- whether it be fines,

25

1

2

16          whether it be some property distributions, whether it

17          be something else.

18          MR. BERNABEI:  I would agree for

19          punitive contempt.

20          THE COURT:  I think it's even remedial.

21          I don't know how on remedial -- so long as -- I'd agree

22 with you completely if it says -- if there's no list.

23 I'll take a look at it here.  If there is no listing of

24 what the sanction would be, it leaves the Court in a very difficult -- oh, okay, I can find,

okay, they're

in contempt.  And I think the Court can still do that and find them in contempt.

3          But what's the sanction for that?

4          Nothing.  There's no "bite" to it, if you will.  Unless

5          there is an indication of what they're going to be

6          seeking from the Court as a sanction for being in

7          contempt.  I think you and I are agreeing on that.  Or

8          I think we may be disagreeing on, though, is just

9          because somebody doesn't seek confinement and therefore

10          doesn't put it in there as a possible consequence of

11          being held in contempt doesn't make the contempt

25

February 4, 2022                                    Pretrial discussion  41

1

2

12              necessarily go way.  I just means you can't now ask 13 the Court,

nor can the Court place them in confinement

14              because it wasn't sought.  Does that make sense?

15              Hopefully, I'm doing okay.

16              MR. BERNABEI:  It does.  But -- but if

17              you look at that Court rule, the question is, you know, 18 if you

are –- if you are -- in the instrument,

19       initiating instrument in a remedial contempt, the -- it

20       must state in the instrument whether the party seeks a 21 sanction of confinement.  So

it's not if you seek it

22 and you don't include it, then you don't -- you're not 23 able to get it later.  This is whether

you do and

24 which, you know, implies you either do, or you don't.

And so the way I read that statute or that Court rule

is because of the use of whether it means, you know, whoever is initiating, has to state

whether they're -–

3               THE COURT:  I appreciate what you're

4               saying.  I'm just not so sure it's a fatality at that

5               point in time.  It makes the --

6               MR. BERNABEI:  All right.

25

1

2

7                    THE COURT:  -- request null and void.

8                    MR. BERNABEI:  Well, in any event,

9            the -- the unsworn statement certainly --

10                   THE COURT:  That's certainly a much more 11 compelling

     argument.

12                   MR. SHIPLEY:  Your Honor, we did -- the

13           document that was submitted as support was a 14 declaration.

     And the Court accepted that at the time

15           procedurally and went ahead and signed the show cause.

16           So I think to the extent that the Court accepted the

17           document, which is titled "The Declaration" and signed

18           by my client, we believe that that would override any

19           issues regarding the procedural shortcomings of not

20           having a sworn statement.  Because the Court --

21                   THE COURT:  Do either of you guys have a

22           case?  I know it's a rule.  But do either of you guys

23           have a case?  The reason why I say that is I'm actually

24           a member of the Oregon Counsel of Court Procedures, and

     generally, the rules make sworn affidavits and

25

1

2

declarations one and the same.  That they're -- the -- generally the difference between one

3   or the other and the importance of them is -- and I'm

4   looking through this and I do think that what makes one

5   sometimes an affidavit better than a declaration, 6 although some declarations still do it -- is under

7                    penalty of perjury.

8                    And what's missing in even the

9                    declaration here is an acknowledgment, an express

10                   acknowledgment that I make these things under penalty 11 of

                     perjury.  And it's the one thing that's missing that 12 an affidavit

                     certainly has.

13                   And I think the reason for that and why

14                   the rules have that are, to some degree, coupled with

15                   some of the other aspects that Mr. Bernabei is pointing

16                   out is -- or what somebody may be seeking from the 17 Court is

                     potential confinement and/or a fine of some 18 sort, a monetary

                     sanction from that.

19                   And therefore, before we want those to

25

1

2

20          go forward, and a person to possibly be sanctioned for 21 those

and have those imposed, we want the other person

22          to have to have made these statements --

23          MR. SHIPLEY:  Your Honor?

24          THE COURT:  -- with the understanding

that if the statements are untruthful, that they can be sanctioned or charged with perjury.

And here, it would be difficult for a prosecutor to take a look at this as

3          there's no acknowledgment that this is done under

4          penalty of --

5          MR. SHIPLEY:  Right.  For that matter,

6          my client will swear right now to the "under penalty of

7          perjury" -- to that statement, and at the same time, 8 the Court

did sign off on that order to show cause at 9 that time, so.

10          THE COURT:  Yeah.  Courts make mistakes

11          all the time.  I think part of what goes wrong with

12          courts sometime is we don't acknowledge when --

13          MR. SHIPLEY:  Right.

14          THE COURT:  -- we make mistakes.  And

15          then we bury our heads even further and don't do the

25

February 4, 2022                                        Pretrial discussion  45

1

2

16          right things when our mistakes are pointed out to us.  17 And

            here, I do think it's deficient.  And I appreciate

18          that she would testify to those things.

19          MR. SHIPLEY:  And I --

20          THE COURT:  But I'll say it with this as

21          well, okay, Mr. Bernabei, I will dismiss this contempt.

22          It doesn't change that they still can't turn around and 23 refile it

            and have her do a sworn document.

24                  MR. SHIPLEY:  Exactly, Your Honor.  I

mean otherwise --

                    THE COURT:  There's no statute of

            limitations that's going to have rung given the facts

3   and the timing of them.  And so I'm not so sure

4   ultimately -- legally, you're correct, and I'll dismiss

5   it if that's what you want.  But it doesn't mean I

6   would prevent them from filing again if they did an

7   affidavit or declaration in which they indicated that 8 they understand under penalty of

    perjury if they make 9 the statements.

10                  MR. BERNABEI:  Your Honor, you know, our

11          response was filed in December.  I think December 2.

25

February 4, 2022                                    Pretrial discussion  46

1

2

12              They had plenty of time if they wanted to amend.  They

13              haven't done that.  I would ask for a dismissal.  If

14              they want, you know, without prejudice, so be it.

15              THE COURT:  Yep.

16              MR. BERNABEI:  But --

17              THE COURT:  Court will grant

18              (indiscernible).  I'm good, then.  They've made that

19              request, and the Court will grant that without

20              prejudice.  So you can refile, and if your client

21              decides to do that --

22              MR. SHIPLEY:  I still intend to admit

23              the -- the voicemails that were left for Dave Smith.

24              Again, I think those are relevant to his testimony, so.

I -- and I --

                        THE COURT:  Sure.  No.  Understood.  If

Mr. White was calling that Mr. Smith because he heard

3   that Mr. Smith was --  potentially be a witness and

4   making statements, that's relevant to the Court.  If he

5   was trying to intimidate a potential witness, there's 6 always relevance.

7                        All right.  Any other pretrial stuff you

25

1

2

8                              want to take up?  I think that's still -- so we don't 9 need to deal

then, obviously, with phone calls to the

10    son.  And I guess we don't need to deal with the $1000

11    in contempt -- in spousal support as far as a contempt

12    matter because that would just be refiled at this point

13    in time, if it is refiled.  I'll leave that up to you

14    to make that call and you, the client.  So we're just

15    left to the things we've talked about earlier as far as 16 the dissolution of the marriage

itself.  All right.

17                              MR. BERNABEI:  And before we get into

18                              the substance, I do want to ask the Court a little bit

19                              about our timing today because I had scheduled a couple

20                              of witnesses for this afternoon, but it sounds like 21 we're not

going to be here.

22                              THE COURT:  No.  We have -- we already

23                              have a 1:30 this afternoon.  Yeah.

24                              MR. BERNABEI:  Well, if -- if I may,

could I have about five minutes --

THE COURT:  Absolutely.

25

1

2

          MR. BERNABEI:  -- so I could call my 3 clerk, and they can alert everyone.

4    THE COURT:  Yeah.  If you can get them

5    in here earlier, that would be great.

6    MR. BERNABEI:  I doubt we're going to be

7    able to do that if you've got Dave Smith.

8    THE COURT:  He'll be fast.

9    MR. SHIPLEY:  I've got Dave Smith -- 10        THE COURT:  He will be five minutes.

11          MR. SHIPLEY:  -- and a realtor to

12          testify.  I mean, the realtor may not -- if we're

13          settling personal property right now --

14          THE COURT:  Yeah.

15          MR. SHIPLEY:  -- is that the game plan?

16          THE COURT:  Yes.  What do you need the 17 realtor for?

18          MR. SHIPLEY:  Well, there is issues

19          of  -- I guess you'd say legal issues of -- there's a

20          refrigerator, a washer/dryer, and, like, a hot tub --

25

1

2

21          THE COURT:  Yeah.

22          MR. SHIPLEY:  –- and some window

23   coverings.

24          THE COURT:  You won't need them.
Because they're going to give you a list, and they're

going to decide what they think the actual values are.

          MR. SHIPLEY:  All right.  So --

3          THE COURT:  Yep.

4          MR. SHIPLEY:  -- then I won't need that

5          realtor to testify pertaining to industry standards in 6 that regard.

7          THE COURT:  Yeah.  I completely concur.

8          I don't know who put it in their memorandum.  They had

9          been –- it may have been you.  We think our stuff is

10          much more valuable than it really is to the rest of the

11          world out there.  And I'm one of those who believe that

12          if you really think it's worth that, put it down on 13 that silent

          auction and pay for it.  If not, it really

14   was not worth that much, and it may have been puffery.

15   So that's kind of where I go with that.  So we don't

16   need the real estate agent to come in and talk about 17 values because they're going to

determine the values of

25

1

2

18          their own stuff.

19          MR. SHIPLEY:  All right.

20          THE COURT:  Does that make sense?

21          MR. SHIPLEY:  I'll let him -– 22          THE COURT:

Yeah, so do you think your

23  –- if you can get a hold of staff, you could possibly

24  call those witnesses and get them in for –- I will say our 10:30 went away.  So we do have

up till noon.

          MR. BERNABEI:  Right.  The problem is I

couldn't get him in the morning --

3          THE COURT:  Okay.

4          MR. BERNABEI:  -- so we scheduled him

5          for the afternoon.

6          THE COURT:  Okay.

7          MR. SHIPLEY:  Well, I mean, the one

8          witness is regarding personal property, so –- 9

          MR. BERNABEI:  Well, that's true.

10          MR. SHIPLEY:  To the extent we are done

11          with that, you won't need to have that person testify. 12

          THE COURT:  Yeah.  I'm not done with it,

25

1

2

13    but we're not going to be having testimony here today.

14    But yeah.  Does that help, Mr. Bernabei? 15   MR. BERNABEI:  It does.  It may.  So

16                         I -- I just need to contact the other witness.

17                         THE COURT:  That's fine.

18                         MR. BERNABEI:  So if I could have just a 19 few minutes.

20                         THE COURT:  Yeah.  We'll take a five-

21                         minute break and kind of get back here ten minutes to.

22                         I'm going to recess real quick.  Yeah.

23                         MR. SHIPLEY:  Thank you.

24                         (Court recessed from 9:43 a.m. and 9:56 a.m.)

                                 THE COURT:  All right.  Hopefully,

       everyone was able to get ahold of the folks and get them in different times.  So with that

                    then, I read 3 through your memos.  So anything else to take up at the

4                         time before you call your first witness, Mr. Shipley?

5                         MR. SHIPLEY:  Did you want these

6                         property lists?

7                         THE COURT:  Not now.

8                         MR. SHIPLEY:  Okay.

9                         THE COURT:  What I'm going to do with

10                        the property lists because I still think we still have

25

February 4, 2022                                    Pretrial discussion  52

1

2

11          the information that Mr. White thinks that she's got

12          certain items that took out that we'll hear some

13          evidence about whether I agree with that, and that that

14          needs to be on that list.  You guys are going to keep

15          the lists.  I need -- and your clients are going to go

16          through the lists and get their silent auction on those 17 lists.  And

            then you're going to submit them to me.

18  And then I'm going to decide, okay, who won.  And if

19  they did, this is how much they're going to pay for 20 that item.  And then, with the

    equalization, hopefully,

21          is in the end.  Does that make sense?

22          MR. SHIPLEY:  Okay.

23          THE COURT:  Yep.  Okay.  With that, you 24 may call your first

            witness.   MR. SHIPLEY:

        Your Honor, then one more -- just a quick question.

            THE COURT:  Sure.

                MR. SHIPLEY:  -- before I call.  We do

3   have a hearing set out –- I -- I know we're trying to

4   get as much done on the dissolution today, but we have

5   a hearing in a set couple months regarding the

25

1

2

6    contempt.  So I -- I assume what we're doing -- we

7    don't have to try to press through and get all through

8    the contempt stuff today to the extent Mr. Bernabei

9    will have evidence.  I assume we'll then have that

10   subsequent hearing at that point.

11   THE COURT:  Yeah, that's fine. 12   MR. SHIPLEY:  Okay.  Yes, my first

13                              witness would be Dave Smith.

14                              DAVE SMITH

15                              called as a witness for the Petitioner, having been

                               duly 16 sworn, testified as follows:

17             THE COURT:  Go ahead and have a seat.

18             And once you're seated, tell us your first and last 19 name,

              and spell your last name for us, please. 20

              THE WITNESS:  My name is David Smith,

21                 S-M-I-T-H.

22                 THE COURT:  And you may inquire.

23                 DIRECT EXAMINATION

24                 BY MR. SHIPLEY:

Q Mr. Smith, there's two notebooks in front of you.

25

February 4, 2022                                    David Smith-D 54

1

2

    The one on the -- you're right is petitioner's trial notebook.  If you could, just to be prepared, go ahead 3 and flip to item number 4, which is going to be Exhibit

4         4.  And we'll be talking about that here in a minute.

5         Mr. Smith, can you please tell

6         the -- the Court what your employment is?

7         A     Yes, sir.  My name is -- I -- I work with my

8         company, Auto Damage Experts.  And I'm an automotive 9 appraiser.

10   Q     And how long have you been a -- or how long 11 have you been an automotive appraiser?

12         A     So I've been appraising automobiles since I

13         was 18, working in the new and used car dealership

14         business.  And then professionally as a sole income

15         since 2008, when I started Auto Damage Experts in 16 Oregon.

17         Q     You said you started at 18.  How old are you

18         now?

19         A     I am 50 -- going to be 51.

20         Q     Okay.  And in your work as an auto damage

21         appraiser, can you tell the Court what type of

22         appraisals you do and for what situations?

25

February 4, 2022                                    David Smith-D 55

1

2

23        A        Certainly.  So we do total loss appraisals.

24        We do bankruptcy appraisals.  We do appraisals for corporations, organizations

such as the IRS, insurance companies, consumers, dealerships, businesses.  All

different types of situations.  We've done them for

3    museums even.  So there's all kinds -- the U.S. Marshal

4    Service, for example.  So we do them for asset

5    forfeiture, those types of things as well.

6    But we also appraise values, damage, as well

7    as diminished value after an accident.  Those types of

8    things too.  So we take all condition involved in 9 consideration when we're appraising

the value of the 10 vehicle.

11        Q        And have you ever testified in court before?

12        A        Yes, sir.

13        Q        How many times do you think you've done that?

14        A        I think in trial, about 20 times; in

15        arbitrations, over 100, maybe 150 times.

16        Q        Okay.  And one of the items that you were

17        asked to appraise was a camper --

18        A        Yes, sir.

25

February 4, 2022                                        David Smith-D 56

1

2

19        Q          -- an Artic Fox camper.  Can you tell the 20 Court what your experiences

is in, in appraising these

21   types of items?

22   A        So I -- when you add up campers, RVs, 23 motorhomes, etc., we probably

appraised over 500 of 24 those in that 14-year period.

Q                    Okay.  Throughout your career, do you

have -- could you estimate, like, how many vehicle and camper/RV appraisals you've

done?

3        A        Altogether, probably at this point, about

4        35,000 appraisals total.  On RVs and campers, probably

5        about 1,000 because we also repaired and totaled out 6 campers and RVs.  And

my experiences is as a collision 7 repair expert, too, in between car sales and

AD. 8  MR. SHIPLEY:  Okay.  Your Honor, we

9                    offer Mr. Smith as an expert.

10                    THE COURT:  Any objection to that, Mr.

11                    Bernabei?

12                    MR. BERNABEI:  In automobile valuation,

13                    I think that the -- if that's what they're offering as

14                    an expert --

15                    THE COURT:  And RV.  He's also indicated

25

February 4, 2022                                        David Smith-D 57

1

2

16          he's done RVs as well.

17          MR. BERNABEI:  Your Honor -- 18   THE COURT:  Travel trailers in

            this 19 case.

20          MR. BERNABEI:  We do not object to Mr.

21          Smith giving an expert opinion.

22          THE COURT:  All right.  We'll so deem

23          him as an expert for these areas.

24          BY MR. SHIPLEY:

      Q               Mr. Smith, was there ever any conversation

with somebody from your office or my office where we ever, prior to you doing

your appraisals, where we 3 asked you or guided you in what type of a number we

4           wanted?

5           A      No, sir.

6           Q      Okay.  Were you ever contacted by Mr. White

7           prior to you starting your appraisals and -- and 8 inspections of the items?

9                  A      Yes, sir.  I've -- my office received

10          voicemails.

11                 Q      Okay.

12          MR. SHIPLEY:  Your Honor, I have

13          this --these on my computer.  I don't know if it -- if

25

February 4, 2022                                           David Smith-D 58

1

2

14          it'll be -– if the speaker will pick it up.  I can

15          crank it up.

16          THE COURT:  It'll be fine.

17          MR. SHIPLEY:  Okay.

18          MR. BERNABEI:  Well, I'm going to object 19 unless it's

            authenticated and offered.

20          THE COURT:  I assumed all you're going

21          to be doing was doing a snippet for him to identify

22          that and say, "Yep, that's a voicemail," --

23          MR. SHIPLEY:  Yes.

24          THE COURT:  -- "that was left," and then

        for them to offer it before you played it in total.

                MR. BERNABEI:  Okay.  All right.  So

    which numbers is this?

3           MR. SHIPLEY:  This is not an exhibit

4           there.  But this is a -– these -- I've sent these to

5           your office before.  They are –-

6           THE COURT:  Well, what are they going to 7 be marked as?

8           MR. SHIPLEY:  I guess we could mark them

9           as –-

25

February 4, 2022                                    David Smith-D 59

1

2

10                    THE COURT:  And do you have a thumb

11        drive or something to place them on for the Court to

12        accept?  I mean, if you want the Court to accept your

13        full computer, I'll --
14                    MR. SHIPLEY:  They can -- they can

15    accept --

16                    THE COURT:  -- accept your full

17    computer.

18                    MR. SHIPLEY:  I get it back if --

19                    THE COURT:  It's not the first time I've

20    accepted somebody's phone.

21    MR. SHIPLEY:  That's fine.  You can a -- 22 I will offer the full computer.

23                    THE COURT:  You don't want to do that

24        because you're going to need it during trial.  Here's what I'm

        going to ask of this.  We'll go through the foundational aspects

        of things.  If it turns out the

                        Court is going to receive it, what I need from you --

3    because we ultimately give you back your exhibits

4    anyways -- is an assurance that you have downloaded it

5    onto a thumb drive; and that you have saved what is on

6    that thumb drive; that you share it with Mr. Bernabei;

25

1

2

7    and Mr. Bernabei agrees that that's what was presented 8 and from the Court, or it was accepted and received by 9 the Court.

10                              MR. SHIPLEY:  All right.

11                              THE COURT:  Then we'll all have a good
12  record at that point.

13                              MR. SHIPLEY:  We could do that, Your

14  Honor.

15                              THE COURT:  Okay.  Go ahead.

16                              MR. SHIPLEY:  Okay.  Hopefully, we can

17                              all hear this.

18                              (Audio played at 10:03 a.m. -- audio

19                              transcribed.)

20                              MR. WHITE:  Hi, David.  This is Dave

21                              White.  I --

22                              (Audio paused at 10:03 a.m.)

23                              BY MR. SHIPLEY:

24                              Q        Is that a voicemail that you received, Mr.

Smith?

            A            Yes, sir, it is.

            Q                              And you've spoken to Mr. White in person; is

3           that correct?

4           A        Yes, sir, I have.

25

February 4, 2022                                    David Smith-D 61

1

2

5          Q        And do you believe that that voicemail was –- 6 that this voicemail was,

in fact, Dave White calling

7    you?

8    A        It was consistent with my recollection of his 9 voice then and when I talked to

him in person. 10          Q          Okay.  And then the voice -- the voicemail

11                          also identifies who the caller is; is that correct?

12                          A          That's correct.

13                          Q          Okay.

14                          THE COURT:  Let's -- you are on Exhibit

15                          –-

16                          MR. SHIPLEY:  We'll call this 26.

17                          THE COURT:  Do we have a 25?

18                          MR. SHIPLEY:  I do -– I –-

19                          THE COURT:  Thank you.  Sure.  We'll

20                          call it Exhibit 26.  Any objection to 26, the playing 21 of what

was purported to be your client's voicemail?

22                          MR. BERNABEI:  Well, I'm -- I'm going to

23                          object on relevancy grounds unless this –- this

24                          conversation was somehow incorporated into the witness's

expert opinion.

25

February 4, 2022                                      David Smith-D 62

1

2

THE COURT:  Objection overruled.  You

may play it.

3           MR. SHIPLEY:  Okay.

4           (Audio played at 10:04 a.m. -- audio

5           transcribed.)

6           MR. WHITE:  I got your crappy, bullshit

7           evaluation of the truck.  You think somebody's going to

8           pay 18,000 —-

9           (Audio paused at 10:04 a.m.)

10          MR. SHIPLEY:  Oh, Your Honor, that's

11          actually the -- the second voicemail.  So I'm going to

12          offer that one, but then there's a second, another 13 voicemail

that was sent prior to him commencing. 14

THE COURT:  So let's -– we'll put them

15          all on the same thumb drive.

16          MR. SHIPLEY:  Okay.

17          THE COURT:  And we'll mark the first one

18          -– let's play the first one --

19          MR. SHIPLEY:  Okay.

20          THE COURT:  -- as 26.

25

1

2

21          MR. SHIPLEY:  Okay.

22          THE COURT:  We'll have him authenticate

23     the next one.  We'll call it 27.

24          MR. SHIPLEY:  All right.

               THE COURT:  And we'll kind of go from

there.

          (Audio played at 10:05 a.m.)

3          MR. WHITE:  Hi, this message is for

4     David Smith.  My name is Dave White of --  5

          (Audio paused at 10:05 a.m.)

6     BY MR. SHIPLEY:

7     Q        Mr. Smith, this was a voicemail that was sent

8     to you.  Was this email or voicemail sent to you from

9     David White?

10    A Yes, sir.  It's our phone system.  Any 11 voicemails automatically are

      downloaded and distributed

12    to the office.

13    Q        Okay.

14    A        So that's how I received this voicemail.

15    Q        And is the voice that we just heard there, is

25

February 4, 2022                                                David Smith-D 64

1

2

16          that consistent with Mr. White's voice that you're 17 familiar with?

18    A     As best as I'm familiar with.  I'm not a 19 voice expert, but it certainly is

consistent. 20  Q     Okay.  So did Mr. White call you before you 21 even began your

appraisals?

22    A     Yes, sir.  Before we ever had contact with 23 him.

24    Q     Okay.  And then the -- the other voicemail, is that he called you after the

appraisals were

completed; is that correct?

      A          Correct.

3          Q     Okay.  And from your listening to these, you

4          know, voicemails, what was your impression of what Mr.

5          White was trying to do?

6          A     Obviously, he had desired to -- 7              MR. BERNABEI:

I'm going to object.

8              THE WITNESS:  -- influence -- 9              MR. BERNABEI:

This calls for somebody 10 else's state of mind.

11              THE COURT:  Calls for speculation.

12              BY MR. SHIPLEY:

13          Q     What did you think?

14          A     It was my opinion that he --

25

February 4, 2022                                    David Smith-D 65

1

2

15          THE COURT:  It's not relevant what he 16 thought.

17          MR. SHIPLEY:  Okay.  All right.  Well,

18          I'll just go ahead and play this one.  I'm offering it.

19          (Petitioner's Exhibit 26 offered into

20          evidence)

21          THE COURT:  Yep.  I got it.

22          MR. SHIPLEY:  All right.

23          THE COURT:  It's been received.

24          (Petitioner's Exhibit 26 received into

evidence.)

                THE COURT:  All right.

          (Audio played at 10:06 a.m.)

3          UNIDENTIFIED SPEAKER:  ChangeTruthInc,

4          cc'd Truth.org.  Hi, you may be getting a call from

5          Shipley, attorney for my wife, who wants you to come

6          out and appraise our vehicles.  Coming out and

7          appraising them is not needed.  I sent to my attorney

8          the KBB data that proves the correct value of them to 9 my

          attorney, and he sent that to Jim Shipley.

10          He wants to waste money and your time to

25

February 4, 2022                                      David Smith-D 66

1

2

11    come out here and do that.  If you want, you can send

12    an email to research@cctruth.org, and I will send you 13 the

document that has the links in it that proves what 14 the value

is.

15    The truck, 2005 Chevy Silverado, 160,000

16    miles, needs a blower.  I have a quote from CARR

17    Chevrolet for that; that was like 5,600, something like 18 that.

The turbo's gone on it, and it needs a new one.

19 And so that dropped the value from 13,000 down to 20 7,000, something like that.  Their

value on KBB was 21 13,000.

22    So,] -- and also for my car, a 2014

23    Volkswagen Jetta Diesel TDI is worth 6,600.

24    You come up with any other values than

those -- if you want to come out here -- you come up

with any other values than those, you will be wrong.

And if Jim Shipley wants to push your values, I will

3    sue the shit out of you and him because KBB, as you

4    know, for this neighborhood is the right value, better

5    than any car dealer, better than anything.  You guys 6 probably use it yourselves.

7    Anyway, my number is 503-995-1231.

25

February 4, 2022                                    David Smith-D 67

1

2

8              Thank you.  Bye-bye.

9              (Audio ended at 10:08 a.m.)

10             BY MR. SHIPLEY:

11             Q        So you received that voicemail just prior to

12             you doing the appraisals; is that correct?

13             A        Yes, sir.

14             MR. SHIPLEY:  Okay.  Your Honor, I'm now

15             going to –-  16 BY MR. SHIPLEY:

17      Q        After you did the appraisals, then you got 18 another voicemail, right?  And that's the other one.

19             Correct?

20             A        Yes, sir.

21             Q        Okay.

22             MR. SHIPLEY:  Your Honor, I'm going to

23             play that one now.  And I -- this will be 27.

24             (Petitioner's Exhibit 27 offered and received

         into evidence)

                    THE COURT:  27.  Um-hum.

               MR. BERNABEI:  Again, I'm going to 3 object on relevance

grounds.

25

February 4, 2022                                    David Smith-D 68

1

2

4          THE COURT:  It's relevant because it's

5      trying to intimidate a witness, so proceed.

6      (Video played at 10:09 a.m. -- audio

7      transcribed.)

8      MR. WHITE:  Hi, David.  This is Dave

9      White.  I saw your crappy, bullshit evaluation of the

10     truck.  You think somebody's going to pay $18,511 for a

11     truck that needs a $5,000 blower?  Are you f'in stupid,

12     high, or what?  I will sue the shit out of you, and 13 I'll get

       another appraisal that will say that yours is 14 junk.

15     And that my Jetta is worth $18,000?  I

16     just bought it in 2018 for that.  And it's gone down in 17 value.

       It's not worth 11,884.

18     And the camper is a bullshit one.  I do

19     RV electrical.  I appraise campers and RVs all the

20     time.  It's not worth 28,498 unless you want to pay

21     that for it again.  If you want to pay any of these

22     prices, bring a truck -- a check for all three, and 23 I'll sell them

       to you.

24              Otherwise, do it over again and do it

25

February 4, 2022                                        David Smith-D 69

1

2

correctly closer to the KBB value.  Those KBB values

are correct based on vehicle sales in this neighborhood.  So you just lied to Jim Shipley.

My

3              number is 503-995-1231.

4              (Audio ended at 10:10 a.m.)

5              BY MR. SHIPLEY:

6              Q       And, Mr. Smith, to confirm that, that 7 voicemail was left for

you after you completed your

8       appraisals, correct?

9       A       Correct.

10      Q       So, Mr. Smith, did you have the occasion to

11      actually inspect -- there was three items, I believe.

12      If you could –- did you have the chance to inspect

13      those three items?

14      A       I did.  I went to his residence and inspected 15 the Jetta, the truck, and

the camper at the same time.

16      Q       Okay.  And so let's go –- I'm going to go

17      ahead and, if you can, I'm showing you Exhibit 4,

18      Plaintiff's Exhibit -- Petitioner's Exhibit 4.  Can you

19      go ahead and look through that and then tell the Court 20 what those are?

25

February 4, 2022                                    David Smith-D 70

1

2

21          A          So these are the completed appraisals on the

22    three pieces or the three vehicles.

23          Q          Okay.

24          A          The three.

            Q                    And so when you –- what did you do –- tell

the Court what your process was in coming up with these appraisals?

3     A          Certainly.  So we use the same process on all 4 appraisals for all clients.  We do

inspection of the

5     vehicle whenever possible.  We document the options and

6     the condition of the vehicle.  Then we run a NADA value

7     which is based on actual vehicle sales for this –- for 8 this market, on that VIN number

with those options.

9     Then we also look for comparable vehicles as close as

10    possible or as close in area to our area, and then we

11    expand that search as needed, depending on the rarity 12 of the vehicle or how

common the vehicle is.

13                    And then we take those comparable vehicles,

14                    what the values are for those, average those out with 15 adjustments

                    for mileage and condition, and then we take 16 the NADA value and

                    average those two together.

25

February 4, 2022                                    David Smith-D 71

1

2

17          The NADA value is behind.  For example, in

18          this, in the year 2021, from the beginning of the year 19 to the end of

the year, we've seen an uptick in used

20   car values as much as 30 percent by some opinions.  So

21   the NADA value is still a live indicator behind the 22 actual comparable vehicle

marketplace.

23          So that's one of the things that we do, to

24          make adjustments for that too.  So, in this case, we did the same exact

process.  We ran a NADA historical value or a current market value.  We

looked for –- searched for comparable vehicles with similar mileage,

3    condition, and options.  And then we averaged those

4    numbers out to come up with the market value with 5 adjustments.

6    Q       Okay.  And in regards to the Volkswagen –- 7 are these reports the -- your

reports that you created?

8    A       Yes, sir.

9    Q       And were these done in the ordinary course of 10 your business as an auto

appraiser?

11   A       In a consistent process that we do all our 12 appraisals, yes, sir.

13          THE COURT:  Your Honor, I offer these

14          appraisals into evidence as Petitioner's Exhibit 4.

25

February 4, 2022                                        David Smith-D 72

1

2

15              (Petitioner's Exhibit 4 offered into

16              evidence)

17              THE COURT:  Any objection?

18              MR. SMITH:  No.

19              THE COURT:  4 is received.

20              (Petitioner's Exhibit 4 received into

21              evidence.)

22              BY MR. SHIPLEY:

23              Q        Mr. Smith, what is your opinion as to the 24 value of

                the Volkswagen Jetta?

        A                The Volkswagen Jetta's market value would

come in no less than $11,884.88 in the local marketplace.

3              Q        And then the next one is the Chevy Silverado.

4              What was your opinion as to value of the Chevy 5 Silverado?

6       A       The Chevy Silverado, which is a diesel

7       dually, the market value would be no less than

8       $18,511.25.  It was rated as average because it does 9 need some reconditioning and

work.  And so there was 10 adjustments made for that too.

11      Q        And then, what was your opinion as to the 12 value of the Arctic Fox camper?

13              A        The Arctic fart -- Fox camper was 28,498.50.

25

February 4, 2022                                    David Smith-D 73

1

2

14          And again, that was rated as average because there are 15 some issues that

            need to be repaired.

16          Q          Now, the values to these vehicles and then

17          also the camper, just from my historical reference,

18          seem to be high, higher.  Is that -- what is the market

19          like these days?  And I know we -- we see things on the

20          news, we look at cars ourselves, but can you just

21          educate the Court upon your -- your expert opinion on

22          values of vehicles and campers in the -- in the

23          present-day?

24          A          Certainly.  So through the rest of 2021, the

                                    values continued to climb.  We are just now starting to

      see data that, through January, they were still climbing and they may just be

plateauing now.  But 3 through the market, it has been accelerating every 4 single month.

From September through December, we saw 5 month over month increase in market value.

6    Q          And, I mean, would you say your opinion based

7    upon your long-standing history in the industry that

8    the present -- at the present time, the value for used

9    vehicles and campers is, what is it relative to like, 10 say, three years ago?

11          A          Used vehicles are going for an all-time high,

25

February 4, 2022                                    David Smith-D 74

1

2

12          than what -- than what we've seen.  For example, my own

13          personal truck, I paid $33,000 for it in 2016.  Went to

14          Dave Smith's Motors.  Got a great deal.  It's still

15          worth $29,000 as of today.

16          Q          Okay.

17          A          But the market -- there's just a shortage of

18          vehicles or inventory for dealerships.  So trucks 19 specifically, and then it goes

            down from there.  20 Everything is in a high demand and has a higher value 21

            to it.

22     Q          Within those voicemails, Mr. White expresses 23 certain opinions as to values

and the KBB and such.

24 Can you address those opinions in your -- from your professional perspective?

            A                    Certainly.  My venue is in NADA, KBB,

                                  Edmunds -- in my business, whether it be in sales or in

3 collision repair or an appraisal, for about 304 something years.  KBB has two

distinct different

5          numbers they give you.  One -- and this is my problem

6          with KBB -- one, if you're selling something, they give

7          you a very low number.  If you're buying something,

8          they give you a very high number.  So it's verly

25

February 4, 2022                                    David Smith-D 75

1

2

9    (sic) -- very dealer centric.  So it's designed to help

10   you feel more comfortable with the number they give you

11   at trade-in when you're selling something and to make

12   you feel more comfortable when you're going to buy 13 something.  So we can see a

large disparity between 14 those two numbers on KBB specifically.

15              Edmunds is more based on actual market data.

16              NADA, my system, is actually a subscription-based

17              system.  It's only based on actual sales from actual

18              dealerships that are reporting those sales to them.

19              Q        Based upon your work experience –-

20              professional 30-plus years or so -- are you confident 21 in the values

that you've placed on these vehicles and

22              the camper?

23              A        Yes, sir.  I am.

24              MR. SHIPLEY:  Your Honor, no more

questions.

25

February 4, 2022                                    David Smith-X 76

1

2


CROSS-EXAMINATION

BY MR. BERNABEI:

3       Q       If I may take a look at your file there,

4       please?

5       A       Certainly.

6       Q       Is this your complete file on this project? 7       A       Yes, sir.  That's

everything that was in the 8 file.  I had my receptionist print it out.

9               Q       Thank you.  Hang on a minute.  All right.

10              (Pause)

11              BY MR. BERNABEI:

12              Q       When was your first contact with Mr. Shipley 13 on this case?

14      A       I don't have that specific date in front of

15      me.  I believe it was in September.

16      Q       Was it by email?

17      A       I can't –- my -- I can't say for sure because

18      it -- I wasn't the one who received it.  So it could

19      have been the receptionist, or it could have been 20 Emily.  A lot of times, it is

by phone.  And sometimes, 21 it's by email, but I can't say specifically.

22      Q       Well, I noticed your file doesn't have any

23      email or -- or written communications between your

25

February 4, 2022                                          David Smith-X 77

1

2

24          office and the attorney's office?

            A              No.  This is my work file.

            Q              So there's another file?

            A              No.  That's my work file.

3           Q       So did you have any written communications in

4    email or letter form between your office and the

5    attorney's office?

6           A       I'm –- I'm not aware what was written, sent 7 or not, because it was -–

     it didn't involve me.

8           Q       Okay.  So let's start with the voicemails.

9    You said after you got the first one, you actually

10   scheduled the appraisal with Mr. White; is that right?

11          A       I believe we contacted the attorney's office

12   to coordinate that, if I -- if I remember correctly.

13          Q       Mr. Shipley's office?

14          A       I believe so.

15          Q       Okay.  But -- but these vehicles were in Mr.

16   White's possession?

17          A       Yes, sir.

18          Q       All right.  And so how was it that you

25

February 4, 2022                                    David Smith-X 78

1

2

19    coordinated a time with him to come and look?

20    A       Again, I don't do that part.

21    Q       Oh.

22    A       I'm looking at vehicles.  So my office would

23    typically -- what we would typically do is contact the

24    party and say can we set up an inspection and look at the vehicle.  After we

      received those emails, the girls

      in my office were quite concerned.  So they -- I recommended they contact Mr. Shipley's

      office to have 3 him coordinate that.

4     Q       All right.  So what emails did you receive?

5     A       The voicemails.  That's what I'm talking 6 about.  They come to us as

      emails.

7     Q       All right.  So the voicemail before the

8     appraisal --

9     A       Yes.

10    Q       -- that comes in, and that caused concern in

11    your office.  Is that what you're telling us?

12    A       Yeah.  My wife was very concerned.

13    Q       And then you schedule the time with --

14    somehow to get to Mr. White's --

25

February 4, 2022                                    David Smith-X 79

1

2

15          A       My office –- my office and the client, yes,

16          sir.

17          Q       And you went alone.

18          A       Yep.

19          Q       And you were able to conduct your appraisal, 20 correct?

21     A       Yes.  My inspection, that's where I do my 22 inspection.

23          Q       Right, your inspection.  So did you call Mr.

24          White back?

            A          No, sir.

            Q       And these were -- the inspections you did were at Mr. White's home,

       right?

3      A       Yes, sir.  And across the street. 4       Q       All right.  Initially, you

were hired to

5          appraise four vehicles; is that right?

6          A       I believe that's correct.

7          Q And so you did not appraise Ms. White's 8 vehicle, correct?

9      A       No, sir.  It was involved in an accident, 10 from what I understand.

11                   Q       All right.  So in the other binder that you

12                   have in front of you, probably to your far left or

13                   maybe it's underneath -- usually we do white and black,

25

February 4, 2022                                    David Smith-X 80

1

2

14          but we -- we got tied up on this, I guess.  If you

15          could go to Exhibit 124.  Did you --

16          MR. SHIPLEY:  Can we -- can you give me

17          a second to get there, please.  Sorry.

18          BY MR. BERNABEI:

19          Q          Could -- could you tell us what 124 is? 20          A

            Yes, sir.  It's a Kelley Blue Book sell-to21 private-party market

            range.

22     Q          All right.  And you mentioned a -- that 23 Kelley Blue Book has two values.

One is if you're 24 trading-in value, to a dealer, right?

            A                      Well, they have -- yeah, they have what --

25

February 4, 2022                                      David Smith-X 81

1

2

Q          All right.  Hang on.

A          -– they have two values.

3                    Q        So let's just stick --

4          MR. SHIPLEY:  Your Honor --

5          MR. BERNABEI:  -- with the one of two.

6          MR. SHIPLEY:  So Mr. Bernabei did not

7          allow my -- the witness to answer the question.

8          THE COURT:  I think he is, but he just

9          wanted to make sure he was clear what the question was.

10          Go ahead, Mr. Bernabei.

11          BY MR. BERNABEI:

12                    Q        So there's -- there's two categories that KBB 13 uses as

-- as I understand your testimony, right? 14      A        There's

two primary directions that KBB sends 15 the inquirer to.

16          Q        And one of those is trade-in value, right?

17          A        Trade-in value is a component.  But it's more 18 along the lines of a sell-

to -- to a private party or 19 to buy-from a dealership.  Those are the two

components 20 that I was speaking of.

21      Q      All right.  Does Kelley Blue Book provide 22 data on trade-in value if you're

going to trade in your

25          Q

February 4, 2022                                          David Smith-X 82

1

2

23      vehicle?

24      A        Yes, sir, they do.

                                And do they provide a private party value, if

you're going to sell your own vehicle to a willing purchaser?

3       A        They do.

4       Q        And then do they also have a third component

5       which is what a dealer would sell a like

6       model/make/year car for?

7       A        They do.

8       Q        All right.  And those are the three, you

9       know, whether you call them components or categories, 10 those are the three

classifications that Kelley Blue 11 Book uses, right?

12      A        There's actually more than that.  When you

13      actually dig into it, there's probably about eight or

14      nine different categories.  That's why, I said, you

15      have to look at them in sub-classifications.

16      Q        And I know there are a lot of sub-

17      classifications, but those are the three that most 18 consumers and most -- even

within your industry -- look 19 to, those three components.

20      A        There's more than that.  But they are three

25      Q

February 4, 2022                                          David Smith-X 83

1

2

21          components that are available.  So, I mean, there's

22          loan value.  There's all different kinds of components.

23          That's why I have to be careful in answering your 24 question.

             But these other components you're talking

about are subcategories of those three, right?

             A                    Trade-in value is also a subcategory.  So

3      when I was talking about sell-to and by-from, I was

4      giving you the example why there's such a large

5      disparity between the two.  And then, I'm explaining

6      that the sell-to is to help the trade-in or the seller

7      be more comfortable with a lower trade-in value.  Where 8 the by-from -- for example,

the dealership -- is to 9 help the dealership collect more money for what they're

10          selling.

11          So those two numbers in Kelley Blue Book

12          specifically are the most broad of any of the 13 guidebooks or the online

             databases for market 14 valuation.

15          Q       Okay.  So -– so, if I'm hearing you

16          correctly, I'm saying -- what I hear is there are two 17 sale categories; one is

             selling to the dealer, and one 18 is selling on the market, a private party sale.

19          A       So the dealership is part of the market.

25          Q

February 4, 2022                                         David Smith-X 84

1

2

20          That's part of the fair market value.  So --

21      Q          Okay.  And that's -- and you use that in

22      determining your values, right?

23      A That's a component that we use in determining 24 our values.

                                    Okay.  And you also used -- or you relied on

25          Q

February 4, 2022                                      David Smith-X 85

1

2

what dealers sell comparable vehicles for, you know, arriving at your value.

3     A     As a component to our value.

4     Q     I understand.  All right.  So going to 124,

5     did you look at Kelley Blue Book private party value

6     for the Chevy Silverado 3500 Crew cab?

7     A     No, sir.

8     Q So -- but you've indicated Kelley Blue Book 9 is a recognized source of information in your industry, 10 right?

11     A     It's a recognized source of information -- 12     Q     But you didn't -- Oh, I'm sorry.

13          A     -- in the public.  But Kelley Blue Book does

14          not have a subscription-based service for professionals

15          that do automotive appraisals like NADA does because it

16          doesn't carry the same weight as an NADA actual sales 17 reporting database

          does.

18     Q     All right.  So you did not use Kelley Blue

19     Book at all?

20     A     No, sir.

21     Q     All right.  Then let's go to Exhibit 125.

22     Again, I will represent this as a private party Kelley

25

February 4, 2022                                    David Smith-X 86

1

2

23          Blue Book.  Did you -- did you look at the Kelley Blue 24 Book for the

Volkswagen Jetta?

            A                         I did not look at Kelley Blue Book for any of

these vehicles.

        Q       And so, Mr. White, in his phone message, said 3 he was looking at Kelley Blue

Book, and you didn't 4 bother to follow up on that, right?

5           A       No, sir.  I never take comparables or values

6           from clients when I'm doing an appraisal for a client. 7    Q       But you do

take information regarding the use 8 and condition of the car?

9 A That's why we do a physical inspection of the 10 vehicle.

11          Q       All right.  So you don't take any information

12          from the --

13          A       We will take pertinent information, such as

14          equipment, modifications, just like I did on the 15 adjustments for both the --

the camper as well as for

16 the truck.  We'll take into consideration those things.

17 We'll take into consideration invoices for maintenance

18 and oil changes and ownership history.  We take into 19 consideration all kinds of

factors.

20              But I cannot let a client, either pro or

25

February 4, 2022                                        David Smith-X 87

1

2

21          against, the valuation I'm doing try to influence that 22 evaluation by providing comparables or by providing

23   data –- data set information on values that they found

24   because then those are obviously biased.  My job is to provide an unbiased opinion to the value of the

vehicle.

Q        So, in doing that, you don't account for 3 anything that the client says?

4          A        Sir, I follow the same process and procedure

5          that I follow on every appraisal I do.  That's what

6          makes it consistent.  That's what makes it unbiased.

7          Q        So tell me a little bit about, if you're 8 able, in this case, how does NADA value differ from

9          Kelley Blue Book value?

10          A        Well, the data is in my appraisals.

11          Q        It -- it's what?

12          A The data is in my appraisals.  13 Q And how does that differ from Kelley Blue 14 Book?

15 A Do you have those appraisals as one of your 16 exhibits, sir?

17                    THE COURT:  He does.  He's got -- 18                    MR. SMITH:  What number is it?

25

February 4, 2022                                    David Smith-X 88

1

2

19                     THE COURT:  -- he's got copies of it.

20                     MR. SMITH:  Exhibit 4? 21 MR. SHIPLEY:  It's Exhibit 4 in that

22 book.

23     THE COURT: 4 in the other book. 24                MR. SHIPLEY:  On the

right hand.

                          MR. SMITH:  Okay.  I want to make sure

I'm in the right book at the right time.

                     THE COURT:  Yep.

3     THE WITNESS: So, for example, on page 7

4     of Exhibit 4, it breaks down the value of the vehicle

5     specifically in NADA or is also known as JD Power.

6     BY MR. BERNABEI:

7     Q        And this is a nationwide breakdown, correct?

8     A        No, sir.  This is Pacific Northwest.  This is

9     specific to our area.  And you can see it's also VIN 10 specific, meaning it's identifying

this particular

11     vehicle and its VIN number.  It's also very specific

12     via mileage.  It's not a range.  It's an actual 13 mileage.

14 Q And so let's start with the Pacific 15 Northwest.  That includes the Seattle

Metropolitan 16 Area?

17                A        Oregon -- is what -- when you type in
25

February 4, 2022                                              David Smith-X 89

1

2

18    "Oregon," it comes up a specific Northwest data set. 19   Q        And does the

Pacific Northwest also include

20    Washington?

21    A        Yes, sir, it would.

22    Q        And northern --

23    A        Oregon and Washington would be in that same

24    marketplace.

Q        And Northern California?

A        No, sir.  That would be southern -- that would be the California

segment.

3   Q        What area does Pacific Northwest cover under

4   NADA?

5   A        Oregon and Washington.

6   Q        Okay.

7   A        But we enter, specifically we enter Oregon.

8   And it puts you into that category.

9   Q        Well, like on page 7, the page you referred 10 us to, the region is Pacific

Northwest.

11    A        I understand.  My –- what I'm telling you is

12    what we enter in the software is Oregon.  And then it 13 picks that region.

25

February 4, 2022                                    David Smith-X 90

1

2

14          Q        All right.  And when I look at page 7, and I

15      go down about two-thirds of the way to the -- under the

16      used cars/truck values, the last item there talks about

17      an average, and then a clean and the adjusted value is

18      −- excuse me, $9,200.

19          A        That's under trade-in, yes, sir.  20        Q        All right.  And the

weekly auction rate, the 21 high was $9,768, right?

22 A Sir, say that again, please, because I'm not 23 following.

24      Q        Sure.  On that same page, right about where we were talking, where the

adjusted value was 9,200, if

you go to the weekly auction category -- you see that?

            A            Yes, sir, I do.

3          Q        So the average there is $7,193; is that

4      right?

5          A        For the auction, yes, sir.

6          Q        And the high at the auction is $9,768, right? 7    A        After

adjustments, that's correct.

8 Q Yeah, these are adjusted values.  And then we 9 have the -- above that the monthly trade-

in.  And these

10      are all NADA, right?

25

February 4, 2022                                                    David Smith-X 91

1

2

11    A        This is all NADA information, yes, sir. 12 Q          All right.  So –- so here we've got the

13            average at $8,150, right?

14            A        Again, that's trade-in.

15            Q        I understand.

16            A        So that would not be available to a consumer 17 or in a fair market

               situation.

18            Q        And then you –- you mentioned that -- that

19            it's, you know, important to try to stick within the

20            same, you know, as close as possible to the subject 21 car.

22            A        As possible.  Yeah, a lot of times it's not

23            possible, especially with a highly sought-after and

24            rare vehicle such as all three of these vehicles, quite honestly.  You're going to

               have to expand that search outside of the typical marketplace.

               Q                                    And when you expand it like that, like North

3            Carolina?

4            A        Yeah.

5            Q        I mean –- I mean that's where you had to go 6 for a comparable?

25

February 4, 2022                                    David Smith-X 92

1

2

7      A       Yes, sir.  Because you're only dealing with 8 what's available on the marketplace.

9              Q       Right.  I mean, you know, you can only go on

10             the data you have, right?

11             A       That's correct.

12             Q But the farther out you get like that, the 13 less reliable that comparable is.

       Would you agree with 14 that?

15             A       Not necessarily.  I would say it depends on

16             the region of the areas that it's in.  For example, if

17             the vehicle was in Pennsylvania, I would not give that

18             vehicle near as much weight because Pennsylvania has a

19             lot more rust in the vehicles, a lot more significant

20             damage to the vehicles that we see typically in those 21 marketplaces.

22     Q       So what's the purpose of trying to get as 23 close as possible to the location?

24             A                 Because market conditions can change, so.

       Q       Right.

       A       That's why we try to get as close as possible.  And, for example, in one marketplace --

3      Q       Well, hang on.  I'll -- I'll give you a 4 question.  You'll be able to answer, and your attorney 5 will, or Ms. White's attorney can follow up.

25

1

2

6      All right.  So in -- now I want to go to the

7      Chevy Silverado.  This is still Exhibit 4.  And when I

8      look at -- my page number says 5.  But it's -– it's 9 page 5 of the Chevy Silverado

appraisal. 10  A       That -- that is the NADA sheet for that 11 vehicle, yes, sir.

12             Q       All right.  So starting with -- at the same

13             area on the page where we talk about trade-in values,

14             you've got N/A's.  There's no --

15             A       Data.

16             Q       -- comparable data.

17             A       That's correct.

18             Q       And obviously, as with any opinion, the more

19             relevant data you have, the better the opinion, right?

20             A       Depends on the data.

21             Q       Well, if it's relevant, don't you want it?

22             A       More bad data doesn't make it better data.

23             Q       Well, why do you have this on the page, then?

24             A       Because it's a component of the appraisal.

               Q                    And so, in that component, there's nothing

that you were able to draw from to base your opinion on, right?

3              A       Absolutely not.

25

February 4, 2022                                          David Smith-X 94

1

2

4          Q         Okay.  Well, what was the trade-in value that

5          you relied on --

6          A Is somebody trading the car in?  Did I 7 misunderstand?

8    Q        No.  I'm just looking at page 5 of your

9    report.  Maybe -- no, maybe I'm not tracking it.  But 10 on the other one, there was some numbers -- you had

11    some values -- earlier, you said you looked at all of

12    these, the NADA report, is, you know, gives you data 13 that you rely on, right?

14          A         So the trade-in value is not a component of

15          what we're appraising here.  If you look above that --

16          Q         Okay.  So we'll -- we'll back out trade-in

17          value.  And then we have the –- well, on this page, all 18 we have then is the

auction value.  We have weekly

19    auction low –- well, this is right in the middle of the

20    page –- you've got a low, average, and high value.  Do 21 you see those?

22    A        Sir, I don't look at auction either because 23 that's not what we're dealing with.

24    Q        So you didn't rely on this information that's in your appraisal to form your

opinion?

A                    Sir, if you go about that –-

Q                    Excuse me.  Did you hear the question?

25

February 4, 2022                                    David Smith-X 95

1

2

3          THE COURT:  He heard it, Mr. Bernabei.

4          He was just trying to answer your question.  So you got

5          to give them a chance.  You've cut him off a couple of

6          times.  So let Mr. Smith answer your question.

7          MR. BERNABEI:  I'm sorry.

8          THE WITNESS:  Sir, if you go above that,

9          it clearly states clean retail value of $17,550.  And

10         if you go above that, it clearly states clean loan

11         value of $13,325.  And if you go above that, then it 12 gives you

           actual values, even for trade-in for rough,

13    average, and clean.  Above that, for the 14, 13, 11, 9.

14    On this particular vehicle, what we looked at was that

15    $17,550 of the claimed retail value, and then we made 16 adjustments from there based

      on condition. 17                    MR. BERNABEI:  I'm -- I'm going to move 18 to

      strike.  It's not responsive.

19         THE COURT:  Overruled.  He's doing his

20         best.  I think the –- I think what, perhaps, is being

21         missed here is this is the sheet that he gets from NADA

22         or JD Power.  And it prints everything out because JD

23         Power doesn't know what the person wants the

25

1

2

24        information for.

            But for his evaluation, he's looking at

fair market value.  Fair market value is what you are going to sell this on the market as.

Not trade-in.

3    Not auction.  Right?

4    And so he's, although he gets all this

5    data, he's just using that clean loan, clean retail,

6    and then from there trying to do the comparables in the

7    market; and then also adjusting it for our current

8    market fluctuation which vehicles are 20 to 30 percent

9    higher, and I think the 30 percent has been for trucks 10 out there.

11            I say that with experience.  I've never

12            made money on selling a used car until I sold my son's

13            recent Ford Explorer Trac.  I made more money selling 14 it

            three years later than what I purchased it for.

15            And I think that's the –- I think that's

16            where the -- you guys are at odds.  You keep asking

17            about that information.  It's not information he used.

18            Mr. Smith, correct me if I've got it wrong.  This is

25

February 4, 2022                                      David Smith-X 97

1

2

19          what I interpreted from you.  You've just used the 20 clean loan

            and clean retail because that's what you

21          used for fair market value, what you were asked to do.

22          MR. SMITH:  Yes, sir.  I don't even use

23          the clean loan.  I use the clean retail and make

24          adjustments back from there.  And then, on a particular vehicle

            like this, there's also a reason why we have so

many comparables to try to be fair to the average –- to the current marketplace since

NADA and any of these

3       databases are months behind because they're waiting to

4       collect that data from the dealerships, or from the

5       services.

6       BY MR. BERNABEI:

7       Q        Okay.  Thank you.  My point is the clean

8       retail –- if you're not even using clean loan, the only

9       item on this page that you're using is clean retail,

10      right?

11      A        That's correct.  And then we'll make 12 adjustments backwards from

        there.

25

1

2

13    Q        Okay.  But before you start with your 14 adjustments, clean retail means what -- what a vehicle

15        is sold -- it includes by a dealer, correct?

16        A  Not necessarily.

17        Q  Well, in this case, it does.  You've got some

18        comparables on page 6 that are all from dealers.  19        A  That's because that's where vehicles are

20        available.

21        Q  Okay.

22        A  We don't -- we don't exclude private party

23        sales.  We don't search out only dealership listings.

24        We don't just search out the highest prices we can find.  We look for the most

          comparable vehicles in the marketplace.

      Q  And those happened to be all dealer sales. 3 A  That's just because of what the vehicles are, 4 yes, sir.

5 Q  All right.  And so your opinion of the value 6 for the -- for the crew cab is based upon the clean 7 retail item in here in -- on page 5, and then you made 8 adjustments.

9        A  No, sir.  Let me -- can I clarify what that

10        value's based on?

25

February 4, 2022                                    David Smith-X 99

1

2

11          Q   In a moment.  So is your opinion -- in 12 forming your opinion, did you rely on

the clean retail

13   value on page 5?

14   A   It is a component of the valuation. 15          Q   All right.  I understand.  So you did

rely on

16   it.

17   A   It is one component out of many on the 18 evaluation.

19          Q   All right.  And "clean retail" essentially

20   means it's -- the vehicle's operable and in good 21 condition.  Is that what

clean means?

22          A   It's operable, clean, and ready for the

23   marketplace in a clean retail situation.

24          Q   And this vehicle that you actually inspected, you -- you mentioned had some

blower -- blower issue?

25

February 4, 2022                                        David Smith-X 100

1          A

2

                    It had numerous issues.  And that's why we

put an adjustment on there that we did.

3          Q        Did you decrease your -— the adjustment that

4     you just mentioned -- did you decrease the value to 5 a  -- based upon the

anticipated repair costs of the 6 blower?

7          A        No, sir.  Because that's not how price is

8     impacted.

9          Q        What was the decrease you gave?

10          A        We put a $2,500 deduction on that particular

11     vehicle.

12          Q        So are you aware of how much a blower

13     replacement costs?

14          A        Yes, sir.

15          Q        Is it $5,000?

16          A        It depends where you have the estimate from.

17     It depends what they're doing.  It depends on who's 18 doing the work.

19          Q        So a dealer could do it at cost, right?

20          A        A dealer or a consumer or a, you know, a

21     garage shop down the street.  They all have different

25

February 4, 2022                                David Smith-X 101

1          A

2

22          labor rates.  They all charge different prices.  And an 23 educated buyer –- an

informed buyer is going to make

24 the best decision for themselves.  Some people look for bargains just for that reason so they

can save the

money.  Some people don't.  Some people don't want to hassle with it.

3                    So that's why we put in an adjustment on the

4          value of the vehicle not deducting every itemized cost,

5          just like we wouldn't add every itemized cost to a

6          vehicle for accessories or add-ons, for example.

7          Q          Okay.

8          A          So for -- if we're adding winches or hitches

9          and those types of things, we don't add the full cost

10          of those.  We add what the impact to the market value

11          is.

12          Q          All right.  Well, we're not talking about 13 that.  But let's go

back to the adjustment for the

14 blower on the Chevy Silverado.  You -- you deducted

15 $2,500 as an adjustment because the blower needed 16 fixed.  Right?

25

February 4, 2022                                    David Smith-X 102

1            A

2

17    A        No, sir.  I adjusted it $2,500 because the 18 vehicle's current condition,

including the blower, but 19 also including cosmetic issues on the vehicle. 20    Q        Oh,

okay.  So -- so -- of that, how much is

21    attributable to the blower?

22    A I adjusted $2,500 off the price of the 23 vehicle.

24            Q                    I understand.  How much of that is

attributable to the blower?

It was not -- I did not assign a percentage to the blower or a percentage to the paint or

3 percentage to this.  I adjusted the entire value of the

4 vehicle based on what the vehicle needed. 5        Q        So you're not able

to tell me what the 6 adjustment is for the blower alone?

7            A        That's not how we appraise vehicles.

8            Q        Okay.  All right.  You mentioned you don't

9            include the value of the add-ons to the vehicle, like

10            the hitch and other things you are talking about; is 11 that right?

12            A        Aftermarket equipment.  So if the vehicle had

13            a hitch from the factory, that's built into the system.

14            But if the owner added a front basket or a front hitch,

15            like in this particular vehicle, we didn't add for

16            those things either.  Those are taken into

25

1          A

2

17          consideration in the overall adjustment of the vehicle.

18          Q          And is that because they are used add-ons?

19          A          It's because they're a component of the

20          vehicle.  So they'll have attraction to some buyers.  21 They won't have

attraction to others.  They'll be a

22 detriment to some buyers.  They'll be a -- they won't

23 be a detriment to others.  It depends on -- see, you

24 have to look at the market as an average as well, not just those particular items.

Q          All right.

A          Somebody may not like the style of wheels 3 that you have on your car

that you spent $3,000 for, so 4 you don't get a $3,000 adjustment for them.

5      Q          Okay.  So let's go to -- now we're going to 6 go to the Arctic Fox.  And I noticed

you based this as

7          average condition; is that right?

8          A          Yes, sir.  That's not because -- this

9          particular JD Power does not take into -- this is

10          considered on the base value of the vehicle.  It's not 11 near as reliable as

comparables on this type of

12 vehicle.  So that's why we have the comparables broken 13 down as much as we do on this

particular vehicle.

25

February 4, 2022                                          David Smith-X 104

1          A

2

14         Q        All right.  So let's start on page 4.  You

15         got the base price.  These are list prices that a

16         dealer would be selling for, correct?

17         A        Well, the suggested list price is.

18         Q        Yep.  But this is dealer numbers?

19         A        Well, they act -– well, not necessarily.  The

20         average retail would be what's being for sale.  The low

21         would be the low.  And then the suggested list price 22 would be the high.

23         Q        All right.  Do you -- once again, here did

24         you –- did you rely primarily on dealer or comparables from dealers rather than

           private parties?

                              No.  It looks like there's quite a few

private parties in here too.

3          Q        This is –- this is a seven-page or -- or

4          eight-page report?  Is that right?

5          A        That's what it says is eight pages, yes, sir.

6          Q        All right.  Starting with the last.  7 Broodmoor -- Broadmoor RV

           SuperStore. 8    A        Yes, sir.  That's -- that would be a

9          dealership.

10         Q        Page 7?

25

February 4, 2022                                      David Smith-X 105

1          A

2


11         A        Yep.  8.  That was page 8.

12         Q        Right.  And so, page 7, D. H. Truck Camper

13    Emporium, that's a dealer?

14         A        Yes, sir.

15         Q  Page 6.  This is the North Carolina one?  And

16    this is a private seller, right?

17         A        That's correct.

18         Q        All right.  So –- and so you use pictures.  I

19    take it you didn't go to North Carolina?

20         A        No, sir.  I look at the listings.

21         Q        At least for the charge for this case, right?

22    And then page 5, Gig Harbor.

23         A        Yes, sir.

24         Q        So let me ask you about Gig Harbor.  That's

      –- that's in Northern Washington, right?

           A        Yes, sir.

           Q        And --

3                       MR. SHIPLEY:  Your Honor, for the

4                       record, Gig Harbor is on the Olympic Peninsula, not

5                       Northern Washington.

25

February 4, 2022                                  David Smith-X 106

1          A

2

6                    MR. SMITH:  It's still Northern

7                    Washington.

8                    MR. SHIPLEY:  It's south of Seattle.   9                    THE

COURT:  It's certainly if you were

10 to find the middle and go north, it's north of the 11 middle of Washington.  It's a four-plus, about a five-

12          hour drive, long day.

13          BY MR. BERNABEI:

14          Q        Are you aware of what the parties paid for

15          the camper?

16          A        No, sir.

17          Q        Do you know when they purchased it?

18          A        No, sir.

19          Q        Do you know how they purchased it?

20          A        No, sir.

21          Q        Do you know whether they purchased it new or

22          used?

23          A        No, sir.

24          Q        So here you mentioned that there was not a lot of JD Power data for

the camper.  Is that -- did I

25

1

2

understand your right?

      A                    That's correct.  And that's pretty typical

3  when we're dealing with campers and RVs and motorhomes.

4  Q     All right.  And so you had to go around to

5  these various spots that are identified on pages 5

6  through 8?

7  A     Yes, sir.

8  Q     So tell me, what happens when -- if somebody

9  buys a vehicle like this, brand-new, off the lot, is 10 there immediate depreciation in value?

11 A Depends on the rule of economics, supply and 12 demand.

13      Q     Well, what about in -- if this -- what about

14      here where we are talking about a –- as you -- let me

15      back up a second.  Page 5, the Gig Harbor.

16      This -- this is not a sale, is it?

17      A     This is a –- this is a for sale as comparable

18      vehicle for sale.

19      Q     Did you follow up to see if it was sold?

20      A     No, sir.

25

February 4, 2022                                    David Smith-X 108

1

2

21      Q       So this is somebody's wish list on what they 22 want to sell the camper

for?

23      A       No.  The assumption is that's a fair and

24      equitable sale that somebody's making.  That's why they have it listed for sale.

Q       Were you here when the Judge said, you know, most people think their stuff is

worth a lot more than 3 it actually is?

4               MR. SHIPLEY:  Objection, it's not a

5               question.

6               MR. BERNABEI: Yeah, it is.

7               MR. SHIPLEY:  It's argumentative.

8               THE COURT:  It's a fair question.

9               MR. BERNABEI:  Were you here?

10              THE WITNESS: So if I was looking at a

11              comparable on the market –-

12              MR. BERNABEI:  Were you here?

13              THE COURT:  Here's the –- go ahead, Mr.

14              Smith.  He was here.  And then, Mr. Smith, go ahead and

15              answer --

16              THE WITNESS:  If -- If I was looking at

25

1

2

17                 a comparable vehicle on the marketplace, and somebody

18                 had a "wish list," as you put it, then I would see an

19                 outlier for what they were asking for that vehicle.  I

20                 wouldn't see four consistent price points for the same

21                 property to render that one being a wish list.

22                 BY MR. BERNABEI:

23                 Q      So it's consistent with the dealer's price?

24                 A      So I believe out of these four listings, two were dealers, and two were private parties.

           Q      And this is consistent with the dealer price, right?

3  A      Or the private parties price.  It depends on 4 what perspective you want to take.

5                 Q      Well, okay, so -- so both dealers' listings

6                 are similar to the private seller listings, right?

7                 A      Exactly.

8                 Q      Okay.

9                 THE COURT:  One's quite a bit more

10                but  --

11                THE WITNESS:  It's also a larger version 12 of the camper.

13  MR. BERNABEI:  Thank you, sir.  That's 14 all I have.

25

February 4, 2022                                             David Smith-X 110

1

2

15          THE COURT:  I do have one before I turn

16     you back over.  In your comparables on the -- a camper

17     because I appreciate when it comes to vehicles -- JD

18     Power or NADA, depending on what you want to call 19 it -- that

       information is on actual sales, correct?

20     THE WITNESS:  That's correct.

21     THE COURT:  And the camper, it's a fair

22     question that these are what the asking prices are, and

23     sometimes asking prices are obviously different than

24     what the sale price is because the way campers, particularly,

       work is there's going to be some

25

February 4, 2022                                      David Smith 111

1

2

negotiation as to purchase price, right?

                 THE WITNESS:  Typically.

3           THE COURT:  20,699 is the high, right,

4           that they've said that if you want to pay that, it's

5           yours.  That's the way contract law works.  But you 6 could
certainly go in and negotiate and say I would pay 7 you 24.
Would you take 24?

8           THE WITNESS:  You could try.

9           THE COURT:  Sure.  That's what I'm

10 saying.

11         THE WITNESS:  And it all depends on the

12        market at the time of when you're trying to buy

13        something.

14        THE COURT:  Right.  But you agree that

15        those prices that are in your comparables are, for

16        sure, unless you pay this, then I would --

17        THE WITNESS:  Both done deals, like buy 18 now price.

19      THE COURT:  But they could also have 20 took in less for these.

21      THE WITNESS:  Do you think it -- 22      THE
COURT:  Do you factor?  So my

23 question for you is in regards to the camper:  Is that

25

February 4, 2022                                    David Smith 112

1

2

24    factored into your valuation that these comparables that you're using are asking prices

      and not necessarily

      sale prices?

                    THE WITNESS:  Yes, it is. 3                    THE COURT:

Okay.  And how is that 4 factored in?

5                              THE WITNESS:  So it's -- it's mainly

6                              factored in by condition and availability.  So if I'm

7                              seeing a lot of something available, that's going to 8 impact that
                               price point more.
9                              THE COURT:  Higher or lower?

10                             THE WITNESS:  It's going to impact it

11    lower.

12                             THE COURT:  Okay.

13                             THE WITNESS:  Because there's more

14    options for the prospective buyer.  When you're talking

15    -- so -- out of that, when we're talking

16    about --recreational vehicles, RVs, motorhomes,

17    trailers, campers -- the hardest one to find is camper.

18    They produce less of those than they do any of the 19 other vehicles.  So that

      marketplace is already tighter

20                             than the other three put together.

25

1

2

21          So we look at that.  We look at

22          condition.  The number one issue with any RV is water

23          damage.  That's why we made such a significant

24          adjustment on this one for the roof because we did have some

            moisture leaking -- leaking in to the vehicle.  So

      we made that adjustment accordingly.  So we look at all of those things.  He also has a lot

of additional 3 equipment that we also take into consideration on his 4 particular camper.

5          THE COURT:  Okay.  Mr. Bernabei, any

6          questions based on that question that I asked.

7          REDIRECT EXAMINATION

8          BY MR. BERNABEI:

9          Q  Were you able to determine whether the

10          comparables had any water damage?

11          A  None of the comparables listed water damage.

12          Because had they listed the water damage, the price 13

            point would have been lower than would've -- than 14

            would've –- I wouldn't have taken an adjustment for 15

            those comparables.

16      Q        Well, this doesn't --there's nothing listed 17 at all on any of these.  Was there

something else you 18 were looking at?

25

February 4, 2022                                    David Smith 114

1

2

19      A        These are the listings that are on the online

20      resource for these.  So when you print it out, this is

21      what it prints for you.  As you can see, there's 22 numerous photos attached to

        each and every one, too.  I

23      didn't print each and every one of those out either.

24      Q        So -- so on -- on the online listing,

                        there's -- there's additional information about these?

25

February 4, 2022                                                          115

1

2

David Smith-ReX

     A     Sometimes there's a paragraph or two.  I -- I can't control what fields will print from --

3     Q     No.

4     A     -- the system and which ones won't.

5     Q I understand, but on these -- these comps 6 that you use, there -- there was additional information 7 listed.

8     A     Sir, I ran this report back in November.  I

9     can't speak to what it was or not.

10     Q     Okay.

11              MR. BERNABEI:  Nothing further.  Thank

12     you.

13              THE COURT:  Mr. --

14              RECROSS-EXAMINATION

15     BY MR. SHIPLEY:

16     Q     Mr. Smith, is how the Whites purchased the

17     camper or any person who purchased a -- a vehicle, is

18     that relevant to when you're appraising the value --

19     the present value, the present market value of a -- of

20     an item.

21     A     No, sir.

25

February 4, 2022                                                                116

1

2

22        Q        Okay.  And I -- and I noticed that you do --

23        you have four comparables.  Is that because those were

24        the only comparables you could find, or that's just you picked 4 out of 100 or

something like that?

David Smith-ReX

A        I try to find as many as I can.  I like to -- that way, I can try to narrow

it down.  On this

3        one, that -- I believe that's all I could find going

4        off the best of my memory.  Otherwise, we would have

5        those printed up separately.  But because of what it 6 is, it's rare.  It's hard to find these.

7                        And I personally know people that have

8                        purchased campers for their vehicles.  And it's a six-

9                        month ordering process.  You don't get a discount on

10                        them because they just don't produce near as many of

11                        them as they do the other vehicles.  You don't see

12                        these sitting around Curtis RV or Camping World because 13 they just

                        don't produce them in the same numbers.

14        Q        So, based upon your knowledge of the industry

15        and the market, is it your testimony then that campers

25

1

2

16          such as this are a very rare find?

17          A          Everything right now is a rare find. 18                    MR. SHIPLEY:

No more questions, Your

19                    Honor.

20                    THE COURT:  You may step down.

21                    THE WITNESS:  Thank you, sir. 22                        THE

COURT:  Any objection to the witness

23          being excused?

24                    MR. BERNABEI:  No, Your Honor.

                              THE COURT:  Mr. Shipley, any objection

to the witness being excused?

                              MR. SHIPLEY:  Oh, no, Your Honor.

3                    THE COURT:  You're excused.

4                    THE WITNESS:  Thank you, sir. 5   THE COURT:  You may call

your next 6 witness.

7                    MR. SHIPLEY:  I believe this is yours?  8 I think Mr. Bernabei's --

9                    THE COURT:  All right, yep, yep.  Yeah.

10                    MR. BERNABEI:  Yes.  It's okay.

11                    MR. SHIPLEY:  Yeah.

12                    THE COURT:  You all right?

13                    THE WITNESS:  Yep, yep.

25

February 4, 2022                                          118

14            MR. BERNABEI:  Watch that step.   15  THE WITNESS:  I know.

That's -- that's 16 (indiscernible).

17            MR. SHIPLEY:  Your Honor, we're going to

18     take Mr. Bernabei's witness out of order.
19     THE COURT:  That's fine.

20            Okay.  Mr.  Bernabei, you may call your

21     witness.

22            MR. BERNABEI:  I'm going to give her a

23     call, and then she's going to log in.

24            THE COURT:  Okay.

              MR. BERNABEI:  It's going to be by

Webex.

                    THE COURT:  All right.

3             MR. BERNABEI:  Give me one moment.

4             THE COURT:  Okay.

5             (Court attempts to connect via Webex at 11:04

6      a.m.)

7             (Court and attorney converse.) 8                    THE

COURT:  And what's the witness's 9 name?

10  MR. BERNABEI:  Christine Knutson,  11 K-N-U-T-S-O-N.

12            (Court attempts to connect via Webex from

25

February 4, 2022                                                    119

1

2

13                    11:05 a.m. to 11:14 a.m.)

14                    MR. SHIPLEY:  Judge, can I ask a

15                    question, like, on the personal property?  Is that

16                    something like we'll hand you our list, they'll hand

17                    you their list, and then you'll --

18                    THE COURT:  Correct.

19                    MR. SHIPLEY: -- so I don't share my list

20                    with --

21                    THE COURT:  Nope.

22                    MR. SHIPLEY:  All right.

23                    THE COURT:  We'll -- we'll come up with

24                    −- I mean, you guys are going to share blank lists.

             And then, we'll vote -- the items that are disputed,

   right, that -- I'll let you know if those should be included on that list or not on that,

right, on that 3 list.  But that list is going to be the same for both 4 you guys.

5                    THE COURT:  And then, they're going to

6                    go through and list down there what -- what they

7                    would -- what they're going to pay for that property.  8 And if

                     they win the auction, right, that's what they're

9                    going to pay to the other side for that property.

25

February 4, 2022                                                           120

MR. SHIPLEY:  Okay.

THE COURT:  And so you guys are going to

send it to the Court, and I'm going to take that

information and let you guys know what the equalizing

value is based on that property, who gets this

property, and what that equalization value would be. 16

MR. SHIPLEY:  So this is something we'd 17 submit to you after

the fact?

THE COURT:  Correct.  It looks like

we're going to have to have another hearing anyways, 20 but.

THE RESPONDENT:  Can I ask a question?

THE COURT:  Ask Mr. Bernabei first.

THE RESPONDENT:  Okay.

THE COURT:  And then, if you still think

it's appropriate, you can ask that question.

THE RESPONDENT:  Okay.

(Court attempts to connect via Webex from

11:15 a.m. to 11:24 a.m.)

THE COURT:  What is she going to be 5 testifying to?

MR. BERNABEI:  She's a CPA.  She would

February 4, 2022                                          121

1

2

7          be testifying to a reasonable rate of return on the --

8          THE COURT:  The IRA?

9          MR. BERNABEI: -- the home sale proceeds.

10          Or -- or the equity that it's not a sale, but Ms.

11          White's equity in the home.  And we've calculated about

12          half of the retirement –- the two IRAs, putting those

13          in wife's side based upon those assumptions with the 14 rate of

            return would likely be.

15          (Court attempts to connect via Webex from

16          11:24 a.m. to 11:26 a.m.)

17          THE COURT:  What I'd do -- once we get

18          done with Ms. Knutson -- what I would also like to do

19          is put on evidence regarding the items that Mr. White

20          believes Ms. White has, for the Court to make a

21          consideration because we're certainly going to have

22          to -- is that we're not going to have enough time to 23 get

            everything done.  So we're going to have to set a 24 second

            hearing.

                  And my hope is, in the interim, we've

25

1

2

got the list of the personal items, and your clients will get that done.  And then they'll just

turn it into 3 the Court at our next hearing.  So I want to get those

4      other pieces of property that your client believes that

5      she has that she has indicated she doesn't have,

6      whether or not those should be included.

7      MR. BERNABEI:  All right.  You know, it

8      looks like both parties have their separate lists, and

9      it -- in their -- and I haven't compared the Exhibit of 10 petitioner --

11                          MR. SHIPLEY:  Well, if we're going to --

12                          I mean, I guess if -- if we're not going to get to the 13 today.

14                          THE COURT:  Well, hopefully, we do.

15                          MR. SHIPLEY:  Okay.

16                          THE COURT:  Yeah.

17                          MR. SHIPLEY:  But in 30 minutes, but I

18                          guess -- I mean, we can always -- Vince and I can

19                          exchange emails --

20                          THE COURT:  Well --

21                          MR. SHIPLEY:  -- just on the list. 22                    THE

                            COURT:  -- give me an idea from your

23      client's perspective.  What items does he believe Ms.

25

1

2

24    White has that are not on the agreed-upon list?

MR. BERNABEI:  Then the --

THE COURT:  That the Court needs to make

a factual finding of whether she does or doesn't have, 3 or whether she did or didn't

take them would be a 4 better way to say it.

5              MR. BERNABEI:  All right.  So -- so

6              you're asking what items -- what items were not on the

7              wife's list?

8              THE COURT:  Yeah.  There was an

9              indication in your memo about your client believing

10             there were certain items that were taken by Ms. White

11             when she left that may not be on that list.  I assume

12             your client's list has more items or at least some 13 different

items than Ms. White's list.

14             MR. BERNABEI:  I -- I haven't really --

15             the COURT:  That's why I'm trying to

16             figure out this because your client had -- the

17             suggestion in the trial memo was those items should be 18 given

some value, and your client should get an offset

19             for those items.

25

February 4, 2022                                                        124

1

2

20          MR. BERNABEI:  Right.

21          THE COURT:  And that's what I'm trying

22          to figure out what those items are, whereas Mr.

23          Shipley's memo indicated his client doesn't believe

24          there was any other items that's not on the list that she took.

            And, therefore, there shouldn't be any

offset because there's just –- those items, they either don't exist or didn't -- weren't taken

by her.  Does

3           that make sense?

4           MR. BERNABEI:  It does.

5           THE COURT:  Okay.

6           MR. BERNABEI:  I think I'm following,

7           Your Honor.  So -- and I haven't -- I have not compared

8           Petitioner's Exhibit 25, which is their list, with our

9           Exhibit 111, which is our list.  But --

10          THE COURT:  So let's go to page -- go

11          ahead.  Sorry.  I didn't mean to cut you off.

12          MR. BERNABEI:  On the last page of our

13          exhibit in red are, you know, things that are missing

14          from the home.  And --

25

February 4, 2022                                                    125

1

2

15                    THE COURT:  And which exhibit are you 16 looking at?

17  MR. BERNABEI:  This is Exhibit 111 in 18 respondent's binder.

19                    THE COURT:  Okay.  All right.  So, like,

20          and I want to make sure I've got the -- like the -- if

21          it's in red, that's the, like -- towels, dishes -- is

22          that what we're talking about?  Or is it --

23                    MR. SHIPLEY:  The left --

24                    THE COURT:  -- the last page.

                     MR. SHIPLEY: -- left-hand side.

                                   MR. BERNABEI:  Yeah, if you go to last

          page of -- the legend is on the last page.  But --

3                    THE COURT:  Gotcha.

4                    MR. BERNABEI:  There is blue -- 5                    THE

          COURT:  Front room marble coffee

6          table, two bedside tables.  Is that what we're talking

7          about, that red?

8                    MR. BERNABEI:  Um-hum.  Yes.

9                    THE COURT:  The reason why I say this is

10          because in the bottom legend there, it said, it sort of

11          suggested that it was in red.  And there was a couple,

25

February 4, 2022                                                          126

1

2

12              like, houseplants I've had on other pages, and dishes, 13 towels

on the first page wrote in red.  So I -- the 14 suggestion I have in

looking at that was those are the

15              items he believes she took with her.

16              MR. BERNABEI:  Yes.

17              THE COURT:  Okay.  So here's what I

18              think will work then because I don't know if we're

19              going to have enough time to get to it today.  Take the

20              most exhaustive list that you guys have, right, and I

21              believe this is it.  You guys value all those different

22              items.  And then, we'll hear testimony as to whether 23 those are

items that were or were not taken at the time

24 that his wife left the home.

MR. BERNABEI:  Right.

THE COURT:  And therefore, whether they

should or shouldn't be part of the valuation process.

3    But we go ahead and have them bid on them at this point

4    in time, and the Court can make a finding of whether or

5    not that's property that should be included at a later 6 time.

7    (Court attempts to connect via Webex from

25

February 4, 2022                                                127

1

2

8    11:31 a.m. to 11:32 a.m.)

9    THE COURT:  All right.  So we have Ms. 10 Knutson on the telephone.

11    Ms. Knutson, can you hear me?  This is 12 Judge Bailey.

13                              MS. KNUTSON:  Yes, I -- yes, I can hear

14                              you.

15                              THE COURT:  Okay.

16                              CHRISTINE KNUTSON

17                              called as a witness for the Respondent, having been duly

                              18 sworn, testified as follows:

19                       THE COURT:  Thank you for hanging out

20                       with us.  The first person that's going to ask you some

21                       questions is Mr. Bernabei.  And if you can't hear us,

22                       let us know.  I may have to really have them move a 23 little

                       closer.  Okay.

24                              THE WITNESS:  Yes, thank you.

                       THE COURT:  All right.  To Bernabei,

25

February 4, 2022                                    Christine Knutson-D 128

1

2

make it quick.

MR. BERNABEI:  Thank you.

3          DIRECT EXAMINATION

4          BY MR. BERNABEI:

5          Q        Good morning, Ms. Knutson.  What is your

6          occupation?

7          A        I am a -- C -- a Certified Public

8          Accountant --

9          Q        And --

10         A        Tax Practitioner.

11         Q        And how long have you been a CPA and tax

12         practitioner?

13         A        Since 1990.

14         Q        All right.  If you can, take us a

15         little -- take us through your -- your educational 16

           background and your work history.  Let's start with 17

           your education.

18         A        I received my BA in -- in administration with

19         a concentration in accounting from California State

20         University in Fullerton.  I received that in 1984.  I

25

February 4, 2022                                        Christine Knutson-D 129

1

2

21          worked for a CPA for a number of years and prepared

22          taxes.  And then I worked for a medium-sized firm as a

23          tax -– mostly preparing taxes but also working on 24 accounting for 11 years in

            Irvine, California.

                         I've been, in 2001, moved to Northern

        California and worked for a firm in Walnut Creek as a tax -- tax manager for four years.

And then I went out 3 on my own, with a small partnership, a small tax

4       practice in Napa, California, and I worked there for 15

5       years.  In April of 2021 -- actually, in January of 6 2021, we sold that practice.

7                        And I wrapped up some work until April 2021,

8                        and then I was traveling for a while.  And I'm

9                        presently working for R.L. Hug, CPA, in Tigard, Oregon.

10               Q       All right.  And are you -- are you working as 11 a CPA for the R.

                 Hug office?

12          A        Yes, I am.  I still –- I have my California

13          CPA license, and I have an application that I've

14          submitted to the Oregon Department of Accountancy.  And

15          that -- that is pending, but I expect that to be

16          accepted within 60 days.

17          Q        Okay.  Why don't you tell the Judge what you

25

February 4, 2022                                    Christine Knutson-D 130

were asked to do in preparation for your testimony 19 today?

A       I was asked to look over Dave White's

worksheets and -- I am the principal here at the at the

accounting firm -- with that had -- had talked to Dave,

and we made some minor changes to his sheet.  And

but -- and so I was asked then to just indicate on the sheet that -- that the

numbers were all provided by

Dave White and that we would be available for further tax planning.

And I made some minor mass corrections.  And

then I was asked further to prepare some schedules to

determine what amounts of withdrawals Julie 6 Right -- White could

take based on four assumptions.

Q       All right.

A       The first assumption was that the rate of

return would be 4 percent on -- on invested value of

350,000.  And that the distributions or withdrawals

from that investment would be over 25 years.  And then 12 the second part of

that would be assuming a rate of 13 return of again at 4 percent, the

withdrawals would be

at 30 years, over 30 years.

February 4, 2022                                    Christine Knutson-D 131

1

2

15      Q        All right.

16      A        And so I did that.  And then the second or

17      third scenario would be that the annual yield was 10

18      percent and that the withdrawals would be over 25 years

19      and then also over 30 years, the purpose being to

20      determine what amount −- what the maximum amount could

21      be to -- for Julie Right -- Julie White to take monthly

22      withdrawals and not deplete the accounts before 25 or

23      30 years respectively.  And -- but to pay down the 24 entire amount as to the

end of the 25 or 30 years.

        Q                        All right.  So let's start with your

calculations.  Do you have your -- your --

                                MR. SHIPLEY:  Your Honor, I object to

3 these −- the -- the witness has not been called out as 4 an expert except as a CPA.  But we're

talking about

5      investment returns at this point and projections based

6      on that.  If we want to -- the reason I was going to

7      say that these are just hypothetical assumptions

8      and -- and this witness will testify to what these

9      projections will be, that's fine.  Again, we don't have

25

February 4, 2022                                    Christine Knutson-D 132

1

2

10   any evidence that this witness is an expert in what 11 investment returns would be.

12                    THE COURT:  So, Ms. Knutson, in your 30

13                    years, 30-plus years of experience, is part of your

14                    sort of day-to-day actions -- including doing the

15                    accounting that you do -- making such or similar

16                    projections on investments?

17                    THE WITNESS:  No, sir.

18                    THE COURT:  So what qualifies you to

19                    have done it in this case?

20                    THE WITNESS:  I was not asked

21                    to -- I'm -- I'm not trying to say that the 4 percent

22                    or the 10 percent would be the reality and that they

23                    are expected returns.  I was just asked to determine

24                    these amounts based on the assumption that an annual yield

                     would be 10 percent or 4 percent.

                          THE COURT:  I guess we --

                              THE WITNESS:  The -- at first, I did

3    actually run the projection assuming that the annual

4    yield would be 4 percent and then 10 percent, but the

5    client would -- I mean Julie White -- would only take a

25

February 4, 2022                                    Christine Knutson-D 133

1

2

6   4 percent draw during the --

7   THE COURT:  Here's my question -- 8   THE WITNESS:  -- the remainder of her 9 life.

10                          THE COURT:  Here's my question, Ms.

11                          Knutson.  Here's my concern, Ms. Knutson, is typically

12                          accountants are looking backwards and taking a look at

13                          the former year or the former time period, correct?

14                          THE WITNESS:  Correct.

15                          THE COURT:  And you are doing a forecast

16                          that maybe a financial advisor would do.  Do you agree 17 with

                           me on that?

18                          THE WITNESS:  No, sir.  I am not doing a

19                          forecast.  I'm just -- I'm just calculating the numbers

20                          and a schedule of what would happen if those

21                          assumptions were true.

22                          THE COURT:  Well, what would happen if

23                          the $285,000 was used to purchase a home?  But what

24                          happened to the yield over a 30-year period of time, at

                    10 percent or 4 percent?  If the 285,000 was used

           tomorrow to purchase a home.

                                   THE WITNESS:  Well, of course,

25

February 4, 2022                              Christine Knutson-D 134

1

2

3    the -- the entire projections would have to be redone.

4    They  -- I don't know Ms. White's history or her

5    intentions, or her health.  There are many things that

6    can affect us.  But I was asked if she was -- just

7    based on the assumption that she has this amount of

8    money -- in the -- invested now.  And these two

9    different yields occurred, then what -- how long could

10   her money last?  I mean, I'm sorry, what would the 11 maximum monthly withdrawal be

     for the money to last 25 12 or 30 years?

13              THE COURT:  I guess I'm trying to figure

14              out what are your qualifications -- of what a CPA 15 typically

                would have as qualifications that makes you 16 qualified to

                make future projections.

17              THE WITNESS:  Again, I'm not making any

18              future projections.

19              THE COURT:  Sure you are.

20              THE WITNESS:  I was --

21              THE COURT:  Sure you are.  You're

22              saying, here's the yield, and if this is the amount of

23              money that's in here and over 25 to 30-year period of

25

February 4, 2022                                    Christine Knutson-D 135

1

2

24                              time, this is the estimated yield that would be produced on that

money.  How much could she take out every month?  That's a --

you agree with me.  You don't know if that's going to happen in

the future.  3 Inflation could go up.  A lot of different things

could

4    happen.

5    THE WITNESS:  Correct.

6    THE COURT:  Right.  So --

7    THE WITNESS:  And --

8    THE COURT:  I'm just trying to figure

9    out, as an accountant, what makes you qualified to make 10 those kinds of projections.

Does that make sense?

11    What -- as in, because you're an accountant, they want

12    you to certify as an expert.  And I'm trying to figure

13    out what is it about you as a CPA that makes you 14 qualified to give these figures to the

Court. 15   THE WITNESS:  I'm sorry.  Who is 16 speaking right now?

17                              THE COURT:  This is Judge Bailey.

18                              THE WITNESS:  Oh, thank you, sir.

19                              The  -- as a CPA, I'm not a qualified expert on this.

20                              THE COURT:  Okay.

25

February 4, 2022                                    Christine Knutson-D 136

1

2

21          THE WITNESS:  I --

22          THE COURT:  Objection sustained.  Hold

23          on.  There was just an objection.  The Court had to

24          make a ruling on the objection.  So the objection is sustained as

far as if there's going to be any qualification of her being an

expert.  If you want this to be just demonstrative information,

no different than

3    an exhibit being received by the Court for

4    demonstrative purposes, I'll allow her to continue to 5 testify about that for

demonstrative purposes.

6          MR. BERNABEI:  Well, Your Honor, my

7          question was, you know, let's turn to the schedule she

8          prepared.  I'm going to --

9          THE COURT:  Yep.

10          MR. BERNABEI:  I will ask her to

11          identify them.  I am going to ask her to make some

12          assumptions which will fill in the blanks later, but

13          you know her -- her testimony will be based on some 14

assumptions.

15          THE COURT:  Okay.  And that's all fine,

25

February 4, 2022                                    Christine Knutson-D 137

1

2

16                    and I get it, but it's not going to be considered

17                    expert testimony going to be my point.  She's not an 18 expert

in this field to make the sort of numbers.

19    Okay.  Don't get me wrong.  She's, I'm sure, a much

20    better mathematician than I could ever be as I told you

21    guys earlier; that's why I became a lawyer, but

22    I -- the Court will accept that information for 23 demonstrative purposes and not as an

expert opinion. 24 BY MR. BERNABEI:

Q                      All right.  So with that, Ms. Knutson, I'm

going to kind of go through this in summary fashion.

You prepared four schedules; is that correct?

3    A      That's correct.

4    Q      And what are the -- what are the criteria as

5    far as the amount that is being invested in each

6    schedule?

7    A      The amount being invested is 350,000 based on

8    the assumption of $250,000 in -- in the cash bank 9 account and a 100 -- $100,000 from

the IRA for a total 10 of 350,000.  Was that your question?

11          Q      I think so, yes.  So let me -- let me direct

25

February 4, 2022                                    Christine Knutson-D 138

1

2

12        your attention -— in your capacity as a CPA, do you 13 assist clients in their

          retirement investment planning?

14        A        I'm sorry.  What was that?

15        Q        In your capacity as a CPA, do you assist 16 clients in their retirement

          and investments?

17                          MR. SHIPLEY:  Your Honor, we object.

18                          THE COURT:  Hold on.  19  MR. SHIPLEY:  I mean, the

                            Court's

20                          already ruled on this.

21                          THE COURT:  No.

22                          MR. SHIPLEY:  Yes, you have.

23                          THE COURT:  Let her answer the question.

24                          MR. SHIPLEY:  Okay.  All right.

                                    THE COURT:  All right.  You may answer

          that question, Ms. Knutson.

                                    THE WITNESS:  I have over the years,

3         yes.

4         MR. BERNABEI:  All right.

5         THE WITNESS:  It's not a major part of

6         -— of my practice.

25

February 4, 2022                                         Christine Knutson-D 139

1

2

7    BY MR. BERNABEI:

8    Q        I understand.  One of the criteria we've

9    asked -- you mentioned it earlier.  The 4 percent 10 annual rate of return, but you also called it "annual

11                        yield."  Is that the same thing?

12                        A        Yes.

13                        Q        And based upon your professional involvement

14                        with clients and assisting with retirement investments,

15                        do you have an opinion on whether 4 percent is a

16                        reasonable rate of return to be expected on an

17                        investment?

18                        MR. SHIPLEY:  Objection.  That's calling

19                        for financial opinion.  She's not an expert.

20                        THE COURT:  Sustained.  She's indicated

21                        it's not a part of her primary practice.  She cannot

22                        render an opinion as an expert.

23                        BY MR. BERNABEI:

24                        Q        All right.  We asked you to assume a four percent rate

                        of return; is that correct?

              A              That's correct.
25

February 4, 2022                                    Christine Knutson-D 140

1

2

Q                         And if -- let's start with just if it was

3 interest only, so if the principal amount is never 4 touched, how much would that generate per month?  How

5          much income?

6          A        If it was never touched?

7          Q If the principal was never invaded? 8 A It would be $1,200 per month, 4

          percent of 9 350,000.

10          Q  All right.  And if it's 10 percent, it would

11          be 35,000 a year.

12          A        Yes.

13          Q        All right.  So let's assume that Ms. Julie

14          White's life expectancy is another 25 years.  Based on

15          that and based upon a 4 percent rate of return on a

16          $350,000 investment, how much could Julie White

17          withdraw for the duration of her expected life? 18          A        So let me

          repeat that.  The 10 percent rate of return?

19 of return?

20          Q        Let's go with the 4 percent first.

21          A        All right.  The 4 percent rate of return.

22          Q        Twenty-five years.  Payments --

25

February 4, 2022                              Christine Knutson-D 141

A        And --

Q        Payments -- payments on a monthly basis.

A              The maximum would be $1,847 per month.

Q        And would that continue for the 25-year period?

A        Yes, it would.

Q        All right.  And these are -- and then let's 5 go to page 2 of your

schedule.

MR. BERNABEI:  I tell you -- I guess

I'll move to admit these -- at least for demonstrative

purposes.

THE COURT:  Any objection?

MR. SHIPLEY:  No objections.

MR. BERNABEI:  All right.  And just so

I'm clear, Your Honor, I'm actually offering them for

normal purposes, but I understand your ruling.

THE COURT:  Correct.

BY MR. BERNABEI:

Q        All right.  So let's go to the next item, or

the next schedule is a 4 percent rate of return over a

30-year withdrawal period.  Correct?

1

2

19          A       Correct.

20          Q       And -- go ahead.

21          A       That amount would be $1,670.95.

22          Q       Each month for the -- for 30 years.  Is that

23   right?

24          A       For 30 years, correct.

     Q                   All right.  And then page 3, same factors

except it's a 10 percent annual yield and the withdrawal period is 25 years.  What is --

3    A       Yes.

4    Q       What would be the scheduled payment be then?

5    A       The scheduled payment would be $3,180.45. 6   Q       And then the

final calculation you made was

7    10 percent over 30 years, correct?

8    A       Correct.

9    Q       And what was the --

10   A       And that would be $3,071.50.

11   Q       All right.  And you mentioned earlier,

12   what  -- do you have any knowledge of what Julie White

13   intends to do with her investments or even if she has

14   this investment?

25

February 4, 2022                                    Christine Knutson-D 143

15    A    No, I have no knowledge of that.

16    Q    All right.  You also mentioned that Mr. White

17    had asked you and your -- another CPA in your office to

18    review his financial calculations?  Do you have those

19    available?

20    A    Yes, I do.

21    Q    I will -- I will represent to you that the 22 one -- the financial analysis

       for Dave White is our

23    Exhibit 109.  Yours probably doesn't have an Exhibit

24    number on it.  But do you have one for Dave White and one for Julie White?

       A             Yes, but I have those in front of me.

       Q             All right.  So let's start with the one for

3      Dave White.  And tell us what you did on this, please?

4      A    I -- we simply looked at the numbers and just

5      to see whether they were reasonable, whether they made

6      sense in just based on what Dave White was -- was

7      telling us.  He said he receives $2,093 per month

8      Social Security and -- and all these various other

9      things.  We do not verify any of these numbers.  We did

10     not look at the underlying documents.  We just were

25

1

2

11          looking to see if the overall presentation made sense.

12          There was one part that needed adjustment.  13 We spoke to Dave about that,

and he agreed.  And we

14 made that small adjustment.  And then I just did some 15 cosmetic things about -- I –- I checked the math.  And

16          made sure that everything added up.

17          Q          And so this wasn't so much a cash flow

18          analysis as it was a net worth analysis; is that

19          correct?

20          A          There's two parts.  The first was a cash flow

21          based on Dave's -- Dave White's representation, that he

22          has the income and expenses.  Mr. White prepared all 23 this.  We just checked

the math.  And then the assets 24 would be a net worth analysis.

           Q                                    I see.  So the top half is the cash flow, and

the bottom half is the net worth?

           A                          That's correct.  And again, this was all

3    prepared by Dave White, but we  -- we checked the math

4    and -- and it seemed reasonable based on what he was 5 telling us.

6          Q          All right.  And then our Exhibit 110 is the

7          financial analysis for Julie White.  Did you conduct

25

February 4, 2022                                    Christine Knutson-D 145

1

2

8        the same sort of a check as with Dave White's analysis?

9        A        For Julie White --

10       Q        Yes, ma'am.

11       A        I checked the math, and these are all numbers

12       from -- from Dave White.  We didn't question the

13       numbers. Honestly, a withdrawal from the bank up at

14       the top that apparently was some special item -- the 15 withdrawal from the

         bank for 38,000 divided by 4

16   months.  That's the only thing that was questioned.

17   And then the representation that she had $250,000 in

18   the bank.  Again, we did not look at any of the

19   underlying documents.  And the IRA matches the same 20 amount on -- on Dave White's

     balance sheet -- or not 21 balance sheet, but his work paper.

22           So, essentially, we checked the math on that. 23Q        All right.  And then

you're -- from -- based

24 upon what Dave White has told you, you're familiar that with the fact that his -- his primary

     source of income

     at this point is through his Social Security benefits; is that correct?

3                A        That's correct.

4                Q        And how does that -- based upon the numbers

25

1

2

5          he's given you, is there –- is it a taxable event

6          assuming those numbers that he's provided for his

7          income?

8          A       Based on that, based on, for him, with Social

9          Security and an IRA withdrawal --

10         Q       Yeah.

11         A       -- there would not be taxes on that. 12   Q       And you're –- you're

talking about if he's a

13    single filer, he's -- there's no tax, right?

14         A       A single filer.  He would not meet the

15    threshold for the Social Security to be taxable -- oh, 16 I'm sorry.  Excuse me.

Excuse me.  Honestly, I did not

17    make that calculation.

18         Q       All right.  But --

19         A       But his -- just doing it quickly in my head,

20    his standard deduction -- and -- and perhaps the

21    mortgage, but I don't know what the breakdown is 22 between the -- tax and

interest, but the standard

23    deduction would make his tax minimal, if anything.

24         Q       Right.  So really his adjusted gross income

25

February 4, 2022                                    Christine Knutson-D 147

1

2

would have to be more than $25,000 minimum before he --
he would start getting taxed.  Does that sound about right?

3    A        His adjusted gross income -- 4   Q        Ms. Knutson,
are you there?

5                          THE COURT:  She's there.

6                          THE WITNESS:  I am.  Sorry. 7  THE COURT:  She's just
doing some

8                          calculations for you.

9                          THE WITNESS:  The adjusted gross income

10                         would have to be greater than $14,000 for there to be

11                         any tax.

12                         BY MR. BERNABEI:

13                         Q          Okay.

14                         A  But the adjusted gross income would be his

15                         $12,000 IRA -- IRA withdrawal at a thousand per month,

16                         except if that's -- if that's allocated to Julie at

17                         half, then it's only 500 per month.  So after the

18                         allocation to Julie White, his adjusted gross income

19                         would -- and then after the

20                         (Indiscernible) -- after -- okay, and so the adjusted

25

February 4, 2022                                  Christine Knutson-D 148

1

2

21          gross income would have to be more than -- I'm sorry,

22          we're in about $13,000.

23          Q          Before the income tax.

24          A Before there would be any tax.

                              MR. BERNADAI: Okay.  Thank you.  That's

all I have but hold on.  The other attorney may have some questions.

3                    THE COURT:  All right.  Ms. Knutson,

4          you're going to hear from Mr. Shipley.

5          Go ahead.

6                    MR. SHIPLEY:  Okay. 7    CROSS-EXAMINATION

8    BY MR. SHIPLEY:

9          Q          Ms. Knutson, going back to, I think it was

10    number -- give me a second, Your Honor -- the Exhibit

11    135, Investment Schedules, did you actually produce 12 those documents, or

were those documents given to you

13    by Mr. White?

14          A          I produced those documents.

15          Q          Okay.

16          A          The investment withdrawal schedules?

17          Q          Yes.  Yes.

25

February 4, 2022                                    Christine Knutson-D 149

1

2

18    A       Yes, I produced those.

19    Q       If Ms. White were to choose to say take

20    $250,000 that she has and buy a home so that there 21 would only be $100,000,

would that make a difference in 22 your schedules?

23    A       Yes.  The beginning -- the -- at some point

24    either at the beginning balance or some point at some date, the balance would

be reduced by $250,000, and

25

February 4, 2022                                    Christine Knutson-X 150

1

2

that would be a significant difference.

Q              Okay.  The 4 percent and then the 10 percent

3    investment return that these schedules are based upon,

4    did you come up with those figures, or did Mr. White 5 give you those figures?

6    A       The -- well, Mr. White, through his attorney, 7 gave me those figures.  They're

just assumptions. 8    Q        Okay.  So you did not actually make any sort 9 of -- okay.

10   A       Mr. White is familiar -- is familiar with an 11 investment that has a historical

yield of 10 percent.

12 MR. SHIPLEY:  Objection, Your Honor.  13 It's nonresponsive.

14 THE COURT:  Overruled.  Go ahead.  Go 15 ahead and finish, Ms. Knutson.

16                  THE WITNESS:  And so he was -- he was

17                  thinking that if all the money was invested in that

18                  investment or similar investment that would

19                  yield -- that could yield 10 percent, that 10 percent

20                  would be a -- a figure -- yield to use in these

21                  calculations.

22                  BY MR. SHIPLEY:

23                  Q        So none of those rates of return --

24                  A        Four percent is a very conservative yield.

But it's -- and I'm just speaking as a CPA and

25

February 4, 2022                                    Christine Knutson-X 151

1

2

observation of -- and conversations with financial planners -- 4 percent has been a rule of thumb for

3    withdrawals because obviously there are ups and downs

4    in a market and depending on the timing within

5    the -- the withdrawal period, if it's early in the

6    withdrawal period, it could be very significant.  And

7    if one is taking more than 4 percent, then that could

8    really reduce the investment value, of course, and

9    future earnings.  If it -- if a downturn is

10   experienced, in the middle or toward the end of the 11 period, the 25- or 30-year period of the life, then of 12 course, the impact is not as great.

13                    MR. SHIPLEY:  Your Honor, I move to

14                    strike this testimony because she's not --

15                    THE WITNESS:  So that's why we use 4 16 percent.

17                    MR. SHIPLEY: -- not qualified to give

18                    financial advice as an expert.

19                    THE COURT:  She's doing her best to 20 answer your questions.

21   MR. SHIPLEY:  Well, she's gone beyond 22 that.

23                    THE COURT:  I know you believe she has,

24                    but she's doing her best answer your questions.

25

February 4, 2022                                    Christine Knutson-X 152

1

2

                          MR. SHIPLEY:  All right.  Okay.

                          THE COURT:  Do you have any additional

questions for the witness?

3                          MR. SHIPLEY:  My question was –- my

4                    question was actually did she come up with these 5 figures,

                    or were these figures given to her by Mr.

6                    White?  And that was actually what I'd asked.

7                    THE COURT:  And she gave the answer to

8                    that both.  One, Mr. White; and secondly, that sort of

9                    in talking with other folks out there, the 10 percent

10                 is from that, and the 4 percent comes from that's a 11 pretty

                    standard rate of return if you don't want to

12                 touch the principal.

13                 MR. SHIPLEY:  Okay.

14                 THE COURT:  Ms. Knutson, is that pretty

15                 much your testimony?

16                 THE WITNESS:  Yes, Your Honor.

17                 BY MR. SHIPLEY:

18                 Q      Also, within the investment schedules, it

19                 does not indicate -- they don't indicate whether or not

25

1

2

20          there would be tax implications for these withdrawals;

21          is that correct?

22          A       That's correct.

23          Q       Okay.  Let me go to -- Ms. Knutson, I want to

24          go to Exhibit 109, and -- yeah, let's go to 109, which was the

financial analysis of husband.  The Exhibit

109, did you create that document, or is that a document that was given to you by

Mr. White? 3 A That was given to us by Mr. White. 4 Q So this is not your work product;

is that 5 correct?

6    A       That's correct.  Is this -– are you -- it's 7 the same for either one, but are you

referencing Julie 8 White or Dave White?

9          Q       I was -- I was referencing Dave White, but my

10          next question was going to be pertaining to Julie

11          White, which is --

12          A       Okay.

13          Q       -- that's Exhibit 110 for us.

14          A       All right.

15          Q       And so the same question then goes for

16          Exhibit 110.  Is that a document that was created by

25

February 4, 2022                                    Christine Knutson-X 154

1

2

17          Mr. White for his attorney and given to you, or was 18 that -- is that your work

            product?

19 A It's not our work process, I mean --  20 Q Work product.

21          A       It was given to us by Dave White. 22    Q       Okay.  And you did not perform

any type of an

23          audit on these figures; is that correct?

24          A       That is correct.

            Q                      And the assumption in No. 109, which is Mr.

        White's -- Dave White's, the assumption there is that his employment income is only

$50 per month.  So are 3 you aware of whether or not he earned more than that in

4           2021 or not?

5           A       No, I'm --I am not aware.

6           Q       Do you know anything about Mr. White's

7           earning capacity?

8           A       No, I don't.

9           Q       Have you ever reviewed Mr. White's resume?

10          A       Pardon me?

11          Q Have you ever reviewed Mr. White's resume or 12 work history?

13          A       No.  I -- and I'm not -- I don't have the

14          knowledge of whether Mr. Rick Hug, CPA, has.  He wasn't

25

February 4, 2022                                   Christine Knutson-X 155

15          —- he's not available at this time.  But he introduced

16          me to Dave White during a phone meeting.

17          Q        All right.

18          A        And I do not have personal knowledge of Mr.

19          White's or Ms. White's history or current -- current 20 income or past income.

21          Q  Okay.  So the figures then in 109 and 110,

22          you simply checked the math on those, that every 23 assumption and piece

            of information within those is

24 from Mr. White or his attorney, correct?

            A            That is correct.

        Q        The question that you were testifying about adjusted gross income.  So your

  testimony is that until 3 somebody's adjusted income goes over $14,000, they 4 don't -- they

  would not have —-there would not be a tax

5    liability.  Is that correct?

6    A        If the adjusted gross income is less 7 than -- sorry -- than $14,000, they

    would not have

8          taxable income.

9          Q        Okay.

10         A        And no tax liability.

11         Q        Okay.  This is just a general tax question.

25

February 4, 2022                                    Christine Knutson-X 156

1

2

12      It -- if somebody earns 15,000 in adjusted gross

13      income, is it true that the only -- the amount over the

14      $14,000 threshold, such as the one thousand, that's the

15      only amount that would be taxed, correct?

16      A       Correct.

17      Q       So the 14,000 that was still below, that

18      would not be taxed, correct?

19      A       That's correct.

20      Q       So if somebody earned 20,000, they would only

21      pay tax on that additional 6,000 over the adjusted

22      gross income; is that correct?

23      A       That's correct.

24      Q       So is there any situation where if somebody all of a sudden earned that

        -- like went one dollar

        over that 14,000, then all of a sudden the IRS would want to tax that first 14,000?

3       A       With just $1 over?

4       Q       Yes.

5       A       No.  I'm not aware of any situation.

6       Q       Okay.

7       MR. SHIPLEY:  No more questions, Your 8 Honor.

25

February 4, 2022                                   Christine Knutson-X 157

1

2

9          THE COURT:  Mr. Bernabei, any follow-up

10         questions?

11         MR. BERNABEI:  No, Your Honor.

12         THE COURT:  All right.  Thank you, Ms.

13         Knutson. That's it.  You can terminate the call.

14         THE WITNESS:  Thank you, Your Honor.

15         THE COURT:  All right.  Obviously, we

16         have to set up the second hearing.  And so what dates 17 are

           we looking at, April, May, now?

18         THE CLERK:  Yeah.  And they'll be coming 19 back on their contempt

cases?

20         THE COURT:  And what -- how much time do 21 we have set aside for

that?

22         THE CLERK:  March 29th at 10:30, so we 23 would have an hour and a

half.

24                 THE COURT:  Okay.  Let's just do that.

           March 28th at 10:30.

25

February 4, 2022                                              158

1

2

MR. SHIPLEY:  Is that with the date we already have?

3          THE COURT:  No.  It was the date for the

4          contempt cases.  That was dismissed.  So we'll go from

5          there.  All right.  Thank you all.

6          MR. BERNABEI:  And you said 10:30?

7          THE COURT:  Yes.

8          MR. BERNABEI:  Okay.

9          MR. SHIPLEY:  Then -- then in the

10         interim, are you, of course, expecting us to do the 11 personal

           property.

12         THE COURT:  Yes.  Yup.  And again, take

13         the most exhaustive lists, and we'll go from there, and

14         the Court will make certain factual determinations.

15         MR. SHIPLEY:  Should we leave our

16         Exhibit books then?  The ones that have been put aside 17

           somewhere?

18         THE COURT:  Nah.  You guys can take them

19         back.

20         MR. SHIPLEY:  All right.

25

March 29, 2022                                                                159

THE COURT:  The ones the Court has received though, we'll need to keep.  You have your 23 own -- you have your -- the ones you've received into 24 evidence so far.

MR. SHIPLEY:  The ones that are received or on the witness stand, I guess.  Those are my originals, but I guess --

THE COURT:  You got them.  They've been received?

THE CLERK:  Yes.

THE COURT:  You can take the bench books.

MR. SHIPLEY:  I don't mind leaving them.

THE CLERK:  I don't mind you taking them.

THE COURT:  And then make sure we get either a CD or thumb drive or whatever for those other 13 exhibits.

MR. SHIPLEY: Yes, I will.  Thank you, Your Honor.

(Proceedings concluded at 12:14 p.m.)

March 29, 2022                                                      160

1

2

19

20

21

22

23

24

****************************

March 29, 2022

TRANSCRIPT OF COURT TRIAL

THE HONORABLE D. CHARLES BAILEY

CIRCUIT COURT JUDGE.

APPEARANCES:

For the Petitioner:              Attorney at Law
                                 By:  James T. Shipley
                                 Portland, OR 97321

For the Respondent:              Attorney at Law
                                 By:  Vincent J. Bernabei
                                 Beaverton, OR 97008

****************************

(10:34 a.m.)

                      THE COURT:  All right.  This is a
continuation in the matter of Julia White, petitioner,
and David White, respondent, 21DR02783.  We have Mr.
Shipley here on behalf of the petitioner and Mr.

March 29, 2022                                                161

1

2

16    Bernabei on behalf of the respondent.

17                                I wish I'd taken notes.  I don't know if
18    we had -- but I didn't write down who was testifying
19    last to remind myself where we're going to start off
20    at.
21
22 before we actually begin with taking more testimony? 23                        Is there anything we need to take up
                      MR. SHIPLEY:  Yeah, Your Honor.
24
      The -- the last witness to testify, I believe, was the

      CPA who had testified --

25

March 29, 2022                                                        162

1

2


                              THE COURT:  Knutson?

                    MR. SHIPLEY:  -- for the respondent. 3                    THE COURT:  Is

that who it was?  Is that 4 why I had that in my notes?

5                        MR. SHIPLEY:  I -- we had filed a motion

6                        to compel production of documents.  There was some bank

7                        statements from KeyBank that had been filed.  So we

8                        filed a motion on that -- on a request for oral 9 arguments.  So I

                         don't know if that could be something

10                       the Court could address now or -- or not?

11                       THE COURT:  Sure.

12                       MR. SHIPLEY:  So, anyways -- 13                    MR. BERNABEI:

                         Before we start that, I

14 don't recall a motion being filed.  I did not receive a 15 copy.

16                       MR. SHIPLEY:  I copied -- I sent a copy.

17                       MR. BERNABEI:  When was the motion

18                       filed?

19                       MR. SHIPLEY:  Hold on here.  Let's see.

20                       That was filed on the 9th of March.

21                       MR. BERNABEI:  All right.  I'll take a

22                       look.  Hmm.  Yeah, I see it.

25

March 29, 2022                                                         163

1

2

23            THE COURT:  Do you have it?

24            MR. BERNABEI:  No.

                      THE COURT:  I can print it out for you

real quick.

              (Court and clerk converse.)

3              (Pause)

4             THE COURT:  When you're done.  Thanks.

5              (Pause)

6             THE COURT:  Mr. Bernabei?

7             MR. BERNABEI:  Yes.

8             THE COURT:  You've had a chance to read

9             it over now, and saw that there was an actual motion

10            filed.  So what your client's –- or find you on behalf

11            of your client's response to the request for those

12            Climate Truth account statements, bank account

13            statements.

14            MR. BERNABEI:  Your Honor, the motion

15            does not indicate that it was ever served.  And I never 16

              received it.  So it's not properly before the Court.

17            THE COURT:  It was filed with the Court.

25

March 29, 2022                                                            164

1

2

18                     And so it's properly here.  And we can go get Mr.

19                     Shipley.  I think he put it in his declaration that

20                     he's conferred with you, that he -- that you know.

21                     I'll pull it up there again.

22                     MR. BERNABEI:  And -- and we did, yeah,

23                     I -- I discussed this and --

24                     THE COURT:  So is there a reason why

they haven't been –- I mean, they would have been

certainly part of the original discovery request.  He has authority and uses them for his

personal accounts.  3 They'd certainly be part of the -- what should have 4 been provided in

the original production.

5                     MR. BERNABEI:  Well, Your Honor, before

6                     I get to the substance of this, we have not had a -- a 7

opportunity to respond to the motion because it was not 8 served

on us.

9                     THE COURT:  I'll give you a chance now.

10                    What is your response to it now?

11                    MR. BERNABEI:  Well, Your Honor, under

12                    the Court rules, we have 14 days to respond to any 13 motion.

14                    THE COURT:  Huh.  Then I'll set

25

March 29, 2022                                                      165

1

2

15                        this -- we'll set this hearing out, and we'll give you 16 14 days and

set a hearing for that point in time.

17 Clearly can't go forward unless your client hands over 18 these records.  And they were --- I

don't, honestly,

19        don't know what the issue is because it's nothing -- I

20        want to guess in reading the declaration that this is

21        nothing that your client wasn't expecting, nothing that

22        you weren't anticipating, and at his deposition he

23        clearly said he had authority over those accounts and

24        has used them for his personal matters.  They were clearly part of the original production.

They should

have been part of the original production.  They shouldn't have even had to go to the

level of asking 3 the Court for the -- to compel these documents.

4                        MR. BERNABEI:  Well, Your Honor, I think

5                        that's a incorrect characterization of what these

6                        records are.  They are --

7                        THE COURT:  Mr. Bernabei.

8                        MR. BERNABEI:  -- corporate records.

9                        Mr. White does have access to them because he is a

10                       board member.
25

March 29, 2022                                                                166

1

2

11          THE COURT:  Um-hum.

12          MR. BERNABEI:  It's of a nonprofit.

13          These -- these records are not for his individual use.

14          And -- and the account is not for his individual use.

15          And I don't think he's said at deposition or otherwise

16          that it was for his --

17          THE COURT:  In your declaration, you

18          indicated that he did say in his deposition.

19          MR. SHIPLEY:  Yeah, I mean, I have the

20          deposition transcript.  He actually -- Mr. White,

21          testified that he is the only signer on the account.

22          And he also testified that Climate Change Truth paid to

23          landscape his front yard.  That was unequivocal.  And

24          he said how much it was.  So that's part of his deposition

            testimony, Your Honor.

            THE COURT:  What do you want to do, Mr.

Bernabei?

3           MR. BERNABEI:  I'm not prepared to
4             address it, Your Honor.  It's not properly before the

5             Court.

25

March 29, 2022                                                                167

1

2

6              THE COURT:  All right.

7              MR. BERNABEI:  So we should move forward

8              with what little, little time we have –-

9              THE COURT:  Nope.

10             MR. BERNABEI:  All right.  Well, let me,

11             if I may, let me speak to my client then  --

12             THE COURT:  Yep.

13             MR. BERNABEI:  -- because I -- I -- 14              THE

               COURT:  This is part and parcel of

15   everything that's going on in this particular case.

16   And everybody needs to have whatever documentation.  I

17   know you've gone on many tangents in this case, and I

18   am sure this will take us down another to be explained

19   metaphor as a "rabbit hole." I get that.  But that's 20 part of the fairness of this system if

     you will.

21             And I've been doing my best to give due

22             process to your client, and I think I denied one of

23             their motions based on some of that due process.  But

24             it's got to go back down the way as well.  If he testified at his

               deposition that he is the one that has access to that account and

25

March 29, 2022                                                          168

1

2

it was used for personal purposes, I don't care if it was one time to pay

3    for -- he, the gardener -- that's enough to open it up

4    for them to take a look at the -- to see if there's 5 anything else in there.

6                  I can do it subject to an order -- of a

7    protection order.  I have no problem with that if there 8 may be

some proprietor issues with the bank accounts.

9 But certainly, if it turns out in his deposition and/or 10 that if he just knows that he has used it for other

11   personal items, or if they paid other personal bills of

12   his in addition to his gardener, if you will,

13   landscaping, they're entitled to at least take a look

14   at it to see if there's anything else in there, or

15   other types of incomes, other types of resources, 16 whatever it may be.

17                  Essentially it becomes an income.  All

18   right.  He said the gardener's paying for -- or the 19 companies

paying for his landscape person, gardening, 20 it becomes a

source of income.

21                  MR. BERNABEI:  Well, Your Honor, I just

22                  -- let me talk.  You know -- we did file a response to

25

```
 1

 2

23        the request for production.  I noticed declaration

24        states we did not.  So the problem is -- because it just came to me

          now -- I don't really have an opportunity to prepare a formal

          response.

                  And that does concern me since if it's a 3 motion to compel, ordinarily,
the Court would provide

 4   some advanced notice.  And even if the Court grants the

 5   motion to compel, we're here for trial today.  And I

 6   don't know, as I stand here, whether Mr. White would

 7   even be able to gather the records that he's asking

 8   for.

 9   THE COURT:  Most of them are online, so 10 it shouldn't be that hard.

11                  MR. SHIPLEY:  Your Honor, I -- if -- I

12                  would say if because we do have such limited time -- if

13                  they agree to provide those, I would -- I have a couple

14                  witnesses I would like to get through.  I have on 15 online right

                  now that those documents are not going to 16 germane to their

                  testimony.

17                  THE COURT:  That's fine.  We'll do it.

18                  MR. SHIPLEY:  And then I have another

25
```

March 29, 2022                                                                170

1

2

19          witness outside.  And again, the documents; but in

20          terms of examination of.  We could also start into the

21          examination with Mr. -- Mr. White, and then we probably

22          won't get done with that, with him, before noon 23 anyways.

24                  THE COURT:  Okay.  That's fine.

(Indiscernible) we can do it.  That's fine.

                        MR. BERNABEI:  Well, then that -- that

                            would give me a little bit more opportunity to speak to

3           my client about it.

4                   THE COURT:  Okay.  That's fine.

5           Anything else?

6                   MR. BERNABEI:  Your Honor, for

7           respondent there is.  Where we left off at -- at the

8           end of our last hearing was each side had submitted

9           a -- a blind bid on personal property.  And then the

10          Court was going to decide who gets what at what value.

11          There are some items on there that -- on the

12          list -- that we have that we don't believe should be

13          divided as personal property and that are included as

14          either part of the home or there were some gifts and

25

March 29, 2022                                          171

1

2

15          inheritances, things like that.  How does the Court

16          intend to --

17          THE COURT:  I assume you guys in your

18          testimony are going to have your clients up there and

19          go through the things that there are -- that they don't

20          believe exist.  And then the Court will -- as I told

21          you guys before -- Court will listen to that testimony

22          and maybe agree with them or disagree with them.  If

23          the Court disagrees with them, and they've got a value,

24          and they want out, they're going to get that item, even if it

            doesn't exist, and at that value.

            MR. BERNABEI:  Okay.  I think just -- he

wanted --

3           THE COURT:  Yes.

4           MR. BERNABEI:  -- me -- so we'll

5   just  --

6           THE COURT:  That's fine.  Yep.

7           MR. BERNABEI:  -- we'll present it as

8           part of our cases.

9           THE COURT:  Yep.  Anything else?

25

March 29, 2022                                                                  172

1

2

10                     MR. BERNABEI:  Yes, Your Honor.

11                     We -- yesterday we had filed a motion to allow

12                     telephone or a remote location testimony of a Ken Nicks

13                     (phonetic).  But we have not heard --
14          THE COURT:  I granted it.

15                     MR. BERNABEI:  Oh, you did.  Okay.

16  Thank you.

17                     THE COURT:  Yep.  I don't know if we'll

18  get to him today or not but --

19  MR. BERNABEI:  Right.  Thank you. 20                    THE COURT:  Yep.  All right,

anything

21  else before you call your next witness?

22  MR. SHIPLEY:  Nothing, Your Honor. 23                    THE COURT:  All right.  So you

may call 24  your next witness.

                       MR. SHIPLEY:  Your Honor, I call Brian

White.  He is the -- on --

    THE COURT:  I don't see anybody else on 3 the system there.

4                     THE CLERK:  He's there.  I just --

5                     THE COURT:  Oh, you just do there.

6  Okay.

7                     Mr. White, I need you to put your video

8                         on for us, please.  Mr. White, can you hear -- there

25

March 29, 2022                                                                173

9          you go.  And make sure your mute is off.

10         MR. WHITE:  Okay.

11         THE COURT:  I can hear you now, so it

12         must be off.  You'll raise your right hand to be
           sworn.

13         BRIAN WHITE

14         called as a witness for the Petitioner, having been
           duly

15         sworn, testified as follows:

16         THE COURT:  All right.  It's -- it's

17         really jumpy.  How far away are you from your
           router?

18         THE WITNESS:  I apologize.

19         (Indiscernible) –- I'm actually at a hotel on a work 20

           conference system.  I could possibly attempt to join

           by

21         phone if that would work better.

22         THE COURT:  I don't know.  That's

23         between you and Mr. Shipley.  I wasn't part of always

24         my rule is that the attorney's required to make sure that you have

           the proper tools so we can see and hear

25

March 29, 2022                                                                                  174

1

2

you and it's not jumbled.

THE WITNESS:  I –- I apologize.  I just 3 received the link as -- as it started.

4                    THE COURT:  But it's not the link.  It's

5                    the -- whatever you have and the bandwidth that you

6                    have or how close you are to the router and/or the 7 speed of

                    your device.

8     MR. SHIPLEY:  Mr. White, is there a

9     place you could go in the hotel to get a better 10 connection?

11                    THE COURT:  You see.  He keeps

12                    (indiscernible).  He's -- he keeps going dead. 13

                     THE WITNESS:  I –- I can (indiscernible)

14                    maybe five minutes.

15                    THE COURT:  Okay.

16                    MR. SHIPLEY:  Your Honor, I can call my 17 other witness in the

                    meantime.

18                    THE COURT:  Yeah.  We just got to know

19                    because we may have to send you another link.  20 Sometimes,

                    it takes a second link.  There's going to be

21    a second email with a link.  Okay?  All right.

25

March 29, 2022                                                175

1

2

22    THE WITNESS:  Thank you, sir. 23                THE COURT:  All right.  You

may call 24 your other witness.

UNIDENTIFIED SPEAKER:  (Indiscernible)

25

March 29, 2022                                              Tammy Davis-D 176

1

2

far is she?

MR. SHIPLEY:  Your Honor, I'm calling 3 Tammy Davis.

4                THE COURT:  Ms. Davis, once you get up

5                here, could you raise your right hand for me, please?

6                TAMMY DAVIS

7                called as a witness for the Petitioner, having been duly

8                sworn, testified as follows:

9                THE COURT:  Go and have a seat, in a

10               (indiscernible) chair seat, and tell us your full name

                 11 and spell your last name for us, please?

12     THE WITNESS:  Tammy A. Davis, D-A-V-I-S.

13     THE COURT:  You may inquire.

14     MR. SHIPLEY:  Your Honor, you have

15     the -- the original exhibit list or exhibits there

16     so --

17     THE COURT:  I do.

18     MR. SHIPLEY:  -- if we could hand her

19     the --

20     THE COURT:  Yep.  Yes.

25

March 29, 2022                                    Tammy Davis-D 177

1

2

21              MR. SHIPLEY:  -- petitioner's exhibits. 22              THE

COURT:  Okay.  Are those yours?  Are 23 those mine?

24                      MR. SHIPLEY:  I think those ones right

there --

                    THE CLERK:  I have this.

                                THE COURT:  You have the originals?  Oh,

3      okay.

4              THE CLERK:  I have it.

5              THE COURT:  Perfect. 6   DIRECT EXAMINATION

7   BY MR. SHIPLEY:

8   Q        Okay.  Ms. Davis, what I -- I will just ask 9 you some questions, and then at some point, I'm going

10          to reference in --

11          A        Okay.

12          Q        -- to the notebook in front of you.  Ms.

13      Davis, what is your relationship to my client, Ms.

14      White?

15          A        I'm her little sister.

16          Q        Okay.  And what do you do for a living?

17          A        I'm an antique dealer.

25

March 29, 2022                                              Tammy Davis-D 178

18    Q    Okay.  And how long have you been in that 19 business?

20    A    Professionally, a decade, but my whole life.

21    Q    Okay.  Have you sold antiques to your sister?

22    A    No.

23    Q    Does she have -- do you know if she has any

24    or has had any antiques from you?

      A    Yes.  Lots.

      Q    And so how is it that she came to have those antiques?

3     A    I -- wanted my sister to have beautiful

4     things, so I asked her if I could store things at her

5     home, on the basis that she knew that if she ever

6     didn't want them anymore that I would just resell them.

7     And then I would use her home for staging as well.  She

8     had a beautiful blank canvas which I could decorate and

9     then take photos to use on my Facebook page and

10    Instagram.

11    Q    Is -- is that something normal within your

12    industry where you would have, I guess, inventory

13    located not in your shop?

14    A    It's normal for me.  I can't really say what 15 other people do.

25

March 29, 2022                                        Tammy Davis-D 179

1

2

16    Q       Okay.  Now, this case began in February of 17 2021.  Do you know if Ms. White

had any pieces of yours

18           that belonged to you?

19           A       I believe so.

20           Q       Okay.  If you -- Ms. Davis, in that -- in the

21           exhibit binder in front of you -- if you could please 22 turn to Exhibit 9?

23                   And if you could please just look at the

24                   first three or four photos there, the first four photos.  And that's the

                     photos of the house?

             A       Um-hum.

             Q                       Is that Ms. White -- was that the White's

3            home?

4            A       It is.

5            Q       Okay.  And if we can go to page 5 --

6            A       Yes.

7            Q       -- are there any items in that photograph 8 that you owned?

9            A       There are.  The mirror and also the wooden

10           brackets above the fireplace I purchased from a 11 sorority house.

12                   Q       The mirror, I don't see a mirror.  I

13                   see -- it looks like a --

25

March 29, 2022                                               Tammy Davis-D 180

1

2

14          A        On page 5.

15          Q        Isn't there a painting and then the -- I

16    think you're looking at page 6.  Possibly?

17          A        No.

18          THE COURT:  She is.  There's no -- there

19    is no mirror in page --

20          THE WITNESS:  This just -- 21                    THE COURT:  --

      on number 5.

22          THE WITNESS:  -- says page 5.

23          THE COURT:  This is my 5.

24          THE WITNESS:  Oh, I don't have that

picture.

BY MR. SHIPLEY:

          Q        Okay.

3     A        But the picture above the -- of the birds,

4     that's mine as well.

5     Q        Okay.

6     MR. BERNABEI:  Wait.  Wait.  Who -- I

7     don't have a bird.

8     THE COURT:  I --

25

March 29, 2022                                    Tammy Davis-D 181

1

2

9      MR. SHIPLEY:  That -- the photograph of 10 the bird.

11  THE WITNESS:  In -- in my book, it's -- 12  MR. BERNABEI:  This?

13                        THE WITNESS:  -- page 4 that you're

14                        referring to.  And it's a -- a frame -- an antique

15                        frame with a Audubon portrait or sketch of a -- of a

16                        heron.  And that --

17                        BY MR. SHIPLEY:

18                        Q        Ms. Davis, the Court just showed you a

19                        photograph that was marked as 5.  In your book, is

20                        that --

21          A        In my book, it's page 4.

22          Q        Okay.

23                        THE COURT:  May I take a look?

24                                        THE WITNESS:  Yeah, see.  It's this.  It
                says 4.

25

1

2

THE COURT:  Oh, yeah, that's my 5.

MR. SHIPLEY:  All right.

3          THE WITNESS:  Okay.

4          MR. SHIPLEY:  So we might be off a page.

5          Sorry.

6          BY MR. SHIPLEY:

7          Q        All right.  So the -- the -- the artwork on

8          the wall of the Audubon, that was yours --

9          A        Um-hum.

10         Q        -- and that -- that -- the wooden

11         decoration --

12         A        Yeah.

13         Q        -- above the mantle is yours?

14         A        Correct.

15         Q        Okay.  And the table in the corner, was that

16         yours as well?

17         A        It is.

18         Q        Okay.

19         A        It's a marble antique (indiscernible) -leg

20         style --

21         Q        Is that real marble?

25         A

March 29, 2022                                    Tammy Davis-D 183

1

2

22     A        It is.

23     Q        Okay.  And then turning to the next page, 24 there's a mirror on the

wall and --

Yes, that -- by the front door, that is mine

as well.

Q        Okay.

3      A        And then the corner behind the sofa there,

4      there's two antique tables that her plants are on.  5 Those were also my

tables.

6                              Q        Okay.  All right.  Well, let's go forward

7                              to --

8                              A        On page 7, there's a cabinet that I was with

9                              her when she purchased, but it wasn't mine.

10                             Q        Okay.  So that one's not yours?

11                             A        No.

12                             Q        All right.  That would be on page 8, Your

13                             Honor.

14                             THE COURT:  Gotcha.

15                             THE WITNESS:  So if we go to what I

16                             believe would be your page 10 --

25     A

1

2

17          BY MR. SHIPLEY:

18          Q        Okay.

19          A        -- we're in the bathroom now.  And there's an

20          antique bird print above the commode that is mine, as

21          well as the baskets that I had her hang her towels in.

22          Q        So those baskets --

23          A        Um-hum.

24          Q                              -- that are above the toilet?

                          Actually, the -- the drape is mine as well,

25          A

March 29, 2022                                                          Tammy Davis-D 185

1

2

4       but I'm sure it's going with the house.

5              Q       So the -- above the toilet paper roll, 3 those --

               A       Um-hum.

               Q       -- two decorative baskets --

               A       Um-hum.

               Q       -- were yours.

               A       Yep.

               Q       Okay.

               A       And the -- the bird print above the toilet as

11      well.

12             Q       I have that.  Okay.  And then on the next

6       13 page, are there any items there that were yours? 14  A          Uhm.  I don't believe that

7       those in the 15 bedroom -- in the guestroom belonged to me. 16          Q          Okay.

8       And then to what would be your page

9       17                              11, our page 12.

10      18                      A       Yeah, the mirror was something --

11      19                      Q       Oh, that's on our 13.

12      20                      A       -- that I lent her.

13      21                      MR. BERNABEI:  Is this the same one?

14      22                      BY MR. SHIPLEY:

15      23                      Q       So page 13, our 13, that mirror on the wall

16      24                      was yours.

        25              A

March 29, 2022                                          Tammy Davis-D 186

1

2

17                    Um-hum.  Correct.

25          A

March 29, 2022                                Tammy Davis-D 187

1

2

Q          All right.

A  And if you go to what I believe is your page 3 16, there's a -- an antique print

with a mirrored

frame.  That was mine.

Q        That would be our 17, I believe.

A        Okay.

Q        So the -- the -- the artwork with the flowers

in a frame --

A        Correct.

Q        -- that was yours?

A        Correct.

Q        Okay.  All right.

A        On my 18 which I think is your 19, it's just 14 another shot of the -- the

bird print and the table.

Oh, and the lamp with the hummingbird is mine as well.

Q        Oh, that lamp there --

A        Um-hum.

Q        -- on page -- our page 20?

A        Correct.

Q        Okay.

March 29, 2022                                  Tammy Davis-D 188

1

2

21          MR. BERNABEI:  Hold on.  Hold on. 22                THE WITNESS:  Do you

want me just to 23 keep going?

24                              MR. SHIPLEY:  Can she keep going?

THE COURT:  Yep.

BY MR. SHIPLEY:

Q         Yes.

3          A         If -- if you go to -- what I -- it's my page

4          19, it would be your page 20 -- I believe in the garden

5          window, there are three antique vases.  Those were

6          mine.

7          Q         That would be page -- our page 21.

8          A         Okay.  And then my page 21 shows two large 9 foil pieces of art with

birds in the -- in the family

10                    room.

11                    Q         That would be on our page 23.

12                    A         Those are mine.

13                    Q         Okay.  And then on the next page, which is

14          our 24, that's the --

15                    THE COURT:  Going back to the last

25

March 29, 2022                                        Tammy Davis-D 189

1

2

16                    one, which one did you say was yours?  The pictures? 17

                              THE WITNESS:  Yes.  The antique foil -- 18

                              THE COURT:  -- above the sofa.

19              THE WITNESS:  -- of the birds.  Um-hum.

20              Yeah.  The -- the little Asian desk and stuff, that is

21              not -- that was not mine.

22              BY MR. SHIPLEY:

23              Q      Okay.

24              A      And the clothes aren't mine.  If you go to my

page 27, there's a large mirror.  It's a designer from

the 70s.  I've -- I've lost the name in my head currently, but that mirror on the teal wall.

3              Q      On our page 29?

4              A      Um-hum.

5              Q      With, like, the bronze-looking pieces --

6              A      Yes.

7              Q      -- that are surrounding it?

8              A      Yes.  That was an item of mine.  And then on

9              the next one, there's an oil painting in pink that

10             belongs to me.  And then we're to the garage,

11             I -- I --  none of those items, I believe --

25

1

2

12          Q       Okay.

13          A       -- are mine.  Then the -- in her garden, most 14 of the potted plants I

had lent her.

15                          MR. BERNABEI:  So what was on your 29?

16                          THE COURT:  The mirror art.

17                          THE WITNESS:  That -- that big, huge

18                          bronze mirror with all the little -- looks like coins 19 around it

almost.

20  MR. BERNABEI:  Yeah.  Yeah.  Okay. 21  THE WITNESS:  Yeah.  That came from a

22          buyout I did at the Hibiscus House in Salem.

23          BY MR. SHIPLEY:

24          Q       Okay.  Moving forward, then?

A  My page 34, it's just a large potted plant

that I purchased it in an estate sale.

MR. BERNABEI:  Your Honor, I'm going to 3 have to object because of --
4                          THE WITNESS:  Okay.

5                          MR. BERNABEI:  -- we're off on the

6  pages.

7                          THE WITNESS:  Okay.

8                          MR. BERNABEI:  We're not able to track

9  this.  I think questions from the attorney and answers

25

March 29, 2022                                    Tammy Davis-D 191

1

2

10  from the witness --

11  THE WITNESS:  Oh -- 12  THE COURT:  Okay.

13                              THE WITNESS:  Okay.

14                              MR. BERNABEI:  -- would --

15                              THE WITNESS:  We don't need to look at

16                              the --

17                              MR. SHIPLEY:  Tammy, Tammy, let me.

18                              I'll ask questions, I'm sorry --

19                              THE COURT:  Yeah.

20                              THE WITNESS:  Okay.  Sorry.

21                              MR. BERNABEI:  Yeah.

22                              THE COURT:  Ms. Davis.

23                              MR. SHIPLEY:  What's that?

24                              THE COURT:  Ms. Davis.

                                MR. SHIPLEY:  Sorry, sorry, Ms. Davis, sorry.

                                    THE COURT:  Go ahead.

3  MR. SHIPLEY:  Okay.  All right.  4  THE COURT:  You just got to make sure

5                              you guys are on the same page.

6                              THE WITNESS:  Okay.

25

March 29, 2022                                    Tammy Davis-D 192

1

2

7          MR. SHIPLEY:  Right.  So lets -- 8  THE COURT:  I'm not saying

you guys were

9          looking at the same pages (indiscernible).

10         THE WITNESS:  Right.

11         BY MR. SHIPLEY:

12         Q        So on our page 37, there's that potted plant

13         that's near the hot tub.  And you're saying that that

14         was an item.

15         A        Correct.

16         Q        -- of yours.

17         THE COURT:  Which one?  There's a clay 18 pot.

19         THE WITNESS:  It's a big –- it's square.

20         MR. SHIPLEY:  Kind of gray coloring? 21  THE WITNESS:  Um-

hum.  It's more green, 22 but that's good.

23         THE COURT:  All right.  It's this one.

24         You'll see it.  You'll see there's a brown clay pot that's right next

to the hot tub, and then there's this

one here.  In the next picture, it's all by itself.

MR. BERNABEI:  Okay, so.  Let me see.

3          THE COURT:  It's my 36.

25

March 29, 2022                                    Tammy Davis-D 193

1

2

4          MR. BERNABEI:  36?

5          THE WITNESS:  It's my --

6          THE COURT:  -- your numbers and my

7     numbers have been pretty much the same.

8          MR. BERNABEI:  Right.

9          THE WITNESS:  It's just got one.

10          MR. BERNABEI:  Okay.

11     BY MR. SHIPLEY:

12     Q          Okay.  Going forward from there, the next

13     picture, which is our 38, is a picture of the pond.  Is

14     there anything within that photo that --

15          THE COURT:  And what is yours because

16     yours are the official --

17          MR. SHIPLEY:  Yeah, I think yours is 37.

18          MR. BERNABEI:  37, probably.

19          THE COURT:  You're the official Court

20     records, so yours say 37; it'll pass this decoder right

21     here.

22          THE WITNESS:  Oh.  Mine is 36 -- 23   THE COURT:  Okay.

24               THE WITNESS:  -- page 36 on mine.

25

March 29, 2022                                        Tammy Davis-D 194

1

2

Several of the floats came from my shop that I -- that

I lent her, but from this photo, I can't tell.

                    MR. SHIPLEY:  Okay.

3               THE WITNESS:  But -- 4                    MR.

SHIPLEY:  All right.

5          BY MR. SHIPLEY:

6          Q        Moving forward, our 40 is under the umbrella

7          in the backyard.  I think that might be your 38 or 39?

8          A  I don't see anything there that's -- 9               THE COURT:  Is that the

           metal table

10                            that's on the rug?

11                            THE WITNESS:  I don't see a metal table.

12                            Sorry.

13                            THE COURT:  Under the umbrella itself. 14

                              THE WITNESS:  No.  That round table was 15 not mine.

16                            UNIDENTIFIED SPEAKER:  This one here.

17                            THE COURT:  So, no?

18                            THE WITNESS:  No.

19                            THE COURT:  (Indiscernible).

20                            BY MR. SHIPLEY:

25

March 29, 2022                                    Tammy Davis-D 195

21          Q        All right.  Go ahead and flip through the

22     rest of the pages --

23          A        Okay.

24          Q        -- and then let -- let me know --

       A        All right.

       Q                    -- if you identify any other items there.
And then we'll figure out the pages.

3      A        If you go to the -- the next section, section

4      10 --

5      Q        Well, hold on.  We're not there -- 6              THE COURT:

We're not there yet.  7              MR. SHIPLEY:  Yeah, we're not going

8                there right now.

9                THE WITNESS:  All right.  Well, I didn't

10               see anything else --

11               MR. SHIPLEY:  Okay.

12               THE WITNESS:  -- that jumped out at me. 13 BY MR. SHIPLEY:

14     Q        All right.  Now, Ms. Davis, please flip over

15     to Exhibit 10.

16     A        Um-hum.

17     Q        Hopefully, I've paginated these better.  If

25

March 29, 2022                                    Tammy Davis-D 196

1

2

18          you could please flip through those and identify if any

19          of those items were items either that -- let's just say

20          if you own them.

21          A        Okay.

22          Q        I think some of them may have been -- 23        A        Page 3 is the

mirror that we already spoke 24 of.

            Q                                    Okay.  So hold on.  Let make -- let everybody

get there.  This is the mirror with, like, the coin or something, bronze things all around

the outside?

3                         THE COURT:  It's different than the

4                         original one that was behind the teal wall.

5                         THE WITNESS:  But it's the same mirror.

6                         THE COURT:  I know it's the same mirror.

7                         THE WITNESS:  Okay.  I'm sorry. 8                          THE

                          COURT:  That's okay.  You couldn't

9                         get it confused with another.

10                        THE WITNESS:  Okay.

11                        MR. SHIPLEY:  Is that the same as the

12                        one that was in the house?

13                        THE WITNESS:  It is.

25

March 29, 2022                                      Tammy Davis-D 197

1

2

14          MR. SHIPLEY:  All right.

15          BY MR. SHIPLEY:

16          A       If you go to page 7, there are three blown

17    glass -- they're supposed to be fern leaves.

18          Q       Yes.

19          A       Those are mine.

20          Q       Those -- those green items.

21          A       Yes, um-hum.  If you go to page 10, there's a

22    large rabbit hutch that I had a handyman make as a

23    prototype with -- it's all recycled, reused, and

24    repurposed items -- that he made for me so that I could have a

      prototype to show for future clients if they

wanted to order one.

      Q                 Was that yours or did you give it to Ms.

3     White?

4     A I had it made.  It's mine.

5          Q       Okay.

6     THE COURT:  So the structure itself --

7     A Yes.  Um-hum.

8     THE COURT:  -- you had made?

25

1

2

9                      THE WITNESS:  It's just all repurposed

10            architectural salvage items that I had my handyman

11            make.

12            BY MR. SHIPLEY:

13            Q          Okay.  All right.  Moving forward.

14            A And he has sold others.  On page 11, there's

15            a white, two-tiered plant stand with a light.  That is

16            mine.

17            Q          So the one right --

18            A -- in the corner --

19            Q          -- in the back?

20            A Correct.  There's another photo of it on page

21            14.  On page 16, there are two small marble-topped 22 tables

              that have plants on them.  Those are mine, as

23 well as the birdcage on the wall, the antique birdcage. 24      Q          So, looking at 16, I see

--

              A                                         It looks like a plant stand, but it -- it's a

little small marble table with a plant on it.

              Q                          Okay.  That's the one in the --

3            A          Um-hum.

25

March 29, 2022                                    Tammy Davis-D 199

1

2

4       Q       -- corner next to the window?

5       A       Um-hum.  And then the one with the pink 6 flowers, that is mine as

well, as well as the birdcage

7                       that's on the wall.

8               Q       So not the big birdcage?

9               A       No.

10              Q       -- that has birds --

11              A       Nuh-uh.

12              Q       -- but the item that's hanging on the wall.

13              A       The antique one.

14              MR. BERNABEI:  Whoa.

15              MR. SHIPLEY:  Okay.

16              THE WITNESS:  Page 23, it's just the

17              table and lamp that we've already mentioned previously.

18              And 24 is again the rabbit hutch.  And I think that's

19              it.

20              BY MR. SHIPLEY:

21              Q       Okay.  So, Ms. Davis, what's your expectation 22 in

regards to these pieces?

23              MR. BERNABEI:  Objection, relevance.

25

March 29, 2022                                          Tammy Davis-D 200

1

2

24              THE COURT:  Overruled.  You may answer.

                        THE WITNESS:  My expectations if they're

not in my sister's home anymore, then I should sell them.

3              MR. SHIPLEY:  Okay.

4              BY MR. SHIPLEY:

5              Q        And so, within your business, like you have 6 items at

                Ms. White's home, or maybe, do you have items

7        in other people's homes?

8        A        Uh-huh, I do.

9        Q        And so when those people then --

10        A        Right.

11        Q        -- bring them back to you, then you would --

12        A        Right.

13        Q        Okay.

14        A        Ms. White always knew that -- 15        Q        You have to wait until I

ask a question.

16        A        Okay.

17        Q        Sorry.  Now, is your daughter also in the

18        antique business?

19        A        She is.

25

March 29, 2022                                                  Tammy Davis-D 201

1

2

20    Q        And what is her role in the antique business?

21    A        She was my business partner who went out on

22    her own and now owns an estate sale company of her own.

23    Q        Okay.  Do you know if your daughter had lent

24    any antique pieces to Ms. White? A        I don't know for sure.

      Q            Okay.  All right.

      A                     I don't know if it -- yeah, I don't -- I

3     don't know.

4     Q        All right.  Over the years, you've had pieces

5     in Ms. White's possession.  Does she return those to

6     you, or does she sell them for herself, or does she 7 always return them to you?

8     A        She never sold them for herself.  They were

9     always swapped out for different items.

10    Q        Okay.

11                     MR. SHIPLEY:  Your Honor, no more

12    questions.

13                     THE COURT:  Mr. Bernabei.

14                     CROSS-EXAMINATION

15    BY MR. BERNABEI:

16    Q        Good morning, Ms. Davis.  So do you have 17 these items that we talked

      about that you identified;

25

March 29, 2022                                    Tammy Davis-D 202

1

2

18          do you have them?

19          A       I have some.

20          Q       Well let's go through the ones you have.

21          A       You want me to start back at the beginning?

22          Q       Yes.

23          A       Okay.  Well, I don't --

24          Q       Would it be easier for you to tell us what you don't have?

25

1

2

THE COURT:  I don't want you to go back to the beginning.

3            THE WITNESS:  Well, some --

4            THE COURT:  What do you have of all the

5    pictures you just showed and talked about?  What is it

6    that you believe you currently have?

7            THE WITNESS: The rabbit hutch. 8   THE COURT:  So you got the

rabbit hutch 9 back.

10           THE WITNESS:  Some of the items that she

11   has returned to me, I don't know if I should be

12   speaking about?  I was (indiscernible) --

13           THE COURT:  No, I just asked you a

14   question.

15           THE WITNESS:  Oh.

16           THE COURT:  So what other items -- 17                      THE

WITNESS:  Some of the items that she 18 returned to me have

already been sold.

19           THE COURT:  -- and I just want to know

20   what is it that she's returned to you? 21  THE WITNESS:

Small pieces of art -- 22  THE COURT:  Which ones?

25

March 29, 2022                                      Tammy Davis-X 204

1

2

23                    THE WITNESS:  -- small tables.

24                    THE COURT:  Which art?

You had the Audubon one and --

                      THE WITNESS:  The Audubon has been

returned.

3                     THE COURT:  Okay.  The Audubon has been THE WITNESS:  The

4    returned.

5                     rabbit hutch has been

6    returned.

7                     THE COURT:  Yeah.  I got that.  You had

8    the --

9                     THE WITNESS:  There were items --

10                    THE COURT:  You had the mirror-framed

11   artwork.

12                    THE WITNESS:  It has not been returned.

13                    THE COURT:  Okay.  You had the pictures.

14 I think they were another picture of the bigger one's 15 art.

16                    THE WITNESS:  Have not been returned.

17                    THE COURT:  Okay.  So you have -- the

18                    only art that you can think of that's been returned --

25

March 29, 2022                                      Tammy Davis-X 205

1

2

19                          THE WITNESS:  -- is the Audubon one --  20

THE COURT: -- the Audubon one that was

21                  the smaller one above the couch.

22                  THE WITNESS:  Correct.

23                  THE COURT:  The --

24                  THE WITNESS:  And I have the rabbit

hutch.

THE COURT:  Correct.  I know that.

You've said that.

3    THE WITNESS:  I'm sorry.

4    THE COURT:  You've made that clear.  You

5    had the mirror that was next to the front door.

6    THE WITNESS:  Has not been returned.

7    THE COURT:  Yeah.  Oh, there was the

8    bird prints in the bathroom.

9    THE WITNESS:  Not returned. 10  THE COURT:  And the baskets that were in

11                  there.

12                  THE WITNESS:  Not returned.

13                  THE COURT:  You had the coined mirror. 14  THE WITNESS:  Not

returned. 15  THE COURT:  You had the mirrored frame

25

March 29, 2022                                    Tammy Davis-X 206

1

2

16    that had artwork.

17    THE WITNESS:  Not returned. 18  THE COURT:  The lamp with the

19                              hummingbird on it?

20                              THE WITNESS:  Not returned.

21                              THE COURT:  The marble table?

22                              THE WITNESS:  Not returned. 23  THE COURT:  The vases that

                              were in the

24 window?

                              THE WITNESS:  Not returned.

                                   THE COURT:  We talked about the little

    pictures above the couch.  Well, there was an oil 3 painting that you referred to.  It was,

I think, on the 4 opposite wall of where the coin one was.

5  THE WITNESS:  I think it's been returned 6 and sold.

7                              THE COURT:  Okay.  You had the three 8 glass stems in the garden.

9                              THE WITNESS:  No.  Not returned.

10                              THE COURT:  You had the end tables? 11  THE WITNESS:  Not

                              returned. 12  THE COURT:  And you had the antique

13    birdcage?

14    THE WITNESS:  Not returned. 15  THE COURT:  And there was the small

16                              marble tables that were in that same room.

17                              THE WITNESS:  Returned.

25

March 29, 2022                                    Tammy Davis-X 207

1

2

18          THE COURT: Okay. What about the other

19          marble table in which the --

20          THE WITNESS: Not returned.

21          THE COURT: -- the hummingbird was on.

22          THE WITNESS: Nuh-uh.                    THE

23          COURT: And what about the ones that you couldn't get a

24          good picture of that were behind --

                    THE WITNESS: Not returned.

                              THE COURT: -- the couch. Okay. Does

          that help, Mr. Bernabei? I think that was all the

3    items that she had indicated that were hers.

4    MR. BERNABEI: All right.

5    BY MR. BERNABEI:

6    Q        So did you give these items to Ms. White all

7    at once?

8    A        No.

9    Q Did you give any items to Ms. White for 10 gifts?

11          A        They were all gifts until she didn't want

12          them anymore, and then they were returned to me.

13          Q        And she (indiscernible)--

25

March 29, 2022                                      Tammy Davis-X 208

1

2

14      A       I never -- I never took money from her. 15      Q       All right.  And

she didn't want them anymore

16      once the divorce was filed, right?

17      A       No.  Throughout -- throughout the

18      relationship that I've had with my sister since she's

19      been in Oregon, I have always decorated her home and

20      traded out those items periodically.  So some of

21      the -- none of those items were given all at once.  Mr.

22      White knows that I would show up with a carload --

23      Q       Okay.

24      A       -- he would disappear, and I would redecorate their house.

        Q        Are you done?

        A        Okay.

3       Q       So the items that you've discussed that

4       you've identified in your testimony, did Ms. White tell 5 that she didn't

want them anymore after the divorce

6       was filed?

7       A       No.

8       Q       So when did she tell you I don't want this 9 anymore?

10   A      For which item?  Because not all of them are 11 in -- even in my possession?

25

March 29, 2022                                    Tammy Davis-X 209

1

2

12              THE COURT:  Any of them.  Let's start 13 there.

14                      THE WITNESS:  Well, like, the hutch.

15                      She couldn't take the rabbit hutch with her.  So I took

16                      it back.

17                      THE COURT:  You got that one back.

18                      THE WITNESS:  Right.

19                      THE COURT:  But of the items that you

20                      don't have, of any of those items, did she ever tell

21                      you that she didn't want them anymore?

22                      THE WITNESS:  No.

23                      BY MR. BERNABEI:

24                      Q        Well, where are these items?

          A        I don't know.

          Q              Did Ms. White tell you where they are?

          A                      No.  I don't know if they're still in her

3    home, her residence that is not hers anymore, or if

4    they're up at her daughter's house.  I don't know.  I 5 don't know if they're in the garage.

     I was told Mr.

6     White was putting a bunch of stuff outside months ago

25

1

2

7    to come and get, but I don't know if it's still there. 8    Q    All right.  So of the items you have that 9 you -- that you took back, those were taken back after 10 the divorce was filed.  Am I tracking that right?

11         A    I -- I assumed the divorce had been filed.

12              Her life was in chaos, and I came and removed some of

13              my items and took them back.  I don't know if the 14 paperwork had been filed

                 yet or not.  I -- I don't 15 know.

16 Q Well, what was Ms. White telling you at the 17 time?

18         A    My sister was in a puddle.  She wasn't

19              telling me much of anything.

20         Q    Well, what was the chaos about?

21         A    About Mr. White's affair.

22         Q    So the -- the divorce had started?

23         A    Correct.

24         Q    Okay.

           A                    Well, I don't even know if that's correct.

                THE COURT:  Hold on.  Wait until there's a question.  Yeah, just wait for

           a question.

3    BY MR. BERNABEI:

4    Q    So of the items you do not have, were any of

25

1

2

5   those given by you as a gift to Ms. White?

6   A       No.

7   Q       Have you been to Ms. White's home in

8   Washington?

9   A       I have not.  I mean -- 10      Q       Where does she live?

11                          A       She lives with my niece.

12                          MR. BERNABEI:  Hold on.  Your Honor, Mr.

13                          Shipley is signaling to the witness.
14                          THE COURT:  I didn't see anything.

15                          MR. BERNABEI:  Well, I would just

16  encourage --

17                          THE WITNESS:  She -- she lives with my

18  niece.

19                          MR. SHIPLEY:  Your Honor, I did --

20                          THE WITNESS:  And -- and I have been to

21 my niece's home.
22                          MR. SHIPLEY:  If I can interrupt --

23                          THE COURT:  Hold on.  Hold on.  Hold on.

24  Ms. Davis?

                             THE WITNESS:  But it's not since my
                        sister has lived there.

                                     THE COURT:  Ms. Davis, hold on.

25

March 29, 2022                                    Tammy Davis-X 212

1

2

3                          MR. SHIPLEY:  I was -- I did -- my

4               purpose, and for instance, like, he -- she needed to 5 wait for
                him to answer to ask his questions.
6               THE COURT:  Don't.  Don't.

7                          MR. SHIPLEY:  So I will not do that

8        anymore.

9                          THE COURT:  Don't send signals to the

10       witnesses.

11                         MR. SHIPLEY:  I will not do that.

12                         THE COURT:  All right.  Go ahead, Mr.

13       Bernabei.

14                         MR. BERNABEI:  Thank you.

15                         THE WITNESS:  Do you want me to repeat

16       the answer?

17                         THE COURT:  No.  You're going to wait

18              for Mr. Bernabei's next question, and then we'll go

19              from there.

20              BY MR. BERNABEI:

21              Q       Did Ms. White give you any furniture or

22              furnishings throughout the -- the marriage?

23              A       No.

25

March 29, 2022                                          Tammy Davis-X 213

1

2

24          Q       Did Ms. White work with you on your estate sales?

            A       I don't host estate sales.  I don't work estate sales.

3    Q   Oh, I'm sorry, antique –- your antique 4 dealing.

5           A       Did she work in the shop?  She did work at

6    the shop a few days.

7           Q       When?  Before or after the divorce?

8           A       Before.

9           Q       How long before?

10          A       I was open eight years prior.  She probably

11   worked a handful of days for me every year, so I could

12   go on vacation.  It wasn't a routine thing.  She 13 didn't -- she didn't work for

me often.  And I always 14 paid her cash for working.  She didn't work for

things.

15      Q  So where is your store?

16          A       Currently, it's in Salem.  My antique mall

17   burnt to the ground in October of last year.

18          Q       I'm sorry to hear that.

19          A       Me too.  I have a new, like, location that's 20 opening in south Salem.

21          Q       All right.  So Ms. White has not worked at

25

1

2

22    the south Salem location.  But she did work at the

23    prior location that burnt down?

24    A        Correct.

Q        Where was that?

A          Mount Angel, Oregon.

Q                    All right.  And you paid her cash.  How much

3     did you pay her?  Was it an hourly rate or a daily

4     or --

5     A        She got $75 a day for working for me.

6     Q And -- and how many hours was that? 7 A It depends on what day she

worked, usually, 8 about six.

9     Q        Did Ms. White store any of her furniture or

10    furnishings of these items such as what you testified

11    about at your shop?

12    A        No.

13    Q        And so you don't know where these other items

14    are that --

15    A        I don't.

16    Q        -- you left with Ms. White?

25

March 29, 2022                                      Tammy Davis-X 215

1

2

17          A          I have not been back to the home where Mr. 18 White resides, and I

have not been up to Washington to 19 where my sister lives, since all this

happened. 20     Q          Well, certainly you talked to your sister 21 about where

these items are, haven't you?

22          A          My building burnt down in October.  I've been

23          a little busy.  I haven't asked her about the stuff.  I 24 have not.

          Q                          Have you talked to your sister about where

these items are?

          A          No.

3                                        MR. BERNABEI:  Thank you.  Nothing

4          further.

5                          THE COURT:  Rebuttal. REDIRECT EXAMINATION

6

7     BY MR. SHIPLEY:

8     Q          Ms. Davis, just to clarify, is it -- is it

9     your expectation that when your sister no longer wants 10 those items that you will --

you expect to receive them

11          back?

12          A          Absolutely.  Yes.

13          Q          And I think you said that you, like, take

14          pictures for Instagram or something like that, so if a

25

March 29, 2022                                    Tammy Davis-X 216

1

2

15    customer were to see one of those items and want to buy

16    it, is that some situation --

17    A        It's an option.

18    Q        -- that you think you would go ahead with.

19    A        Yes.

20    Q  These items that we've identified through the

21    photographs, is it your expectation that they're in the

22    possession of Ms. White or at the home?

23    A        I have no idea.

24    Q        Okay.  Do you -- well, do you trust your

sister that they're not --

25

March 29, 2022                                                                          217

1

2

Tammy Davis-ReD

A        Yes.

MR. SHIPLEY:  All right.  No more 3 questions, Your Honor.

4                        THE COURT:  I've got a question.  So

5                        these items here, I assume if they're items in which

6                        you were trying to sell as part of your business, you

7                        had pictures of them, and you put it on, like, a

8                        website or do anything with these things?  Or did you

9                        just give them to your sister with the idea of --

10                       THE WITNESS:  Her --

11                       THE COURT:  -- whatever she's done with

12                       them, so it was a gift, so basically, it becomes part 13 of the

household?

14                       THE WITNESS:  I used her house as a

15                       staging area.

16                       THE COURT:  Okay.  If you're using it as

17                       a staging area -- if I may get back to -- if you're

18                       using it as a staging area, typically the staging areas 19 because

you're going to take pictures of it and you're

20                       going to need it to use it online, on Etsy or something

25

March 29, 2022                                                                                        218

21            of that nature, or in your shop, you would have

22            pictures of them --

23            THE WITNESS:  Correct.

24            THE COURT:  -- and people could come in

and/or ask something --

                                                                            Tammy Davis

              THE WITNESS:  Correct.

                    THE COURT:  -- and you could say I've

3             got these things, right?

4             THE WITNESS:  Um-hum.

5             THE COURT:  Are these items the ones

6             that you don't have back?  Do you have, like, an Etsy

7             that there's some other verification of these items 8 that --

              versus being gifts that you gave to your sister

9             at the end of the marriage?

10            THE WITNESS:  Um-hum.

11            THE COURT:  No.  Okay.  Any questions

12            based on those -- the questions that I asked, Mr.

13            Bernabei?

14            MR. BERNABEI:  No, Your Honor.

25

March 29, 2022                                          219

1

2

15          THE COURT:  Mr. Shipley?

16          MR. SHIPLEY:  No, Your Honor.

17          THE COURT:  Okay.  Thank you.  You may

18          step down.  You can just leave -– yeah, just hand that

19          book up to me real quick and I'll give it back to my 20 staff

            person.  Thank you.

21     THE WITNESS: Do I need to leave the 22 court, or can I stay?

23          THE COURT:  Do either of you intend to

24          call Ms. Davis as a witness going forward?

                 MR. SHIPLEY:  No, Your Honor.

                                              Tammy Davis

                 THE COURT:  Okay.  As long as

       you're -- nobody intends to call her forward, you may 3 remain in the court here, just

   dismissed from this 4 seat.

5          Call your next witness.  We have Mr.

6          White, back?

7          MR. SHIPLEY:  I call Brian White.

8          THE COURT: All right.  Mr. White, if

9          you'll turn on again your video and audio for us,

10          please?  You're in the same room?

25

March 29, 2022                                                          220

1

2

11          MR. WHITE:  Your Honor, (indiscernible)

12     Hopefully, this is better.

13          THE COURT:  You're still jumbled.

14          MR. WHITE:  I'm –- I'm sorry, Your

15     Honor.  This is the only room I could get at this 16 resort.

17          THE COURT:  All right.  We'll give it a

18     try.  But if it keeps to being where we can't

19     understand then --

20          MR. SHIPLEY:  Okay.

21          THE COURT:  Again, I put in on the

22     attorney to make sure that people have the right

23     software so they can handle it.

24          THE COURT:  Mr. White, if you'll raise

your right hand to be sworn.

25

March 29, 2022                                             Brian White-D 221

1

2

BRIAN WHITE

called as a witness for the Petitioner, having been duly

3      sworn, testified as follows:

4      THE COURT:  All right.  Tell us your

5      full name and spell your last name for us, please?

6      THE WITNESS:  My name is Brian White.

7      And my last name is spelled W-H-I-T-E.

8      THE COURT:  You may inquire.

9      DIRECT EXAMINATION

10     BY MR. SHIPLEY:

11     Q        Mr. White, are you aware if your father

12     traveled to Ghana, Africa, in January of 2021?

13     A        Yes.

14     Q        And do you know what his stated reason was 15

for going?

16     A        Yes.  He had, in the middle of January, 17 stated that he suddenly needed to

leave to Ghana on a 18 mission trip.

19     Q        Did you learn at some point that that was not

20     true?

21     A        Yes, I did.

25

1

2

22          Q          Okay.  How did you learn that something was 23 wrong?

24          A          My sister was contacted via Facebook by a friend that neither of us ever had

before.  And this friend was aware that he had gone on a trip and told us that there was --

and he was concerned that my father

3          might be in danger.  So my -- he contacted my sister

4          originally, and then he and I spoke.  And that's why I

5          learned that he hadn't actually gone for a mission

6          trip.  He had gone because of a previous -- 7  MR. BERNABEI:  Objection, hearsay. 8   THE

WITNESS:  -- online relationship

9                              that he had started up.

10                              MR. BERNABEI:  Move to strike.

11                              MR. SHIPLEY:  Your Honor, the testimony

12                              goes to the state of mind, not to the truth of the

13                              matter.  Because of what it did and what Mr. White will

14                              testify to is that it created alarm in his mind, and

15                              then he then took certain courses of action that

16                              ultimately led to saving Mr. White's life.

17                              THE COURT:  How is any of this relevant?

18                              MR. SHIPLEY:  Your Honor, it's relevant

19                              because the -- the respondent has filed a contempt

25

1

2

20          motion.  So a lot of these facts go to my client's

21          state of mind in terms of why she did certain things or

22          why she took certain actions, like why'd she remove

23          some firearms from the home and such.  If -- since

24          there is a contempt motion against my client, it's relevant to that

fact is that her state of mind and

what action she took.

          THE COURT:  Why can't she testify that 3 she did all those things, and

then I don't have to

4          worry about the hearsay?

5          MR. SHIPLEY:  Well, we can move past the

6          hearsay and talk about what actions he took because he

7          did certain things and was involved in certain 8 activities and

communications with Mr. White.  We could

9          get past the hearsay in that regard.

10         THE COURT:  Court will accept the

11         testimony now, not for the truth of the matter 12 asserted, but

only for its effect on the listener and 13 what the listener did

afterwards.

14         MR. BERNABEI:  Thank you, Your Honor.

25

1

2

15          BY MR. SHIPLEY:

16          Q        Mr. White, after you learned this

17          information, what did you do next?

18          A        This was on January 26th.  I learned this

19          around 8:00 p.m.  So I started driving over to my

20          parents' residence.  I didn't want to tell my mom this

21          information over the phone.  So I waited until I was in

22          the neighborhood, and then I called her and said I had

23          something important I needed to share with her.

24          Q        Then what did you do after that?

A                                    At that time -- because we were told that he

was going to Ghana for evangelism for a mission trip, and the information that I had

received on what he was

3          actually doing there -- it was alarming, concerning.

4          It didn't line up.  The first thing I did was I

5          contacted the Washington County Sheriff.  And a sheriff

6          came out to the house, and we started filing a missing

7          person's report.

8          Q        Did you contact any other authorities?

9          A        I did.  Over the course of the next couple of

25

1

2

10         days, I spoke to the Washington County Sheriff a few

11         times.  I called the FBI.  I called the consulate

12         trying to help my father get access to the Embassy in

13         Ghana.  I called the VA Hospital.  I -- I spent the

14         next three days with almost zero sleep trying to 15 coordinate different time

           zones and trying to get him 16 safely back home.

17    Q         Did you take any actions in reference to the 18 parties bank accounts?

19         A         I did.  So he had left his laptop logged in

20         to an Ally Bank account in his office.  So I pulled up

21         his laptop, and when I pulled up this Ally Bank

22         account, I could see several transactions for varying 23 amounts to the total of

           thousands of dollars that were

24 withdrawn from an ATM in Ghana.

           Q         The ATM --

           A              This was -- it --

           Q            -- in Ghana?

3          A         Right, this is over -- the ATM was in Ghana,

4          and this was over the course of -- of a few months.

5          Q         Okay.  And did you happen to have any 6 communication with your

           father after that, after you 7 got access to the accounts?

25

March 29, 2022                                      Brian White-D 226

1

2

8      A      I did.  So when I got access, I called Ally 9 Bank to freeze his account, worried that someone would 10 be trying to funnel more money out of their account.

11     Once they froze the account, that is when my father

12     texted me because I -- I was able to get them to change

13     it to my email address.  That must've alerted his phone

14     that the account had changed.  So he had contacted me 15 wondering if I had -- had stolen his account. 16     Q      So what was your conversation with your 17 father after that point?

18          A      I talked to him.  At the time, he told me

19          that he was in an apartment in Ghana.  I asked if there 20 was anyone with him there.  He said that there was

21     another man in the room and that he needed to step into

22     a separate room to talk to me.  And at that time, I did

23     my best to convince him that whoever he was with, I did

24     not think that they were the person that they said they were.  And I asked him just leave

       that (indiscernible)

       and try to get a taxi to the (indiscernible).

                    MR. BERNABEI:  I'm sorry, Your Honor.  3 He's kind of cutting out there.

I didn't hear that end 4 part.

5     THE COURT:  He said apartment is what he 6 basically said.

25

1

2

7                    MR. BERNABEI:  Okay.  Yeah.

8                    THE COURT:  You may ask your next

9        question.

10       BY MR. SHIPLEY:

11       Q        Mr. White, you cut out a little bit from the

12       apartment.  Where did you want him to go?

13       A        I asked him to get a taxi to the U.S.

14       Embassy, hoping that he could get help from the U.S.

15       Embassy.

16       Q        And then what happened after that point?

17       A        He (indiscernible) couldn't find his

18       passport, so he was not allowed into the Embassy.  At

19       that point, it was getting later in the day so I booked

20       a hotel room for him at a Marriott Hotel.  And then 21 tried to start figuring out

         what I could do to get him 22 back into the country.

23                    I -- he had not had a meal.  I ordered room

24                    service for him.  I contacted Delta Air Lines to attempt to move his flight a

                       week earlier and convinced

         them to do that without any change fees.  I paid for a COVID test so that he could take a

         test and attempt to

25

March 29, 2022                                              Brian White-D 228

1

2

3    get back into the country.

4    Q        And ultimately, was your father –- your 5 father able to return?

6                  A        He -- he was.  He hopped a flight.

7                  Initially, the first COVID test had come back positive.

8                  And he was able to have them swab, eventually, his

9                  other nostril and that one came back negative, which

10                 allowed him to board the plane and fly back to the U.S.

11                 When he landed, his first stop was at JFK.

12                 He went through customs there.  And a customs official

13                 confiscated a handgun that was in his baggage.  At that

14                 time, I had to contact Delta again.  They had held him

15                 too long to make his next connection.  So I contacted

16                 Delta again and got them to move his flight once more

17                 so that he could make it the rest of the way back to 18 Portland.

19          Q        After your father was back in the Portland

20    area, did you act as something as an intermediary 21 between your parents?

22    A        I did briefly.  When he first came back, he

23    went to the VA Hospital for, I believe, maybe a day or

25

March 29, 2022                                    Brian White-D 229

1

2

24          two.  My mom did not want him back -- back in that house.  She was shaken by

            what had gone on.  So I arranged (indiscernible) truck (indiscernible) so that he

            could stay there temporarily.

3           Q       Could you --

4           MR. BERNABEI:  I'm sorry.  I, yeah, I 5 didn't hear that.

6                        MR. SHIPLEY:  I'm going to ask him

7                        after --

8                        THE COURT:  -- VA.

9                        BY MR. SHIPLEY:

10                       Q       After the VA Hospital, did you say you

11                       dropped something for him to have a place to stay?

12                       A       Yes.  I drove the truck and camper to him so 13 that he

                         could stay in the truck and camper while things 14 started to get

                         sorted out.

15          Q       Did you tell your mother that your father had

16          attempted to bring a gun or was traveling with a

17          handgun over to Africa, and that he was --

18          A  I did.

19          Q  -- when he came back?

20          A       Yes, I did.

25

March 29, 2022                                    Brian White-D 230

1

2

21          Q        Okay.  I'm going to switch gears a little, 22 Mr. White, and go into some

other questions -- another

23              line.

24              Did you help your mother prepare the

home -- the family home for sale?

            A                I did what I could.  I worked and

(indiscernible) I did.  I did help out some.

3          Q        Okay.  Did you move some firewood?

4          A        Yes.

5          Q        And where was that wood located? 6    A        It was at the back corner

of their backyard, 7 behind the hot tub.

8    Q      Was it just on the dirt, or where was it -- 9 where was in on?

10    A      It was on a -- like a little wooden platform. 11    Q        And how big was that

platform?

12          A        I didn't measure it, but if I looked at -- we

13          lifted it up to do some cleaning.  (Indiscernible)

14          there were 8-foot posts one direction, and it wasn't

15          quite square.  So I would say probably 8 feet by 10 16 feet, possibly 12 at the

most.

17          Q        Okay.  And the firewood that -- so you moved

25

1

2

18          the firewood, correct?

19          A          I did, yes.

20          Q          What was the condition of that firewood when 21 you moved it?

22          A          We were moving it because we were preparing

23          the home to sell.  It was covered in tarps.  There were

24          rat feces all over it.  I guess one of their neighbors has some chickens, so I'm

            guessing they were drawn to

the feed and used that to nest in.

            Q                    Did you see any rats?

3    A          Yes, we did.  There were a couple of dead 4 ones underneath and then a couple

that scurried away as

5    we lifted the -- the platform up.

6    Q          Okay.  And did you end up taking that

7    firewood with you?

8    A          I did.

9    Q Okay.  How experienced are you in dealing 10 with firewood?

11          A          I have been using firewood my entire life.

12          Growing up with my parents, we often primarily heated

13          the home with firewood.  I live east of Portland and 14 Corbett.  I solely heat my

            home with firewood.  I would 15 say very, very experienced.

25

1

2

16 Q And do you know what the size of a cord of 17 wood is?

18 A Yes.  It's 4 feet by 4 feet by 8 feet if it's 19 tightly stacked.

20 Q Okay.  And what did you transport the wood 21 in?

22    A        I used my truck.  It's an older Chevy 2500 23 with a standard 8-foot bed.

24    Q        Please, if you could turn to your -- I -- you have -- you should have Exhibit 7 with you.  Do you --

         A        I do.

         Q                     -- have that?  Do you have that?

3        A        Yeah.

4        Q        Okay.  Could you please tell the Court what 5 Exhibit 7 is, the first photo there?

6    A        The first (indiscernible) is just a picture 7 of the bed of (indiscernible).

8    Q        And when you moved that firewood, did it fill 9 up the bed of that truck?

10        A        It did, so (indiscernible), but I did take

11        (indiscernible) my home, truck back, and it was only

12        about half full.  And taking it across Portland through

13        town.  I didn't even stack it above the -- the

14        sidewall.

15        Q        So your testimony is it took one and a half

16        loads in the back of your truck; is that what you 17 testified to?

25

1

2

18    A      That -- that's correct.  So if -- if the

19    truck were stacked to the -- the wall of the bed there,

20    that truck would hold a half of a cord of wood.  So in 21 total, it's probably about

three-quarters of a cord of 22 wood, maybe a little bit less.

23    Q      Okay.  All right.  This -- the -- in Exhibit

24    7, there's three more photos of a structure.  Could you just tell the Court what

that is?

      A      Yeah.  This is a large woodshed that I built at home.

3  Q    All right.  And how many cords of wood does 4 that woodshed hold?

5     A      I don't stack them (indiscernible) because I

6    want some airflow.  But I would say I usually put maybe 7 five or five and a half

cords of wood into that shed.

8                          Q      Okay.  Mr. White, did your father ever make

9                          any threats to you?

10                         A      He did, yes.

11                         Q      Okay.  Please turn your -- turn to Exhibit 8.

12                         Or actually, before I move on, Your Honor, I'd offer up

13                         Exhibit 7 into evidence.

14                         (Petitioner's Exhibit 7 offered into

15                         evidence)

25

March 29, 2022                                          Brian White-D 234

1

2

16          THE COURT:  Any objection to 7?

17          MR. BERNABEI:  No objection.

18          THE COURT:  7's received.

19          (Petitioner's Exhibit 7 received into

20          evidence.)

21          BY MR. SHIPLEY:

22          Q       All right.  Sorry, Mr. White, Brian White.

23          Please turn to Exhibit 8 if you could.

24          A       Okay.

        Q               Now, you testified earlier that you had

helped your father escape from Ghana, and you had, like, hired or you had paid for a

hotel.  Would -- did 3 Mr. White, or did your father ever pay you back for any

4   of that?

5   A       No, sir.

6   Q       Okay.  On the second page of Exhibit 8, your

7   father sent you a message there, and is that -- or who

8   sent that message to you?  Let me ask you that.

9   A       My father sent me that text message. 10       Q       Okay.  So these text messages are messages

between you and your father?

25

March 29, 2022                                    Brian White-D 235

1

2

12     A     That's correct.

13     Q     Okay.  So there's a -- there is one here

14     where it says, "You will lose your Netflix job next

15     week if I email these people how you lied and took the

16     guns, which is a felony."  So is that -- your father 17 sent that to you?

18     A     He -- he did.  And he included the picture

19     above it, which is a picture of his laptop where he

20     typed out executives and -- and publicly available 21 emails of, like, the Board of

       Directors of Netflix, who 22 is my employer.

23     Q     And on the next page, there is a message that

24     says, "Sent to Netflix this morning.  Good luck finding another job."  Was that

       from your father to you?

       A          It -– it was, yes.

       Q                Why -- do you know why these were sent you?

3      A     At the time, he was insisting that I force my

4      mom to sell -- sell him the house and that I

5      (indiscernible) do that at a lower value of the home.

6      That, in addition to demanding that firearms were 7 returned to him.

8 Q Okay.  Did you remove the firearms from the 9 home, or did your mother remove the

firearms from the 10 home?

25

March 29, 2022                                          Brian White-D 236

1

2

11    A        My mom removed the firearms from the home.

12    Q        And did you assist her in that?

13    A        I -– I did, yes.

14    Q        So if -- if we go to the first page of that

15    Exhibit, of Exhibit 8, on the third bubble -- bubble

16    down, it says, "Please tell Mom she needs to provide

17    data to prove the counteroffer."  Is that -- what is

18    that?  What is your father -- is she -- is your father

19    relying on you to communicate to your mother about his 20 offers or what?

21                    MR. BERNABEI:  I'm going to object.  It

22                    calls for --

23                    THE WITNESS:  That's –– that's --

24                    MR. SHIPLEY:  Hold on a second, Mr.

White.

                        THE COURT:  Sustained.

                        MR. SHIPLEY:  Okay.

3    BY MR. SHIPLEY:

4    Q Was your father communicating to you about 5 the offers that he was making to your

mother? 6 A Yes.  Even though I -- I had asked him not to 7 several times.

8                    Q        What did your father ask you to communicate

9                    to your mother?
25

March 29, 2022                                    Brian White-D 237

1

2

10          A          He -- he would attempt to have me

11          communicate, I guess -- I don't know -- bypassing the 12 attorneys or something. He was asking to

13  (indiscernible) reference to these text messages.  He

14  was wanting other information about the value of the 15 home.

16          Q          Okay.  Did your father ever leave you

17          voicemails or call you?

18          A          He did, yes.

19          Q          And what -- what was the nature of those 20 calls and voicemails?

21          A          Again, I had told him several times not to

22          contact me.  But I would periodically get text messages

23          or voicemails.  The voicemails, again, I mentioned at

24          one point he wanted me to force Mom to sell him the house at a cheaper price.  I was told that if I did not

do this that he would sue the shit out of me.  Sorry for the language.  I was told that I would be sued for 3 everything I've ever made and everything I'm ever going

4          to make.  Those were his words.

5          Q          Okay.

6          MR. SHIPLEY:  Your Honor, I'm not going

7          to bother -- technically, I think trying to get their

25

1

2

8          voicemail -- I'm not going to try to -- it would be a 9 nightmare.

So we'll -- I'll rest at that.  Same with

10          this.

11          THE COURT:  Mr. Bernabei.

12          MR. BERNABEI:  Thank you, Your Honor.

13          CROSS-EXAMINATION

14          BY MR. BERNABEI:

15          Q          Good morning, Mr. White.  My name is Vince

16          Bernabei.  I have a few questions for you.  I represent

17          your father.  You filed a restraining order against

18          your father, right?

19          A          I did, yes.

20          Q          And that was in Multnomah County, correct?

21          A          Correct.

22          Q          And that was in August of 2021, correct?

23          A          I -- I believe so -- I, yeah.

24          Q          All right.  And your request for a

restraining order was denied; is that correct?

25

1

2

A          That's correct.

Q                    Let's go to -- do you have your restraining

order?  Do you have the exhibits in front of you?

A        I'm sorry, I -- I don't.

Q        That's all right.  We can -- we can walk

through it.  In your petition for the restraining 7 order, you indicate "My father

is not mentally stable."

Do you recall writing that?

A        I do, yes.

Q        And that was under oath, right?

A        I -- yes.  I guess I'm not 100 percent sure.

Q        Well, you submitted this in court, right?

A        Yes.

Q        And -- and so would it be fair to say that

that's truly how you felt?

A        Yes.

Q        And you still feel that way, correct?

A        Yes.

Q        And that's because of the Ghana trip that you 20 just spoke about,

correct?

1

2

21     A     Correct.  If -- if -- if I could, as well

22     (indiscernible) to sue his son, trying to get me fired

23     from my job, the things I just testified to.  I, yeah, 24 it was a painful time.

          Q     Which is extraordinarily different from your father's behavior and your

relationship prior to 2021, right?

3     A     Yeah.  He had never threatened to sue me in 4 the past if that's what you mean.

5     Q     Well, at least up until 2021, you two had a 6 cordial relationship, right?

7     A     We had a good enough relationship.  I would

8     say we -- we didn't spend a whole lot of time together,

9     but, yeah, I invited him up to my cabin, for example.

10     Q     And you have children, right?

11     A     I do, yes.

12     Q     And Mr. and Ms. White, your -- your parents,

13     would socialize with you, your family, your children,

14     correct?

15     A     Correct.

16     Q     But you noticed a big difference in Dave 17 White's demeanor and his

       behavior in -- starting in

18     early January of 2021; is that right?

25

1

2

19    A        (Indiscernible) I would actually say 20 I've -- I've seen a change in him maybe

over the past 21 four to five years.

22    Q        Oh, so this is a gradual change.  It's not 23 just an abrupt change; is that right?

24        A                    It definitely became significantly more

aggressive recently.

        Q        And did you feel that Mr. White was obsessed with the climate change

work that he was doing?

3        A        Yes.

4        Q Did that cause you concern for his mental 5 health?

6        A        Yeah.  I would say seeing someone obsess over

7        one individual, (indiscernible) thing.  Yeah, I was 8 (indiscernible).

9    Q        And r.. White was threatening to have you 10 arrested?  He was threatening

to tell your employer, 11 trying to get you fired.  Correct?

12        A        Correct.  He didn't just threaten.  He sent

13        (indiscernible).  I had to contact my boss, my head of

14        HR, to give them a heads up that they might see this 15 email come through.

16                Q        And -- and that is out of character, at least

17                for the few years preceding, when he actually did that,

18                right?

19                MR. SHIPLEY:  Objection, calls for

25

1

2

20          speculation --

21          THE WITNESS: Yes and no. 22   MR. SHIPLEY: -- like mental

            health 23 manipulation.

24                    THE COURT:  (Indiscernible) It's just

out of character, is it not?

                         MR. SHIPLEY:  Okay.

                    THE COURT: Not calling for any -- you 3 may answer the question, Mr.

White.

4          THE WITNESS:  Okay.  I would say out of

5          character to -- to be that aggressive.  The thing that

6          wasn't out of character was if there was something that

7          he wanted, he always needed to get his way.  He was not

8          the person that would really ever -- ever compromise or

9          ever -- look for, I guess, any kind of common ground.

10          BY MR. BERNABEI:

11          Q          Mr. White, you talked a little bit about your

12          job.  What do you do at Netflix?

13          A I am a director of relations for the DVD

14          division of Netflix.

15          Q          I -- I missed that, requisitions?

25

March 29, 2022                                        Brian White-X 243

1

2

16          A I'm sorry.  Director of content operations.

17          Q       Are you involved in hiring at Netflix?

18          A I -- I have been.  Not recently, but

19          (indiscernible) many people at Netflix.

20          Q       Yeah.  What do you think a restraining order

21          –- how does that affect a hiree's opportunities?

22          A I -- I don't actually know.

23          Q       All right.  Let's talk a little bit about

24          these guns.  First off, how many guns are we talking about?

     A                  I -- I don't remember the specific number.
My guess would be maybe five or six.

3           Q       Did you remove the guns from the White home?

4           A       I helped my mom remove them from the home.

5           She was concerned.  For example, if they were loaded, 6 being able to unload it

            to safely transport them.

7           Q       Since you just walked us through this, here's

8           what I was wondering, Mr. White.  Did you take the guns 9 from the property?

10          A       Yes.  So I went over.  My mom showed me where

11          the guns were located and helped me load them into the

12          car.

25

1

2

13    Q        And when did that happen?

14    A        I -- I don't recall the exact date.

15    Q        Where was Mr. White, your father? 16   A        Mr. White, I

(indiscernible) he was staying 17 in an RV at the time.

18    Q        So this was after he came back from Ghana?

19    A        Right.

20    Q        After the divorce case was filed?  Right?

21    A        Correct.

22    Q        Your mother asked you to remove the -- the 23 guns.  You take the

guns.  Where do you bring them?

24    A        They were stored in my barn in a safe for a short period of time until my mom

could come, and we

went and turned them into the -- it was the Multnomah County Sheriff.

3     Q        All right.  And other than the guns, anything 4 else that you took at that time?

5                          MR. SHIPLEY:  Objection.  He's saying,

6                          "He took."  So is it -- is he saying -- is he

7                          clarifying regarding the wife, whether --

8                          THE COURT:  Just rephrase your question.

9                          MR. BERNABEI:  I'm sorry.  Thank you,

10                         Your Honor.

25

1

2

11          BY MR. BERNABEI:

12          Q        Mr. White, what I'd just like to be real

13          clear on is:  We talked about five or six guns your

14          mother asked you to remove.  And so you took those

15          guns, you stored them in a -- on your property

16          somewhere, right?

17          A Correct.

18          Q        What other items did you take at that time 19 or -- or

did your mother give you at the time? 20   A        There was a

chest freezer.  And I believe her

21     two kayaks.  And that's all I can recall.

22     Q        Was there any ammunition?

23     A        I -- I believe so.  I -- I assume there

24     would've been.

       Q        Do you know how many rounds?

       A        I don't.

       Q                                    So you didn't inventory at the time?  Is that

3      right?

4      A        I -- I did not, no.

5      Q        Was there military artifacts?

25

March 29, 2022                                                    Brian White-X 246

1

2

6      A      Not to my knowledge.

7      Q      What about, like, containers?

8      A      There was -- they were in a -- like a hard

9      plastic case, is what I would call it.

10     Q      What was in that hard plastic case? 11   A      The guns were in, like,

a big, hard plastic 12 case.

13     Q      Was ammo, loose ammo in that case also?

14     A      I -- I believe so.

15     Q      Were there holsters in that case?

16     A      I don't remember.

17     Q      How about this?  Do you remember going to the

18     Multnomah County Sheriff's office and -- with your

19     mother, to turn the items over to Multnomah County

20     Sheriff.

21     A      Yes.

22     Q      The items that you brought that you and your

23     mother brought to Multnomah County Sheriff, are those

24     the same items that we're talking about here -- the guns, the container,

whatever else there may have been?

25

March 29, 2022                                    Brian White-X 247

1

2

A        Yes, sir.  The -- the entire container was handed over to the sheriff.

3        Q        And you were with your mother when she did

4        that?

5        A        Yes, I was.

6        Q        And you heard your mother say she wanted all 7 of these items

destroyed; is that correct?

8     A        Yeah.  (Indiscernible) I think we were asked 9 if -- I believe we were asked if we

wanted them -- or,

10     sorry.  That's right.  We were told we could either

11     take them to a second-hand store and attempt to sell

12     them, just have them destroyed by Multnomah County 13 Sherriff.  And on their advice,

we did.

14        Q        And at the time that you brought -- you and

15        your mother -- brought those firearms and other items

16        to Multnomah County Sheriff's, were you aware that your

17        father was requesting that those be put in the hands of

18        a neutral party.

19        A        I remember him asking to get the guns.  20 I -- I don't recall for sure if

there was -- asked for 21 a neutral party or not.

22        Q        Okay.  Did you ever have any discussion with

25

1

2

23          your mom during this time about, hey, you know

24          there -- there is a restraining order, maybe we shouldn't be doing this?

                    MR. SHIPLEY:  Objection, that assumes that he understands that there

was a statutory

3                          restraining order.

4                          THE COURT:  Overruled.  He can answer

5                          the question.

6                          MR. SHIPLEY:  Okay.

7                          THE WITNESS:  I'm sorry.  Can you state

8                          that again?

9                          BY MR. BERNABEI:

10                         Q        Sure.  Did -- at the time you're turning the

11                         guns and the -- the firearms and all this other stuff

12                         you talked about, did it -- did you ever discuss with

13                         your mother that, you know, there was a restraining 14 order in

                           the divorce case.

15      A        I was -- I was not aware of a restraining 16 order.  We were told by the sheriff

that she had the

17      right to turn in firearms for any reason at any time.

25

1

2

18    Q        Let's go to some of these firearms.  Do you 19 know how your father acquired these firearms? 20        A        There were -- there are a couple I know he 21 had had for a while.  There was a hunting rifle.

22    I -- I assumed he purchased it.  I wasn't involved with

23    the purchase.  There were also -- there was at least

24    one handgun I believe he had.  And then there were a couple of older guns that were my grandfather's.  And I believe that he got those after my grandfather passed away.

3            Q        So he inherited a couple of these guns?

4            A        Yeah, I believe so.

5            Q        And you were aware that --

6            A To -- to be fair the -- I'm sorry, go ahead. 7 Q You were aware they held special significance 8 to him.

9            A        No.  The -- the other guns were, honestly, I

10    would describe them as junk.  The one that would have

11    been significant to him would be maybe his hunting

12    rifle and probably the handgun that he took with him.

13    I believe that there was a second one that was similar

14    to that.  The other ones were mostly junk.  I think

15    that's how the -- the sheriff described them as well.

16            Q        So you're telling us, Mr. White, that the

25

1

2

17        guns that he inherited from his father were 18 insignificant to him?  Is that -- is

that your 19 testimony?

20        A        I (indiscernible) can't speak to how

21        important they were to him.  I will say that he never

22        brought them up to me previously.  And looking at them, 23 they were not

taken care of.  They were not in good

24 shape.  I -- I honestly don't know if some of them were working.

          Q        All right.  Let's go back to your restraining order petition.  You -- you

indicated there that after

3        your mother filed for divorce, there was a May hearing.

4        Mother was granted exclusive use of the home to prepare 5 for sale.  Do you recall

stating that?

6        A        I -- sorry.  I don't have it in front of me.

7        But if that's what's on there, then yes.

8        Q        I'm looking at Exhibit 131, page 207, at the

9        bottom.  So you were at the hearing, that -- the May

10        2021 hearing, right?

11        A        Yes, I was.

12        Q And you heard the Judge say that the purpose 13 of the support was for

your mom to prepare the home for 14 sale.  Is that right?

25

March 29, 2022                                        Brian White-X 251

1

2

15      A       I'm sorry.  You're referring to the -- the

16      spousal (indiscernible)?

17      Q       Yes.

18      A       It was for (indiscernible)

19      Q       You kind of broke up there.  I'm sorry.  It

20      was for her to prepare the home for sale?

21      A       That's my understanding, yes.

22      Q       Yeah, okay.  So you returned the freezer and

23      the two -- one kayak, correct?

24      A       That's correct, yes.

        Q               And you used the firewood, correct?

        A       Yeah, I -- I used most of it.  There was some of it that just went to a scrap burn

pile. 3      Q       Your father asked you to return that this

4       winter, right?

5       A       Yes.

6       Q       And you knew that he used the wood to heat

7       the home, right?

8       A       Well, yes.

9       Q       And you did not return it to him on request,

10      right?

25

March 29, 2022                                    Brian White-X 252

1

2

11        A       Correct.

12        Q       Let's talk about when you moved the firewood.

13        Was it after the divorce was filed?

14        A       Yes.  So it -- it would have been after that

15        May hearing after she was granted exclusive use to the 16 home to prepare it

          to sale.  It was removed as part of 17 preparing it for sale.

18                Q        And that was in your mother's request, right,

19                you removed it.

20                A        Yes.

21                THE COURT:  How much more time do you

22                think you're going to have, Mr. Bernabei, with this 23 witness?

24                              MR. BERNABEI:  I'm on my last line right

now.

BY MR. BERNABEI:

          Q                              Did you -- you said you changed the Ally Bank

3         account to your email address; is that right?

4         A Yes, sir.  Or either put it in my email 5 address or put it -- it -- somehow, I put my

          name on 6 it.  Yeah.

7         Q        And you were concerned because you thought, 8 not just the mental instability,

but that Mr. White was

25

March 29, 2022                                    Brian White-X 253

1

2

9   being taken financially advantage of, correct?

10  A       Yeah.  At the time, it was apparent that 11 someone was draining their

account.  There were ATM 12 withdrawals from Ghana.

13  Q       So you didn't trust him in that time to be 14 managing his own finances,

correct?

15          A       Well, I wouldn't say that.  I asked for the

16          account to be frozen.  I didn't, like, take –- I didn't

17          access the account myself.  I -- sorry.  I should say I

18          didn't -- I did not remove any funds or did not manage

19          the accounts.  I simply asked them to freeze the 20 account so that there

            wouldn't be further withdrawals 21 from Ghana.

22          Q       And you did that because you didn't think Mr.

23          White had the capacity to do that, right?

24          A       No.  It -- at the time, I didn't know what was going on.  I had seen that

            there were withdrawals

for months to an ATM in Ghana.  So my assumption at that point was maybe someone

has access to his account

3   without his knowledge, or their something fishy going

4   on here.  So just like I would do with my personal 5 finances, I tried to get it stopped.

6           Q       And other than the Ally Bank, have you also
25

1

2

7          accessed other accounts of Mr. White, of your father?

8          A        Yeah.  When his -- well, I don't know if you 9 want to call it an account.  When his laptop was there

10 logged in, I pulled up his email as well.  Again, he 11 was caught in a foreign country.  At least, that's what

12    he had said and information that's -- still concerning.

13    I tried to get as much information as I could to piece 14 together where he had gone or what might've happened.

15          Q        Okay.  Did you ask him to reimburse you for

16          the expenses you incurred in -- in your investigation

17          in getting him to returned from Ghana?

18          A        No, I did not.

19    MR. BERNABEI:  Thank you, sir.  That's 20 all I have.

21                    THE COURT:  Mr. Shipley, any other

22    questions?

23                    MR. SHIPLEY:  Just a couple.

24                    REDIRECT EXAMINATION
BY MR. SHIPLEY:

25

March 29, 2022                                                        255

Brian White-ReD

Q       Mr. White, why did you file a restraining order against your father?

3          THE COURT:  We lost him.

4          MR. SHIPLEY:  Oh.

5          THE WITNESS:  (Indiscernible) several

6          times.  I'm sorry, did I break up?

7          THE COURT:  You did.

8          THE WITNESS:  I asked him several times

9          to not contact me.  And I'd received those -- those

10         threats about my employment and suing me.  And I simply 11

           wanted him to stop contacting me.  I was honestly

12    worried that -- that he would escalate.  That's what he

13    had continued to do is threaten and threaten and

14    threaten.

15    BY MR. SHIPLEY:

16    Q       Okay.  Mr. Bernabei had asked you about the

17    purpose of the temporary support that Judge Fun had 18 ordered in this case.

      Are you aware if your mother had

19    any income in May of 2021?

25

March 29, 2022                                                          256

20      A       Not that I'm aware of.

21      Q       Do you know what you and your sister -- well, 22 did you provide your

mother with financial support?

23      A       Yes.  So I -- I loaned my mom some money for

24      your retainer.  I helped her buy a few things to either repair the home or -- or

otherwise get it ready for its Brian White-ReD

sale.  My sister has done similar things.

        Q       Okay.

3               MR. SHIPLEY:  No more questions, Your

4       Honor.

5               THE COURT:  Okay.  Thank you, Mr. White.

6               All right.  So next dates we have

7                available for you all are the July 14th -- no.  I'm

8                actually not available for those dates.

9               THE CLERK:  Okay.

10              THE COURT:  I have put them in the

11              calendar yet, but the 14th or the 15th. 12

                MR. SHIPLEY:  So is it the 14th is

13      available then?

14              THE COURT:  It's not.

25

March 29, 2022                                                                257

15          MR. SHIPLEY:  Okay.

16          THE COURT:  Nor is the 18th.  Any dates

17          either later?

18          (Court and clerk converse)

19          THE COURT:  So July 25th at 1:30.

20          MR. SHIPLEY:  Is there any possibility

21          of getting a lengthier piece of block of time, Your 22 Honor?

23          THE RESPONDENT:  Maybe in September or 24 something like that.

            MR. SHIPLEY:  So July 25th at 1:30, we

have the afternoon at least?

            THE COURT:  Yes.  Unless we schedule

3    something else afterwards?  I don't control what

4    others -- when others --

5    MR. SHIPLEY:  No, I won't -- 6          THE COURT:  -- people decide to get

7          divorced.  It's a modification.

8          MR. SHIPLEY:  I haven't made my 25th-

9          anniversary plans yet, so --

10          THE COURT:  I wish I could control what

11          the other folks do on the outside --

25

March 29, 2022                                                    258

12          MR. SHIPLEY:  I won't go that weekend. 13

THE COURT:  -- and decide to -- as Will

14          Smith says, after he slapped the guy, right?  "Peace.

15          Love."

16          THE CLERK:  Yeah.

17          THE COURT:  Yeah, wish I could help.

18          MR. SHIPLEY:  So July 25th at 1:30? 19                    THE

COURT:  July 25th at 1:30 if that

20          works for you, Mr. Bernabei?

21          MR. BERNABEI:  Yes.

22          THE COURT:  Okay.

23          MR. BERNABEI:  It does, Your Honor. 24   THE COURT:  All right.

MR. SHIPLEY:  Could we get, like, a

backup date -- another day after that in case we don't get done on that day.  I'm just

saying --

3  THE CLERK:  Maybe we could book both 4 days.

5          THE COURT:  So July 26th at 1:30.

6          THE CLERK:  Yep.

7          MR. SHIPLEY:  All right.  So if we could

8          book both days then for --

25

March 29, 2022                                                                259

1

2

9          THE COURT:  Yeah.

10          MR. BERNABEI:  Oh, yeah.

11          THE COURT:  I -- I just hope we get past

12          the squabbling over cords of wood.

13          UNIDENTIFIED SPEAKER:  Um-hum.

14          THE COURT:  If we're squabbling over

15          cords of wood and stuff like that, you guys

16          realize -- and that's probably more for you, Mr.

17          White -- realize that you just paid him today -- for 18 his

services today, you could've bought, probably, two

19          or three cords of wood.

20          UNIDENTIFIED SPEAKER:  Um-hum.

21          THE COURT:  Yep.  But I'll let you

22          guys -- if you guys can't figure things out and you

23          want to squabble, and then pay -- good attorneys, don't

24          get me wrong --  good attorneys, they earn every bit of money

that you decide to pay them.  You certainly can,

but --

                    MR. SHIPLEY:  So, Your Honor -- 3                    THE

COURT:  -- I highly encourage you

25

March 29, 2022                                                                    260

1

2

4    guys to keep chatting and figure things out.

5    MR. SHIPLEY:  In -- the silent auction

6    item, Your Honor --

7    THE COURT:  Yep.

8    MR. SHIPLEY:  And so basically -- my

9    understanding is that after you've heard all testimony, 10 then you'll review that.

11              THE COURT:  I'll review that, and if I

12              think it's an item that should've been a marital asset

13              and that the highest bid gets that one and

14              (indiscernible)

15              MR. SHIPLEY:  Thank you, Your Honor.   16   THE COURT:  Yep.

              Yep.  All right.

17              MR. BERNABEI:  So just to clarify, you

18              really won't tell us anything about those lists -- 19

                   THE COURT: -- until final judgment. 20

               MR. BERNABEI:  -- until the conclusion

21              of the case.

22              THE COURT:  Correct.

23              MR. BERNABEI:  Yeah.

24              THE COURT:  Yep.

25

March 29, 2022                                                                261

1

2

                              MR. BERNABEI:  Thank you, Your Honor.

25

July 25, 2022                                                          262

1

2

THE COURT:  We are in recess.

(Proceedings concluded at 12:20 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

25

July 25, 2022                                                                      263

1

2

22

23

24

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

July 25, 2022

TRANSCRIPT OF COURT TRIAL
THE HONORABLE D. CHARLES BAILEY
CIRCUIT COURT JUDGE.

APPEARANCES:

For the Petitioner:              Attorney at Law
                                 By:  James T. Shipley
                                 Portland, OR 97321

For the Respondent:              Pro Se
                                 By:  David C. White
                                 Portland, OR, 97229

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

(1:29 p.m.)

THE COURT:  All right.  This is Julia

White v. David White matter.  There are several

matters:  21DR02783, 21CN04539, 21CN04610, 22CN01156,

and 22CN02186.  We have Mr. Shipley here on behalf of 16 Ms.

White, and Mr. White now representing himself for 17 the

continuation of our trial.

July 25, 2022                                                    264

1

2

18          Anything we need to take up before we

19          get going with the substantive part of our hearing?

20          MR. SHIPLEY:  Not that I'm aware of,

21          Your Honor.

22          THE COURT:  Okay.

23          MR. WHITE:  Yes, Your Honor.

24          THE COURT:  Go ahead.

                    MR. WHITE:  I would like to talk about

the perjury of three of their witnesses.

                    THE COURT:  No.

3     MR. WHITE:  I'd like you to --

4     THE COURT:  No.

5     MR. WHITE:  -- order the Court to give

6     me their testimony so I can submit it to the DA.

7     THE COURT:  FTRs are right there.  You

8     just go downstairs.  That's what this is.  You just go

9     downstairs.  You pay them money.  They'll get your 10 recording.  And you submit it to

the DA's office.  Good

11          luck.

12          MR. WHITE:  Okay.

25

July 25, 2022                                                                265

1

2

13          THE COURT:  Anything else?

14          MR. WHITE:  I have a USB here to give

15     you that shows what the house was like on March 11th, 16 and

        then how she gutted the house and what was left on 17 August

        20th.

18          THE COURT:  It may come into evidence, I

19     don't know.  But when you decide to put whatever

20     testimony you decide to put on, there has to be a basis

21     for the Court to receive.  Somebody has to lay a

22     foundation.

23          MR. WHITE:  Okay.

24          THE COURT:  Thanks.   MR. WHITE:  I will.

            THE COURT:  And I assume you've turned everything over, all those

pictures over to Mr.

3          Shipley?

4          MR. WHITE:  He already had them.  He

5     gave them to my attorney, so --

6          THE COURT:  Perfect.

7          MR. WHITE:  Yeah.

8          THE COURT:  Okay.  Anything else?  Any

25

July 25, 2022                                                      266

1

2

9              other motions or --

10             MR. WHITE:  When are we going to hear

11             the contempt against her for what she did illegally

12             taking stuff out of the house?

13             THE COURT:  We'll get there.

14             MR. WHITE:  Okay.

15             THE COURT:  There's a lot of things

16             pending on this.  Probably sometime about the same time

17             we get into some of the contempts, on you violating

18             certain orders according to them by, in their words,

19             "harassing," so --
20             MR. WHITE:  Okay.

21             THE COURT:  -- we'll get into all of

22  those.  Yep.

23             MR. WHITE:  Okay.

24             THE COURT:  There's a lot of back-and-

               forth for sure.  Remind everybody if you have any

25

1

2

witnesses here that -- they're potential witnesses, all potential witnesses need to remain

outside.  With that 3 then, I'll let you call your next witness.

4                          MR. SHIPLEY:  Yeah.  My next witness is

5                          remote, so --

6                          THE COURT:  Okay.

7                          MR. SHIPLEY:  I'm going to call him

8                          right now, Your Honor, and have them -- tell him to log

9                          in.

10                         THE CLERK:  I do have somebody logged in 11 right now.

12                         MR. SHIPLEY:  Is that Sean (phonetic)

13                         Psaradelis?

14                         THE CLERK:  Yep.  He is here.

15                         MR. SHIPLEY:  There we go.  He's ready.

16                         THE COURT:  Psaradelis, if you'll turn

17                         your video on for us, please?

18                         MR. PSARADELIS:  Okay.  I'm on. 19  THE COURT:  Thank you.  If

                           you could

20                              raise your right hand to be sworn.

21                              SEAN PSARADELIS

25

1

2

22          called as a witness for the Petitioner, having been duly

23 sworn, testified as follows:

24               THE COURT:  All right.  Again, tell us

your full name and spell your last name, please.

               THE WITNESS:  Full name is Sean

Psaradelis, spelled P as in Paul, S as in Sam,

3               A-R-A-D-E-L-I-S.

4               THE COURT:  Thank you.

5               You may inquire.

6               MR. SHIPLEY:  I have a couple of

7          exhibits.

8               THE COURT:  Um-hum.

9               MR. SHIPLEY:  Or just one exhibit, I

10          think the original and the bench copy.

11               THE COURT:  Okay.  12   DIRECT EXAMINATION

13     BY MR. SHIPLEY:

14     Q          Mr. Psaradelis, could you tell the Court

15     where you are employed?

16     A          Yeah.  I work at Capstone --

17     Capstone Home Loans out of Lynnwood, Washington.

25

July 25, 2022                                    Sean Psaradelis-D 269

1

2

18        Q  And what -- what do you do for that company?

19        A        I'm a mortgage loan officer.

20        Q        And how long have you been in the mortgage

21   loan business?

22        A        About 22 years.

23        Q        Okay.  Were you asked to give some estimates

24   of loans for Ms. White for this case?

     A         I was.

     Q         Okay.  And I am -- I just -- well, I emailed you the exhibit, Exhibit 31.  Do
you have that in front

3    of you there?

4         A        I do.

5         Q        Okay.  And are these the estimates that you

6    came up with?

7         A        Yes, they are.

8         Q        Okay.  And were these scenarios that we asked 9 you to provide

     estimates for?

10        A        Yeah, these are estimates that I was asked to

11   provide for -- for your client, yes, on looking at

12   purchasing a home.

25

July 25, 2022                                    Sean Psaradelis-D 270

1

2

13          Q       Okay.  And so for the Court's information, it

14   looks like there's three scenarios.  And if you could

15   kind of give the highlights of those three scenarios?

16          A       Yeah.  Yeah.  There are three scenarios:

17   $400,000 price, $450,000 price, and $500,000 price.

18   Each of them have a $200,000 down payment.  And I try

19   to include estimated taxes and insurance to show my 20 clients what the

     payments -- full payments will look 21 like on all three of those purchase prices.

22                  And then down at the bottom, you'll see the

23                  estimated cash needed for closing, which includes your

24                  down payment, your closing costs, and collection of rebate items.

            Q       Okay.  And for the record, on the $400,000 loan, what was your
     estimated total payment?

3           A       Well, $1,566.

4           Q       And then for the $450,000 purchase price?

5           A       $1,911.

6           Q       And then for the $500,000 purchase price?

7           A       $2,257.

8           Q       Okay.  Do you know right now whether or not 9 Ms. White would qualify

     for any of these loans?

25

1

2

10     A       She's not submitted her paperwork in for an 11 official loan approval but based on the initial 12 conversation, it seems highly unlikely that she would 13 qualify for these.

14     Q       If -- I believe you're familiar with Ms.

15     White's daughter, Laura Bramwell; is that correct?

16     A       Correct.

17     Q       If Ms. Bramwell and her husband were to give

18     their financial backing to a loan and agree to cosign, 19 would she be able to qualify for these loans?

20     A       Without looking at the full documentation, it

21     would be hard to get that answer.  Although I would

22     tell you based on the knowledge I have of their

23     finances, I believe that she would.

24     Q       Okay.

MR. SHIPLEY:  Your Honor, we offer Exhibit 31 into evidence.

(Petitioner's Exhibit 31 offered into

3     evidence)

4     THE COURT:  Any objection, Mr. White?

5     MR. WHITE:  Yes.

25

July 25, 2022                                        Sean Psaradelis-D 272

1

2

6    THE COURT:  What's your objection?

7    MR. WHITE:  My objection is very simple.

8    I doubt -- well, from his own testimony, she hasn't

9    even applied.  I doubt she would -- from her deposition 10 testimony --

11                    THE COURT:  Do you have any objection to

12                    the exhibit?  You're kind of --

13                    MR. WHITE:  Yes.

14                    THE COURT:  -- giving me the testimony.

15                    MR. WHITE:  Sorry.

16                    THE COURT:  But what is your specific 17 objection to the exhibit?

18                    MR. WHITE:  These numbers are nonsense.

19                    I have graduate studies, and I took engineering

20                    finances, and regular finances in college.

21                    THE COURT:  So those are getting into

22                    the merits.  Maybe you'll ask --

23                    MR. WHITE:  All right.

24                    THE COURT:  -- Mr. Psaradelis any

questions you have based --

                    MR. WHITE:  Okay.

                              THE COURT:  -- on those numbers.  But do

25

July 25, 2022                                              Sean Psaradelis-D 273

1

2

3          you have any objections to the exhibit itself?

4          MR. WHITE:  I guess not.

5          THE COURT:  Okay.  31 is received.

6          (Petitioner's Exhibit 31 received into

7          evidence.)
8          MR. SHIPLEY:  No more questions, Your

9   Honor.

10          THE COURT:  Go ahead, Mr. White.  You

11                may ask him questions.

12          CROSS-EXAMINATION

13          BY MR. WHITE:

14          Q        All right.  Sean, who contacted you first

15          about this?

16          A        Laura Bramwell did.

17          Q        Okay.  How do you -- well, you said that she

18          probably wouldn't qualify, right?

19          A        Um-hum.

20          Q        These houses -- I mean, I will easily

21          stipulate that the houses in Seattle are easily 10 to

22          20 percent more than the houses in Oregon, as you

23          probably know that.  Also, because of Biden

25

July 25, 2022                                                  Sean Psaradelis-D 274

1

2

24                              inflation --

                                      MR. SHIPLEY:  Objection, Your Honor.  Is

25

July 25, 2022                                        Sean                                        275

1

2

Psaradelis-X

there a question?

           MR. WHITE:  Yes.  I'm -- I'm getting to 3 that.

4           THE COURT:  There was a lot of other

5           information that -- without somebody testifying to.  I

6           just --

7           MR. WHITE:  Well --

8           THE COURT:  -- just ask your question.

9           MR. WHITE:  Yes.

10           THE COURT:  Get to the heart of it. 11                    MR.

WHITE:  Well, I guess I won't.  Then

12           I'll just leave it the way it is.

13           THE COURT:  Okay.

14           MR. WHITE:  No more questions, Your 15 Honor.

16           THE COURT:  Thank you, Mr. Psaradelis.

17           MR. SHIPLEY:  Thank you, sir.

18           THE COURT:  You may -- 19   THE WITNESS:  All good.

20           THE COURT:  Yep.  You may go.

21           MR. SHIPLEY:  All done.

22           THE COURT:  Yep.

25

July 25, 2022                                    Tammy Davis 276

1

2

23          THE WITNESS:  Okay.  Thank you.

24          THE COURT:  Call your next witness.

                    MR. SHIPLEY:  Your Honor, I'm going to

                                              -D

call Tammy Davis.  She testified previously, but she had some information that arose after

she testified --

3          THE COURT:  Okay.

4          MR. SHIPLEY:  -- since last time. 5                    THE

COURT:  Okay.  Ms. Davis, come on

6              forward.  Raise your right hand to be sworn.

7              TAMMY DAVIS

8              recalled as a witness for the Petitioner, having been

              9 duly sworn, testified as follows:

10          THE COURT:  Go have a seat.  Once you're

11          seated, you can tell us your full name and spell your 12 last name,

          please.

13          THE WITNESS:  Tammy A. Davis, D-A-V-I-S.

14          THE COURT:  You may inquire.

15          DIRECT EXAMINATION

16          BY MR. SHIPLEY:

25

July 25, 2022                                    Tammy Davis 277

Q       Ms. Davis, you previously testified earlier 18 in this trial that there was property remaining in the home that belonged to you; isn't that correct?

A       Correct.

Q       After you completed your testimony at our last hearing date, did Mr. White talk to you?

A       Yes.

Q       And could you tell the Court what he told you?

A       He said, "You can come by and get your things."

Q       Okay.

MR. SHIPLEY:  No more questions, Your 5 Honor.

THE COURT:  Mr. White, do you have any questions for the witness?

MR. WHITE:  Yes, I do. 9  THE COURT:  Go ahead.

CROSS-EXAMINATION

BY MR. WHITE:

Q       Ms. Davis, you testified in the previous testimony that a bunch of these pictures were your items.

A       Yes.

July 25, 2022                                                    Tammy Davis 278

1

2

16          Q        But a bunch of the things that Julie took out

17      of the house are clearly at our daughter's house in

18      Sammamish that you said were yours.  And I know for a

19      fact they are not because I helped her unload those

20      from --
21  MR. SHIPLEY:  Your Honor --

22  MR. WHITE:  So I'm getting to a
23  question.  So I'm asking you --

24          THE COURT:  We'll strike all that

other --

                                                        -X

          MR. WHITE:  All right.

                    THE COURT:  -- basically the testimony.

3  BY MR. WHITE:

4  Q        Did you lie in your previous testimony?

5  A        No.

6  Q        Who -- okay.  All right.  That's fine.  I'll

7  prove you did.  Thank you.

8  THE COURT:  Any rebuttal? 9  MR. SHIPLEY:  No more questions, Your 10 Honor.

11                  THE COURT:  You may step down.

12                  You may call your next witness.

25

1

2

13              MR. SHIPLEY:  Your Honor, then I'll call

14     Laura Bramwell, the daughter of the parties.  She's in 15 the hall.

16                   THE COURT:  Come forward.  Watch your

17              step up there.  So raise your right hand to be sworn.

18              Raise your hand.

19              LAURA BRAMWELL

20              called as a witness for the Petitioner, having been duly

       21 sworn, testified as follows:

22     THE COURT:  Go have a seat.  Once you're

23     seated, if you could tell us your full name and spell 24 your last

       name, please.

                   THE WITNESS:  Yeah.  My name is Laura

25

July 25, 2022                                    Laura Bramwell-D 280

1

2

Bramwell, B-R-A-M-W-E-L-L.

THE COURT:  You may inquire. 3                          MR.

SHIPLEY:  I have a few exhibits,

4          Your Honor.  Get those all at one time.

5          (Pause)

6          DIRECT EXAMINATION

7          BY MR. SHIPLEY:

8          Q  Ms. Bramwell, has your father reached out to

9          you in the last year to communicate about this case?

10         A  Yes, he has.

11         Q  And how many occasions has that happened?

12         A  In the last year, the -- a minimum of

13         three --

14         Q  Okay.

15         A  -- possibly more.

16         Q  I just handed you Exhibit -- three exhibits.

17         The first is Exhibit 38.  And is that a -- can you tell

18         the Court what that is?

19         A  Those are text messages from my father.

20         Q  So that was -- was that a communication

25

July 25, 2022                                    Laura Bramwell-D 281

1

2

21          between you and your father?

22          A  Correct.

23          Q  Okay.

24          MR. SHIPLEY:  Your Honor, I offer --

BY MR. SHIPLEY:

          Q                          -- and then also if you could look to Exhibit

35.

3 A Those were text messages to and from him as 4 well.

5          Q          Okay.  And then 36, could you tell the Court,

6          like, what Exhibit -- Petitioner's Exhibit 36 is.

7          A          Email from him.

8          MR. SHIPLEY:  Your Honor, we offer 35, 9 36, and 38 into evidence.

10          (Petitioner's Exhibits 35, 36, and 38 offered

11          into evidence)

12          THE COURT:  Any objection, Mr. White?

13          MR. WHITE:  Nope.

14          THE COURT:  They are received.

15          (Petitioner's Exhibits 35, 36, and38 received

16          into evidence.)

17          MR. SHIPLEY:  Okay.

25

July 25, 2022                                        Laura Bramwell-D 282

1

2

18                    BY MR. SHIPLEY:

19                    Q        I want to look to Exhibit 38.  Could you tell

20                    the Court -- I mean, the Court has it, but it appears

21                    that your father was asking you to show up to the 22 property

                      and pick up personal property for your mother; 23 is that correct?

24    A        I asked him.  He -- I had had him blocked before because I did not want to receive communication

from him.  So I unblocked him and sent him the first message.  That was -- can I read it?

3                    Q        Yeah.

4                    A        Okay.  It says, "I've seen the

5                    email" -- there was an email previously -- "about

6                    getting Mom's items out of the garage" -- of his

7                    home -- "I would be willing to do that but

8                    unfortunately cannot come this week due to weather and

9                    road conditions.  What is the reason it must be done

10                   within a week?"

11                   And so I was the one that reached out to him

12                   because I wanted -- the email had stated that they

13                   needed to be removed from his front porch within a week 14 or he was

                     going to dispose of my mom's belongings. 15    Q        Okay.  Why did

25

July 25, 2022                                    Laura Bramwell-D 283

1

2

he -- why did he want, all of 16 a sudden, to give this property to your

mother?

17          A          Well, further on in the text threat, I asked

18     him that because he was told -- we've all been told not

19     to move property until this is settled.  And so I asked

20     him why does this need to be done this week.  And he

21     said, "I told -- I told you over a week ago last week."

22     And then he's saying she needs to pay a

23     storage fee to him for her items, and the storage fee

24     needs to go to his -- his business that he owns, cctruth.org, apparently.

So he wanted -- he, I guess,

just wanted them gone or -- oh -- to move -- and then he sent me photos of his car.  I think

he wanted them 3 moved out of the garage so he could park his car in the 4 garage.

5          Q          So he reported that as there was too much

6     stuff in the garage, that he needed to get his -- is

7     that what you --

8          A          From what I understood, yeah.

9          Q          And then did you guys end up exchanging and

10     getting the property?

11          A          No, we did not.

25

July 25, 2022                                    Laura Bramwell-D 284

1

2

12          Q          Why not?

13          A          Well, I had arranged with a friend

14    to -- because I was -- I was at my home in

15    Sammamish -- the weather, it was icy and not safe to

16    drive.  So I had arranged with a friend to come and

17    retrieve the items and hold them for -- for us until I

18    could retrieve them.  And so I asked him here on the

19    fourth page, "I wanted to make sure I have permission 20 to get them" --because I

didn't want anything to happen 21 to my friend.

22           And so I asked, "Is -- is that" -- I asked 23 several times -- okay.  I said, "Is that all

you're

24 releasing to her right now?" and he says, "Enough to get my car in" and "These are what I've

been through so far," and then I said, "Okay.  I have -- I have arranged for someone to

come by tomorrow to pick up.

3                   Please have it all on the front porch and ready."

4                   And then he said, "If the splitter is not

5                   coming," -- the wood splitter that he owns with my

6                   brother -- "if he didn't get the wood splitter from my

7                   brother, he's not going to release the property."

8          Q          All right.  And so you did not get any

25

July 25, 2022                                    Laura Bramwell-D 285

1

2

9          property returned at that time, correct?

10         A        No.  Because I didn't want a -- a friend of

11         mine to be -- yeah.  No --

12         Q        Okay.

13         A        -- I did not.

14         Q        Okay.  Okay.  I want to go on to when was the

15         next time that your father contacted you? 16     A        The next time

           was the Saturday message, 17 Exhibit 35, that was Saturday, April 9th.

18     Q        And so he goes ahead and contacts you and

19     says, "Brian will be charged with identity theft and 20 perjury next week if Mom

       doesn't end the divorce this 21 week.  My attorney has the proof."

22         And then you say, "More threats will not go

23         well for you in court."

24         And then he said, "Washington County Sheriff

           is ready to charge Brian with two felonies.  He told

       Orlando (Phonetic) he hacked my account while testifying."

3          And then you said, "Stop making threats, and

4          don't contact me."

5          A        Correct.

6          Q        And then you again told him, "I do not want

25

July 25, 2022                                    Laura Bramwell-D 286

1

2

7          to hear from you, not by phone or email.  Go through

8          your lawyer."  Is that correct?

9          A       That is correct.

10         Q       Let's move on to Exhibit 36.  And this looks

11         like your father emailed you; is that correct?

12         A       Correct.

13         Q       And when did he email you?

14         A       Two days later.

15         Q       Okay.

16         A       On April 11th.

17         Q       And what did you say to him at that time in

18         that email stream?

19         A       My reply is --

20         THE COURT:  Speaks for itself.  I can

21         read it.

22         MR. SHIPLEY:  Okay.

23         THE WITNESS:  Yep.

24         MR. SHIPLEY:  All right.

BY MR. SHIPLEY:

           Q       Have you had any -- has your father contacted you again after this?

25

1

2

3    A    I do not believe so.

4    Q    Okay.  And are you aware that a contempt case

5    was filed against him on the basis of your 6 communications?

7    A    Contempt case filed against?

8    Q    Your father.

9    A    Yes, I am aware.

10    Q    Okay.  All right.

11    MR. WHITE:  I'm not aware of that.  I 12 haven't seen you.

13    MR. SHIPLEY:  No more questions, Your 14 Honor.

15    THE COURT:  Mr. White, do you have any

16    questions for Ms. Bramwell?

17    MR. WHITE:  No.

18    THE COURT:  Okay.  You may step down.

19    You may call your next witness.

20    THE COURT:  Leave those, actually, leave 21 those there.

22    THE WITNESS:  Do I leave those?  Okay.

23    THE COURT:  It's all right.  I'm going

24    to grab those from you.

THE WITNESS:  Okay.  Thank you.

THE COURT:  I don't know if you need

25

July 25, 2022                                    Laura Bramwell-D 288

1

2

those or not, but those should be your copies.

3 THE WITNESS: I have copies. 4   THE COURT:  You do?  Okay.  Then give

5                                    them back to us.

6                                    (Pause)

7                                    THE COURT:  Come forward, sir.  Chair

8                                    over here.  If you'll raise your right hand to be

9                                    sworn.  Watch your step up there.

10                                    BRIAN WHITE

11                                    called as a witness for the Petitioner, having been

                                    duly 12 sworn, testified as follows:

13                          THE COURT:  Go have a seat.  And once

14                          you're seated, you can tell us your full name and spell 15 your

                          last name.

16                          THE WITNESS:  Yep.  My name is Brian

17                          Matthew White.  My last name is spelled W-H-I-T-E.

18                          THE COURT:  Thank you.

19                          You may inquire. 20        DIRECT EXAMINATION

21             BY MR. SHIPLEY:

22             Q        Mr. White, have you had any contact with your

23             father since our last court date?

25

July 25, 2022                                          Laura Bramwell-D 289

1

2

24          A       Yes.  I've had contact from him twice.

            Q                  Okay.  Can you tell us about the first

25

July 25, 2022                                    Brian White-D 290

1

2

contact?

A                                    Yeah.  This would've been the end of April.

3   I don't know the exact date.  But he trespassed on my

4   property, went into my barn, and removed the wood 5 splitter.

6          Q        Okay.  Were you at home when that occurred?

7          A        I was not home.  I was traveling at the time.

8          My wife and kids probably would have been at school at 9 the time, is my guess.

10         Q        Okay.  Did you tell your father to come onto

11         your property and go into your barn to take the wood

12         splitter?

13         A        No.

14         Q        Okay.  So that was all without your

15         permission then?

16         A        Correct.

17         THE COURT:  How do you know it was your 18 father?

19                   THE WITNESS:  I know it was my father

20                   because I actually contacted his neighbor to ask if he 21 had

                     seen the wood splitter in his driveway.  And he had 22 seen it

                     and confirmed that.

23                   THE COURT:  Still how do you know your

25

July 25, 2022                                        Brian White-D 291

1

2

24              father was the one that came over and picked it up?

THE WITNESS:  I -- I -- I don't know for sure.  You're right.

THE COURT:  All you know is conversing 3 with somebody else -- it is now at your father's or 4 was -- it was removed.

5              THE WITNESS:  Yes.  Taken to his house.

6              THE COURT:  All right.  Thank you.

7              BY MR. SHIPLEY:

8              Q        Did you happen to call the police?

9              A        I did, yes.

10             Q        And what did -- did the police speak with 11 your

               father?

12     A        Yes.  They told me that they would call him 13 and warn him against coming on my property.

14             Q        Okay.  And then was there another occasion

15             here recently that your father came on your property?

16             A        Yes.  He came on my property this last 17 Friday.

18 Q Okay.  And why did he come onto your 19 property?  Do you know?

20     A        He was there to serve a subpoena. 21    Q        Was he serving it, or was somebody else 22 serving it?

25

July 25, 2022                                    Brian White-D 292

1

2

23    A        He brought someone else with him, and he

24    parked near my barn, and someone else served the subpoena.

      Q        Okay.  But he actually drove onto your property, correct?

3     A        Yes.  He was there in his car.

4     Q        All right.

5     MR. SHIPLEY:  No more questions, Your 6 Honor.

7         THE COURT:  Mr. White, you have any 8 questions for Mr. White?

9                         MR. WHITE:  Yes.  I have some questions

10                        for him.

11                        CROSS-EXAMINATION

12                        BY MR. WHITE:

13                        Q        How do you claim that the road in front of 14

                          your house is your property when it's public right of 15

                          way for three houses?

16    A     It's an easement.  I posted a no-trespassing 17 sign before that.

18                        Q        But it's not on the road.  All's -- anyway,

19                        it is not true that I went onto your property, and you

20                        just testified I did, which is a lie and more perjury.

21                        THE COURT:  Is that a question?

25

July 25, 2022                                    Brian White-D 293

1

2

22              MR. WHITE:  No.  That's a statement. 23   THE COURT:  Then it's

stricken from the

24 record.

              MR. WHITE:  Yes.

25

July 25, 2022                                    Brian                    294

1

2

White-X

THE COURT:  Do you have a question for

Mr. White?

3       MR. WHITE:  Yes, I do.  Some additional
4        questions I need to ask him that his mother needs to be

5        out of the room.  This was a deal made with -- is this

6        your last witness before you rest your case?

7        MR. SHIPLEY:  No.

8        MR. WHITE:  Oh, okay.  Well, then,

9        I'll -- we'll call him again for these other questions.

10       THE COURT:  Okay.

11       MR. SHIPLEY:  No more questions, Your 12 Honor.

13   THE COURT:  You may step down.

14   You may call your next witness. 15  MR. SHIPLEY:  Your Honor,

we call Dave 16 White.

17                      THE COURT:  Watch your step up.  Raise

18        your right hand to be sworn.

19        DAVID WHITE

20        called as a witness for the Petitioner, having been

duly 21 sworn, testified as follows:

22   THE COURT:  Go have a seat.  Once you're

25

July 25, 2022                                    David White-D 295

1

2

23           seated, you could tell us your full name, spelling your 24 last

             name for us, please.

                            Mr. White, you're going to have to wait

outside.

             MR. BRIAN WHITE:  Okay.

             THE COURT:  Because you're a potential

3

4   witness.

5            MR. BRIAN WHITE:  Okay.

6            THE COURT:  I assume Mr. Davis is not

7            going to be a witness, or Ms. Bramwell is not going to

8            be called as a witness?

9            MR. SHIPLEY:  Not by me.

10           THE COURT:  Well, do you intend to call

11           Ms. Davis or Ms. Bramwell as a witness?

12           MR. WHITE:  No.

13           THE COURT:  Okay.  Then they can remain.

14           MR. SHIPLEY:  Your Honor, when we were

15           last in, we left the trial notebooks.  So there was

16           the -- so I don't know if I could get the witness one.  17 And then
             there was the bench one.  So if I could -- 18   THE COURT:  Should
             be there.  Everything 19 that was left should be right there.

25           A

1

2

20                    THE CLERK:  I have the bench one, then

21    just --

22                    MR. SHIPLEY:  Okay.  All right.

23                         DIRECT EXAMINATION

24 BY MR. SHIPLEY:

          Q                        Mr. White, can you please turn to Exhibit 15

in the notebook in front of you?

          A        Um-hum.

3         Q        And -- are you there?  Whenever your -- let

4    me know when you're there?

5         A        Yeah, I'm there.

6         Q        Okay.  Could you please identify that 7 document for the Court?

8         A        Yeah, it looks like our 2020 tax return.

9         Q        Did your wife sign that?

10        A        We e-signed it, both of us.

11        Q        Are you sure that your wife reviewed and 12 signed it before it was filed?

13        A        I don't remember.  I've usually told her

14    whether we were getting a refund or a -- or we have to

15    owe.  And then told her when I put it in, if she wanted

16    to look at it, she's free to look at it anytime she

17    wanted.

25        A

July 25, 2022                                                David White-D 297

1

2

18      Q       Do you recall when this was filed?

19      A       I don't think it has the date.  No,

20      I -- usually, I try to file it in January or February.

21      Well, if this was -- we were getting a refund, so I 22 would try to file it as early as

possible. 23      Q       Wasn't this filed after you -- or we, my 24 client, had filed

for divorce?

            I don't -- I don't know.  I -- to tell you

the truth, I don't know.

Q       Are you aware -- if you could look at page 2 3 of the document --

4       A       Um-hum.

5       Q       -- isn't it true that each person's actually 6 supposed to sign the return?

7   A       No.  No.  When you e-file, you put in a code

8   that's your signature.

9   Q Okay.  But both -- 10 A We've done that for --

11   Q       -- both people are required -- aren't both 12 filers supposed to actually sign the

document?

13      A       Yes, in years past when this -- you know,

14      with e-filing, you put those in, and she knows her

15      code, and she knows that I have her code.  And I had

25      A

July 25, 2022                                              David White-D 298

1

2

16          permission from her -- I don't know, whenever we 17 started e-filing, which has

            been quite a while -- to 18 use -- to put her code in for her.

19    Q      Are you certain that you had permission in 20 2020 -- in filing the 2020 return in

2021 to -- to sign 21 on behalf of my client?

22    A      She never told me that I couldn't, and she

23    gave me blanket permission.  She -- I don't want to

24    know about -- this is her response to everything financial.  Well, you take care of

      it.  I don't want to

know about it.  And, you know, so I have done this for a long time with her, same as I did

this year also.

3                          MR. SHIPLEY:  Your Honor, before I move

4                          on, I do want to offer Exhibit 15 into evidence.

5                          (Petitioner's Exhibit 15 offered into

6                          evidence)

7                          THE COURT:  Mr. White, any objection to

8                          the Court receiving?

9                          MR. WHITE:  No.

10                         THE COURT:  15 is received.

11                         (Petitioner's Exhibit 15 received into

12                         evidence.)

25    A

July 25, 2022                                           David White-D 299

1

2

13          MR. WHITE:  No.  No objection.

14          BY MR. SHIPLEY:

15              Q      Now, part of 15, wasn't there also a Oregon 16 state tax

return that was filed?

17    A      Yes.  And same thing with Oregon state.  We 18 use the same pin.

19    Q      But you're not aware that my client actually 20 gave you permission to sign on

her behalf? 21    A      I'm not aware she told me I couldn't when I 22 had done so for 15

years.

23              Q      Okay.  Looking at Exhibit 42, could you tell

24              the Court what this is?

                    This was the preliminary tax return I

submitted for this year.

                    Q                                    Okay.  And I think you just testified that my

3 client did not review and sign off on this document; is 4 that correct?

5    A      She didn't on 90 percent of the ones that I 6 submitted in the last 15 years.

7              Q      I just asked, though, if she reviewed and

8              signed off on this return --

9    A      Not --

10    Q      -- before you submitted it.

11    A      -- not that I know of.

25              A

July 25, 2022                                    David White-D 300

1

2

12      Q        Okay.  On this document it says that you took

13      total IRA distributions of 38,490.  Is that correct?

14      A        No.

15      Q        That's what the document says; does it not?

16      A        It's what the document says but the updated

17      one, which you don't have here, shows that I put

18      back -- I think it was 8,000 or no -- 12,000, something

19      like that -- so you have to subtract that from the 20 38,000 from the actual

amount that was taken out. 21   Q        So you took out 38,000 and then made a

IR or 22 an IRA contribution then?

23      A        Yes.  I had to take out extra to qualify for

24      the loan for the house.

        Q        Okay.

        A        And then I put it back in afterwards.  But the final one -- this isn't the

final one.  If you 3 want, I'll bring it tomorrow.  I can print it out and 4 bring it tomorrow.

5       Q        You also filed the Oregon state tax return 6 on -- without your wife's review and

signature as well;

7                        isn't that true?

8                        A        Yep.  Same thing as always, yep.

9                        (Attorney and clerk converse.)

25                       A

July 25, 2022                                        David White-D 301

1

2

10                      BY MR. SHIPLEY:

11              Q        Mr. White, can you identify for the Court 12 what Petitioner's

                Exhibit 43 is?

13              A        I've never seen this before in my life.  So I

14      don't know how I'm supposed to identify it.  I don't

15      even know if it's true.  It's certainly not what I 16 submitted.

17 Q Well, it's a copy of a check from the State 18 of Oregon.

19              A        I see that, but it could be fake for all I

20      know because it's not what I submitted for a tax

21      refund.

22              Q        Okay.  But when we were last in court at the

23      end of it, I handed -- I showed you and your former

24      attorney a copy of this, so.

                        I believe you showed it to my former

        attorney.  I didn't see it.

                        Q                Okay.  So this is what purports to be a

3       refund --

4       A        Um-hum.

5       Q        -- made out to you and your wife.  And so are

6       you -- are you denying that this is a -- an actual

25              A

July 25, 2022                                          David White-D 302

1

2

7    refund check from the State of Oregon?

8    A       Well, it doesn't match what I submitted for a 9 refund or for -- oh, and I think what I submitted is we 10 didn't owe anything.

11          Q       Okay.  But this -- this purports that the

12   State of Oregon thought you were supposed to get a

13   refund of $43?

14          A       Looks like it.

15          Q       Whether or not they were wrong, is it, in 16 fact, a refund check -- copy of a refund check from the

17                 State of Oregon?

18                 A       It could be.

19                 Q       Okay.

20                 MR. SHIPLEY:  Your Honor, I offer

21                 Exhibit 42 and then also 43 into evidence.

22                 (Petitioner's Exhibits 42 and 43 offered into

23                 evidence)
24                 THE COURT:  Any objection to Exhibit 42?

                   MR. WHITE:  No.

25                 A

July 25, 2022                                   David White-D 303

1

2

THE COURT:  It's received.

(Petitioner's Exhibit 42 received into

3 evidence.)

4          THE COURT:  Any objection to Exhibit 43?

5          MR. WHITE:  Yes.  Because I cannot at

6 this time verify that that is actual without doing some

7 investigation of my own.

8          THE COURT:  Objection sustained.

9          (Petitioner's Exhibit 43 received into

10 evidence.)

11          MR. WHITE:  Okay.

12          BY MR. SHIPLEY:

13          Q          Mr. White, can you please turn to Exhibit 16?

14          A          Um-hum.

15          Q          Is that a Uniform Support Declaration that 16 you filed

with the assistance of your attorney? 17 A          At the time,

yes.  But it's not accurate at 18 this time.

19     Q          Okay.  That document said that your income 20 was $2,476 per month.  Is that

accurate?

21          A          No -- not -- well, it was at the time but not

22 anymore.

25

1

2

23      Q       What is your income at this point?

24      A       3,093. Q         3,093.

        A                                Um-hum.  And my expenses are different also.

        Q                        What is your -- but you did sign this

3               document, correct?

4               A       I think so.

5               Q       On page 2?

6               A       Yeah.  On the -- that was last September.

7               Q       Okay.

8               MR. SHIPLEY:  Your Honor, I offer

9               Exhibit 16 into evidence.

10              (Petitioner's Exhibit 16 offered into

11              evidence)

12              THE COURT:  Any objection to Exhibit 16?

13              MR. WHITE:  No, uh-uh.

14              THE COURT:  It's received.

15              (Petitioner's Exhibit 16 received into

16              evidence.)

17              BY MR. SHIPLEY:

25

July 25, 2022                                          David White-D 305

1

2

18          Q       If you turn to page, what would be the third

19          page of that exhibit, which gets into your budget.

20          A       All right.  It's the one that's labeled

21          "fixed costs," that part.

22          Q       Yes.

23          A       Okay, yeah.  I'm here.

24          Q       Is that -- is 1,831 your mortgage payment currently?

            A                             With taxes and insurance, it's very close to,
I think it was 1,835, yes, essentially.

3       Q       1,835?

4       A       Yeah, I think so.

5       Q       Okay.

6       A       I'll have it tomorrow in what I'll submit.

7       Q       Okay.  But as far as the rest -- the -- it

8       says that your total fixed costs are $3,126.  Is that 9 currently accurate, or are

        you --

10      A       No.  The expenses for June were 30 -- well,

11      it was $3 less than my income, so 3,090.

12      Q       3,090?

13      A       Um-hum.

25

July 25, 2022                                              David White-D 306

1

2

14      Q       Mr. White, if you could please turn to

15      Exhibit 17.

16      A       Um-hum.

17      Q       And is that your residential loan application

18      for the loan you obtained?

19      A       Probably, it looks probably like it is.

20      Q       Okay.  And did you -- is that what you 21 submitted to obtain your

loan?

22      A       I think so.  It looks -- yeah, it looks

23      correct.

24      Q       Okay.  And --

        A                 In April or August, I think.

        Q       Okay.  And what -- and so when did you obtain this loan?

3    A       Meaning when did I apply or when did I -- 4       Q       When did you

apply?

5       A       Well, I don't know.  The date should be

6       on -- it was sometime in August.

7       Q       But if I go to page 5 if that's the date you

8       signed it, it says -- it says August -- or July 23rd,

9       2021.

25

July 25, 2022                                        David White-D 307

1

2

10        A       Oh, okay.  Yeah, that's when it was.

11        Q       Is -- is that accurate, Mr. White?

12        A       Yeah, probably.  Um-hum.

13        Q       Okay.  Mr. White, if you could turn to page

14        2 --

15        A       Um-hum.

16        Q       -- on the -- it says "Income" at the top of

17        the page.  And it says -- it says provide the total 18 amount here for your

income.  So that says that your

19   income was $3,993.65.  And so in July of 2021, correct?

20   A Yes.  That's what I put on because I had to 21 take -- I took out extra out of the IRA to

qualify for 22 this loan.

23        Q       Okay.  But in September, you said your income

24        was about $900 less?

A        Yes.  Um-hum.

Q               So which is the correct income?

A                    Well, that was the income at the time, so I

3    could qualify for the loan.  And then, in September,

4    after I got the loan and moved into the house, I cut

5    down -- I had to cut down the amount because I can't

25

July 25, 2022                                        David White-D 308

6      take that amount out sustainably and pay, you know, pay 7 my bills.  I'd be out of money

       in five or six years.

8      But so right now, Social Security is 2,093, and I take

9      out 1,000 a month from the IRA --

10                Q        Okay.

11                A                -- so I can pay my bills.

12                Q                                So is -- your testimony is that you were

13     providing information to the -- to get a loan that

14     wasn't sustainable or accurate?

15     A        It was accurate at the time, yes. 16        Q        But it wasn't actually income

       that was 17 sustainable, is what you just testified?

18                         A        Right.  It wouldn't be sustainable, yes.

19                         Q        Okay.

20                         A        That's correct.

21                         THE COURT:  I want to make sure I've got

22                         this right.  You knew -- because you already told me

23                         that you were taking economic classes and --

24                         THE WITNESS:  Um-hum.

                                  THE COURT:  -- have all these degrees

       and everything --

                         THE WITNESS:  Yes, um-hum.

25

July 25, 2022                                                David White-D 309

1

2

3                    THE COURT:  -- so you know the purpose

4                    of a -- the income is there when you get a loan, right?

5                    THE WITNESS:  Yes.  Yes, I know what it 6 is.

7              THE COURT:  That that's the belief that 8 that's what you get every

month?

9                         THE WITNESS:  I put down what the -- 10                    THE

COURT:  I know -- I know what you

11                    put down.

12                    THE WITNESS:  -- well -- yes --

13                    THE COURT:  It's right there.

14                    THE WITNESS:  Probably.

15                    THE COURT:  But it's -- you knew at the

16                    time that you put that income in there that that 17 was --

                     they're asking you this is what you're going to 18 be getting

                     every single month?

19                    THE WITNESS:  I'm not 100 percent sure

20                    on that, probably.

21                    THE COURT:  What do you mean,

22                    "probably"?  You're the one --

23                    THE WITNESS:  Well --

25

July 25, 2022                                        David White-D 310

1

2

24                    THE COURT:  -- that told me --

                        THE WITNESS:  Yes.

                            THE COURT:  -- you have all these

financial degrees --

3                    THE WITNESS: Yes, I know.

4                    THE COURT:  So --

5                    THE WITNESS: Probably, I -- I don't

6                    know --

7                    THE COURT:  No, no, no.  Probably?

8                    THE WITNESS:  I'm -- I'm not -- 9                THE COURT:

                        Mr. White, how many houses

10                    have you purchased?

11                    THE WITNESS:  Three or four.

12                    THE COURT:  How many times have you

13                    filled out a loan application regarding houses or cars

14                    or boats, or anything else?

15                    THE WITNESS:  Multiple times.

16                    THE COURT:  So you know what the income

17                    part is for, so they can base whether or not you can

18                    make the monthly payments, correct?

25

July 25, 2022                                          David White-D 311

1

2

19        THE WITNESS:  Yes.

20        THE COURT:  So what I'm hearing you

21        saying is you inflated your income to get your house 22 loan?

23        THE WITNESS:  I did what the mortgage

24        officer told me to do to get the loan.

THE COURT:  Is his signature on there,

or is your signature on there or (Indiscernible)?

THE WITNESS:  My signature is on there.

3         THE COURT:  So you verified that

4         information was accurate?  Are you telling me you

5         should not have signed that because it wasn't accurate?

6         THE WITNESS:  It was accurate at the 7 time.

8         THE COURT:  At the time which you knew

9         that the --

10        THE WITNESS:  At the time that I signed

11        for this document.  Yes, it was accurate.  That's how

12        much I took out per month in July, August, and

13        September.

14        THE COURT:  So how could it have been

15        accurate though for --

25

July 25, 2022                                          David White-D 312

1

2

16                    THE WITNESS:  It's not.

17                    THE COURT:  -- November, December, and

18    January?

19                    THE WITNESS:  Because it's not anymore,

20              but it was during those three months.

21              THE COURT:  So you reported yourself to

22              the loan folks that it's no longer accurate, and

23              whether or not you can actually sustain this loan?

24              THE WITNESS:  I can sustain the loan by

              what I'm paying and what the -- and my expenses, like I said, 3 --

                    THE COURT:  All right.  Mr. Shipley, you

3    may continue.

4    BY MR. SHIPLEY:

5    Q        You just testified that you took that same 6 amount out for July, August, and

      September? 7    A        I think it was -- it could have been plus or 8 minus a little bit,

      but something like that.

9              Q        Okay.  But you submitted that Uniform Support

10              Declaration in September that said your income was $900 11 less.

12    A        Right.  Yeah, because at that date going 13 forward, that's what it was going

      to be.

25

July 25, 2022                                                  David White-D 313

1

2

14     Q        But the date you signed the Uniform Support 15 Declaration, you just testified

that you had taken the 16 same amount out from your IRA.

17          A        My understanding from my attorney at the time

18          of signing that was what it would be in the future, not

19          the past.

20          Q        So do you admit that -- that was -- that 21 document was not accurate?

22          A        I'm not a hundred percent certain because I

23          think I put the money back in the IRA that I had taken

24          out previously during September.  And so that would be accurate at that time.

25

July 25, 2022                                    David White-D 314

1      Q

2

                    Okay.

        A                    Even if I had taken out, for example, 1,750

3   in September, but then I put the total of these $8,000,

4   $6,000, whatever it is back in, in -- you know, I think

5   I did it the day -- the 20th or the 22nd that I signed 6 the loan.  Then I didn't have that as

    actual income for

7        that month.

8        Q      Okay.  Do you receive food stamps?

9        A      Yes.

10       Q      Did you include the food stamps on your

11   Uniform Support Declaration?

12       A      No.  I didn't know I needed to.

13       Q      Okay.

14       A      I'll be happy to fill out another one if 15 you'd like.

16       Q      Mr. White, isn't it true that you also

17   collect the food stamps on account of your wife?

18       A      No.

19       Q      Isn't it true that for all of 2021 and even

20   into 2022, you've collected food stamps on behalf of 21 your wife?

22       A      No.  I told them one person.  And I didn't

25

July 25, 2022                                        David White-D 315

1        Q

2

23       get them until September of --

24       Q            (Indiscernible)

         A                -- 2021.

                                        I'm not asking a question at the moment, sir.

         A                (Indiscernible)

3        Q       Okay.  Can you -- Mr. White, can you turn to

4        Exhibit 18.

5        A       Um-hum.

6        Q       Are you there?

7        A       Um-hum.

8        Q       Okay.  This is -- are these accounts here at

9        Ally that are shown -- there's four different accounts:

10       an interest checking ending in 1877, a Climate Change

11       Truth, Inc., ending 2680, an online savings account,

12       and an online -- ending in 1357, and an online savings 13 account ending 8179.

         Are there any other accounts that

14       you handle personal financial transactions through?

15       A       No.  These are the four.

16       Q       Okay.

17       A       Actually, I think there's three.  I think I

25

July 25, 2022                                    David White-D 316

1       Q

2

18          got rid of one of the savings, but I'm not --

19          Q       Okay.

20          A       -- 100 percent sure.

21          Q       Okay.  So is it your testimony that you

22          don't -- none -- none of your -- the Climate Change 23 Truth KeyBank account,

            that no personal expenditures go

24 through that?

            A       Yes.

                                    Okay.  And I've gone through, and we can go

            through it but -- if we needed to, but -- it appeared

3           that in the interest checking, the account ending 1877,

4           that for 2021 there was $65,000 in deposits.  Do you

5           believe that's accurate?

6           A       For 2021?

7           Q       Yes.

8           A       Yeah.  That would -- well, a bunch of that 9 would include the donations

            for Climate Change Truth

10 Incorporated, and a bunch of that would also be the 11 amount that I took extra out of the

IRA that I put back

12          in.

25

July 25, 2022                                          David White-D 317

1        Q

2

13   Q        And in the Climate Change Truth account 14 that's there, there was for 2021,

there was $33,000 in

15       deposits into that bank account.

16       A        Um-hum.

17       Q        Do you agree with that number?

18       A If that's what the data says.  I don't know 19 the number.

20       Q        Okay.  Your tax return -- where did I just

21       put that?  Your tax return that we just looked at, the

22       tax transcript --

23       A        Um-hum.

24       Q        -- did not indicate that you had deposited or that you have received

that sum of money.  That would

25

July 25, 2022                                          David White-D 318

1

2

be $98,000 between those two different accounts.  I believe -- hold on one second.

What'd I do with that.

3                    MR. SHIPLEY:  I've misplaced my exhibit,

4          Your Honor.  Give me one moment.  Sorry, Your Honor.

5          BY MR. SHIPLEY:

6          Q          Looking at Exhibit 42, you had claimed Social

7          Security benefits --

8          A Um-hum.

9          Q          -- of 23,000.

10         A 40 -- oh, 42 here.  Okay.

11         Q          Yeah.  22,000 Social Security benefits and

12         then $38,000 from your IRA.

13         A Um-hum.

14         Q          That adds up to approximately 61,000, 62,000,

15         but you deposited $98,000 into those two separate

16         accounts.

17         A Well, there's whatever you said 33,000 in the

18         Climate Change Truth account, so that's the difference, 19 right?

20     Q       But that Climate Change Truth account is not

21     your -- isn't the KeyBank Climate Change Truth account

25

July 25, 2022                                David White-D 319

1

2

22          is your primary -- is the --

23          A        Previously, it was that account.  Now, the 24 KeyBank account is the

            Climate Change Truth account.

            Q                But for 2021, you used the KeyBank account

    for Climate Change Truth, sir.  Isn't that true?

            A                When anybody gave me cash or a check for a

3   donation, it went in there at the time because I could

4   do it on my phone, you know, E -- e-upload it or

5   whatever, you know, deposit it.  So those -- anything

6   like that was deposited there and then transferred to

7   the KeyBank account.

8           Q        Okay.  So people were giving you cash

9   donations --
10          A        Um-hum.

11          Q                -- for a charitable organization?

12          A                        Yeah.  From when I had a booth at the
13  Washington County Fair and the Oregon State Fair.

14          Q        Okay.

15          A        Showed a presentation I give at climate

16  change conferences.  And had the IPCC report stuff 17 there that shows their

    reports are deliberate science-

25

1

2

18          fiction.

19          Q       Okay.

20          MR. SHIPLEY:  Your Honor, I didn't offer

21          Exhibit 17 into evidence, his signed residential loan

22          application.  So I do want to offer 17 into evidence.

23          (Petitioner's Exhibit 17 offered into

24          evidence)

                  THE COURT:  Any objections to 17?

              MR. WHITE:  No.

                   THE COURT:  17 is received.

3           (Petitioner's Exhibit 17 received into

4           evidence.)

5           MR. SHIPLEY:  I do believe I did offer

6           the Uniform Support Declaration?

7           THE COURT:  You did.

8           MR. SHIPLEY:  Okay.  And then I want to

9           offer Exhibit 18, the Ally Bank accounts.

10          (Petitioner's Exhibit 18 offered into 11 evidence)

12          THE COURT:  Any objection to 18?

13          MR. WHITE:  Nope.

25

July 25, 2022                                        David White-D 321

1

2

14              THE COURT:  It's received.

15              (Petitioner's Exhibit 18 received into

16              evidence.)

17              BY MR. SHIPLEY:

18              Q        Mr. White, please turn to Exhibit 19.

19              A        Um-hum.

20              Q        And this is your Ally IRA statement; is that 21 correct?

22      A        For December 31st, something like that, yeah.

23      Q        Correct.  Okay.  If you could turn to page 4

24      of 9 --

        A        Okay.

        Q        Okay.  If we go down towards the bottom, it says "Current Year

Information."  Do you see that?

3    A        Um-hum.

4    Q        It says "Distributions:  $38,490."

5    A        Um-hum.

6    Q        So you took $38,490 from the IRA; is that

7    correct?

8    A        Yeah, whatever it says, yeah.

25

July 25, 2022                                    David White-D 322

1

2

9   Q Okay.  And then earlier, you were talking 10 about the IRA contributions.  So that would have been 11 11,600?

12      A      Something like that.  I have -- I'll have to

13      look.

14      Q      Well, it's right there in front of you 15 on -- if you look at that where it says "Current Year 16 Information," on page 4.

17                  A      I think I must be on the wrong page.  Just a

18                  second.  I'm on the page that says -- no, it says

19                  "Money Market Funds" or --

20                  THE COURT:  At the top of it, rather

21                  than the date, it'll say page 4 of 9.

22                  THE WITNESS:  Oh, I see.  There it is.

23                  Okay.  I didn't see the page numbers.  Thank you.

24                  MR. SHIPLEY:  Thank you, Your Honor.

                         THE WITNESS:  Okay.  Now -- now, I'm

here.

BY MR. SHIPLEY:

3                  Q      Okay.  So, yeah, if you go down basically at

4                  the bottom, there's --

5                  A      Um-hum.

25

July 25, 2022                                    David White-D 323

1

2

6       Q      -- it says "Current Year Information."

7       A      Okay.  There it is, yeah.

8       Q      So 38,490 was the distributions you took from

9       the IRA in 2021, correct?

10      A      Yes.

11      Q      And 11,600 were the contributions you made,

12      so --

13      A      Yeah.

14      Q      -- is it -- your testimony is that you took 15 the 38,000 out, but then you

        actually put 11,600 back?

16      A      Yes.

17      Q      So that would mean that you -- your total net

18      out of the IRA would have been right at $27,000 for the

19      year.  Isn't that accurate?

20      A      Roughly, yeah.  Um-hum.

21      Q      Okay.  Your Uniform Support Declaration does

22      not indicate that you pulled out $2,000 per month from

23      your IRA, does it?

24      A      No.

        Q                              And you said that -- I think you said just a

25

1

2

little bit ago that your Social Security is 2,000 per month, correct?

3    A    Uh-huh, yep.

4    Q    And -- but your total income is 3,000 per

5    month.

6    A    Um-hum.

7    Q    So --

8    A    Currently, yes.

9    Q    Right.  But for 2021, you actually would have 10 been more like 4,000 a month

or so; is that correct?

11        A    Well, Mr. Bernabei said I could pay his fees

12        from that, so that's where the extra money went from 13 that.

14        Q    Well, that wasn't quite what I asked you.

15        A    Well, that's -- that -- it -- well, I think 16 that's what you're getting at,

right?  Is where -- what 17 is the difference and that's the difference.

18        Q    No.  What I was getting was whether or not --

19        A    I don't --

20        Q    -- your statement, your Uniform Support 21 Declaration and your

testimony here regarding your 22 income is accurate.

23        A    Yes, it -- what I testified is correct.  I

25

July 25, 2022                                          David White-D 325

1

2

24          didn't include expenses for my attorney because I took those directly out of the

IRA.

            Q        Did you say that you were going to bring in a new Uniform Support

Declaration tomorrow?

3                    A        I could if I can get a form to fill out or

4                    something.  I don't have a blank --

5                    THE COURT:  It's online.

6                    THE WITNESS:  It's online.

7                    THE COURT:  Yep.

8                    THE WITNESS:  Okay.  All right.  I'll

9                    (indiscernible).

10                   BY MR. SHIPLEY:

11                   Q        I want to talk a little bit about Climate

12                   Change Truth.

13                   A        Okay.

14                   Q        Now that is a -- that was a IDIS.  You 15 registered that

corporation as a nonprofit in the state

16    of Idaho, correct?

17    A        Yes, that's correct.  It's a 501(c)(3) 18 Nonprofit.

19    Q        Now, why did you do it in Idaho when you 20 lived in Oregon?

25

July 25, 2022                                              David White-D 326

1

2

21        A        Simple.  The State of Oregon is corrupt, and

22    they charge $100 a year.  In Idaho, it's $15 to

23    register it and nothing every year to update it.

24        Q        Okay.  Now, what do you do for Climate Change

Truth?

        A        I present at climate change conferences.        Q        If you

could --

3                        MR. SHIPLEY:  Before I forget, Your

4                        Honor, I wanted to offer -- sorry.  I wanted to offer

5                        the -- the Exhibit 19.

6                        (Petitioner's Exhibit 19 offered into

7                        evidence)

8                        THE COURT:  Any objection to Exhibit 19.

9                        It's the Ally investment securities.

10                       MR. WHITE:  No.

11                       THE COURT:  It's received.

12                       (Petitioner's Exhibit 19 received into

13                       evidence.)

14                       BY MR. SHIPLEY:

15                       Q        If you could please turn to Exhibit 21.

25

July 25, 2022                                            David White-D 327

1

2

16          A       Um-hum.

17          Q       Okay.  This is a webpage, or this is a part

18   of the webpage for Climate Change Truth.

19          A       Um-hum.

20          Q       Would you agree with that?

21          A       It's been changed since you printed this out.

22          Q       Okay.  But at the time I printed this out,

23   you know, it stated that -- on page 2 of what I've

24   submitted there -- who created that -- well, let me ask you this:

     Who created the content that was on the page

at that time?

            A           I created it, I guess you could

3               say -- who -- who said to put it there or who actually

4               did the work?

5          Q       Who did the work?

6          A       John Elder.

7          Q       And then who did the writing of it,

8   the -- the content of it?

9          A       The content was from me.

10          Q       Okay.

25

July 25, 2022                                    David White-D 328

1

2

11          MR. SHIPLEY:  Your Honor, I offer

12     Exhibit 21 into evidence.

13          (Petitioner's Exhibit 21 offered into

14     evidence)

15     THE COURT:  Is there relevance to it?

16     MR. SHIPLEY:  Yeah.  Well, it gets into

17     his -- I mean, I can -- I can get into that.

18     THE COURT:  Any objection to 21?

19     MR. WHITE:  No.

20     THE COURT:  It's received.

21     (Petitioner's Exhibit 21 received into

22     evidence.)

23          MR. SHIPLEY:  Your Honor, it just -- on

24     page 2 it just provides a description of Mr. White's

       qualifications.  It says, "Dave is a chemical engineer

25

July 25, 2022                                                David White-D 329

1

2

with graduate studies in statistics, currently working on climate change.  He has 30 years

of experience."

3          THE COURT:  I can read it.  I can read 4 it.

5  MR. SHIPLEY:  -- so on and so forth. 6   THE COURT:  Um-hum.

7                    MR. SHIPLEY:  So it's being offered,

8          Your Honor, to establish his credentials, is what it's

9          being offered for.

10          THE COURT:  Okay.

11          BY MR. SHIPLEY:

12          Q          After you graduated from college, from Oregon

13          State, correct?

14          A          Um-hum.

15          Q          With your degree in chemical engineering and

16          graduate studies in statistics, where was your first

17          place that you went to work.

18          A          Intel.

19          Q          Okay.  And how long did you work there?

20          A          A couple of years.  There was a severe

21          downturn, I think.

22          Q          Okay.  And then after that -- and what -- you

25          A

July 25, 2022                                          David White-D 330

1

2

23          were working with doing semiconductor work; is that

24          correct?

          Right.

     Q          Okay.

A Um-hum.  Semiconductor lithography, which is 3 where they print the wiring

patterns on the wafer.

4     Q          And then after you worked at Intel then you 5 moved up to Nampa, Idaho, and you worked for a company

6          called Zilog Semiconductors; is that correct?

7          A          Yes.

8          Q          Okay.  And then after that, once you moved

9          back to Oregon, is that true?  In --

10          A          Um-hum.

11          Q          -- 1988, approximately.

12          A          Somewhere around there, yeah. 13          Q          And then you went to work for Fujitsu in

14          Gresham; is that correct?

15          A          Yes, that's correct.

16          Q          And it -- could you -- what were you doing 17 for them as well?

18          A          Ran -- I was the lithography section head.

25          A

July 25, 2022                                          David White-D 331

1

2

19     Q       Okay.  And then after working for Fujitsu,

20     then did you go work for another company?

21     A       Yes, for TOK Photoresist.

22     Q       And where were they located?

23     A       In Hillsboro.

24     Q       And what -- what did -- what did they do?

       They made the chemical that we print the

wiring patterns on for semiconductors.

       Q                    Okay.  And you were there for 11 years; is

3      that correct?

4      A       Something like that, okay.

5      Q       Well, like, when you say something like

6      that --

7      A       I think so, yeah, 11, 10-11, something like 8 that.

9      Q       And then after that, you went out on your

10     own; is that correct?

11     A       Yes.

12     Q       As a consultant?

13     A       Um-hum.

25     A

July 25, 2022                                              David White-D 332

1

2

14      Q        Okay.  And you were doing this 15 photolithography consulting; is that

correct?

16      A        Yes.  Um-hum.

17      Q        Okay.  Now, isn't it true that there's only

18      two people in the world -- and you're one of 19 them -- who actually know how

to do that particular

20      work?

21      A        In terms of the consulting, yes.

22      Q        Okay.  Now you -- at some point there, I 23 think it was like in 2016 -- is

that when you retired 24 from working at a company?  Is that correct?

                            In 2016, the economy got better, and there

25      A

July 25, 2022                                          David White-D 333

1

2

was no more consulting work.

Q        Okay.  Now I had asked you in your deposition 3 if you are retired, and do you remember what you told

4        me?

5        A        A chemical engineer is never retired.

6        Q        You said, "A person like me is never

7        retired."

8        A        Right.

9        Q        You said, "I'm always -- you're always trying

10        to think of some way to make some money or do

11        something.  You want to stay active."

12        A        Um-hum.

13        Q        "Why let money waste away."  Do you still

14        believe that?

15        A        Absolutely.

16        Q        Okay.  Now, you had also done some work as an

17        electrician of sorts doing RV electrical; is that

18        correct?

19        A        I have done that, yes.

20        Q        Okay.  And my understanding was that you were

25

1

2

21          just -- you worked through some -- some, like, local RV 22 places, stores, or

whatever -- and you would get 23 referrals for RV electrical work; is that

correct?

24          A          Yeah.

Q                                            Okay.  Have -- since your deposition have you

sought out trying to do any of that work?

A          No.

3          Q          Okay.  You said there was an RV body shop on

4          Cornelius Pass Road, and -- and they would call you

5          whenever they needed electrical work.

6          A          Yeah.

7          Q          But that you didn't have any more, like, of

8          your business cards out there.

9          A          Right.

10          Q          Okay.

11          A          I don't have any -- I don't have any money to

12          buy any business cards to put there.

13          Q          Okay.  So you can't -- you couldn't 14 afford -- you can't afford any

business cards?

15          A          No.

25

July 25, 2022                                             David White-D 335

1

2

16     Q     Okay.

17     A     Not with $3 a month in, you know, above my 18 expenses, no.

19     Q     Okay.  If you were to go out there, do you

20     think you -- did you have a good relationship with

21     those people?

22     A     Yeah, um-hum.

23     Q     Okay.  So if you could go out there, even if

24     you didn't -- couldn't afford any business cards, you could at least get your name

out; is that correct?

A          I could.

Q                    Okay.  And then -- now you also teach at an

3     online school, correct?  And -- is that right?

4     A     Online on Local Hubs, yes.

5     Q     Okay.  And that's King's Way Academy; is that

6     right?

7     A     King's Way Classical Academy, yes.

8     Q     All right.  And what do you teach there?

9     A     College biology, chemistry, and physics.

10     Q     Is that all you do for -- is just teach, or 11 do you do any promotional

travel or anything like that 12 for that company?

25

July 25, 2022                                          David White-D 336

1

2

13     A     I traveled to check out some hub locations 14 and went to a homeschool conference in Florida to get

15     us some students.

16     Q     Okay.  And so does the -- the -- the 17 ownership or people running King's Way Academy -- they

go ahead and cover those expenses for you?

19     A     They pay the expenses, yes.

20     Q Okay.  My understanding is you traveled 21 around -- it was like eight different cities; is that 22 right?

23     A     In November something -- yeah, I think so, eight.

Q     Okay.

25

July 25, 2022                                    David White-D 337

1

2

        A        Um-hum.

    Q        And what are you paid now from there?  How 3 much are you paid?

4    A        Last year I was paid -- I would get paid $100 5 per student per term, which was four months, and I had

6    two students.  So I got paid $200.  I was hoping to get

7    some more students this fall, but so far, not

8    happening.

9    Q        My understanding is -- from your testimony 10 and your depositions -- that you spent about 30 hours a

11        week on that job; is that correct?

12        A        At least, yep.

13        Q        Okay.  You also testified -- I think 14 you -- you testified that you also did -- that you do,

15 like, appraisals and things like that for RVs and such. 16        A        If one of the RV customers asked me to 17 appraise their motorhome or whatever -- travel trailer, 18 I would do it.  Yeah.

19        Q        Have you done any appraisals in the last two

20        years?

21        A        No.

25        A

July 25, 2022                                                David White-D 338

Q       Have you done an appraisal -- when was 23 the -- well, let me ask you this:  When was the last 24 time you did an appraisal?

Probably 2020.  Sometime in the spring or summer.  I'm not a hundred percent sure.

Q       In 2020?

A       Um-hum.

Q       How much were you paid for that?

A       I don't charge for an appraisal.  I

just -- they're -- I'm already doing work on their RVs,

so they ask me, "Well, you know, I'm going to sell

this.  How much should I sell it for," -- and that kind

of thing.  It's not like I write up a -- an appraisal 10 for it or something.

Q       So you don't write up an appraisal.  You just 12 give them an opinion on it?

A       I give --

Q       Verbal?

A                               -- I give them an opinion, and it's very 16 accurate because what they sell it for is typically 17 what I told them they could sell it for.

Q       Okay.  I want to go back to January of 2021.

Do you remember going to Africa?

A       Um-hum.

Q       And at that time, you were pursuing what you

A

July 25, 2022                                        David White-D 339

1

2

22      thought was a romantic relationship; isn't that true?

23      A      There was two things.

24      Q      Well, what were the two things?

                              I met with the Christian -- it was the Ghana

Christian Ministries and gave them our evangelism materials.

3       Q      Okay.  So you were married at the time?

4       A      Um-hum.

5       Q      Right?

6       A      Um-hum.

7       Q      And you were traveling to Africa to pursue a

8       romantic relationship with another woman, but you were

9       also, on that same trip, going on a Christian mission

10      trip; is that correct?

11      A      Yes.

12      Q      Isn't it true that you borrowed money on the 13 line of credit against

        your home, and you sent money to

14      this supposed woman?

15      A      Yep.  And it was a lie.

16      Q      All right.  And you took out $6,400 on that 17 line of credit against your

        home to send to this woman

25      A

July 25, 2022                                    David White-D 340

1

2

18          in Africa, correct?

19          A       Yes, I think so.

20          Q       What did you tell your wife when you took

21          that money out on the line of credit?

22          A       I don't know.  I don't remember.

23          Q       Did you -- well, did you tell her you were

24          pulling $6,400 out to send to a -- a woman in Africa?

                    I'm sure I didn't say that, but I don't

25          A

July 25, 2022                                          David White-D 341

1

2

remember --

      Q     Okay.

A    -- what I said.  Or if I even said, if she 4 even asked.  I don't remember.

      Q     Did you possibly tell her that you took that

money out to pay property taxes?

      A     I don't remember.

      Q     Okay.  So you didn't tell her you were going

to meet a woman in Africa, but you did tell her that

you were going on a Christian mission trip, correct?

      A     I don't remember, but probably.

      Q     Okay.  Well, do you recall that when you left

on that flight, your -- your wife went and prayed with

you before you left?

      A     I don't remember.

      Q     Okay.  You don't remember that your wife

prayed with you --

      A     Nuh-uh.

      Q     -- before you left?

      A     Nuh-uh.

25

July 25, 2022                                          David White-D 342

1

2

21          Q          Okay.  While you were in Africa, who was it 22 that convinced you that

you were being scammed?

23          A          I was -- before I even went, I was about 95

24          percent certain.  Once I got there, things weren't as what they said.  And then

my son called, said he put

out a missing persons for me and wanted me to get out of there, so I did.

3          Q          Okay.  So your -- your son, he helped you out

4          there; wouldn't you say?

5          A          Yeah, um-hum.

6          Q          Okay.  Now, you're saying that you were 95

7          percent sure that you were getting scammed, but you 8 still went to Africa.

9          A Well, I wanted to do the Christian mission

10          thing and see if this other was real or not.

11          Q          Okay. 12                          (Pause)

13          BY MR. SHIPLEY:

14          Q          Mr. White, I just handed you two exhibits --

15          A          Um-hum.

16          Q          32 and 33.

17          A          Um-hum.

18          Q          32, is that your declaration that you filed

25

July 25, 2022                                    David White-D 343

1

2

19          in opposition to our motion to compel?

20          A       Yes.

21          Q       And on the second page, that is your

22      signature, correct?

23          A       Yes.

24          Q       Okay.  And on page 33 -- or not page

30 -- Exhibit 33 --

            A       Um-hum.

    Q       -- isn't this a complaint that you filed in 3 the Federal United States District

Court for the

4           District of Oregon?

5           A       Yes.

6           Q       And on page 4 of that document, you signed

7       it --

8           A       Um-hum.

9           Q       -- did you not?  And that's your signature?

10          A       Somewhere there, yes.

11          Q       Okay.

12          A       Um-hum.

13          Q       Yeah, at the bottom of page 4, is that -- 14          A       Yes, um-hum.

25

July 25, 2022                                          David White-D 344

1

2

15   Q       -- signature?  Okay.  Want to go to Exhibit 16 32, sir.

17                   MR. SHIPLEY:  And, Your Honor, I'm

18                   offering 32 and 33 into evidence.

19                   (Petitioner's Exhibits 32 and 33 offered into

20                   evidence)

21                   THE COURT:  Any objection?

22                   MR. WHITE:  Nope.

23                   THE COURT:  They are received.

24                   (Petitioner's Exhibits 32 and 33 received

into evidence.)

BY MR. SHIPLEY:

     Q                   On the second page, the first sentence of

3            item 6 in your declaration says, "No funds in the

4            corporate account are used for my personal

5            expenditures."

6            That is specifically referring to the KeyBank

7            Climate Change Truth account, correct?

8            A Yes, that's correct.

9            Q       Okay.  If you look at -- on Exhibit 33 and at

10           the bottom in Section C, you wrote that language,

25

July 25, 2022                                        David White-D 345

1

2

11          correct?

12          A Which page?

13          Q        Page -- sorry, page 3.

14          A Okay.

15          Q        This would be Section C.

16          A Yes.

17          Q        Okay.  You --

18          A Um-hum.

19          Q        -- so you wrote that language, correct?

20          A Yeah.

21          Q Okay.  You wrote the 501(3)(c)(sic) 22 regulations restrict anyone from

            using nonprofit funds

23    for personal use.

24          A        Um-hum.

            Q          You wrote that, correct?

            A        Yes, um-hum.

            Q        Okay.

3           A        I also -- well, I guess I can't answer that

4     question.

5           Q        Moving to the next page, page 4 --

25

July 25, 2022                                     David White-D 346

1

2

6        A        Um-hum.

7        Q        -- in Section 5 --

8        A        Um-hum.

9        Q        -- you state that you request an injunction

10       be granted to stop Judge Bailey from ordering KeyBank 11 records to be

         produced in the divorce case.

12                "We also request Jim Shipley be compelled to

13                pay $2,000 to climatechangetruth.org for causing extra

14                attorney expense."

15                And then you say, "An additional $2,000 for

16                30 hours of Professor White's time to respond shall be 17 paid to Mr.

                  White."

18                So, Mr. White, my question is:  Is your time

19                worth $66.66 per hour?

20       A        No.

21       Q        Well, this is a sworn document.  You've sworn

22                to this.  And you testified that your time is worth 23 $66.66.

24       A        For doing this, I guess I thought that it was.  I -- I don't know.  But I guess that's

         what it is

         for this kind of work.

25

July 25, 2022                                                David White-D 347

Q          What kind of work?

A          Writing up this and submitting it in a

federal court.  And responding to your "fishing trip."

Q          Well, you said that your -- your time is 6 worth 2,000 -- 30 hours of your

time is worth $2,000.

A          For this kind of work, yes.

Q          Okay.

MR. SHIPLEY:  Your Honor, I've got

KeyBank documents that were -- are subject to 11 protective

orders on one of the (Indiscernible).

THE COURT:  Okay.

MR. SHIPLEY:  Purpose is just to do

this.

(Pause)

BY MR. SHIPLEY:

Q          Mr. White --

A          Um-hum.

Q          -- I'm showing you what's been marked as

Petitioner's Exhibit 34 --

A          Um-hum.

July 25, 2022                                          David White-D 348

1

2

22          Q        -- and these are the KeyBank account

23          statements --

24          A        Um-hum.

            Q        -- for Climate Change Truth.  Is that
accurate?

            A        Yes.

3    Q        And they run from February 28, 2021, until 4 February 28, 2022.  Is that
accurate?

5           A        I suppose so.  I don't -- I need -- I'll

6           agree, yeah.

7           Q        Okay.

8           MR. SHIPLEY:  Your Honor, we offer these

9           statements into evidence.

10          (Petitioner's Exhibit 34 offered into

11          evidence)

12          THE COURT:  Any objections to 34?

13          MR. WHITE:  No.

14          MR. SHIPLEY:  Okay.

15          THE COURT:  34 is received.

16          (Petitioner's Exhibit 34 received into

25

July 25, 2022                                    David White-D 349

1

2

17                    evidence.)

18                    MR. SHIPLEY:  Sorry.

19                    BY MR. SHIPLEY:

20                    Q       Mr. White, if you could please look to the

21            February 28th, 2022, statement?

22                    A       What page or --

23                    Q       In the front page, page 1 of 4.

24                    A       Okay.

          Q                   It looks like there's -- on the deposit

section on two seven two fourteen -- there are ATM deposits, two of them that total

right at $610.

3                     A       Um-hum.

4                     Q       What would those have been from? 5    A       What month

              was this, February --

6    Q       February --

7    A       -- 8th

8    Q       28th, 2022.

9    A       It could have been cash, or somebody gave me 10 a check.  I don't remember.

11                    Q       And then there's a -- on 2/17, there's an

12            internet transfer from an account apparently that ends

25

July 25, 2022                                          David White-D 350

1

2

13          7489 for $6,000.  What account was that transferred 14 from?

15     A     I don't remember.  I -- I don't know. 16  Q     Well, you would have done the transfer,

17     correct, sir?

18     A     Yes.  But I don't remember where it was from 19 or what it was.

20          Q     My understanding is that you were the only

21     signer on this account; is that correct, Mr. White?

22          A     No.  That's not correct.  Randy Veers

23     (phonetic) is also a signer on this account.

24     Q     As of when?

     A               I don't remember.  It's been a long time.

     Q               Are you sure about that?

     A          Um-hum.  Yep.

3     Q     You said a long time Mr. Veers has been a 4 signer?

5     A     It's been a while.  I don't remember when it 6 was.

7          Q     Okay.  Well, when you testified at your

8     deposition on December 1st --

9          A     Um-hum.

10          Q     -- I asked you who was the signer of the

11     Climate Change Truth checking account --

25

July 25, 2022                                                    David White-D 351

12          A       Um-hum.

13          Q       -- and you said yourself.

14          A       Yes.

15          Q       And I said -- and then I followed up, and I

16    said, "Anybody else?"

17    And you said, "No."

18          A       That's what I thought at the time, but then I

19    talked to Randy later, and he said, "No, it's been

20    before that."

21          Q       So you're saying that actually, at the time

22    that you answered that question, you were wrong?

23          A       I was wrong, yes.

24          Q       Okay.  So is it your testimony that you don't know who all is

        making these deposits into this

account?

        A       I'm probably making most if not all of the 3 deposits, but you're asking me

about something from 4 several -- several months ago.  So I -- I don't know

5          where it came from.

6          Q       Okay.  Well, this transfer of $6,000,

7          what -- what account is that?

July 25, 2022                                    David White-D 352

1

2

8         A         I don't have the list of accounts in front of 9 me, so I -- I can't say.

10        Q         Mr. White, you had -- you keep track, or you

11        look at -- you're the -- are you the main person who

12        monitors this account?

13        A         Yes.

14        Q         Okay.  And in December of 2000 -- December 1,

15        2021, you believed you were the only person who had

16        signing authority on this account. 17      A         I thought I did at the time --

18        Q         Okay.

19        A         -- yes.

20        Q         So if all of a sudden, transactions started

21        appearing in his account that you had not done,

22        wouldn't you have been alarmed?

23        A         Yes.  I would have asked him or -- I mean,

24        it's probably something I did, but I don't know what it is.  I don't remember.

          Q         Okay.

          A                          Like, there's also a 1,367.  I don't know

3    what that one is, either.

4    Q         Well, it's the same account.  Do you know 5 what that account is, 7489?

6 A No, I don't know.  Not off the top of my head 7 without looking.

25

July 25, 2022                                David White-D 353

1

2

8       Q       Well, you provided us a -- your Ally checking

9       account statements.  And there's no account ending 10 7489.  Do you have other bank account statements that

11              you haven't provided us?

12              A       No.

13              Q       Are you sure?

14              A       Um-hum.

15              Q       Now, you did testify that you had -- you had

16              your yard landscaped in the back.

17              A       Oh, I think I remember what this is.

18              Q       Hold on.  Where -- where you going to? 19       A       The $6,000,

                that was the loan I got to fix 20 the blower on the truck, the $6,000, yeah.

21      Q       Well, then they also -- then there was also a 22 transfer of 1,367.

23              A       Yeah, I don't remember what that was from.

24              But it had to be the same thing.  I don't -- I don't remember what it was.  But I

                think I -- that's what the 6,000 was.

        Q       But who is -- who -- who is the owner of the 3 account ending 7489?

4               A       I don't know.  It could -- maybe it's the

5               banks where they transfer the money from the loan.  6 I  -- I don't know.

7       Q       Okay.  Yeah, but this -- there was $1,200

25

July 25, 2022                                                    David White-D 354

1

2

8       used to landscape your front yard; isn't that true? 9       A       Yes.  It was paid for

by the corporation, 10 yes.

11                  Q       Okay.  Now you've filed some documents saying

12              that people wouldn't think it really looks that good; 13 is that correct?

14                      A       At the time, but since then, I put some

15              bark -- bark mulch down and --

16                  Q       When --

17                  A       -- it looks much better.

18                  Q       -- when was that?

19                  A       Maybe in the last couple months.

20                  Q       Now, in December, you testified -- I asked

21              you, "How does it look now?"

22              And then you said, "What?"

23              And then I said, "Does it look better now?"

24              And then you said, "Yeah.  I replaced it with

native shrubs."

                    A       Yeah.  Um-hum.

                    Q                       So in December, you thought it looked -- when

3       you testified then -- you thought it did look better?

25

July 25, 2022                                      David White-D 355

1

2

4      A       I thought it looked better than the dead 5 grass that -- that was there.  And --
but my neighbors

6              wouldn't have said it looked better.

7      Q       Okay.  But you liked it.

8      A       I liked it, yeah.

9      Q       Okay.

10     A       Um-hum.

11     Q       All right.  Let's go to page 2 of that
12     statement.

13     A       2 of 4?

14     Q       Yep.

15     A       Okay.

16     Q       Is it your -- your testimony that all of 17 these withdrawals were all for
Climate Change Truth?

18     A       Um-hum.

19     Q       There's quite a few over the next several
20     months --

21     A       Um-hum.

22     Q       -- well, strike that.  I see on February 9th,

25

July 25, 2022                                        David White-D 356

1

2

23          there's a withdrawal for $800.  So was Climate Change 24 Truth doing a lot of

cash transactions?

          A                    There are cash transactions, or there had

been every month, but I don't know what that was for.

          Q        Okay.  Now, on 2/14, there is a purchase for 3 $84.90 for the Oregon Liquor

Store in Newport, Oregon.

4          A        Um-hum.

5          Q        And is it your testimony that that was a

6 business expense?

7          A        Yes.

8          Q        What was happening in Newport, Oregon?

9          A        I -- there's a friend that lives in Depoe

10 Bay.  One of the things I present at climate change

11 conferences is global sea rises 1.4 millimeters linear

12 and not accelerating.  There's no reliability in the 13 NOAA sea level rise -- sea

level data.

14                  And, you know, when I present stuff the best

15                  I can, I like to go check it out.  So a friend of mine 16 lives in Depoe Bay,

                  I go down there and check the sea

17 level rise.  For a while, I was doing that every other

25

July 25, 2022                                    David White-D 357

1

2

18     weekend, I think.  I don't -- I haven't done that

19     lately.  And since I stay at their house for free, I'd

20     buy them a bottle of Scotch or bottle of liquor or

21     something or buy them some food and that kind of thing.

22     Q It looks like on 2/14, you ate at Muchas 23 Gracias in McMinnville, Oregon.  Was that

a business 24 expense?

           A                    Yeah.  I think that was on the way down

there.

           Q                         And then there's a -- on 2/14, there's also

3       a -- a dinner at Taste of Sichuan in Beaverton.

4       A     Um-hum.  I -- I don't remember

5       that -- whether that was Randy and I or what it was.

6       I -- I don't remember.

7       Q     Okay.  And then there is a Burgerville on

8       February 24th --

9       A     In Corvallis, yeah.

10      Q     Yeah.

11      A     That was on the way to Newport.

12      Q     Okay.

13      A     Or to Depoe Bay, I meant.  I'm sorry.

25

July 25, 2022                                          David White-D 358

1

2

14          Q      All right.  Let's move to January 31, 2022.

15          A      Is that the next -- 16     Q      Yeah, the next one.

17    A      Okay.  All right. 18     Q      So if we can look at

page 1 --

19          A      Um-hum.

20          Q      -- I see on January 5th, and again on January

21    12th, there's two deposits from Lyft.

22          A      Um-hum.

23          Q      And that's who you drive for, correct?

24          A      I have done some of that in the past, yes.

            Q                          So that was personal income coming into this

account, correct?

            A                    It -- Lyft has a program where you can have

it go to a nonprofit.  And since, at the time, I had

3    it go to a nonprofit.  And since, at the time, I had

4    the experiment on U.S. 26 -- where the trees by the zoo 5 are consuming all the CO2

from 160,000 vehicles a

6    year -- all the expenses for the car for two years were

7    paid for by the company.  And then any income from 8 Lyft, since that was using that

car, was paid for and 9 the money deposited to the company.

10          Q      Okay.  I see there is a -- a charge on -- if

25

July 25, 2022                                          David White-D 359

1

2

11          we go to the second page -- for Ziply (Indiscernible)

12          of Fiber on January 3rd -- and that is internet,

13          correct?

14          A          Uh-huh, yeah.

15          Q          And don't you also use your internet for your

16          other business, your routering business, or whatever

17          it's called?

18          A          My routering?

19          Q          Where you do some web hosting, correct?

20          A          Yes, um-hum.

21          Q          Okay.

22          A          Yeah.  It's mostly used for the Climate

23          Change Truth, yes.

24          Q          Oh, okay.  And then on January 5th, there is

                        Victor Rico's, that's the Mexican restaurant, correct?

            A          In St. Helens, yeah.  Um-hum.  I don't remember what -- something -- I

went --

3           Q          Okay.

4           A          -- somewhere for something.

5           Q          And then on January 10th, you went to Safeway

25

July 25, 2022                                        David White-D 360

6        in Hillsboro?

7        A        Um-hum.

8        Q        And then you bought razors from Harry's --

9        A        Um-hum.

10       Q        -- in New York.

11       A        Um-hum.

12       Q        How were those used for Climate Change Truth?

13       A        To present at climate change conferences, I 14 need to look decent.

15   Q        When was the last climate change conference 16 you presented at?

17       A        It was -- it was May 26th or something, I

18       think.

19       Q        Okay.  Well, this is January --

20       A        (Indiscernible) address.

21       Q        This is January 13th.

22       A        Yeah, I know.  Well, all during that time --

23       let's -- I don't remember the dates.  I'd have to look

24       them up.

         Q        Okay.

         A                                        But all the -- in the last 2 years, 17 or so.

     They're all online because of COVID, so they're only, 3 like, $100 to present.

25

July 25, 2022                                        David White-D 361

1

2

4          Q        Okay.  Now, I see on the -- do you think it

5          would be accurate if I said -- because I did a little 6 addition -- that from

           November 30, or let's say

7          December 1 through the end of February 2022, that you

8          spent 600 -- just under $600 at liquor stores.

9          A        Probably.

10         Q        Okay.  And then there's -- let's see what I

11         can -- January 14th, there's a direct withdrawal

12         for -- to payment of an Amazon store card for $503.42. 13        A        Yeah, I

           bought something for the company, but

14  I don't remember what it was.

15  Q        Okay.  And then it looks like you -- you 16 spent some money at Mac's

Radiator on December -- on

17         January 21st?

18         A        Um-hum.

19         Q        What was that for?

20         A        Part for the car.

21         Q        Okay.  Then you -- what's -- you -– you -- it

22         looks like on January 28th you spent $35 at the Tide

23         Pool Pub in Depoe Bay.

25

July 25, 2022                                    David White-D 362

1

2

24          A      Um-hum.

            Q               Were you down there again to measure water

levels?

      A      Yes.  I'm sure that was what it was.  3   Q      All right.  We're going

to move on to

4           December 31, 2021.

5           A      Um-hum.

6           Q      Again, there's a deposit for $221.34 on

7     December 29th from the Lyft.

8           A      Um-hum.

9           Q      And then there's also several, looks like,

10    they must have been cash deposits --

11          A      Um-hum.

12          Q      −- on January -- on December 3rd and then 13 also December 21st; is

      that correct?

14    A      I'm on -- I'm on January.  I guess I didn't

15    turn the page.  Just a second.

16    Q      Oh, sorry.

17    A      So you're on the first page of December 31st?

18    Q      Um-hum.  That's correct.

25

July 25, 2022                                                    David White-D 363

1

2

19        A        December 3rd, yes.  Yeah, I have it here.

20        Q        Okay.  On December 16th, it looks like

21    there's a charge for $175 for Red Lion Hotel.

22        A        Um-hum.

23        Q        Now you're -- is it your testimony that that 24 was not for personal?

        A                Yeah.  I don't remember what it was for to

tell you the truth.

Q        And then on 12/22, you spent money at the 3 Levi's Outlet Store, about $59

--

4    A        Um-hum.

5    Q        -- on December 22nd.

6    A        Okay.  It's on the next page or what?

7    Q        Yeah.  This will be 2 of 3.  Sorry.

8    A        Oh, okay, 22nd.  Yes, um-hum.

9    Q  Okay.  Then there was –- 10 A And I can say it again.  Um-hum.

11        Q        -- December 23 there.  It looks like there's

12    a couple charges for about $25 total at Chinook Winds

13    Casino?

14        A        Um-hum.

25

July 25, 2022                                                        David White-D 364

1

2

15      Q      Does that -- you -- is it your testimony that 16 that's not for personal

reasons?

17      A      No.  That's to take them -- I took them there

18      for -- I don't know what we did, I think –-

19      Q      While you were -- 20    A -- May or something.

21      Q      -- when you were down there measuring --

22      A      Yeah, when I was down there.

23      Q      -- sea levels again.

24      A      Yeah, um-hum.

        Q            How do you do that?

        A      I have a -- well, in the -- I don't have it  -- but in Depoe Bay is a tide

gauge.

3       Q      Um-hum.

4       A      It has a USB connection so I can hook it up 5 and download the data.

6            Q      Okay.  Now, moving on to the November bank

7            statement.  On page 1 --

8            THE COURT:  (Indiscernible) I've got

9            to -- there's a bunch of liquor store charges in

10           here --
11      THE WITNESS:  Um-hum.

12           THE COURT: -- that have nothing to do
25

July 25, 2022                                                    David White-D 365

13   with the coast.  A lot of them in Beaverton so trying

14   to figure out what does that have to do with Climate 15 Change Truth?

16                        THE WITNESS:  I -- I probably took them

17                        to the coast for the people I stayed at their house.  I 18 don't

                          know.

19                        THE COURT:  But then you're going to the

20                        liquor stores down there and buying stuff there too.

21                        THE WITNESS:  Um-hum.  Yeah. 22  THE COURT:  So, again, how

                          does this

23                        have to do with Climate Change Truth?

24                        THE WITNESS:  It's a lot cheaper to stay

     at their house then it is to rent a --

                              THE COURT:  Well, hold on.

                  THE WITNESS:  -- hotel for a couple of 3 days.

4                         THE COURT:  But you don't need to.  You

5                         drive down, you plug in your USB, get the data, and go.

6                         THE WITNESS:  No.  I like to check it

7                         over a couple of days and analyze the data while I'm 8 there.

9                         THE COURT:  But you don't have to.  You

10                        agree with me you could head home and analyze the data?

25

July 25, 2022                                             David White-D 366

1

2

11          THE WITNESS:  Yeah.  But if there's

12    something wrong with the data then I have to go back

13    down there and see what's wrong with the tide gauge --

14          THE COURT:  I'm doing my math.  This is

15    before our gas increases.  But it still be cheaper for 16 you to

      drive back down there.

17          THE WITNESS:  Oh, I -- it could be, I

18    don't know.  I haven't calculated it.

19          THE COURT:  Just -- I'm just trying to

20    figure -- there's just -- if you look in this, this 21 month alone, I

      think there's about $300 in liquor store

22    costs.

23          THE WITNESS:  Could be.  I mean if

24    that's what it says, that's what it is.

            THE COURT:  Just saying --

         THE WITNESS:  Um-hum.

             THE COURT:  What -- sure seems that at

3     some point in time that's not what Climate Change Truth

4     should be spending the money on.  So at what point in

5     time to restart to figure this is income to you?

25

July 25, 2022                                    David White-D 367

1

2

6          THE WITNESS:  None.

7          THE COURT:  Well -- 8          THE WITNESS:  There's

--

9     THE COURT:  -- you have to help me out

10    with the Harry's razors, the Levi's, and this

11    type -- how is this not income to you?

12    THE WITNESS:  I -- I already said why 13 it's not income for me.

14        THE COURT:  Well, they pay you for your

15    expertise not to look good, right?

16        THE WITNESS:  They pay me -- what

17    do -- I don't get paid for anything.  What do --

18        THE COURT:  Well, you do because you get

19    all this money --

20        THE WITNESS:  I get donations, yes.

21        THE COURT:  All right.  So

22    your -- you -- you have a lot of personal expenses here

23    that seem to be helping you out.  You're getting new

24    clothes.  You're getting razors.  You're getting alcohol.  You're

getting food.  Sometimes you're getting housing.

25

July 25, 2022                                          David White-D 368

1

2

MR. SHIPLEY:  Gas.

3    THE COURT:  Gas.  So it seems to be a

4    lot of personal items you're getting out of this thing.

5    THE WITNESS:  Yeah, but it is -- wasn't

6    for personal use.  It was --

7    THE COURT:  Sure it was.

8    THE WITNESS:  Some of it was for the

9    experiment I did.  And some of it was going down to 10 Depoe Bay.

11                    THE COURT:  Well, you agree that the

12                    alcohol is for your personal use.

13                    THE WITNESS: No.

14                    THE COURT:  Sure it is.

15                    THE WITNESS: No, it isn't.

16                    THE COURT:  Sure it is.

17                    THE WITNESS:  I shared it with -- well,

18                    I guess I drank some of it because I shared it with 19 them.

20                    THE COURT:  Right, you shared it.  I

21                    agree.  That was an honest statement.  And you agree 22 that

                    the Harry's razors is for you?

23                    THE WITNESS:  The Harry razors was so

25

July 25, 2022                                        David White-D 369

1

2

24                    when I present at climate change conferences, I can shave.

THE COURT:  (Indiscernible) given that you have about the same facial

hair as I do, it doesn't 3 cost a whole lot of money.

4                    THE WITNESS:  No.  But I still have to 5 shave this and this.

6                    THE COURT:  Yeah, about once or twice a

7                    week.  I won't harp.  Actually, right before you

8                    present, right?

9                    THE WITNESS:  I shave a few times every

10                   week --

11                   THE COURT:  No sense in shaving every

12                   day then versus the day you got to present.

13                   THE WITNESS:  Well, yeah, but I -- I

14                   don't wait till the day before I present to shave

15                   my -- shave or anything like that.

16                   THE COURT:  Clothing, that's certainly a

17                   benefit to you.

18                   THE WITNESS:  The clothing, I don't

19                   think it was for me.  I think it was for something for 20 them, of the people in Depoe Bay.

25

July 25, 2022                                          David White-D 370

1

2

21                          THE COURT:  You remember buying them

22   clothing?

23                          THE WITNESS:  Sure.

24                          THE COURT:  Okay.  You may continue.

BY MR. SHIPLEY:

       Q          You testified in your deposition that you spend maybe eight hours a week on Climate Change Truth.  3 But it would seem if you're doing all this traveling, 4 you're spending a lot more than eight hours.

5                          THE COURT:  He's spending more than

6                          eight hours at the liquor store.  We've hit this dead

7                          horse a few times.  Let's move on.

8                          MR. SHIPLEY:  Okay.  All right.

9                          The -- the exhibits have been admitted

10                         into evidence, Your Honor, but I don't know if the 11 Court wants to go through those.  But I do want to look 12 to the September 30th, 2021, statement.

13                          THE COURT:  Deposits or withdrawals? 14                          MR. SHIPLEY:  We'll get to the -- the

15                         deposits on page 2.  Are you there yet, sir?

16                         THE WITNESS:  Um-hum.

17                         BY MR. SHIPLEY:

25

July 25, 2022                                          David White-D 371

1

2

18          Q       I see there that there on 9/21 there was a

19   deposit -- a wire transfer from First American for

20   $9,261 and 40 -- 64 cents.

21          A       Um-hum.

22          Q       Isn't it true that that was actually your 23 loan

refinance money or money that came out that you

24 took over what was needed to buy out Ms. White?

       A       Yes.

       Q       So that was your personal money going into this account?

3      A       Yes.

4      Q    Okay.  And then there is on 9/24 a deposit

5   from Ally Bank for $12,140.  Isn't that from your IRA?

6      A       I don't know for a hundred percent certain 7 what that was from.  I

don't remember.

8  Q     But it was from one of your personal accounts 9 at Ally Bank?

10  A     I guess.  I don't know which account or what 11 it was from.

12          Q       Okay.  So when you testified -- when you

13   submitted the declaration to this Court that said, "No

14   funds in the corporate account are used for

15   personal -- my personal expenditures, isn't that false?

25

July 25, 2022                                              David White-D 372

1

2

16          A        No.

17          Q        It's not?

18          A        No.  It's illegal under federal law. 19        Q        But you put your --

there's no doubt that you 20 put your personal money in that account, sir.

21          A        Putting it in is separate than expending it.

22  You're asking me about expenditures.  You didn't say 23 about putting in.

24                            THE COURT:  But didn't you use it --

            MR. SHIPLEY:  Used.

25

July 25, 2022                                         David White-D 373

1

2

                   THE COURT:  But didn't you use it?

                   THE WITNESS:  Use what?

3                    THE COURT:  Didn't you use those funds?

4                    THE WITNESS:  Yes, I did.  I used them 5 for the corporation.

6                    MR. SHIPLEY:  To buy Levi's?  All right.

7                    I'll move on, Your Honor.
8                    Yeah, I believe 34 has been offered

9    into --

10                   THE COURT:  Yeah, yep.

11                   MR. SHIPLEY:  Okay.  Oh, actually, you

12   know what, sorry.  There was one more item in that.

13   BY MR. SHIPLEY:

14   Q    You like to go skiing; isn't that true, sir?

15   A    Um-hum.

16   Q    And you bought a annual pass from this

17   account, didn't you?

18   A    I don't remember.

19   Q    Well, it's in here.  On October 21st, Ski

20   Hood, for $479 --

21   A    Okay, could be.

22   Q    -- that -- yeah.  If you look to October 31,

25   Q

July 25, 2022                                    David White-D 374

1

2

23          2021, statement, page 1 at the bottom of the page.

24          A        Okay.

                                          That was for a annual ski pass at Mount Hood

Meadows, correct?

          A        The bylaws of the corporation state that -- 3        Q        Well, that wasn't what

I asked you.  I asked

4                          you that was a separate ski pass --

5                          A        That was a ski pass, yes.

6                          Q        Okay.

7                          A        A legitimate expense of the corporation.

8                          Q        All right.

9                          THE COURT:  How?

10                         THE WITNESS:  How?  Because the bylaws

11                         of the corporation, just like photolithography.net, say

12                         that the health of the board members is of utmost 13

                           important to the corporation.  And that anything for 14 that is

                           an expense of the corporation.

15                         THE COURT:  So any vacation you take is

16                         for the -- is it an expense of the corporation?

17                         THE WITNESS:  If the vacation was for

25

July 25, 2022                                    David White-D 375

18          mental, I could construe it that way, but --
19          THE COURT:  Isn't every vacation for
20   mental?

21          THE WITNESS:  What?

22          THE COURT:  Isn't every vacation for
23   mental?

24          THE WITNESS:  Well, I --

            THE COURT:  Isn't that why we call it a
     vacation, for mental --

                              THE WITNESS:  Well, I suppose, in that
3           sense, but --

4           THE COURT:  If you go and buy a firearm

5           because you like to shoot firearms, isn't that

6           something good for your mental --

7           THE WITNESS:  Well, I suppose,

8           but -- no, this is for my physical education. 9

             THE COURT:  All right.  That's kind of a

10          broad bylaw, right?

11          THE WITNESS:  This is for my

12          physical -- physical education.  And I, as the

13          president, can -- can decide all of that.

25

July 25, 2022                                          David White-D 376

1

2

14          THE COURT:  I got it. 15                THE WITNESS:  And for

this --

16          THE COURT:  All right.

17          BY MR. SHIPLEY:

18          Q        Mr. White, how many days did you go skiing 19 last

year?

20    A     The total last year was only about ten, 21 actually.

22          Q        Isn't it true that on April 11th, you were

23    up -- you took your camper --

24          A        Um-hum.

                              -- up to Mount Hood and stayed up there for

25

July 25, 2022                                        David White-D 377

1

2

the week and went skiing?

      A      Um-hum.

3      Q      Is that a yes?

4      A      Yes.

5      Q      Okay.  So you were out there for a full week

6      in your camper skiing at Mount Hood.

7      A      Yes.

8      Q      Okay.  And you're saying that that was for a 9 business purpose?

10      A      It was.  And it was approved by the other two

11      board members as well.  I have emails from them 12 approving that, and I

could bring those if you need me

13      to.

14      Q      Did you do that on more than one occasion?

15      A      In the last year?

16      Q      Yeah, where you took the camper out there and

17      went skiing?

18      A      I think I did twice.

19      Q      Okay.  For like a week at a time? 20    A      Well, it's cheaper to go

for a week than just 21 one day.

22      Q      Okay.  Mr. White, could you turn to Exhibit

25      Q

July 25, 2022                                         David White-D 378

1

2

23          22?

24          A       Um-hum.

                    Are you there?

            A       Um-hum.

    Q       Is this the report of Lyft rides that you did 3 that you provided to us?

4   A       I was on the wrong page.  Just a second.  I 5 flipped to 23.  My mistake.

6   Probably, something like -- yeah, looks 7 right.  Looks right.

8           Q       And what year would this have been?

9           A       I think this was 2021.

10          Q       Okay.  And it looks like in 2021, you didn't

11  work the whole year.

12          A       Right.

13          Q       Why not?

14          A       I started teaching around March, and that

15  took too much of my time.  And then I was kicked 16 out -- out of the house on

    May 16th, and so I couldn't

17  do it after that.

18          Q       Are you doing it now?

19          A       No.

20          Q       Well, the -- the statements that you just

25

July 25, 2022                                         David White-D 379

1

2

21      went through show that you do have income from Lyft.

22      A        In -- not in the last month, or -- 23    Q        So not -- when was the

last time you did it?

24      A                    I don't know.  It's been a while.

Well, like, how long?

A        I don't think I did it at all during the school year last year.  For

example, I don't think I 3 did.  I couldn't say for sure.

4     Q      Well, from, you know, let's say, September 5 2021 until now -- or Feb -- the

end of February 2022,

6     did you do any Lyft during that timeframe?

7     A      I don't believe so.  I -- I'm -- 8      Q       We just looked at the bank

statements that 9 showed you had income from Lyft.

10          A        Well, the company had income from Lyft.

11          Q        Well, you were the driver.

12          A        I was the driver, yes.

13          Q        Okay.  So you were either driving it, or

14      somebody else was driving it.  15        A        No, I was driving it.

16          Q        Okay.  So that's not a true statement if you

17      said that you weren't doing it this whole -- during 18 that timeframe I just gave

you.

25

July 25, 2022                                          David White-D 380

A       Well, I didn't know if your timeframe

included this.  If it includes this, then yes, I did.

It shows it right here.  This is what I gave you.

Q       Well, this is -- this is last year.

A       Yeah, that's last year.

Q       I just asked you for a specific timeframe, and you said you did not, but

that's not what the

July 25, 2022                                    David White-D 381

1        Q

2

statement shows.

      THE COURT:  Let's move on, move on.

3        MR. SHIPLEY:  All right.

4        BY MR. SHIPLEY:

5        Q        Okay.  The camper --

6        A Um-hum.

7        Q        -- isn't that titled in the name of you and

8        your wife?

9        A No.

10        Q        It's not?

11        A No.

12        Q        Whose name is it titled under?

13        A Photolithography.net --

14        Q        Hmm.

15        A  -- which it's owned by.  And Julie testified

16        to that in -- in depth in her deposition.

17        Q        That wasn't what I asked you, sir.

18        A Yeah.  I know what you're going to -- for.

19        Q        Okay.  Sir, can you turn to Exhibit 6?

20        A Um-hum.

25

July 25, 2022                                          David White-D 382

1        Q

2

21                    Q          Okay.  The second title there --

22                    A Um-hum.

23                    Q          -- isn't that the title for the camper?

24                    A It was -- yes, it was that a long time ago, yes.

                                 Well, when you say a long time ago, how long

ago?

3    A        I changed it from this because you were 4 pushing this issue maybe last

summer, a year ago, or

5                    something.  I don't remember.

6                    Q        Sir, didn't I hand you these.  The --

7                    A        I have the title over there --

8                    Q        -- hold on --

9                    A        -- I could show you.

10                   Q        Let me ask you a question.  Didn't I hand you

11                   these titles -- the copy that I just handed you -- on

12                   December 1st, the day of our depositions?  Didn't you

13                   show up to my office and pick them up from me?

14                   A        I don't remember, could be.  I

15                   (Indiscernible)

25

July 25, 2022                                    David White-D 383

1       Q

2

16      Q       So as of December 21st, 2021, this was the 17 accurate title for that

camper, correct?

18      A       I don't know if you pulled it at that time or

19      not.  It doesn't have a date on here, so I don't know.

20      Q       I handed you the actual title, sir. 21       A       Yes, you handed me

the title, but I don't

22      know the date in which you took the photocopy.

23      Q       Well, before I handed it to you?

24      A       Okay.  Since then, it's been changed.

        Q       So since then, you signed this title over to photolithography, correct?

A       Yes, because that's who owns it. 3       Q       Well, sir, Ms. White's

name is on this, so 4 did you forge her signature?

5                       A       No, I think she signed it when you gave it to

6                       me.  I don't remember.

7                       Q       That is false, sir.

8                       THE COURT:  You don't get to testify.

9                       MR. SHIPLEY:  Okay.

10                      THE WITNESS:  I don't remember.  But the

11                      state accepted it, so she must've already have signed

12                      it.

25

July 25, 2022                                          David White-D 384

1          Q

2

13                 BY MS. SHIPLEY:

14                 Q    So you transferred this title, and you wrote

15         her signature on it?

16                 A    No.

17                 Q    No.

18                 A    No, I didn't.

19                 Q    Okay.

20                 A    I didn't write anybody's signature on it but

21         my own.

22                 Q    But just your own signature.

23                 A    I think she -- I think the same thing with

24         the truck; she had signed it.  She signed the truck one.  That's

           for certain.  I know that.

                          But you transferred the assets -- so at the

                   time we filed for divorce, this asset was titled in the

3          name of you and your wife, correct?

4                  A    Yes.

5                  Q    Okay.

6          THE COURT:  Who are all current

25

1        Q

2

7                    shareholders in this other company that now the title 8 for the

                    camper is in?

9                    THE WITNESS:  Randy Veers, Orlando

10                   Castano (Phonetic), and myself.

11                   THE COURT:  So the same folks in your

12                   Climate Truth Group?

13                   THE WITNESS:  Yes.

14                   THE COURT:  Okay.

15                   MR. SHIPLEY:  I have a question in that

16                   regard, Your Honor, we'll get to.

17                   BY MR. SHIPLEY:

18                   Q        So you changed this title or transferred it

19                   to photolithography sometime after December 1st of

20                   2021?

21                   A        Yeah, I think so, I guess.

22                   Q        Okay.  Isn't it true that you filed a 23 contempt action

                    against my client for moving assets; is

24 that true?

        A        Yes.

25

July 25, 2022                                          David White-D 386

1        Q

2

                                        Okay.  Is that -- but is that okay for you to
do that?

3                        THE COURT:  That's argumentative.

4                        THE WITNESS:  I didn't do that.

5                        THE COURT:  Argumentative. 6                    MR. SHIPLEY:

                    That's –- I'll withdraw, 7 Your Honor.

8              THE WITNESS: And -- and I didn't do 9 that.

10                       THE COURT:  You don't need to answer.

11                       MR. SHIPLEY:  All right.

12                       THE WITNESS:  Well.

13                       THE COURT:  That's a question for me to

14                       answer, whether you did or not.

15                       THE WITNESS:  Okay.

16                       (Pause)

17                       BY MR. SHIPLEY:

18                       Q        Mr. White, I just handed you Exhibit 40.

19                       A        Um-hum.

20                       Q        This is a printout from the Oregon Secretary

21                       of State Corporation Division.

22                       A        Um-hum.

25

July 25, 2022                                         David White-D 387

1      Q

2

23                         Q       Would you agree with that?

24                         A       At the time of this date, of 3 -- no, that's the date you

pulled it -- 4 --

3/28/22.

A                 Well, 3/28/22, no, because it's not

3 registered in Oregon as of last December at least. 4 Q Well, this was printed off -- 5

THE COURT:  Sorry.  I am thoroughly

6 confused.  So you registered the vehicle in Oregon that 7 is now registered to a company in

another state?

8                         THE WITNESS:  In Idaho, yes.  Um-hum.

9                         THE COURT:  Okay.

10                        BY MR. SHIPLEY:

11                        Q       So you're saying that photolithography is not 12

registered in Oregon?

13     A       No.  It may have –- may be able to pull this

14     out, and it should say somewhere it's not active.

15     Q       That's correct.

16     A       I don't know where that it is here, but it 17 should say somewhere.

18                        THE COURT:  So it's not an active file

19                        (indiscernible), but it goes on the camper.

25

July 25, 2022                                    David White-D 388

1          Q

2

20                    THE WITNESS:  It owns the camper and

21                    some other items that she testified about in her 22 deposition.

23    THE COURT:  Even though it's not an 24 active LLC?

                              THE WITNESS:  It's -- it's actually an

active corporation in Idaho at this point.  But it has no -- no further income at this time.

3    THE COURT:  At what point? 4   THE WITNESS:  Last December or January, 5 I guess.

6                    THE COURT:  Must have been as of March 7 of this year.
8                              THE WITNESS:  I know.  But this is from

9    Oregon.

10                    THE COURT:  Um-hum.

11                              THE WITNESS:  Yeah, it was registered in

12    Oregon, but I didn't pay the registration on this after

13    maybe 2015 or 2016 because photolithography.net didn't

14    have any more customers.  So it wasn't paid.  So it

15    was --
16                    THE COURT:  So why does it need a

17    camper?

18                    THE WITNESS:  I needed the camper
19                    to -- for the contract I had with FLIR in Wilsonville.

20                    THE COURT:  You need a camper to be

21                    registered in Idaho for a business transaction that you

22                    do in Wilsonville.

25

July 25, 2022                                          David White-D 389

1        Q

2

23                      THE WITNESS:  The camper is not

24           registered in Idaho.  It's registered in Oregon.

                                   THE COURT:  So how does having a camper

25

July 25, 2022                                        David White-D 390

1

2

registered in Idaho or in Oregon to an LLC registered in Idaho help you in your contract

with FLIR?

3                          THE WITNESS:  The contract with FLIR was

4                          for photolithography consulting.  They required I be

5                          there close by, so I wanted to get a RV park in

6                          Wilsonville.  They said that the camper we had before,

7                          which was 2003 or 2002 -- it had to be less than ten 8 years old.
9                          THE COURT:  Where were you currently THE WITNESS:  In

10     residing?

11                         Hillsboro or be -- Rock

12     Creek.

13                         THE COURT:  Like Beaverton?

14                         THE WITNESS:  Well, Rock Creek in

15     between Hillsboro and Beaverton on the north side of

16     26.
17                         THE COURT:  Unincorporated Washington

18     County.

19                         THE WITNESS:  Pardon me?

20                         THE COURT:  It's unincorporated

21                         Washington County.

22                         THE WITNESS:  Yes.

23                         THE COURT:  Which is ten more minutes

25

July 25, 2022                                          David White-D 391

1

2

24                     away from where Wilsonville would be.

                                THE WITNESS:  With all the traffic, it's

about 45 minutes to FLIR.

                     THE COURT:  So you have a camper.  Do 3 you still -- do you have it in

a park in Wilsonville?

4                                THE WITNESS:  No.

5                                MR. SHIPLEY: I believe that was in

6                     2016, Your Honor.

7                                THE COURT:  When was it?  When did your

8                     contract with FLIR expire?

9                                THE WITNESS:  January of 2016.

10                                THE COURT:  So why did you need to have

11                     it -- why did this company need to have a camper in 12 2022?

13                     THE WITNESS:  It was purchased for that

14                     job by the corporation, and the corporation still owns

15                     it, but it's not currently being --

16                     THE COURT:  But it didn't own it in 2022

17                     or 2021, correct?

18                     THE WITNESS: It owned it in terms

19                     of -- in terms of payment for it and from the IRS.

25

1

2

20          THE COURT:  No.  I get that you used

21     this shell company to --

22          THE WITNESS:  It's not a shell company.

23          THE COURT:  You use this company for

24     personal expenses, for example, buying a camper.  I get that.  Or

       perhaps, maybe at some point in time, Harry's shaving shavers,

       stuff like that.

                    But you got to help me out.  Is it a

3     dead corporation?  It's got no contracts.  There's no

4     need for a camper anymore.  And so after your

5     depositions, you decide -- knowing you can't transfer

6     any assets because that would be in violation of the

7     Court's previous orders -- you decided to take an asset 8 that was at the time registered in

       both you and Ms.

9     White and transfer it to this company name -- to this

10     company that is no longer, basically, earning any kind

11     of income at all.  And then move that company 12 afterwards to Idaho.  I just want to

       make sure I

13                    understand your testimony.

25

July 25, 2022                                              David White-D 393

1

2

14          THE WITNESS:  Yes.  But it's not exactly

15          as you're saying.

16          THE COURT:  Tell me how I'm wrong.

17          THE WITNESS:  All right.  This camper,

18          as I said, was purchased by the corporation for that.

19          Same thing with that corporation.  The president can

20          decide everything for that corporation.

21          THE COURT:  Well, we got that.

22          THE WITNESS:  And so --

23          THE COURT:  Hold on.  No, no, no.  No,

24          no, no.  Because we -- I got to do this step-by-step.

                 THE WITNESS:  Yeah.

            THE COURT:  When this camper was

originally bought --

3           THE WITNESS: Um-hum.

4           THE COURT:  -- so if I did a title

5           search on this, was this camper ever registered to 6

            photolithography?

7  THE WITNESS:  No.  Not until this last 8 year.

9                 THE COURT:  So you never used it as an

25

July 25, 2022                                                David White-D 394

1

2

10                          asset of a company.  You never used it as a write-off 11 for the

company.

12                           THE WITNESS:  Well, I used it as an

13                            asset and write-off for the FLIR job.

14                           THE COURT:  But you never registered it 15 other than you and

Ms. White's name.

16                    THE WITNESS:  Right.  And I -- and I can 17 tell you why.

18                           THE COURT:  And this income that you got

19                            from -- basically that you got from this benefited you 20 and Ms.

White at the time.

21                              THE WITNESS:  Yeah, I suppose, yeah. 22                        THE

COURT:  And we know for sure that

23                                you've used this camper for personal use.

24                           THE WITNESS:  We --

                                       THE COURT:  You testified to it already.

                                       THE WITNESS:  Well, it's not personal if

the corporation --

3                           THE COURT:  How is it not personal to go

4                            skiing?  You talked about using this camper for skiing.

5                           THE WITNESS:  Because.  I know.  I know.

25

July 25, 2022                                                David White-D 395

1

2

6       I'll testify that the bylaws of the corporation --

7       THE COURT:  I don't care about the

8       bylaws of your corporation.  And these shell companies 9 that

        you've created to hide your income and all that.

10      I don't care about that stuff.

11      THE WITNESS:  They're not shell

12      companies.

13      THE COURT:  Well, in my mind, that's

14      essentially what they are.  So I just want to make sure

15      I got it right.  Because there is a fair statement

16      here, and I know that in your brain, you can't see the

17      connection.  But you took an asset that was registered

18      in you and Ms. White's name --

19      THE WITNESS:  Um-hum.

20      THE COURT:  And we'll get into whether

21      she signed off on this or not -- my guess is that she

22      didn't -- you changed it to this company, and then now

23      have registered this company in a whole different

24      state.

        THE WITNESS:  Um-hum.

25

1

2

THE COURT:  You don't believe that is moving an asset that was currently in the name at the 3 time the petition was filed?

4          THE WITNESS:  No.  Can I explain why?

5          THE COURT:  You could try, but here's

6          what you're -- here's the problem you're going to have,

7          and you are going to have greatly.  I don't care what

8          your excuse is.  If your excuse -- because here's how

9          this Court works --

10          THE WITNESS:  Um-hum.

11          THE COURT:  -- if you wanted to come

12          into this Court and say and argue and present

13          information to this Court that says, "Hey, I appreciate

14          that this asset is currently in both of our names, but

15          really this is the company's, and here's my documents

16          to demonstrate that."
17          THE WITNESS:  Um-hum.

18          THE COURT:  That's not what you did, Mr.

19 White.

20          THE WITNESS:  Um-hum.

21          THE COURT:  You chose, when this was

22          going on, to move everything without permission from

25

July 25, 2022                                                David White-D 397

1

2

23                     the Court and in violation of the Court's orders.

24                     THE WITNESS:  No.

                                    THE COURT:  So go ahead.  Give me your

best reason how I should not see it in that manner at all.

3    THE WITNESS:  In Julie's deposition,

4    which I submitted to the Court for this hearing, it

5    clearly shows she testified exactly what I'm saying,

6    that the corporation owned that.  The reason why, at

7    the time, we didn't put it in the corporation's name is

8    when I went to get insurance on it -- which I wanted to 9 have for while it was in an RV

park -- if I had it in 10 the corporation's name, it would have cost a lot more.

11   So I put it in our personal name.

12   THE COURT:  Yeah.  So you -- 13  THE WITNESS:  At that time -- 14  THE COURT:  -- so

you decided to benefit

15   you to register in you and Ms. White's name.  And there

16   are consequences to that behavior. 17                      THE WITNESS:  Not to

benefit --

18                     THE COURT:  Sure, there is.

19                     THE WITNESS:  I don't understand what

20                     you mean by "benefit me."

25

July 25, 2022                                                    David White-D 398

1

2

21              THE COURT:  You paid less in insurance.

22              THE WITNESS:  Oh, okay.  Well, the

23              corporation paid less in insurance, yes.

24              THE COURT:  Right.  Which was a benefit

        to you because you were essentially getting all the

receipts from this corporation.

    THE WITNESS:  Right.  Okay, yeah. 3   THE COURT:  Is there any other way of

4               looking at that?

5               THE WITNESS:  No.

6               THE COURT:  Okay.  So there are

7               consequences to those actions, right, including the

8               idea when a temporary order is in place, it says nobody 9 is

                supposed to change any of the assets.  And you chose

10              to do that.

11              THE WITNESS:  But this asset wasn't

12              owned by us, and she testified to it in her deposition.

13              THE COURT:  Well that's not what you

14              told the insurance company, correct?

15              THE WITNESS:  Told the insurance company 16 when?

17              THE COURT:  Whenever.  And that's not

25

July 25, 2022                                                    David White-D 399

18          what you told DMV.

19          THE WITNESS:  Right.  At the

20          time -- at -- at the time until now, yes.

21          THE COURT:  Until after -- 22   THE WITNESS:  Yes, until -- 23   THE

            COURT:  -- your deposition in 24 December.

                        THE WITNESS:  Until she testified and

     agreed that that's what it's owned by.

                        THE COURT:  So she testified and agreed.

3           You certainly were going to then have Mr.

4           Bernabei -- because you were represented at the

5           time -- send a note over to Mr. Shipley that says, "You

6           agree to this, right?"

7           Because he's going to be doing this.

8           Did you do that?

9           THE WITNESS:  I don't remember.  I don't

10          know if I did or not.

11          THE COURT:  You're a smart man.

12          THE WITNESS:  Yeah.

13          THE COURT:  You remember that.

14          THE WITNESS:  I know.

25

July 25, 2022                                          David White-D 400

15          THE COURT:  Did you do it or not?

16          THE WITNESS:  I don't know.  I don't

17          know if I did it or not, but --

18          THE COURT:  Did you --

19          THE WITNESS:  To me --

20          THE COURT:  -- check and make sure you

21          had permission from the Court to do it?

22          THE WITNESS:  To me, it doesn't matter

23          because she testified that --

24          THE COURT:  I know to you it doesn't

matter.  It does to the Court.  The Court takes its

orders very, very seriously.

            THE WITNESS:  No, I -- I understand 3 that.

4           THE COURT:  Go ahead.  Give me your best 5 shot.

6           THE WITNESS:  Well, she testified in

7           deposition the corporation owns this -- the La-Z-Boy

8           chairs, the window coverings, and the garden shed at 9 our

            residence -- in her deposition.

10          THE COURT:  So I want to make sure I got

25

July 25, 2022                                        David White-D 401

1

2

11                    it right then.  Anything she said in her deposition is 12 gospel for

me to use.

13                    THE WITNESS:  Any -- (Indiscernible) -- 14                    THE

COURT:  Anything you disagreed with,

15                    as far as assets go.

16                    THE WITNESS:  What she said in her

17                    deposition --

18                    THE COURT:  I just want to make sure I

19                    got it right.  Anything she said in her deposition is

20                    gospel for me to take?

21                    THE WITNESS:  No.

22                    THE COURT:  Because

23                    you're -- (Indiscernible)

24                    WITNESS:  (Indiscernible)

THE COURT:  So you're going to

(Indiscernible) --

                              THE WITNESS:  (Indiscernible)  that she

3                    said -- (Indiscernible).  No.

4                    THE COURT:  Well, you did.

5                    MR. WHITE:  What I said is what she

25

July 25, 2022                                              David White-D 402

1

2

6                              testified about this --

7                              THE COURT:  I get that.

8                              THE WITNESS:  -- in her deposition.  9                    THE

COURT:  So you took what she said to

10      be true.

11      THE WITNESS: Yes, of course. 12                         THE COURT:  And acted on it.

And acted 13 on it.  So am I to do the same?

14  THE WITNESS:  And I knew it was true 15 also myself.

16                              THE COURT:  Okay.  Mr. Shipley, go

17                              ahead.  Actually, I'm going to go ahead -- this would

18                              be a good time.  Let's go take about a ten-minute 19 break, and

we'll come back.

20                              MR. SHIPLEY:  Well, I've got a -- on

21                              this -- I've got a couple of important questions on

22                              this specific issue, Your Honor.

23                              THE COURT:  (Indiscernible)

24                              MR. SHIPLEY:  But, I mean, they could be

quick.

                              THE COURT:  Okay.

                                   MR. SHIPLEY:  I'll try -- I'll do my

25

1

2

3      best.  Okay.

4      BY MR. SHIPLEY:

5      Q        In regards to photolithography, that was

6      started by you, and then your wife was the -- listed as

7      the secretary, and you were the president, correct?

8      A        Um-hum.

9      Q        I asked you in your deposition, I said, "And

10     the two of you were the owners of all the shares?"

11     And you said, "Yes."

12     A        At that time, yes.

13     Q        Okay.  And then −-

14     THE COURT:  Was there a board meeting in

15     which she was involved in which she was no longer --

16     THE WITNESS:  Um-hum.

17     THE COURT:  -- a member?

18     THE WITNESS:  September of 2017, yes. 19                MR.

       SHIPLEY:  Well, no.  This was December 1, 20 2021.

21     THE COURT:  It's tough to keep these

22     going in the head, I know.

23     THE WITNESS:  Pardon me?

25

July 25, 2022                                             David White-D 404

1

2

24                    THE COURT:  It's tough to keep this all

straight, I know.

                          THE WITNESS:  Yeah, I know.  But

in -- well all -- she and my son will testify that she 3 removed herself from both of these in

September of

4          2020 -- or 2017.

5          BY MR. SHIPLEY:

6          Q       Mr. White, may I ask you a hypothetical.  If

7          the board of Microsoft decided to take the shares of

8          Bill Gates away from him, could they do that without

9          his approval?

10         A       I don't know how their corporation is

11         structured.

12         Q       Okay.  But according to you, you could take

13         the shares that were -- my client, according to you,

14         owned half of them, and according to you, you could

15         just simply decide to take them away from

16         her -- without her --

17         A       But she --

18         Q Hold on -- without her transferring them to 19 you.

25

July 25, 2022                                           David White-D 405

1

2

20          A          She removed herself from the corporation.  I

21     asked her about it.  She said she didn't want anything 22 more to do with it.

23                          THE COURT:  But there's a difference

24                     between removing herself from the board versus selling her

                     shares.  Did she sell her shares?  Is there any

minutes or any paperwork by the secretary of the company -- her -- that would have

designated her half

3    of the stock to whomever?  There's a difference between

4    withdrawing yourself from the company and still owning

5    the stocks.  You agree with me on that?

6    THE WITNESS:  Well no I -- 7                     THE COURT:  No, there's not?

8                          THE WITNESS:  Well, there is, yes.  But

9                     in this case --

10                          THE COURT:  The bylaws -- 11                     THE WITNESS:  --

                     in this -- 12                     THE COURT:  The bylaws keep

                     the two

13   separate or -- because that would be -- pretty

14   sure -- illegal to have --

15   THE WITNESS:  -- in -- 16                     THE COURT:  -- to set it up.

17                          THE WITNESS:  In this case, I asked her

25

July 25, 2022                                    David White-D 406

1

2

18                     about it why -- and why she wanted to remove herself 19 from

                       the board.

20                     And she said she didn't want anything

21                     more to do with it at all.  I took that as meaning she

22                     didn't want her shares or anything with that.

23                     THE COURT:  You just unilaterally

24                     decided she doesn't want any of the money that's involved in this

                       company -- or the shares involved in

this company, including the asset of the camper.

                       THE WITNESS:  That's what she said.  She 3 didn't want to do anything

with it anymore.

4                      THE COURT:  So there's a board meeting

5      minutes --

6                      THE WITNESS:  Yes.

7                      THE COURT:  -- that say I have moved

8      her --

9                      THE WITNESS:  Um-hum.

10                     THE COURT:  -- and so what was your

11     quorum?

12                     THE WITNESS:  Randy and --

13                     THE COURT:  Well, Randy wasn't on the

25

July 25, 2022                                         David White-D 407

1

2

14          board at the time, right?

15          THE WITNESS:  Randy --

16          THE COURT:  You have to have a quorum.

17          You have to have a quorum of your present members.

18          THE WITNESS:  Well, we --

19          THE COURT:  But your current members

20          were Ms. White --

21          THE WITNESS:  Right.

22          THE COURT: -- you, and who else?  23          THE

WITNESS:  That was, at the time, was 24 just us two, right.

                    THE COURT:  Okay.  So quorum would've --

               THE WITNESS:  -- been me, I guess.

                THE COURT:  Well, usually a quorum has

3   to be more than 50 percent.  Do you remember what

4   you're bylaws -- you've read a lot of other bylaws.

5   THE WITNESS:  Yeah.  Yeah.  Yeah. 6   THE COURT:  So have you read the bylaws 7 as far as

what quorum is?

8          THE WITNESS:  Yeah, I'll have to look.

9          I think it's 35 or 40 percent, but I don't remember.

10          THE COURT:  Okay.  Go ahead.

25

1

2

11              MR. SHIPLEY:  Okay.

12              BY MR. SHIPLEY:

13              Q        I asked you again.  I said, "The company was

14              fully owned by you and your wife, correct?

15              And you said, "Yes."

16              A        Yeah.

17              Q        So there's no doubt she was owner of that

18              corporation, correct?

19              A        Partial, yes.

20              Q        Okay.  You –- you testified about the La-Z21 Boy chairs.

                You said the La-Z-Boy chairs were -- and

22              they were located in, like, the front room of the

23              house, were they not?

24              A        In the family room, yes.

                Q                        Okay.  And so it's your testimony that those

        were owned by the business?

                A        Um-hum.

3               Q        And you removed those chairs from the home,

4               and put them into the POD storage container that you

5               hired in May of 2021, correct?

25

July 25, 2022                                              David White-D 409

1

2

6       A       Yes.

7       Q       Okay.  And then how in particular were they 8 used in the operation of

your business.

9       A       I did consulting sitting in the -- in one of

10      them, did semiconductor consulting with my computer.

11      Q       Okay.

12      THE COURT:  You didn't need to be in 13 Wilsonville?

14                      THE WITNESS:  Well, that wasn't for the

15                      Wilsonville contract.  That was for other contracts.

16                      THE COURT:  That was for other

17                      contracts.

18                      THE WITNESS:  Yeah.

19                      BY MR. SHIPLEY:

20                      Q       And when did you do that consulting?

21                      A       Until 2016.

22                      Q       Okay.  And then how about the -- you also

23                      testified that the window coverings --

24                      A       Yes.

        Q                       -- were also owned by photolithography.

        A       Um-hum.

25

1

2

Q        Is that correct?

A        Yes.

Q        Did you remove those from the home and put

those in this POD storage container?

A        No, they were fixed to the wall. 7        Q        Okay.  And then I think

you also said the

toolshed?

A        Right.

Q        The tool shed -- which has, like, the rakes

and --

A        Um-hum.

Q        -- hoes and all that good stuff, the mower --

A        Um-hum.

Q        -- you also said that that was owned by

photolithography as well; is that correct?

A        Um-hum.

Q        Is that yes or no?

A        Yes.

Q        Okay.

THE COURT:  So just -- if I had looked

July 25, 2022                                              David White-D 411

1

2

22          up the list of assets of the corporation, that's going

23          to be on there?

24          THE WITNESS:  Um-hum.

            THE COURT:  So you're using the

corporation to buy a shed and all the tools that were in it?

3          THE WITNESS:  Not all the tools that 4 were in it, just the shed.

5          THE COURT:  That somehow benefited

6          lithography, which I understand from you was some sort 7 of

            computer lines -- semiconductor lines. 8   THE WITNESS:

            Semiconductor lithography

9          is printing the wiring patterns for computer chips.

10          THE COURT:  Correct.  That's what I'm

11          trying to figure out.  How are La-Z-Boy's, a shed, and

12          the tools in the shed help out in any way the

13          consulting thereof of making those type of

14          semiconductors?

15          THE WITNESS:  The tools in the shed

16          isn't part of it.  It's just the shed.

17          THE COURT:  Um-hum.

18          THE WITNESS:  I don't remember what -- I

25

July 25, 2022                                              David White-D 412

1

2

19          don't think there's any part of the lithography --

20          THE COURT:  So you just used the -- 21   THE WITNESS:  -- we used

it as a write22 off.

23          THE COURT: -- so you just used it as a

24          write-off.

THE WITNESS:  Yeah.

THE COURT:  Yeah, to benefit you and Ms.

White?

3          THE WITNESS:  Right.  At the time, yes,

4          in 2015.

5          BY MR. SHIPLEY:

6          Q       So in your testimony, I didn't -- I missed 7 this on the -- you just opened up the

Idaho business,

8          correct?

9          A        In December or January,

10          transferred -- started a back up there, right.

11          Q        January of this year?

12          A        Yes.

13          Q        Because you recall very specific

14          conversations with your wife from six years ago, but

25

July 25, 2022                                         David White-D 413

1

2

15    you're not sure on the month that you started this 16 corporation.  So which

month was it, sir? 17    A    I think it was January.  I'm not sure -- a

18    hundred percent certain.

19    Q    Okay.

20    MR. SHIPLEY:  Your Honor, if you want to 21 take a break.

22    THE COURT:  Well, that's fine.  Let's go

23    ahead and take a break.  Let's come back at 10 to.

24    (Court recessed from 3:37 p.m. to 3:49 p.m.)

THE COURT:  Come on forward, Mr. White, you're still on the stand.  Mr. White, you're still under oath.

3    THE WITNESS:  Okay.

4    THE COURT:  You may inquire.

5    MR. SHIPLEY:  All right.

6    (Pause)

7    BY MR. SHIPLEY:

8    Q    Mr. White, I've handed you exhibit --

9    Petitioner's Exhibit 41 --

10    A Um-hum.

11    Q    -- and this is the statement for Oregon

12    College Savings Plan.

25

July 25, 2022                                      David White-D 414

1

2

13          A Um-hum.

14          Q       Is it true you have statements or accounts

15          set up for all six of your grandchildren?

16          A Yes.

17          Q       And have you taken any money out of these 18 accounts

            in the last six months?

19     A       I -- I'm not a hundred percent sure, but I 20 haven't put any money in, that's for

sure.

21          Q       Okay.  So you may have taken money out?

22          A       I may have.  But I don't remember for

23          certain.

24          Q       Would you stipulate that the money that's in these accounts for the

            children, you know,

would -- should remain as accounts for the children going forward?

3           A       I believe so.

4           Q       If my client agreed to do that.

5           A       I believe so.

6           Q       But it's your testimony you may have? 7          A          I may have.  I'm

            not a hundred percent

8                           certain.
25

July 25, 2022                                          David White-D 415

1

2

9          Q       Okay.

10         THE COURT:  And if you have taken any

11         money out of those accounts, that would be credited

12         against you in the -- these proceedings.

13         THE WITNESS:  I suppose.

14         THE COURT:  Okay.

15         BY MR. SHIPLEY:

16         Q       And then, in terms of the income from Lyft.

17         A       Um-hum.

18         Q       I want to just -- in 2021, did you earn about 19 7,000

           from Lyft?

20    A       I doubt it, but some amount.  I don't -- you

21    had the times I did.  Did you have the amount?  I 22 didn't see the amounts.

23    Q       Well, I think we talked about those in your

24    deposition.  My understanding was --

      A        Okay.

      Q       -- you, did you try to keep your earnings from Lyft at a certain level?

3     A       Yes.

4     Q       And what was that level?

5     A       Usually less than 6,000.

25

July 25, 2022                                          David White-D 416

1

2

6      Q Now, why not more if you could have earned 7 more?

8      A       Because it's a losing proposition for -- can

9      I expand on this?

10     Q       Sure.

11     A       Okay.  All right.  You know, I always planned

12     on retiring from semiconductors or whatever and -- when

13     I was 55 or 50.  I retired when I was 55, and during

14     the time I worked, I paid more in income taxes than

15     most people make for revenue in their whole life.  And

16     so, in retirement, the plan was not to pay any income

17     taxes whatsoever, so to keep our -- you know, pay off

18     the house and keep our expenses low, and just use that

19     as little extra money.  But, if I made more than that,

20     then our whole amount would go to the next level, and 21 we'd pay 40 percent in

       taxes.

22     Q       Now, you brought in a CPA to testify.  And I

23     asked her -- I said if somebody made a certain amount

24     and they were at a tax bracket -- and then if they made, let's say, $3,000 more -- I

       asked her, I said,

25

July 25, 2022                                    David White-D 417

1

2

"Is the whole amount taxed at that higher tax bracket or just the amount that goes over?"

-- and her good

3          answer -- that it's just the amount that goes over.

4          So if you -- if you earned another, you know,

5          5 or $6,000, the entire income isn't taxed at 40

6          percent.  Don't you understand that?

7          A        No, that's not correct.  And she was wrong. 8    Q        So the

CPA was wrong about the tax code?

9        A        In terms of that.  Yes, I've done our taxes

10        every year.  That your total gross minus whatever your 11 deductions are is what

you're taxed on.  So, for

12  example, if we had -- I'll give -- just throw a number

13  out -- $12,000 in income after deductions, then -- and 14 that -- and that was -- I think the

next level is

15        15,000 or 18 -- they've changed it.  I don't know what

16        it is now, but if you go over that, instead of 20

17        percent tax, it's 40 percent tax.  So it's not a

18        hundred percent accurate what she said.

19        Q        I mean, that was your witness.

20        A        Yeah, I -- I know.  I know.  That part of

25

July 25, 2022                                               David White-D 418

1

2

21          what she said, I don't -- or else she misunderstood

22          your question.  I'm not certain.  But she certainly

23          knows that.

24          Q         All right.

            A                        I've run the numbers.  And if I make very

much more than 6,000, then I'll be paying, you know, too much taxes.

3                        MR. SHIPLEY:  I think I'm about done,

4                        Your Honor.  Let me just double-check here.

5                        (Pause)

6                        Yeah, I'm done with the -- 7                    THE COURT:  You

                         may step down.

8                        THE WITNESS:  Do I leave all this here

9                        or --

10                       THE COURT:  Yep.  I'll take care of it.

11                       THE WITNESS:  Okay.

12                       THE COURT:  Thank you.  You may call 13 your next witness.

14                              MR. SHIPLEY:  I call my client, Julia

15                              White.

16                              THE COURT:  Come on forward.

17                              Raise -- watch your step up.  Raise your right hand
                               to

25

July 25, 2022                                              David White-D 419

1

2

18          be sworn.

19          JULIA WHITE

20          called as a witness for the Petitioner, having been

            duly 21 sworn, testified as follows:

22   THE COURT:  Go ahead and have a seat.

23   And once you're seated, tell us your full name and 24 spell your

     last name.

     MS. WHITE:  My name is Julia Annette

25

July 25, 2022                                                    420

1

2

White.  White is spelled W-H-I-T-E.

3                    THE COURT:  You may inquire.                    MR. SHIPLEY:

Your Honor, I want to show

4                                        a video.

5                                        THE COURT:  You may.

6                                        MR. SHIPLEY:  So -- and I -- this video,

7                                        let's see here.  I provided a copy of the U.S. -- or

8                                        the thumb drive to Mr. Bernabei, but I'm not certain if 9 Mr.

White had received it, for after that -- they ended

10    that representation.  But I did have another copy for

11    the Court, so I don't know how we should proceed on 12 that.

13                                        THE COURT:  Okay.  Go ahead and play it.

14                                        MR. SHIPLEY:  All right.

15                                        (The Court, attorney, and clerk converse.)

16                                        (Technical difficulties playing video with 17 audio)

18  THE COURT:  Ms. White, can you see it 19 okay?

20                                        THE WITNESS:  I can't see anything.

21                                        THE COURT:  Okay.  We'll turn it.

22                                        THE WITNESS:  Okay.

23                                        MR. SHIPLEY:  Well --

25

July 25, 2022                                                  421

THE COURT:  There's no audio to it.

MR. SHIPLEY:  Yeah, well, I can play audio here.  Well, maybe I should identify the document or what we can --

THE COURT:  Yep.  We can still pause it.

MR. SHIPLEY:  If we can pause it there.

DIRECT EXAMINATION

BY MR. SHIPLEY:

Q        Ms. White, you've seen this video before. Can you tell us what this is?

A        That is the home that Mr. White and I owned.

Q        Okay.  And did you film this video?

A        No, I did not.

Q        Who did?

A        Mr. White.

Q        Okay.  And do you know -- 15    A        I believe, Mr. White did.

Q        Okay.  He narrates it.  Do you know what this -- the purpose of this video was?

A        To list the house online to sell.

Q        Okay.

July 25, 2022                                                        422

20          MR. SHIPLEY:  Your Honor, I could play

21     it on my computer to where the sound would coincide 22 with

       this, I think.

23          THE COURT:  That's fine.  If you want to 24 see if you can get it --

                    MR. SHIPLEY:  Okay.  If you could back

it up --

            THE COURT:  Yep.

3           MR. SHIPLEY:  -- and then I'll -- we can
4      hit go simultaneously.  All right.  Are you ready?

5           THE COURT:  Yep.

6           MR. SHIPLEY:  Hopefully, this isn't too

7      loud.  All right.  And go.

8           (Video played at 3:59 p.m. -- audio

9      transcribed.)

10          MR. WHITE:  This is our updated and

11     (sic) 2006 ranch home with three garages -- a big RV

12     garage you can see there.  And now I'll take you

13     inside.  We're selling this home without a realtor, and

14     there's no need for any inspection because everything

15     is primo.  But you can get an inspection if you want.

16     This is the entryway and the old -- and

25

1

2

17              the old front room, living room.  Down here, you'll see

18              this is a bedroom, but it's my office right now, kind

19              of messy.  This is the old master bedroom with shower

20              and everything in here -- toilet, full bath.  Another

21              bedroom that was my wife's office here.  And another

22              full bath in this closet -- or not in this closet.  In

23              this –- another full bath in the bathroom here with a 24 nice

                soaking tub.

                                And we have a Trane -- Trane system that

    is excellent, tells the outside temperature, inside temperature.  It can be set however

    you want.  And the 3 table -- everything -- view out to the backyard.   4

        The kitchen -- cabinets, dishwasher,

5               refrigerator, stove -- everything, microwave.

6               This is the addition that we did, along

7               with the extra garage.  We put this in here with the 8 window,

                goes outside.  All this.

9               A woodstove you could use for heat if

10              you want, or you could use the heating HVAC system.  11 But the

                fire is nice when it's raining outside and cold 12 in the winter

                time.

25

July 25, 2022                                                                    424

13    And this is the master suite.  Right

14    here where you could see we have double sinks, you

15    know, bathroom here and shower -- and shower right

16    here.  Big shower.  Nice bedroom.  We have a doorway 17 out

here to a hot tub.  And then here, a nice big room

18    and a walk-in closet right here, with plenty of space.

19    Put everything in drawers, drawers right here that you 20 can use.

21    And this house is reasonably priced and 22 will sell soon.

23    And this is the impeccable backyard.  My

24    wife is an excellent gardener.  So, you know, this is  -- out

here, we have plenty of plants and everything and consuming

a lot of $CO_2$ with what we have here.  I also have a pond with

Koi fish in it.  And

3    again, this is the hot tub over here, which is turned

4    off.  We don't use this so much ourselves, but you can

5    use it.  It's fine.  And then this is a pile of wood 6 here that you can have for the wood

stove inside here.

7    MR. SHIPLEY:  All right.

8    BY MR. SHIPLEY:

9    Q        Ms. White, do you know, was that video

25

1

2

10      created after you initially left the home?

11      A Yes.

12      Q        And you initially left the home -- was that

13      in February or March?

14      A Something around there.

15      Q        Okay.  And then you returned in May to --

16      A Yes.

17      Q        May 16th.  Reviewing that video, can you say

18      whether that accurately shows the personal property 19 that was

in the home on February 2021 when you left?

20      A        Yes.

21      Q        Okay.  Did you take anything from the

22      property when you left at that time?

23      A        Yes, I did.

24      Q        Okay.  And you recall what you took?

A        Mostly my clothing and personal items.

Q        Okay.  Was there anything else that you took?

A        Yes.

3       Q        Okay.  Take your time and think about what

4       things you took at that time when you first left the 5 house.

25

July 25, 2022                                                        426

6       A      I was in a huge hurry, but we have -- I had

7       pets, so I had a dog, two birds, two rabbits and a

8       turtle.

9       Q      Okay.

10      A      So I needed to make sure they were all safe

11      as well as some of my houseplants that I was worried 12 would die if I left

        them.

13      Q      Okay.  What about -- did you take a freezer?

14      A      No.

15      Q      Wasn't there a freezer with meat? 16      A      There was a freezer.  I

        had my son come and

17      move the freezer to his property.

18      Q      And then did you return that later?

19      A      I did.

20      Q      Okay.  And then did you also take some guns

21      from the home at that time?

22      A      Yes.

23      Q      Okay.  All right.

24      A      The guns were actually removed prior to that date, but.

25

July 25, 2022                                                                427

Q        Okay.  And then your sister, Ms. Davis, testified as to various items of property that were in

the home that belonged to her and then also things that

you had taken with you that also that she testified

belonged to you.  Did you agree with her testimony?

A        Yes.

THE COURT:  Hold on.  You

can't -- you'll have to rephrase that.

MR. SHIPLEY:  Okay. 10   THE COURT:  It's calling on the

credibility of another witness.

MR. SHIPLEY:  Okay.

BY MR. SHIPLEY:

Q        The items -- the property that your client or

that Ms. Davis said was left on the property -- and

that you took from the property -- do you agree that

that was the property that was left in the

home -- and/or -- of those items that were hers and

that the items that you took with you -- were

also -- that were -- your list would coincide with Ms.

Davis's list?  Is that --

July 25, 2022                                                              428

22          A        Um-hum.

23          Q        Okay.

24          MR. SHIPLEY:  Then we don't have to go

through it all, Your Honor.  Skipping back  -- I don't

think you want me to talk about values of personal property or anything like that.

So I'm skipping 3 forward here.

4    THE COURT:  We'll get to the bids.

5    MR. SHIPLEY:  Right.

6    BY MR. SHIPLEY:

7    Q        I'd like to go back to January 2021, and Mr.

8    White had testified about going on a trip.  What was 9 your understanding about the

trip at that time before 10 he left?

11    A        Well, it seemed very odd to me because I only 12 heard about it a short amount

of time, less than three

13    weeks before he was leaving -- I think it was about ten

14    days, actually -- that he was going to Africa.  And I

15    know from friends who have gone on mission trips that 16 it takes months of planning

to go on a mission trip.

17    And I was concerned.  Has he really checked into this?

18    Does he really know what he's getting into?  Does he

25

July 25, 2022                                                                                    429

know the culture and the people that he's going to

reach?  Besides the fact that we were in a global 21 pandemic and I thought there's no

way he should be 22 traveling.

Q       Okay.  And had the -- the two of you ever

gone on mission trips before?

A        We never have.

Q       Okay.  Is there anything that you did before he left on that trip?

A       Yes.  I really felt like he wasn't prepared,

so I put together a medical kit for him in case he got

stomach issues or whatever.  I made a really nice

dinner, and I put -- I asked him if he knew about Ghana

and some fun things that he could do while he was

there.  So I looked up on YouTube and found some 9 beautiful sites that he

could see while he was there.

And I also prayed with him before he left.

Q       Now, why did you pray with him? 12      A       For safety, that he would be

able to do the 13 Lord's work while he was there.

Q       Okay.  Did you ever find out what that trip

was really about?

A       Yes, I did.

July 25, 2022                                                    430

17        Q        And what did you understand it to be about?

18        A        On January 26th, I understood that it was a

19        an online romance that he went to go pursue with a 30-

20        year-old --

21        Q        Okay.

22        A        -- woman.

23        Q        And you know if there was anything financial 24 related to that?

          A                                Yes, there was.  He was under the impression that he was going to be getting pallets of gold and stacks of hundred-dollar bills.

3    Q        Okay.  What did he have to do to get that? 4        A        He had to get them through customs. 5        Q        Okay.  He had testified about sending some

6    money.  Were you aware of that?

7    A        I wasn't prior to January.

8    Q        Okay.  Do you know -- were you aware whether 9 or not there was, like, some money borrowed against the 10 line of credit?

11        A        Yes.  I noticed when I was looking at my own

12        checking account.  We were debt-free.  We had no bills

13        owed to anybody.  And worked very hard to get that way.

14        And I noticed that all of a sudden, we had $10,000

15        against our line of credit for our home, for our home

25

July 25, 2022                                                          431

16     equity line.  And I was very concerned about that.

17     Q        And what did you do?

18     A        I talked to him about it.  I wanted to

19     understand what this was for.  I didn't know how we 20 were ever going to pay

       it back because we were on such

21     a tight budget.

22     Q        Did -- what did Mr. White tell you he

23     borrowed the money for?

24     A He said that he tried to defer our property taxes, and for whatever reason, it

       didn't go through.

       And so he borrowed this money and has it in an account just in case he has to pay it

       back.  My understanding

3 is that our property taxes is around $5,000, so it 4 still didn't make any sense to me.

And I still had 5 questions.

6      Q        Do you know if your property taxes were

7      deferred?

8      A        Yes.

9      Q        Okay.  So when you found out -- tell the

10     Court how did you find out, like, how was it that all

11     of a sudden you found out that your husband was
25

July 25, 2022                                                                 432

12          actively pursuing a romantic relationship.

13          A        Well, before he left on the flight, I flew up

14     to see my daughter every year for her birthday and my 15 three grandchildren

       up there.  And I asked him, now

16     that you're growing on this trip should I postpone my

17     trip because it was her birthday.  And he said no, no,

18     you should go ahead and go.  I can get a ride to the 19 airport.  No problem.  Go ahead

       and go.

20                     So I went up, and I was heading back to

21                     Oregon on her actual birthday, which was January 26th,

22                     and I got home probably about 8:00 that night.  And I 23 received a

                       phone call from my son.

24                               And he says, "Mom, I need to talk to you."

                                 And then he says, "I'm coming over to your

       house."

                                 And then he immediately says, "I'm in the

3                      neighborhood.  I'll be at your door in two minutes."

4                      So my heart just starts pounding like crazy;

5                      something happened to Dave on this mission trip.  And I

25

July 25, 2022                                                    433

1

2

6           was really nervous.  And Brian came in and shared what 7 was really

going on, that it wasn't a mission trip. 8  Q       Did Mr. White return

to the family home when 9 he came back to the United States?

10     A       At that point, I couldn't believe anything

11   Mr. White had told me.  So I had help changing the 12 locks on the doors, and

I wanted him out. 13 Q Did he -- did Mr. White ever return to the 14 family

home?

15     A       He came -- I had several neighbors looking

16   out for me because I was nervous.  I didn't know what

17   to expect because it was such erratic behavior.  So 18 they would let me know if

they saw his car, and so he 19 had been kind of stalking the house.

20     Q       Okay.  Was there ever a time when you saw Mr.

21   White at the house?

22     A       Yes, there was.  There was a morning that I

23   was backing out of my driveway going to meet two

24   friends for a Bible study, and I saw him parked at the corner of the house.

25

July 25, 2022                                                          434

1    Q

2

     Then what happened next?

     A             I panicked when I saw his car because I had

3    chose no contact with him.  And so I didn't know.  Do I

4    just go back in that house, and do I close the door, or

5    do I continue going?  And I decided to continue going,

6    so I just left the neighborhood quickly.

7    Q       In your car.

8    A       In my car, yes.

9    Q       And what happened next?

10   A       He was following me.

11   Q       And how long did he follow you for?

12   A       So I got on Highway 26.

13   THE COURT:  Mr. Shipley, how is this 14 relevant?

15             MR. SHIPLEY:  Well, it's relevant to the

16             respondent's motion for contempt regarding her 17 reasoning

               for removing guns out of the home in her fear 18 and such, so.

19             THE COURT:  I'll allow it.  Go ahead.

20             MR. SHIPLEY:  Okay.

21             BY MR. SHIPLEY:

22             Q       So he followed me onto 26 as I was going

25

July 25, 2022                                                    435

about 70 miles an hour.  He was way behind me and

caught up to me, took an exit, and started going through town.

And I was talking to my son on the phone.  I said call your dad

and get him to back off.  I don't know what's going on here, and

I'm really 3 scared.  And he wasn't answering any of my son's

calls

so my son said call 911.  And I did that.

And I was talking to the 911 operator, 6 telling her exactly which intersections I was going

through.  At one point, I went through a yellow light.

He's still following me.  I'm sure the light had turned

red.  And finally, three police officers, three

different police cars, came and pulled him over.

Q        Okay.  What were you thinking after that?

A        My heart was pounding.  The officer pulled me

over about half a block ahead of him.  One officer came

to me -- and two went to him -- and just wanted me to 15 breathe a little bit and

calm down because I was about 16 ready to pass out, hyperventilated.

Q        Okay.  And what did you -- once you returned 18 home -- what did you do after

that?

July 25, 2022                                                    436

19        A       So the officer told me that even though I

20        changed the locks on the house, that I have no rights

21        to keep Mr. White out of the house, that he's still on

22        the title.  And so I decided it wasn't safe for me to

23        be there any longer.  And I called my daughter

24        immediately, grabbed my stuff that I needed -- my pets, my clothes, and some

          houseplants -- and left.

                              And then what about the guns?  Is that about

when he took them?

3         A       No, it was prior to that.

4         Q       Okay.  And why did you take the guns?

5         A       Well, we were seeing a -- Dave, Mr. White was

6         seeing a psychiatrist at the VA Hospital, Dr. David

7         Douglas.  And he wanted me there at every single visit.

8         And it went fine.  I didn't think it was that

9         necessary, but he still called me and wanted to do a

10        conference call just to make sure that what was being 11 said was true.  And he

          told me in front -- with Mr. 12 David in the room, Mr. White -- that I needed to

          remove

13        all the guns from the house.  Immediately.

25

July 25, 2022                                                                                  437

Q        And --

A        This was about four or five years ago. 16        Q        When Mr. White came home from Africa, did he 17 have any problems coming into the country.? 18                 THE COURT:  Wait a second.  I missed that.  Did you say it was four or five years ago?

THE WITNESS:  That the guns were initially removed.

THE COURT:  Okay.

BY MR. SHIPLEY:

Q        And then the guns came back?

A        He kept bugging me about the guns, over and over and over.  When are you going to bring them back? When are you going to bring back?  You got to bring 3 those guns back.  So I finally relented, brought the 4 guns back into the home, but at the same time, I bought a gun safe.

Q        Okay.

A        And I said, okay, if these guns are stored in 8 this gun safe, I will bring them back in the house.

Q        Okay.  My question was, when Mr. White was

July 25, 2022                                                    438

10    returning to the United States, did he have any 11 problems entering the

country that you were aware of?

12    A        Yes, he did.

13    Q        And what was that?

14    A        When he was going through customs -- I

15    believe it was New York -- we had a missing persons

16    report out for it -- for him because we didn't believe

17    anything he said at that point.  We didn't really know

18    if he was in Ghana or where he was.  And they flagged

19    him, called us to let us know that they had him, and 20 they found a gun in his

possession at the time. 21        Q        So he was trying to bring a gun through

--

22    A        Yeah.

23    Q        -- customs?  Okay.  Ms. White, if you could

24    turn to Exhibit 9.

A        I'm there.

Okay.  Can you tell the Court what Exhibit 9

is?

3    A        This is the home that Mr. White and I had.

4    Q        Okay.  But these photographs, they look

25

July 25, 2022                                                            439

5        different.  Go ahead and look through those

6        photographs, please.

7        A        Yes.  Okay.

8        Q        Do you know who took these photographs?

9        A        Yes, I do.  I don't know specifically the

10       guy's name, but the Honorable Judge Fun ordered that

11       Steve Grey (phonetic)-- he's a realtor -- to sell the

12       house.  And he brought in his specialist who does the 13 photography for his

         home sales.

14  Q        Okay.  Were these photos taken before or 15 after you prepared the home

for sale?

16       A        Just after I prepared the home for sale.

17       Q Okay.  And can you tell the Court what 18 you -- and were you the only

         person preparing the home 19 for sale?

20       A        Yes, again.  Judge Fun determined that I was

21       the one to prepare the house for sale because I'm the

22       one that did most of the maintenance on the house 23 anyways.  And so, yeah, I

         did a lot of work in that

24 house getting it ready for sale.

         Q                Did you have a lot of help?

25

July 25, 2022                                                          440

A          I had a lot of help.

Q          From who?

A          Friends and family.

Q          Okay.  And can you tell the Court what you 5 did to prepare the home

for sale?

A          I painted six different rooms.  I replaced a

bathroom floor, some molding.  I decluttered, and I

polished the hardwood floors, and cleaned all the

windows, and I just did a ton of work, hours and hours.

Q          And we saw the video, and there was a lot of 11 stuff in the house.  Did

you throw it all out?

A          No, I did take a lot of loads to goodwill.  I

had to take two truckloads and one trailer load to the

dump because they weren't even good enough for 15 goodwill.  And the rest I

boxed up and put in the 16 garage.

Q     What -- like what kind of stuff did you take 18 to the dump?

A          An old dresser.  I had it out on the street

for free, and nobody wanted it.  And I knew goodwill 21 wasn't going to take it,

so that.  Random broken parts

and old stuff that had no value anymore.

July 25, 2022                                                                441

1

2

23          Q        Okay.

24          A        We had lived there for over ten years, so we had accumulated a bunch

of junk.

                    Okay.  I'd like to look at pictures -- I

think it's -- I think I have -- I could be wrong on the 3 numbers, but I have them as 32, 33,

and 34.  They

4                               should all be pictures of your garage.

5                               A        Okay.  Mine is 30, 31, and 32.

6                               Q        Okay.

7                               MR. SHIPLEY:  I don't know which one you

8                               have.  It's the --

9                               THE COURT:  They're --

10                              MR. SHIPLEY:  They should be -- 11                    THE

                                COURT:  My 31 is a bathroom.  My 32

12                              is the --

13                              MR. SHIPLEY:  Okay.

14                              THE COURT:  -- looks like the shop area

15                              of the --

16                              MR. SHIPLEY:  Garage.  Okay.

25

July 25, 2022                                                                 442

1

2

17                      THE COURT:  -- garage.

18                      THE COURT:  And then the bottom

19              pictures --

20                      MR. SHIPLEY:  So is hers the official

21              one, or yours is?

22                      THE CLERK:  Hers is?

23                      THE COURT:  Hers, is it?

24                      MR. SHIPLEY:  Okay.

BY MR. SHIPLEY:

            Q  So for you, it's -- it's picture -- what numbers were they?

3           A         30, 31, and 32.

4           Q         Okay.  So those would be 32, 33, and 34 for 5 the other ones.  Okay.

            Can you describe for the Court

6  what we see in these pictures?

7  A         Yes, I also cleaned up the garage.  So

8  this  -- this is the garage, and it's also the stack of

9  stuff that I boxed up that I would like to move -- is 10 out there.

11          Q         Okay.  And so I see in picture -- what would

12              be your -- is our 32 -- it's like the shop area was

13              all -- and I, you know, there's cabinets there.  And

25

July 25, 2022                                                                443

14          there's like -- stuff looks to be in place.  Did you 15 organize that, or was it

organized like that already?

16          A          No, I organized all that.

17          Q          Okay.  And then in the next picture, there's

18          like -- looks like there's a couple physio-balls and a

19          stroller.

20          A          Right.

21          Q          And then --

22          A          Some furniture and stuff that I decluttered 23 the house and put out in

the garage.

24          Q                                              And then -- and then the -- 34 for us, which

I think would be 32 or 33 for you --

1

2

A          Yeah.  Um-hum.

Q          -- is that like when you said you'd put 3 stuff, stacked stuff, or put stuff in boxes and put it

4          in the garage?  Is that what we see there?

5          A          Yes.

6          Q          Okay.  When you left the home, was

7          that -- did that garage look –- was there anything else

8          removed from the garage before you left?

9          A          Not that I'm aware of.

10          Q          Okay.  And when Mr. White texted your

11          daughter about moving stuff so he could get the car in

12          there, would that have been that pile of the stacked

13          stuff there?

14          A          That is what I imagine it to be.

15          Q          Okay.  All right.  Did you happen in -– did

16          you do this at the, like, at the direction of the 17 realtor, or how -- did you just

           do it all on your own, 18 or how did that go?

19          A          We have also been in a position to sell homes

20          on our own with for sale by owner.  So I've been

25

July 25, 2022                                                                 445

1

2

21          through this process before.  And by the time Steve 22 Grey came in, he said

that I had done a fantastic job 23 and my house was ready for sale.

24          Q                    I think there's a picture in here of the

toolshed.  (Indiscernible).  Now, in one of the

pictures, it does look like your lawn was a little beat up.  Was there any reason why that

was?

3                              A          Absolutely.  We had temperatures of 115, and

4                              a lot of plants were crispy, including part of the

5                              lawn.

6                              Q          Okay.

7                              A          I have the toolshed.

8                              Q          What page -- what number is it on?

9          THE COURT:  Inside or outside of it?

10         THE WITNESS:  Inside, 41.

11         THE COURT:  Mine's 44.

12         MR. SHIPLEY:  44, okay.  I'm going the

13         wrong direction here.

14         BY MR. SHIPLEY:

15         Q          And would that be number 42 for you, Ms.

16         White, or --

25

July 25, 2022                                                                    446

1

2

17          A       It doesn't have a number on it, but --

18          Q       Okay.

19          A       -- it's prior to 42, it's 41.  But there's 20 also another 41,

so anyway it's there.

21     Q       All right.  The picture -– there is a picture 22 of inside the toolshed, and there's

a lot of tools and 23 other things in there.  How much of that did you remove

24 from that toolshed when you left?

          A       Maybe 10 percent.

          Q            Like, what did you take?

     A       I took a long shovel, just some of my flower 3 containers.  I actually -- I took a

picture of the

4                   things that I took from the shop.

5          Q       Right.  Okay.

6          A       It was -- it was just a small pile of things.

7          Q       All right.

8          A       I left the lawn mower and all the --

9          MR. SHIPLEY: Your Honor, I

10          think -- I'm not sure -- I think Exhibit 9 was already 11 offered

into evidence?

12          THE COURT:  I'm pretty sure it was.

25

July 25, 2022                                                                447

1

2

13          MR. WHITE:  Um-hum.  For sure, it was.

14          THE CLERK:  I don't have it on here.

15          MR. SHIPLEY:  Your Honor, we offer 9.

16          (Petitioner's Exhibit 9 offered into

17          evidence)

18          THE COURT:  Any objections to 9?

19          MR. WHITE:  No.

20          THE COURT:  9 is received.

21          MR. WHITE:  Okay.

22          (Petitioner's Exhibit 9 received into

23          evidence.)

24          BY MR. SHIPLEY:

    Q                    Ms. White, now I want to look at Exhibit 10.

    A       Um-hum.

    Q              And go ahead and look through the -- those

3           pictures.

4           (Pause)

5           THE WITNESS:  Okay.

6           BY MR. SHIPLEY:

25

July 25, 2022                                                          448

1

2

7              Q       Is that all of the personal property you took 8 from the

home or is there other stuff?

9    A     This does not show my clothing or makeup and 10 shoes, that sort of thing, but.

11             Q       Okay.  And then, I want to look at number 11.

12    It should be numbered.  Is there a number 11 there?

13    A       Yes.

14    Q       And can you tell the Court what that is? 15    A    Yeah.  This is

the room that I'm living in at 16 my daughter's house.

17    Q     Okay.  So at the time this was taken, was 18 that your bed?

19    A     Yeah.  I was in a used twin mattress on the 20 floor.

21    Q     Okay.  And then the rest of those, the 22 property, is that what we see in

the picture as the

23    decorations in that room?

24    A     Correct.

Q  Okay.

MR. SHIPLEY:  I don't know if this has been offered, Your Honor, but I'm

going to offer

3    Exhibit 11.

4    THE COURT:  11, 10, but 11 -- my 11 is a 5 mirror.

6              MR. SHIPLEY:  No, no, I'm saying the

25

July 25, 2022                                                                          449

7        entire -- sorry, entire Exhibit 10.  Sorry.

8        THE COURT:  Yep.

9        (Petitioner's Exhibit 10 offered into

10       evidence)

11       MR. SHIPLEY:  All of those photos.

12       THE CLERK:  I don't think I have those.

13       THE COURT:  Okay.  Any objection to 10?

14       MR. WHITE:  (Indiscernible.) 15              THE COURT:

         It's received.

16       (Petitioner's Exhibit 10 received into

17       evidence.)

18       MR. SHIPLEY:  Okay.

19       BY MR. SHIPLEY:

20       Q        Ms. White, I want to show you -- if you can

21       please turn to Exhibit 5.

22       A        Okay.

23       Q        You there?

24       A        Yeah.

         Q                Okay.  Can you tell the Court what this is?

         A        Yes.  I was in a auto accident.  And this is my GEICO information.

25

July 25, 2022                                                          450

Q        Okay.  And were you determined to be at

fault?

A        Yes, I was.

Q        Okay.  And then the -- and this was a Pontiac

Vibe that you had at the time you filed for divorce,

correct?

A        Correct.  Um-hum.

Q        And the second page there, is that -- well, 11 what did the -- what did

you receive from the insurance 12 company?

A        The insurance company -– their total value

for my car was $8,225.90.  Out of that, there was a 15 $1,000 deductible and

some other little expenses.  So 16 my settlement amount was $7,398.10.

Q        Okay.  Now, on this document, it lists a base

value.  What's that?  It's up at the top --

A        Yeah, I see it.

Q        -- of that calculation.  How much is that?

A        It is $7,451.

Q        Okay.  And then the insurance company added 23 tax; is that correct?

A                        Correct.  Because I was in the state of

Washington.

July 25, 2022                                                              451

Q        Okay.  And does this accurately reflect the payment that you received?

A        Yes, it is.

MR. SHIPLEY:  Your Honor, we offer

Exhibit 5 into evidence.

(Petitioner's Exhibit 5 offered into

evidence)

THE COURT:  Any objection?

MR. WHITE:  No.

THE COURT:  5 is received.

(Petitioner's Exhibit 5 received into

evidence.)

BY MR. SHIPLEY:

Q        Ms. White, please turn to Exhibit 11.

A        Okay.

Q        And please tell the Court what this is? 18        A

This is the TD Ameritrade account that's in

my name.

Q        Okay.  And this is a Roth IRA?

A        Yes.

July 25, 2022                                                    452

22    Q    Okay.  Does that -- the figures accurately

23    reflect what the account was at the end of 2021?

24    A    Yes.

MR. SHIPLEY:  Your Honor, I offer

Exhibit 11.

(Petitioner's Exhibit 11 offered into

3         evidence)

4         THE COURT:  Any objection?

5         MR. WHITE:  No.

6         THE COURT:  11 is received.

7         (Petitioner's Exhibit 11 received into

8         evidence.)

9         BY MR. SHIPLEY:

10    Q    Ms. White, I'm showing you what has been

11    marked as Exhibit 12.

12    A    Um-hum.

13    Q    Can you tell the Court what these are? 14    A

This is Social Security benefits, benefits 15 for spouses.

16    Q    Okay.  And is this information you can get

17    online to calculate your benefit then?

25

July 25, 2022                                                    453

1

2

18      A       Yes.

19      Q       Okay.  What -- and what is it -- 20                    MR. SHIPLEY:

Your Honor, I offer this

21              into evidence.

22              (Petitioner's Exhibit 12 offered into

23              evidence)
24                      THE COURT:  Any objection to 12?

                MR. WHITE:  No.
                        THE COURT:  12 is received.

                (Petitioner's Exhibit 12 received into

3       evidence.)

4       BY MR. SHIPLEY:

5       Q       So based upon this, is the maximum that you

6       would get from Social Security is if you get 50 percent

7       of Mr. White's amount that he receives from Social

8       Security?

9       A       Yes.

10      Q       And based upon the second page there, when is

11      that -- when can you get that much?

12      A       In 2029.

13      Q       Okay.  Is that July of 2029, correct?

25

July 25, 2022                                                      454

14      A       Yes.  Yes.

15      Q       If you were to take Social Security now, do

you know how much you would receive?

17      A       From the earnings that I --

18      Q       Well, actually, let me ask you this.  Do you 19 know if you're even

eligible to receive Social Security

20      at this moment in time?

21      A       I'm not.

22      Q       Okay.  And then the earliest you can do that

23      is August 2024.

24      A       I believe so.

        Q                       All right.  And at that time, according to

this, you would receive 32.71 percent of what Mr. White receives; is that correct?

3       A       Yes.

4       Q       Okay.  Do you know if you qualify -- if you

5       would qualify for Social Security on your own earnings?

6       A       I have some Social Security that I've paid in

7       throughout my life, but it will never match what Mr.

8       White's would be.

9       Q       Okay.

July 25, 2022                                                          455

10          A        It would be around $400 a month. 11    Q        Okay.  I'm showing you

-- or I want you to 12 look at Exhibit 13.

13                    MR. WHITE:  I don't have anything under

14                    Exhibit 13.  It's empty.

15                    MR. SHIPLEY:  That's empty?

16                    MR. WHITE:  Um-hum.

17                    MR. SHIPLEY:  It was provided.  Let me

18                    show you what that is.

19                    MR. WHITE:  Okay.

20                    BY MR. SHIPLEY:

21                    Q        Can you --

22                    MR. WHITE:  Oh, okay.  I've seen it, but

23                    I don't -- I don't have it in here.

24                    MR. SHIPLEY:  All right.

BY MR. SHIPLEY:

           Q                    Ms. White, can you tell the Court what

Exhibit 13 is?

3     A        Yes.  This is a document saying that I'm 4 going to repay my children the money

that they advanced 5 to me during the divorce.

6          Q        Okay.  And then the -- the next page, how

25

July 25, 2022                                                456

1

2

7          much does it say -- how much do you owe to your

8          daughter?

9          A        $12,312.49.

10         Q        And then what about Mr. Brian White?

11         A        Brian White is $4,452.30.

12         Q        Do you still owe both of them?

13         A        No, I don't.  I went ahead and paid off Brian 14 through the proceeds of

           the home.

15                           Q        Okay.  But do you still owe your daughter?

16                           A        Yes, I do.

17                           Q        Okay.  Ms. White, please turn to Exhibit 14.

18                           Are you there?

19                           A        Yes.

20                           Q        Okay.  This is a Uniform Support Declaration.

21                           Is this still accurate?  On your income?

22                           A        No.

23                           MR. WHITE:  Yes.  It's there.  I found

24                           13, put it in 14 so.

           BY MR. SHIPLEY:

                     Q                           Ms. White, I've handed you what's Exhibit 44,

25

July 25, 2022                                                        457

1

2

I believe.

3              A      Um-hum.

4              Q      And can you tell the Court what this is?

5              A      This is a Uniform Support Declaration.

6              Q      All right.  And when did you sign this one?

7              A      Yesterday.

8              Q      Today?

9              A      Yesterday.

10             Q      What about that today.

11             A      Today, excuse me.

12             Q      All right.  And that's your signature

13      appearing on that?

14             A      Yes, it is.

15             MR. SHIPLEY:  Your Honor, we offer

16      Exhibit 44 into evidence.

17             (Petitioner's Exhibit 44 offered into

18      evidence)

19             THE COURT:  Any objection?

20             MR. WHITE:  I'm not certain I have

21      the  --

22             MR. SHIPLEY:  This is the one I just

25

July 25, 2022                                                                    458

23          handed you today.

24          MR. WHITE:  Oh, might be.

THE COURT:  Your USB.

MR. SHIPLEY:  Yeah.  It should be in there.  I just handed it to you.  There,

that's it.

3          MR. WHITE:  This one?

4          MR. SHIPLEY:  Yep.

5          MR. WHITE:  Okay.  All right.  Yeah,

6          yeah.  This is fine.

7          MR. SHIPLEY:  Okay.

8          THE COURT:  Received.

9          (Petitioner's Exhibit 44 received into

10          evidence.)

11          BY MR. SHIPLEY:

12          Q          Ms. White, have you become employed?

13          A Yes, I have.

14          Q          All right.  And what are you doing?

25

July 25, 2022                                                       459

15          A I am working as a nanny.

16          Q       All right.  And about how many hours a week

17    do you work?

18          A Close to 40.

19          Q       Okay.  Now, is it -- when you say close to 20 40, you

      know, it matters.  Is it, like, close to 32 or

21    36?

22          A       Probably about 36.

23          Q       Okay.  And then what do you get paid an hour?

24          A       I get $25 an hour.

            Q               And are you paid directly from the parents,

      or do you -- does it go through, like, a company?

            A               I'm paid directly.

3           Q       All right.  So is there any withholding on

4     your -- the money received?

5           A       Not currently.

6           Q       Okay.  Have we consulted with a tax 7 professional in regards to being

      prepared for how much

8      tax you may have to pay?

9           A       Yes.

25

July 25, 2022                                                      460

1

2

10          Q       Okay.  And based upon that information, what

11          is your understanding of, like, do you have, like, a 12 percentage that you

            believe you will have to --

13     A       I'm not remembering the exact numbers, but 14 yes, I have to -- I have to

consider it a -- a private

15          business.

16          Q       Okay.

17          A       And so my taxes is pretty high.  I think it's 18 about 24 percent, but I

            can't remember.

19          Q       Twenty-four percent?  Could it be 27 percent?

20          A       It could be.

21          Q       All right.  And as far as, like, the other

22     expenditures -- now that's your income.  So your sole

23     source of income right now is -- is the working as a

24     nanny, correct?

            A       Yes.

            Q       Okay.  And then there are expenses listed on that budget, if you go to

       the -- back two pages, I

3           believe.

4           A       Yes.

25

July 25, 2022                                                  461

5      Q       And are those -- do you believe those

6      expenses are accurate?

7      A       Yes.

8      Q       And the -- the amount used for -- what was

9      the amount on there for a mortgage or payment?

10     A       1,911.

11     Q       Okay.  From the exhibit that was previously 12 admitted -- I believe it

       was 33 -- is that -- that was

13                          for a $450,000 home on that.

14                          A       Correct.

15                          MR. SHIPLEY:  I think that exhibit is up

16                          there.  That would be Exhibit 31?  Is Exhibit 31 up 17 there?  It

                            would not be in the book.  It would be --  18 BY MR. SHIPLEY:

19     Q       Just for sake of being quick, Your Honor, the

20     1,911 payment -- that was for the $450,000 home.  And

21     then if you bought a $500,000 home, that would have 22 been then the $2,256.

       Have you been looking around at

23     homes?

24     A       Yes, I have.

       Q                       And in the area you're currently living,

25

July 25, 2022                                                    462

what -- could you buy a home for 450,000?

     A     No.  I would have to go quite a ways out. 3     Q     Okay.  Did you -- so how about -- like, how

4     far from there would you have to go, do you think?

5     A     Probably 45 minutes out.

6     Q     Okay.  And at this moment in time, with your

7     income, are your children paying any of your expenses 8 anymore?

9     A     My daughter's still providing me a place to

10     live --

11     Q     Okay.

12     A     -- food, electricity, all that.

13     Q     Do you pay her for any of that?

14     A     I'm putting it on an account.

15     Q     Okay.  All right.  Do you plan on continuing

16     to live on the floor of your daughter's home?

17     A     No, I don't.

18     Q     Okay.  So --

19     A     I want to get my own home.

20     Q     All right.  So is that -- what's your game 21 plan in that regard?

22     A     My plan is to get a small home that I could

25

July 25, 2022                                                                463

1

2

23        have a garden of my own.  I could have the grandkids

24        over to play at grandma's house that I could live independently.

          Q                                    Okay.  Now, you testified in deposition that
I think you were, you know, possibly you were looking

3         at various things, but is -- nanny, is that something

4         you've done in the past?

5         A        It is.

6         Q        Okay.  And how is that going for you?

7         A        I love it.

8         Q        Okay.  And once this job ends, do you think 9 you would -- I mean, do

          you think you'd be able to find

10   another job?

11   A        Just in the few months I've worked, just 12 taking the baby around for walks,

I've had three people

13        want to hire me.

14        Q        Okay.  How did you get that job?

15        A        Through an online nanny website locally. 16        Q        Okay.  And so

          you, like, post something on

17        there.  How does that work?

18        A        I responded to somebody else's ad --
25

July 25, 2022                                                                            464

19          Q          Okay.

20          A          -- that they were looking for a nanny.

21          Q          Okay.  And then how did it go from there?

22          A          Well, it was a temporary position.  Their

23    current nanny was out helping her husband through a

24    medical crisis.  And they said they didn't know how long it would be.  And then,

      on the second day, they offered me a full-time job and said, "Would you, please,

      just be our regular nanny?  The baby has such a

3     bond with you" --

4     Q          Um-hum.

5     A          -- "that we don't want our old nanny back

6     now."

7     Q          Ah.  Mr. Psaradelis testified about your

8     ability to qualify.  Do you know if, you know, 9 your -- are you aware whether or not

      your children will 10 cosign for you?

11          A          Both of my children said that they would be

12    happy to get me into a home.

13          Q          Okay.

14          A          Help me get into a home.

15          Q          Okay.  Do you receive food stamps?

25

July 25, 2022                                               465

16        A        No, I do not.

17        Q        Did you ever apply for them from the State of

18        Oregon?

19        A        I sure did.

20        Q        Do you know if you're eligible?

21        A        When I got back into the home to prepare it

22        for sale, I had absolutely not a dime to my name, and I 23 was totally living on

          money from my son and daughter.

24 And, I thought, well, at least I could do food stamps.

                              And I wouldn't have to be borrowing money for food.  So

          I applied at that time for food stamps.

                              MR. SHIPLEY:  This should be 39, Mr.

3         White.

4         BY MR. SHIPLEY:

5         Q        Okay.  Ms. White, you said you were denied.

6         I just showed you what's been marked as Petitioner's 7 Exhibit 39.  Can you tell

          the Court what that that is? 8        A        This was my stamp eligibility decision.

          They 9 denied.

10                          Q        Okay.  And if you can look at the second

11                          page, does it tell you why you were denied?

July 25, 2022                                                                                    466

12          A       Due to already receiving benefits.

13          MR. WHITE:  Um-hum.

14          BY MR. SHIPLEY:

15          Q       Did you -- had you ever received -- but you

16   had never received the food stamp benefits?

17          A       Not at that time, I did not.

18          Q       Did you find out -- did you ever call them or

19   phone?

20          A       Yes, I did.

21          Q       And what happened?

22          A       They said that Mr. White was receiving

23   benefits for both of us.

24          Q       Okay.

                    MR. SHIPLEY:  Your Honor, we offer
     Exhibit 39 into evidence.

                    (Petitioner's Exhibit 39 offered into
3 evidence)

4                   THE COURT:  Any objection?

5                   MR. WHITE:  Yes.  Well -- well, we just
6    haven't decided on 44 yet.  You didn't offer this yet.

7                   THE COURT:  I believe, objection to 39?

25

July 25, 2022                                                467

8          If there is --

9          MR. WHITE:  I have an objection to 44.

10          THE COURT:  What's your objection to 39?

11          MR. WHITE:  This uniform support -- no.

12          THE COURT:  No, 39, stamps, eligibility

13          decision.

14          MR. WHITE:  No, I don't have any

15          objection to that.

16          THE COURT:  39 is received.

17          (Petitioner's Exhibit 39 received into

18          evidence.)

19          MR. WHITE:  But 44, I do.  I didn't hear

20          that submitted to evidence.

21          MR. SHIPLEY:  I'll offer 44 into 22 evidence.

23          THE COURT: I think 44 might already 24 have been received.

          MR. SHIPLEY:  I thought it was already received.

          THE COURT:  It is.

3          MR. WHITE:  No, and I object -- I object

4          to it.  This --

5          THE COURT:  It's untimely.

25

July 25, 2022                                                                468

1

2

6                    MR. WHITE:  Your Honor --

7                    THE COURT:  You didn't object.  I asked

8               you at the time --

9                    MR. WHITE:  I didn't --

10                   THE COURT:  -- and you said you didn't

11              object.  It's already been admitted.

12                   MR. WHITE:  I didn't see it.  I didn't

13              know that was going on, but this Uniform Support

14              Declaration is not --

15                   THE COURT:  Mr. Shipley, you may ask 16 your next question.
17          MR. SHIPLEY:  Okay.

18                   THE COURT:  44 had already been

19     received.

20                   MR. SHIPLEY:  All right.

21                   THE COURT:  You can certainly ask

22              questions once you get to (Indiscernible).

23                   MR. WHITE:  I will.

24                   BY MR. SHIPLEY:

           Q                    Ms. White, what is your plan regarding the

      $285,000 that you received from selling the -- your interest in the home to Mr. White.

25

July 25, 2022                                                    469

3    A        My plan currently is to put about 200,000 4 down on a home for myself to live in.

5              Q        Okay.  How much of that 285,000 do you have

6              remaining after paying for legal expenses and other 7 expenses -- and, I think, I

               don't know what else you've

8              spent it on.

9    A        I don't know.

10   Q        Is it --

11   A        I don't know off the top of my head.

12   Q        Is it more than 250?

13   A        What was the total amount, 280 –- 14   Q        The 285 was what

               (Indiscernible) -- 15      A        (Indiscernible) It's probably right around 16

               there.

17   Q        Okay.  What have you, other than attorney 18 fees, what else have you spent

     the money on? 19      A        I bought a -- new car.  My car was totaled

20             in that accident.

21   Q        Okay.  All right.

22   A        A new used car.

23   Q        You've asked for spousal support.  How much

24             spousal support do you think the Court should award you?

25

July 25, 2022                                                               470

1

2

A                          I think the Court should award me half of his

Social Security.

Q     Okay.  And what about when you receive Social 4 Security.

A      Then I think it should be equalized at that 6 time.

Q      Okay.  Your husband has -- within their

opening statement and other hearing memorandums and

such -- that you could simply take the home proceeds

and invest that to supplement your income and just live

at your children's house.  What's your thoughts about 12 that idea?

A      I'm not going to have Mr. White dictate where 14 I live.  And I want to be

independent.

Q      Okay.  Let's see here.  Please go to Exhibit

6.

A      Okay.

Q      And if you could look through, there is four

titles, and then it looks like a registration for a

white trailer.

A      Um-hum.

Q      Does that account for the -- what -- well, 23 what vehicles are there?

There's the camper; I think

25

July 25, 2022                                                            471

24 we covered that one.

A          Right.  A 2005 Chevy pickup --

Q          The second one's the camper.

A          Okay.  The camper 2015; 2010 Pontiac Vibe,

which was my car that was totaled; a '69 trailer.  I'm

not seeing his --

Q          Well, I think -- well, he owed money at the 6 time on that.

A          Oh, okay.  All right.  I didn't have the 8 title for his car.

Q          All right.  Was the trailer, the utility 10 trailer, was that something he had

before you guys were

married or got from his dad?

A          He got it as an inheritance.

Q          Okay.

A          -- part of his inheritance.

Q          Okay.  And you're not claiming an interest in

that trailer; is that correct?

A          No.

Q          Did you ever agree to transfer the camper to

photolithography?

A          Absolutely not.

July 25, 2022                                                                472

1

2

21          Q       Okay.  Did you ever agree to sell any

22    interest you had in photolithography?

23          A       Absolutely not.

24          Q       Okay.  How was the camper and truck used

during your marriage?

            A       Trips to Yellowstone and the beach and camping.

3           Q       Okay.  And who would go on those camping

4     trips?

5           A       Both Mr. White and myself.

6           Q       Okay.

7           A       Occasionally, my daughter and her children.

8           Q       Okay.  And Mr. White had testified that it

9     was used, like, down -- I guess because he didn't want

10    to travel to and from Wilsonville --

11          A       Right.  Um-hum.

12          Q       For how long did that go on?

13          A       That job was six months, I believe.

14          Q       Okay.

15          A       Or less.

16          Q       So after that six months, you guys -- it was

25

July 25, 2022                                            473

17          your camper and trailer?

18          A       Yep, yeah.

19          Q       Okay.  Mr. White also testified that -- the

20          La-Z-Boy chairs, the window treatments, and the

21          toolshed were purchases of the business where they

22          were, I guess, owned by photolithography -- but were 23 those items, as far as

you are aware, ever used for any 24 kind of business purpose for

photolithography.

            A                               I know he sits on his computer a lot.  But I

have no idea what he was doing.

            Q        Okay.

3           A       He'd basically sits in front of the

4           television.

5           Q       There, like in the TV room?

6           A Yeah.  They're our lounge chairs. 7 Q So if you were, like, watching a football

game, you might be sitting in them?

8           A       Absolutely.

9           Q       Okay.  Like, what about, like, the toolshed?

10          As far as you're aware, was there anything done with

11          photolithography that you're aware of?

12

July 25, 2022                                                474

13          A          Nothing.

14          Q          Okay.  What -- what went on in the toolshed?

15          A          I love to garden, so it had all the garden

tools, the lawn mower, the clippers, the chemicals, all 17 that type of stuff.  And

some of my pond supplies.

18          Q          Okay.  What was your understanding?  Did Mr.

19  White -- he testified that he told you that something 20 was being a write-off or

something like that.  What was

21  your understanding of that?

22  A          He did all kinds of stuff like that 23 throughout our marriage.  We even joked

about the La-Z24 Boy chairs being office furniture.

Q All right.  Was anybody else ever involved in photolithography that you were aware of?

            A                                          I know that Randy and Orlando were involved.

3          (Indiscernible) --

4          Q          How would -- but how did -- how were they

5  involved?

6          A          By name only.

7          Q          Okay.

8          A          Just -- they -- they weren't involved at all,

9  really, in the day-to-day operation.

25

July 25, 2022                                                                475

1

2

10          Q        So the photolithography work that your

11    husband was doing, was that -- was only that six-month

12    period, that he --

13          A        No.  He did a little bit of work on a 14 contract in California.  I think he

      had two or three

15    different jobs, little jobs.

16    Q        Okay.

17    A        That was his biggest job of the

18    (indiscernible).

19    Q        Prior to 2020, did you and -- did you review

20    and sign your tax returns before they were filed?

21    A        Yes.

22    Q        Okay.  Was there ever a situation where you

23    didn't even look at them?

24    A        Not that I recall.

      Q                                      Okay.  Did you review and sign your 2020 tax

returns?

      A            Absolutely not.

3     Q        Prior to us receiving copies of them, were

4     you even aware that they had been filed?

25

July 25, 2022                                                                    476

1

2

5          A        Not until I received -- the refund.

6          Q        Well, I'm saying for 2020?

7          A        No, I wasn't aware.

8          Q        Okay.  How did you -- how did you become

9    aware -- and I think you just answered that -- so

10   is -- you received a refund check.  Is that how you 11 became aware that your

     2021 returns were filed? 12       A        Yeah.  I was very shocked to receive a --

     a 13 refund for something that I never filed for. 14        Q        And did Mr.

     White ever call you and talk to

15   you about those returns being filed?

16         A        Not a word.

17         Q        Okay.  And then I think it was -- oh, sorry,

18   whatever exhibit that one was here.  That was Exhibit

19   43.  That was a copy, and I think the -- the original 20 was in the court file -- was

     that

21 something -- you -- you received that from the Oregon 22 Department of Revenue?
23                  A        Yes.

24         Q          Okay.

                                                MR. SHIPLEY:  Your Honor, I -- and we're

     right at 5:00 so --

        THE COURT:  How much more are you going 3 to have with Ms. White?

25

July 25, 2022                                                            477

1

2

4       MR. SHIPLEY:  I just needed to kind of

5       go through it, and then -- I have, like, a couple of

6       key cleanup questions.  If we could just pick it up,

7       like, right at the beginning tomorrow and then -–

8       THE COURT:  Go ahead and finish. 9               MR.

SHIPLEY:  Okay.  I don't even know

10      if I do.  I just got to go through this real quick.

11      THE COURT:  Um-hum.

12      (Pause)

13      BY MR. SHIPLEY:

14      Q       Ms. White, how long do you intend to work

15      for?

16      A       As long as I can.

17      Q       Okay.

18      A       Probably till I'm 67.

19      Q       Okay.  If you're physically able, would you

20      work beyond that?

21      A       Possibly.

22      Q       The -- other than, like -- there was some

23      outdoor, or outdoor, like, decorations that were in

25

July 25, 2022                                                478

24          those photos -- was the other -- is the other, like, items that you

-- that came with you from the

home -- is that in your room now or --

         A          Most of it, yes.

3     Q        Okay.  Okay.  And did you ever -- when was 4 the last time you worked full-time

as you are now? 5     A        When Mr. White was in college, I worked three 6 jobs.

7               Q        So while he was in school, you were working

8               three jobs?

9               A        Yes.

10              MR. SHIPLEY:  Your Honor, no more

11              questions.

12              THE COURT:  Okay.  We'll start tomorrow

13              with the -- Mr. White being able to ask questions of 14 Ms.
White.  We have -- our 9:00 went away, so 9:00 is 15 available.

16              MR. WHITE:  Okay.

17              MR. SHIPLEY:  I think I told a few
18              people I would call them.  Can we start at 10?

19              THE COURT:  We can.

20              MR. SHIPLEY:  Okay.

21              THE COURT:  Yep.  All right.

25

July 25, 2022                                                                479

MR. SHIPLEY:  Thank you.  23              THE COURT:

We'll be back here for 24 10:00.

MR. SHIPLEY:  Can we leave our stuff in

here?

THE COURT:  The only thing that ever

comes up is ex parte.  And I obviously wouldn't leave

anything --

MR. SHIPLEY:  No, I'll take, like, my

computer --

THE COURT:  -- expensive, like don't

leave the computer.  Ms. Ragstall (phonetic) tends to

walk away with those things.  But that's okay.

UNIDENTIFIED SPEAKER:  Huh.

THE COURT:  But, yeah, I mean, don't

leave things that you're going to be worried about, but

your books, that's fine.

(Proceedings concluded at 5:02 p.m.)

July 25, 2022                                                    480

1

2

18

19

20

21

22

23

24

25

July 26, 2022                                                                481

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

July 26, 2022

TRANSCRIPT OF COURT TRIAL
THE HONORABLE D. CHARLES BAILEY
CIRCUIT COURT JUDGE.

APPEARANCES:

For the Petitioner:        Attorney at Law
                     By:  James T. Shipley
                     Portland, OR 97321

For the Respondent:       Pro Se
                     By:  David C. White
                     Portland, OR 97229

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

(9:59 a.m.)

THE COURT:  All right.  This is our

continuation in the White proceedings with multiple

cases.  We have Mr. White here representing himself.

We have Ms. White here, represented by Mr. Shipley.

Ms. White, I think we left -- is there anything we need

to take up, I should say before we bring Ms. White back 18 up

and allow for cross-examination?

MR. SHIPLEY:  Not that I'm aware of, 20 Your Honor.

July 26, 2022                                                    Julia White-X 482

1

2

21                          THE COURT:  No.  Okay.  Come on forward,

22                          Ms. White.  It's a new day.  We will swear -- re-
                            swear

23                          you in.  Raise your right hand.

24                          JULIA WHITE

recalled as a witness for the Petitioner, having been

duly sworn, testified as follows:

                    THE COURT:  Watch your step up.  Once 3 you're there and seated,

tell us your full name and 4 spell your last name, please.

5                           THE WITNESS:  My name is Julia Annette

6                           White.  My last name is W-H-I-T-E.

7                           THE COURT:  Mr. White, you may ask

8                           questions.

9                           CROSS-EXAMINATION

10                          BY MR. WHITE:

11                          Q        Yes.  Do you have your Exhibit 44?  Or I can

12                          bring you this one if you'd like.

13                          THE COURT:  It's your USB.

14                          THE WITNESS:  Yes, I do.

15                          MR. WHITE:  You have it?

16                          BY MR. WHITE:

25

July 26, 2022                                      Julia White-X 483

1

2

17          Q          Okay.  So page 1 of 2 it says at the bottom.

18          A          Um-hum.

19          Q          These numbers here, are they actually your

20   current expenses?

21          A          On the first page?

22   THE COURT:  No.  He's talking -- it's

23   actually --

24   MR. WHITE:  No.  This page here.

THE COURT:  -- the attachment, third

page.

MR. WHITE:  It says 1 of 2 on the

3   bottom.

4   THE WITNESS:  Okay.  No.

5   BY MR. WHITE:

6   Q       Could you please provide to me what  -- one

7   of these of your current expenditures in the near

8   future so we can correctly assume what it is.  Are

9   these actually projected?  So sometime in the future, 10 you would have these

expenses, or where did these come 11 from?

12          A          As soon as I'm out and have a house of my

25

July 26, 2022                                    Julia White-X 484

own, this is what I think my expenses will be.

Q Okay.  However, didn't yesterday you 15 testified that it would probably be a long time before 16 you do that because the houses are too expensive there?

A        I don't recall saying that.

Q        Well, you said that the houses are too 19 expensive, so I won't be buying a home for quite a 20 while, something like that.

A        I don't remember saying anything like that. 22   Q        No, you said that --

23 A I said that I would have to go out about 45 24 minutes.

Q                              Out about 45 minutes.  Okay.  Yeah, because they're too expensive.

A        Correct.

Q        Okay.  All right.  And then yesterday, you also testified -- I believe you testified, and you can correct me if I'm wrong -- that the grass was dead on the front lawn because of some high-temperature.  You 7 couldn't keep the plants and grass, right?  Did you say something like that?

A        I said, we had 115-degree weather.

Q        Yeah.  Okay.  Well, I downloaded the actual

July 26, 2022                                    Julia White-X 485

1

2

11          weather data from last August.  There was no 115 day.  12 And it's right -- and I

put it in today's -- where I 13 put it in -- tell me where in the weather last

August,

14     this page or the next one, you see 115 value?

15     A        I don't see one on your page.

16     Q        Yeah.  And there is not one on either page,

17     and that is data from online that anybody can search

18     for last August values for Portland, and you'll get the

19     same data.  So there was no 115 temperature last August 20 here.

21 A I'm speaking of the year prior to -- to last 22 August.

23                        MR. SHIPLEY:  Your Honor, I object.

24                        He's taking testimony as questions --

                        MR. WHITE:  No --

                        MR. SHIPLEY:  -- and that should be

stricken.

3                        THE COURT:  Overruled.

4                        Everybody -- it's a fair question.

5                        MR. SHIPLEY:  Okay.

6                        THE COURT:  Just wait for him to ask a

7                        question.

25

July 26, 2022                                    Julia White-X 486

1

2

8          BY MR. WHITE:

9          Q        I believe -- well, we were talking about the

10         grass so you -- I thought you were talking about the 11 grass

being dead last August, right?  Yesterday? 12

THE COURT:  I'm not sure it was last 13 August.

14         MR. WHITE:  Well, that's when I -- when

15         the pictures were -- that were taken she said, right?

16         On the exhibit, the pictures were taken --

17         THE COURT:  I believe she was talking

18         about the video, that --

19         MR. WHITE:  Oh, the video -- yeah,

20         when --

21         THE COURT:  And I don't know if it was

22         ever established as to when the video was taken.
23         MR. WHITE:  Okay.

24         THE COURT:  Do you know when you took

the video?

MR. WHITE:  That video was in March.

There wasn't any dead grass at that time.

3    THE COURT:  Okay.  Just saying -- do you

4    have a question for her about --

25

1

2

5     MR. WHITE:  But I do have --

6     THE COURT:  I'm not sure how it's really

7     relevant.  You guys have already sold the house.

8     MR. WHITE:  Yes, I understand that.  But

9     I want to point out -- what I'm trying to get at is 10 that she testified that she did all this stuff -- why

11     am I getting that.  I turned -- I turned the sound off.

12     I don't know why that's coming up.  The sound is off.  13 Anyway, she testified she did all these things, but she

14                         did absolutely nothing for curb appeal.

15                         THE COURT:  I don't know how it's

16                         relevant.  You guys have already sold the house.  The

17                         house sold for what it is.

18                         MR. WHITE:  I --

19                         THE COURT:  The division is up for the

20                         Court to make -- decide on.  I don't think -- are you

21                         asking this Court to give you a greater amount of the

22                         house that was sold because of the work that you

23                         testified you put in?

24                         THE WITNESS:  I wasn't asking for that,

25

July 26, 2022                                    Julia White-X 488

1

2

but I wouldn't be opposed to it.

            THE COURT:  She's not asking for it.
            MR. WHITE:  No, she's not asking for it.

3    relevant.         THE COURT:  Yep.  I don't know how it's

4

5               MR. WHITE:  Well, how it's relevant --

6               THE COURT:  And I know for sure -- and I
7       know -- just to, for the -- because the Court could

8       take judicial notice of --

9        MR. WHITE:  Well --

10       THE COURT:  -- whether that –- there was

11      certainly some 115-day weather last year.

12      MR. WHITE:  I'll look up the other data, 13 but there certainly

wasn't in August.

14     THE COURT:  What day was it that it was

15    100-plus degrees in here?

16    THE CLERK:  June 29th.

17    THE COURT:  June 29th.

18    MR. WHITE:  Okay, June 29th. 19  THE COURT:  Yeah.  Because air-

20    conditioning stopped here in the courthouse.

25

July 26, 2022                                              Julia White-X 489

1

2

21                          MR. WHITE:  Oh, okay.  Well, on June

22                          29th then, but -- okay.  All right.  Well, I have some

23                          other questions.

24                          BY MR. WHITE:

            Q                          So Exhibit 9, do you have this up there?

            A            Yes.

            Q                          When you go to -- well, maybe it's 10, I

3      guess.  I'm sorry.  Yeah.

4      MR. SHIPLEY:  Are we in Exhibit 10?

5      MR. WHITE:  Yeah, I think so.

6      MR. SHIPLEY:  Okay.

7      MR. WHITE:  I'm trying to locate some of

8      the -- find the pictures.  I'm trying to find the

9      pictures of the items that were taken up to 10 (indiscernible).  I think they're in here

somewhere.

11      Yeah, let's start on page, I think it's 7 of number 10.

12      BY MR. WHITE:

13      Q        So this green thing here, do you remember 14 when you purchased it?

15              A        I purchased it in the Spring Fling Garden

16              Show one year.

25

July 26, 2022                                    Julia White-X 490

1

2

17    Q    Um-hum.

18    A    I go every year, so I'm not sure which year.

19    Q    Okay.  And the items on page 8, do you know 20 when you purchased

those?

21    A    That pile came from several different places

22    and times throughout the years.

23    Q    From estate sales or --

24    A    Estate sales, from Fred Meyer, from probably goodwill --

25

July 26, 2022                                           Julia White-X 491

1    Q

2

            Okay.

     A          -- who knows.

3          Q        Same thing on 9, I suppose?

4          A        That stuff came from estate sales.

5          Q        Okay.

6          MR. SHIPLEY:  Your Honor, I'm going to

7    object to relevance.  I thought we'd kind of resolved 8 that

     we're going to go through this auction process to 9 deal with

     the personal property.

10         THE COURT:  Is there anything that's

11   relevant to the questions for her now?

12         MR. WHITE:  Yes, there is.

13         THE COURT:  Okay.  Go ahead.

14   BY MR. WHITE:

15         Q        All right.  This picture --

16         THE COURT:  That is -- no, no, no.  Not

17   just because you tell me that there is.  What is the

18   relevance?

19         MR. WHITE:  The relevance is

25

July 26, 2022                                          Julia White-X 492

1          Q

2

20                              that -- well, there's a -- like, there's a couple of 21 things here.
                                If you want to talk about mediation and 22 why we didn't do it,
                                we can talk about that.

23                              THE COURT:  No.  I don't want to settle

24                              negotiations.  It's not allowed in by statute.  What is the
                                relevance of this personal property that was agreed

          that you guys have had an auction.  You guys have already given me your -- what you
          thought is
3 appropriate, and then the Court will make a decision on 4 those when it makes its final
decision.

5                              MR. WHITE:  The relevance here is that

6                              yesterday she said she agreed with what her sister 7 said.
                                Her sister said that the stuff that she just

8          said she purchased was hers, in previous testimony.

9          The same thing as this item number 10 where I went and 10 picked it up, and she gave -
- her sister gave it to her 11 for her birthday.

12                             THE COURT:  So what's the relevance?
13                             I'm still trying to figure that out.
14                             MR. WHITE:  Well, the relevance is more

25

July 26, 2022                                    Julia White-X 493

1    Q

2

15                        perjury.  It's more of the same saying something is 16

                          something when it's not.

17                        THE COURT:  Objection sustained.  Move

18                        on.

19                        MR. WHITE:  All right.

20                        BY MR. WHITE:

21                        Q        When was the last time we did paper tax forms

22                        for personal, where we would actually sign the

23                        documents?  How -- it's been how long?  Do you

24                        remember?

     A                    I don't -- I don't recall.

                                    Was it like 1990s?  2000s?  Do you remember

that rough timeframe?

3         A        I remember the timeframe.  I have no idea.

4         Q        Okay.  But since then, at least doing it

5    online, I always did it.  I oftentimes -- or especially

6    if you wanted, I'd show you the information.  But you 7 always gave me

     permission to use your pin to do that; 8 is that correct?

9    A It wasn't a blanket for the rest of my life,

10   no.

25

1       Q

2

11      Q        Did you ever tell me that? 12    A        I never -- I never believe I gave

you 13 permission to use my pin?

14      Q        I -- I created the pin and told you --

15      A        Correct.

16      Q        -- what it was.

17      A        Yes.  I believe that you did create a pin,

and you did tell me what you were going to do.

19      Q        Yeah.

20      A        I don't remember giving permission. 21  Q        Oh, well, we did it that

way for --

22 A Yes, that's the way it was done. 23 Q -- several years.  Okay.  All right.  So you 24 don't think

you ever gave me permission?  All right.

So then if you didn't think it -- so you never revoked

that permission then either, right?

A        Apparently not.

3       Q        Okay.

4       A        How can you revoke something you didn't --

5       Q        Yeah.

6       A        Yeah.  Um-hum.

7       Q        All right.  Dr. Doug -- David Douglas --

25

July 26, 2022                                    Julia White-X 495

1       Q

2

8       A       Um-hum.

9       Q       You testified that Dr. Davis called to verify

10      what I said.  Do you remember that time when he called

11      you when I was sitting in his office after the

12      Christmas thing?

13      A       Um-hum.

14      Q       Okay.  And did you -- you ended up

15      corroborating what I had to say, I guess.  You said the

16      same thing that I had said that happened on Christmas,

17      right?  If I remember right?  This --

18      A       I'm not sure what you're talking about?

19      Q       Well, I was -- 20      A       Why we were there?

21      Q       Yeah, while I was there, he was -- he had you

22      on speakerphone.  He was calling you to verify what I 23 had told him about

        what happened on Christmas.  Do you

24 remember that conversation?        A       Not

        particularly.

                        Oh, okay.  All right.  So who

                actually -- well, it was on that, so if you don't

3       remember, then maybe that's too bad -- but do you know
25

July 26, 2022                                              Julia White-X 496

1      Q

2

4      who actually brought up the guns first to Dr. Douglas?

5      A        He did.

6      Q Okay.  All right.  I'll move on.  SNAP 7 benefits.  Did we apply in October 2020

for SNAP?

8      A        You did, yes.

9      Q        For both of us, right?

10     A        Correct.

11     Q        Right.  And who had that card in their purse

12     and used it mostly?

13     A        That would be me.

14     Q        Right.  Did you still have that card in this

15     frame when you tried to apply for other -- 16     A        No, I had thrown it out.

I moved to 17 Washington, and then I came back to Oregon to prepare

18     the house for sale.

19     Q        Oh.

20     A        And that's when I tried to apply. 21     Q        Oh, okay.  Well, the

reason why you were

22              denied is because they were still on there.

23              MR. SHIPLEY:  Objection.

24              THE COURT:  Sustained.    MR. WHITE:  All right.

25

1          Q

2


BY MR. WHITE:

     Q          What was from my father's estate besides the 3 trailer and the guns?  What

items did we get from his 4 estate?

5          A          Money.  It seemed like boxes of pictures, and

6          I don't know what all.

7          Q          Okay.

8          A          A bunch of stuff in the garage.

9          Q          All right.  In your deposition, you testified

10         that you were looking at a SPED program in Gresham.

11         A          I have no idea what that is.

12         Q          You had talked to somebody that they had an

13         opening or something in S -- SP -- special ed in

14         Gresham back in?

15         A          Yes.  Um-hum.

16         Q          That didn't pan -- pan out, I guess?

17         A          I didn't pursue it.

18         Q          Oh, you didn't pursue it.  Okay.  All right.

19         Oh, I see.  So Exhibit 44, which was the paper one,

20         right?

21         A          Right.

25

July 26, 2022                                        Julia White-X 498

1        Q

2

22       Q        I think that was the taxes, right?

23       A        It was the Uniform Support Declaration.

24       Q        Oh.  Oh, okay, that -- that was the one I already asked you about.

25

1

2


          A        Correct.

          Q        Okay.  Yeah, I don't need that, then.  In 3 June of 2021, did three or four realtors contact you 4 with clients interested in purchasing the home?

5    MR. SHIPLEY:  Objection, relevance. 6    THE COURT:  Just out of curiosity, how 7 is it relevant?

8    MR. WHITE:  She testified that she did

9    everything she could to get the house for sale.  But 10 I -- she didn't.

11                      THE COURT:  I guess I go back to whether

12                      she did or she didn't, I'm just not sure how relevant

13                      it is to what this Court has to decide.

14                      MR. WHITE:  Okay.

15                      THE COURT:  And if you can give me a

16                      good reason how it is, then I'm -- I'll let you ask the

17                      questions.  But I'm not sure what it is.  The house is

18                      sold.

19                      THE WITNESS:  Yes.

20                      THE COURT:  And the Court will make an

21                      equitable distribution of the --

22                      MR. WHITE:  Yes.

23                      THE COURT:  -- proceeds of that home.

25

July 26, 2022                                        Julia White-X 500

1

2

24                    MR. WHITE:  Yes.  We already did that,

yes.

                    THE COURT:  Right?  So --

                    MR. WHITE:  The relevance here, Your 3 Honor, is that just more lies

by witnesses on the

4 petitioner's side.  And I don't like lies.  And I 5 know -- I'm pretty sure you don't like people

lying on

6                    the stand.

7                    THE COURT:  I don't --

8                    MR. WHITE:  And that's why -- 9                    THE

                    COURT:  -- I don't like people lying

10                   anywhere, but --

11                   MR. WHITE:  Well, yeah, I don't, either.

12                   That's why I'm going to get the testimonies of the

13                   other ones and put in for perjury with the county.

14                   And -- but what this shows is that she didn't -- she

15                   says she did things to get the home ready for sale.  16 But this

                    proves that she didn't.  And she lied under 17 oath.  And that's

                    more perjury, right?

18                   THE COURT:  It's not lying under oath.

25

July 26, 2022                                        Julia White-X 501

1

2

19          MR. WHITE:  Isn't she under oath, and

20     she said --

21          THE COURT:  She is, but saying "I did

22     everything right" is essentially not a factual 23 statement.

24     MR. WHITE:  Well, if she did, she said  -- she said --

                    THE COURT:  Because you -- because

          really, could you ever measure what everything is?

3          MR. WHITE:  Well, no.  She didn't say

4     everything.  She said --

5          THE COURT:  That's what you said.

6     You've said three times that's what she said. 7

           MR. WHITE:  Well, she said specific

8     things she did.

9          THE COURT:  Correct.

10          MR. WHITE:  Right.

11          THE COURT:  And no -- nothing is ever

12     brought up whether or not she did anything regarding 13 any

     real estate agents prior to in her getting the home

14     ready for sale.

15          MR. WHITE:  Right.

25

1

2

16        THE COURT:  So she hasn't given me any

17        testimony regarding anything prior to that.  How could

18        it be perjury?  She hasn't even been asked that

19        question --
20        MR. WHITE:  She --

21        THE COURT:  -- or answered that

22  question?

23        MR. WHITE:  She testified yesterday that

24  she --

THE COURT:  She testified yesterday that
she did a bunch of things to get the house ready for sale, yes.

3        MR. WHITE:  Yes.

4        THE COURT:  That has nothing to do with
5  whether or not three real estate agents contacted her 6 previous to that.

7        MR. WHITE:  Yeah, that's -- that's fine.

8        I don't need that question, but the next question will 9 show

that she knows what to do, and she didn't do it.

10        THE COURT:  Go ahead and ask your next

11        question then.

12        MR. WHITE:  All right.

13        THE COURT:  Sustained.

14        BY MR. WHITE:

25

July 26, 2022                                                    Julia White-X 503

1

2

15          Q         How many -- how many curb appeal shows have

16     you watched in your life?

17          A         Hundreds.

18          Q         Hundreds, yeah.  What's the first thing a

19     buyer sees when they come up to a house for sale?

20          A         Front of the house.

21          Q Yeah.  Exactly.  Did you pressure wash the 22 concrete in the

       front?

23          MR. SHIPLEY:  Objection, relevance.

24          MR. WHITE:  No.

                THE COURT:  I'll let him.

                MR. SHIPLEY:  What's that?

                   THE COURT:  I'm going to allow it.

3          MR. SHIPLEY:  Okay.

4          THE WITNESS:  No, I did not.

5          BY MR. WHITE:

6          Q Yeah.  Anyway, okay, that's fine.  Why didn't 7 you pressure

       wash the concrete?

8          A         I had limited amount of time to get the house

9     ready for sale as quickly as possible.  Judge Fun

25

July 26, 2022                                              Julia White-X 504

1

2

10      specified that -- I can't remember the guy's 11 name -- he -- he gave us Steve

Grey, is the one that

12      was supposed to sell the house, not me.

13      Q        Um-hum.  Um-hum.

14      A        And he said the house looked fantastic.

15      Q        Um-hum.  However, in your deposition, you

16      testified that you're -- or that you were there, I 17 think, like 60 percent of the

time during the summer.

18      You weren't there the whole summer, right?

19      A        No, I was not.

20      Q        So if you had stayed there, you could have

21      got things done, but you were doing other things,

22      right?

23      A        I disagree with that statement.

24      Q        Okay.  All right.  Where are the oak slabs that I had that I'd got from the

Wood Ministry at

Sunrise where we -- where I can cut him so we could make, like, a bench out of them?

Do you know where

3       those are?

4       A Yes, at the dump.  They were moldy. 5  MR. SHIPLEY:  Okay.  Could you say

25

1

2

6          that -- I couldn't hear that, Your Honor.

7          THE WITNESS:  They were covered in mold.

8

9          MR. SHIPLEY:  Okay.

10          BY MR. WHITE:

11          A  So when I was making dump runs, I took them 12 to the dump.

13    Q       They were sitting in the garage covered with

14    mold?

15    A       Um-hum.

16    Q       I don't know how that happened.  Okay.  Did

17    you remove yourself from the boards of Climate Change

18    Truth and photolithography in September of 2017?

19    A       Yes, I did.

20    Q       And why did you do that?

21    A       I saw some things being done that I didn't 22 want my name associated

with.

23    Q       And did somebody tell you to remove yourself

24    from those?

A       No.

Q       Okay.

25

July 26, 2022                                          Julia White-X 506

1

2

A     It was my own conviction.

3       Q  Okay.  Did you -- and -- what did you tell me

4       when I -- when you asked me to remove yourself?  Do you

5       remember?

6       A  Yes.  I want my name off of all of it.

7       Q  Um-hum.  And did you say anything else?

8       A  I don't recall specifically what I said.

9       Q  Okay.

10      A  It was several years ago.

11      Q  Did I tell you when you were removed?

12      A  I don't specifically recall.

13      Q  Okay.  All right.

14      MR. WHITE:  I think that's all I have at

15      this time.

16      THE COURT:  Mr. Shipley, follow-up.

17      REDIRECT EXAMINATION

18      BY MR. SHIPLEY:

19      Q  You wanted to be removed from the board of

20      that;  that's correct?

21      A  Correct.

25

July 26, 2022                                    Julia White-X 507

1

2

22          Q  Did you ever agree that you were giving up 23 any

interest, like ownership interest, in the business,

24 any of those businesses?

A       No.

25

July 26, 2022                                                                 508

1

2

Julia White-ReD

Q        Okay.  Did you ever sign any documents transferring your ownership

interests in any of those

3        businesses?

4        A        I don't believe I did.

5        MR. WHITE:  I submitted both of these to 6 the board.

7                        THE COURT:  Hold on.  Mr. White, you're

8                        done.  Have a seat.

9                        MR. WHITE:  Okay.

10                       THE COURT:  You said you were finished,

11                       and so it's Mr. Shipley's turn.

12                       MR. WHITE:  All right.

13                       MR. SHIPLEY:  No more questions. 14                        THE

COURT:  You may step down.  You may 15 call your next

witness.

16  MR. SHIPLEY:  Your Honor, at this time 17 we rest.

18                       THE COURT:  Mr. White, this is your

19                       opportunity to present your side.  You may --

20                       MR. WHITE:  Well --

21                       THE COURT:  -- call your first witness.

25

July 26, 2022                                                               509

1

2

22              MR. WHITE:  Okay.  Julie White, please. 23   THE COURT:  Ms.

White, sit down and have

24 a seat.

MR. WHITE:  Um-hum.

Julia White-ReD

THE COURT:  Remind you you're still

under oath.

3              You may inquire.

4              JULIA WHITE

5              called as a witness for the Respondent, having been

6              previously sworn, testified as follows:

7              MR. WHITE:  All right.

8              DIRECT EXAMINATION

9              BY MR. WHITE:

10             Q   So you -- so you just agreed you removed 11

yourself from those boards.  I'll show you these.

12       THE COURT:  Just show them to Mr.

13       Shipley, first.

14       MR. WHITE:  He's -- he already has them.

15       I emailed them to him --

25

July 26, 2022                                                          510

1

2

16                    MR. SHIPLEY:  Whoa.

17                    THE COURT:  Hold on.

18                    MR. WHITE:  -- last night. 19                    THE COURT:
Show him.  He doesn't know 20 what you're going to show her.

21          MR. WHITE:  Oh, okay.

22                    THE COURT:  So you need to show him

23     those.

24                    MR. WHITE:  Those two meeting minutes

from 2017 where she was removed and the shares

transferred to other people based on her wishes at the time.  She may testify

differently but what she's 3 saying is simply not true.

4                    THE COURT:  And all of that commentary

5                    is stricken from the record.

6                    BY MR. WHITE:

7                    Q          So tell me what you see in these, please? 8          A

I see two pieces of paper with your signature 9 on it.

10          THE COURT:  Were you present at this 11 meeting?

12          THE WITNESS:  When these were typed up, 13 no.

14                    THE COURT:  Yeah.  Were you present at

15                    the meeting when it occurred?

16          THE WITNESS:  No.

17                    THE COURT:  Were you secretary at the 18 time?

25

July 26, 2022                                                        511

1

2

19              THE WITNESS:  I had relinquished that.

20              THE COURT:  You had.  I just wanted to

21       make sure.  You relinquished that role by asking, at

22       the time --

23              THE WITNESS:  Right.

24              THE COURT:  -- to be removed from

everything.

25

1

2

You may ask a question.

BY MR. WHITE:

3     Q       Yeah.  So does it say that you still own any

4     shares in either one of them?

5     A       These are just pieces of paper, Dave.

6             THE COURT:  No, ask -- answer the

7     question.

8             THE WITNESS:  No.  No.  These do not

9             say --

10            BY MR. WHITE:

11            Q       They're not just pieces of paper.

12            A       -- these do not say that.

13            Q       They're not just pieces of paper.  They're

14            legal documents.  They show --

15            THE COURT:  Well, I don't know if

16            they're legal documents.  They're --
17            MR. WHITE:  Well, they are.  It's --

18            THE COURT:  No, they're business

19     documents.

20            MR. WHITE:  Well, they're legal business

21            documents (indiscernible).

22            THE COURT:  Again, I don't know if

25

July 26, 2022                                        Julia White-D 513

1

2

23          they're legal.  That's a totally different question.

24          But they're certainly business documents.

MR. WHITE:  Well, they're certainly from those dates when they were
done.

THE COURT:  I don't know that.

3          MR. WHITE:  All right.

4          THE COURT:  I've got no foundation for 5 that but go ahead.

6          MR. WHITE:  Yes, you do.  In what I

7          submitted, I put pictures of the file dates in with

8          that -- in what I submitted to the Court.  So you

9          certainly do have that.

10          THE COURT:  I have nothing in evidence,

11          Mr. White.  Continue.

12          MR. WHITE:  Pardon me?

13          THE COURT:  Ask your next question.

14          MR. WHITE:  Okay.  All right.

15          BY MR. WHITE:

16          Q          Later -- a couple of years later, standing on

17          the back porch of my home, did you tell me that you

18          wanted to divorce me if I didn't stop working on

25

July 26, 2022                                           Julia White-D 514

1

2

19          climate change?

20                    A       I know I was over the climate change, and I 21 could

            have said that, but I don't recall telling you I

22    wanted to divorce you.

23          Q       Well, all right.

24          A       I told you that I was gagging on all the

climate change stuff, and I couldn't take it anymore.

            Q          Yeah.  Okay.

MR. WHITE:  Okay.  All right.  I think 3 that's all I have then.

4                              THE COURT:  Mr. Shipley, any questions?

5                     CROSS-EXAMINATION

6                     BY MR. SHIPLEY:

7                     Q       Ms. White, once again, did you ever sign any 8

            document transferring your ownership interest in any

            of

9     those businesses to anybody?

10          A       No, I did not.

11          Q       Was that ever your intention to relinquish 12 any ownership interest in

photolithography or any other

13                              businesses?

25

July 26, 2022                                                    Julia White-D 515

1

2

14                        A  No.

15                        MR. SHIPLEY:  Okay.

16                        THE COURT:  Mr. White?  Do you have any

17            further questions based on those questions asked by Mr.

18            Shipley?

19            REDIRECT EXAMINATION

20            BY MR. WHITE:

21            Q  When you say that you didn't relinquish any

22            of that, what -- what did you say to me -- well, you

23            just answered this question a little bit ago.  You

24            said -- or did you say something like, "I don't want

             anything to do with those anymore" -- or something like

25

July 26, 2022                                                    516

1

2

Julie White-ReD

that?  A minute ago you said you were -- you're fed up with it or something, right?

3          A       Yeah, absolutely.

4          Q       So you -- you said you didn't want anything 5 to do with it anymore or

something like that.  Was that

6       true?

7          A       That was true.

8          Q Yeah.  To me, that means you relinquish -- 9  MR. SHIPLEY:  Objection.

10  MR. WHITE:  -- all right to it. 11  THE COURT:  Sustained.  Whatever it

12                    means to you is not appropriate.

13                    MR. WHITE:  Okay.

14                    THE COURT:  That's commentary.

15                    MR. WHITE:  All right.  That's it.

16                    THE COURT:  Step down.

17                    THE WITNESS:  Thank you.  18  THE COURT:  You may call your

next 19 witness.

20                    MR. WHITE:  Brian White.  And Julie

21                    needs -- is he here?  He should be here.

22                    MR. SHIPLEY:  I don't know if he's here.

23                    MR. WHITE:  He is subpoenaed for him to

25

July 26, 2022                                          Brian White-D 517

1

2

24            be here, and Julie needs to leave the room when he's testifying.

                        MR. SHIPLEY:  My client is not going to
leave the room.

3                       MR. WHITE:  Well, okay.

4                       THE COURT:  Mr. White, come on forward

5               once again.  You'll raise your right hand once again to

6               be sworn.

7               BRIAN WHITE

8               called as a witness for the Respondent, having been

                duly 9 sworn, testified as follows:

10      THE COURT:  Have a seat.  Once you're

11      seated and comfortable, let us know your full name and 12 spell

        your last name for us.

13                      THE WITNESS:  My name is Brian Matthew

14              White.  And my last name is spelled W-H-I-T-E.

15              THE COURT:  You may inquire.

16              DIRECT EXAMINATION

17              BY MR. WHITE:

25

July 26, 2022                                    Brian White-D 518

1

2

18              Q        In 2017, did you tell your mother to remove 19

herself from Climate Change Truth and photolithography

20      consulting?

21      A        I don't remember that.

22      Q        Okay.  Later did you tell your mother to tell

23      me to -- that she would divorce me if I didn't stop

24      working on climate change?

A                              We had conversations about your relationship.

I don't remember specifically.

Q                      Okay.  All right.  Next question:  Have you

3       helped plan this divorce since 2017?

4       A        No.

5       Q        When you contacted the Washington County

6       Sheriff about me being a supposed "missing person," did

7       they ask you if you tried to contact me before you 8 reported it?

9       A        They -- they did ask if I tried to contact

10      you, yeah.

11      Q        And what did you tell them?

12      A        I told them that, as far as I knew, you were

25

1

2

13          in Ghana, and you had said something about your cell 14 phone wouldn't work

while you were there.

15          Q       How -- but did you call me a few days later?

16          A       Yes.

17          Q       So when the -- when the Washington County

18          Sheriff asked you that, you told him you hadn't

19          contacted me, so why did they start the missing persons

20          when every -- well, why did they start the missing

21          persons when every -- well, why did they start the

22          missing persons --                        MR. SHIPLEY:  Objection.

23          In terms -- he can't know the state of mind of the 24 Washington County Sheriff.

THE COURT:  Calls for speculation.

MR. WHITE:  Okay.

THE COURT: Sustained. 3                              MR.

WHITE:  All right.

4          BY MR. WHITE:

5          Q       Next question, I want you to consider

6          carefully your answers.  I have the data and the IP

7          address and therefore, the physical address where one

8          Discover Card, three checking accounts, and one savings

25

July 26, 2022                                    Brian White-D 520

1

2

9        account were fraudulently attempted at Discover Bank on

10       May 15th, 2022.  And I'll show you -- show that to you, 11 and I'll show it to him.

12                    MR. SHIPLEY:  Your Honor, I don't know

13                    what the relevance of this would be.
14                    MR. WHITE:  We'll find out in a few

15  minutes.

16                    THE COURT:  What's the relevance?

17                    MR. WHITE:  The relevance is there's

18                    only three people in the world who know my Social

19                    Security number.  And --

20                    THE COURT:  Actually, there's a lot more

21                    than that.  There is an entire government officials who 22 knows

                     your Social Security number.

23                    MR. WHITE:  Well, there's -- yeah --

24                    THE COURT:  -- well --            MR. WHITE:  -- the

                     IRS.

                     THE COURT:  I just want to make sure

    because --

3                    MR. WHITE:  Well, no -- but I mean --

4                    THE COURT:  -- you're the person that's

5   arguing to this Court about when people make certain

25

1

2

6      statements, whether the veracity of those statements is

7      true or not -- the accuracy of those statements is true 8 or not.

9                        MR. WHITE:  Right.

10                       THE COURT:  So if you're going to give

11                       me statements that are you purporting to be completely

12                       accurate -- but I know, and you know are not

13                       accurate  -- you should be called out on that.

14                       MR. WHITE:  Yes, sir --

15                       THE COURT:  So the statement that only

16                       three people know --

17                       MR. WHITE:  All right.

18                       THE COURT:  -- you and I both know

19                       that's not true.  In fact --

20                       THE WITNESS:  Let me --

21                       THE COURT:  -- every single credit

22                       company that you've ever applied for knows your Social

23                       Security number, the government and all the people

24                       within the government knows your Social Security number -- that

                         includes the federal and the state --

                                 MR. WHITE:  Right.

25

July 26, 2022                                      Brian White-D 522

1

2

                            THE COURT:  -- knows your Social

3           Security number.

4           MR. WHITE:  Can I rephrase?

5           THE COURT:  Any of the -- sure, you can.

6           MR. WHITE:  All right.

7           THE COURT:  So I'd be careful what you

8           say  --

9           MR. WHITE:  Yes.

10          THE COURT:  -- if you're going to hold

11          everybody else to the same sort of --

12          MR. WHITE:  I will.

13          THE COURT:  -- veracity in character.

14          MR. WHITE:  All right.  The only three

15          people who might want to hurt me --

16          THE COURT:  No.  We don't know that 17 either.

18          MR. WHITE:  Well, there wouldn't be

19          anybody in the government or at a bank or something -- 20

                THE COURT:  I don't know.  You've made

21 some statements about taxes and other stuff that would

22 indicate perhaps -- NOAA not being a truthful

25

July 26, 2022                                    Brian White-D 523

1

2

23    organization -- and some other stuff that there are

24    different ways in which people can hurt that aren't necessarily financial, right?

Sometimes it can be physical.  Sometimes it can be emotional.

                    MR. WHITE:  Yes.

                    THE COURT:  Okay.  Just ask your
3
4    question.
5                    MR. WHITE:  Yeah.
6                    THE COURT:  Without the prefacing of
7    whether or not something's true or not.

8                    BY MR. WHITE:

9                    Q        Did you apply for these in my name?

10                   A        No.

11                   Q        All right.  Did you give my information to

12   someone else to do this in -- and?

13                   A        No.

14                   Q        Okay.  All right.

15                   MR. WHITE:  That's all I have.

16                   THE COURT:  Mr. Shipley, any questions?

17                   MR. SHIPLEY:  No.

25

July 26, 2022                                          Brian White-D 524

1

2

18          THE COURT:  No, you can step down.  You 19 may call your next

witness.

20          THE WITNESS:  Can I sit in the courtroom

21    now or --

22          THE COURT:  Do you have any intent to

23    call Mr. White back a witness?

24          MR. SHIPLEY:  No.

                    THE COURT:  Mr. White, do you have any

25

July 26, 2022                                    David White-D 525

1

2

intention to call your son as a witness again?

                MR. WHITE:  No.

3            THE COURT:  You may -- it may remain in

4           the court here, and you're excused from your subpoena.

5           You may call your next witness.

6           MR. WHITE:  So I don't know, like, the

7           guy that's supposed to show up to interview me hasn't 8 got here

            yet.  How do I --

9           THE COURT:  What do you mean interview

10          you?

11          MR. WHITE:  Well, to ask me the

12          questions when I testify for myself.

13          THE COURT:  It doesn't work that way.

14          Unless it's an attorney again -- it's going to be your 15 attorney --

           that's going to ask -- it doesn't work that 16 way.

17  MR. WHITE:  So how do I testify and ask 18 myself questions?

19          THE COURT:  You just get up the stand

20          under oath, and you tell me what you think is important

21          for me to know.  Then I'm -- then Mr. Shipley will be

22          able to ask you questions.  Did you want to call

25

1

2

23                    yourself as a witness?

24                    MR. WHITE:  Yes.  I want to call myself

as a witness.

THE COURT:  Okay.  Come on forward.

MR. WHITE:  I want to put this in to

3                        play some videos.

4                        THE COURT:  Hold on.

5                        MR. WHITE:  Like he did, this is the

6                        list of the videos on it.  I want to play --

7                        THE COURT:  Mr. White?

8                        MR. WHITE:  Yes.

9                        THE COURT:  Mr. White, come over to the

10                       box over here.

11                       MR. WHITE:  Okay.

12                       THE COURT:  Yep.  Raise your right hand

13                       to be sworn.

14                       MR. WHITE:  Okay.

15                       MR. SHIPLEY:  Right hand.

16                       THE COURT:  Right.

17                       MR. WHITE:  The right hand.  Sorry.

25

July 26, 2022                                             David White-D 527

1

2

18                          DAVID WHITE

19                          called as a witness for the Respondent, having been duly

20                          sworn, testified as follows:

21                          THE COURT:  Go ahead.  Have a seat.

22                          THE WITNESS:  Um-hum.

23                          THE COURT:  Tell us your full name and 24 spell your

                            last name.

                    THE WITNESS:  David Charles White.

                            THE COURT:  Okay.  What do you want to

tell the Court.

3                           DIRECT TESTIMONY

4                           THE WITNESS:  What I want to tell the

5                           Court is that my wife and my son planned this divorce

6                           since 2017.  She removed herself from both of those

7                           corporations in 2017.  Later, she told me that she

8                           would divorce me if I didn't stop working on climate

9                           change.  When I asked her who told her that, she said

10                          Brian did.  They tried to put me in a mental

11                          institution.  They had me go to Dr. David Douglas, and

12                          Dr. David Douglas diagnosed me as narcissistic

25

July 26, 2022                                                    David White-D 528

1

2

13          delusional.

14          However, every -- I looked over 60 pages

15          of his notes.  Every time I went there, he offered me

16          psychotropic drugs.  If I had taken those drugs, I 17

            would be a vegetable right now, and slobbering all over

            18 my face, that kind of thing.

19          THE COURT:  So was the psychologist part

20          of the 2017 ploy?

21          THE WITNESS:  No.

22          THE COURT:  So he just did this on his

23          own?

24          THE WITNESS:  On his own, right.

            THE COURT:  Not because of his

hypocritical oath to do no harm or because he thought that was the appropriate therapy

for you.

3           THE WITNESS:  He thought that was the

4           appropriate --

5           THE COURT:  Okay.

6           THE WITNESS:  -- therapy.  But -- 7                      THE

            COURT:  But?

25

July 26, 2022                                          David White-D 529

1

2

8              THE WITNESS:  I looked up what those

9       would be, and I put that in what I submitted today.  I

10       would be a complete and utter vegetable by now.  But 11 the first

         thing is --

12             THE COURT:  (Indiscernible) I want to

13       make sure --

14             THE WITNESS:  Yes.

15             THE COURT:  -- we live in what's called

16       a no-fault state.

17             THE WITNESS:  Okay.

18             THE COURT:  So the reasons that are

19       surrounding people getting divorced are not relevant.

20             Is there something about this ploy that you're asking 21 the Court

         to consider that is related to the property

22       divisions that are before this Court?

23             THE WITNESS:  Yes.

24             THE COURT:  What?  What is it?

                      THE WITNESS:  Well, if I could finish, I

   think you'll see.

                      THE COURT:  No, no, no.  I'll need you

25

July 26, 2022                                                David White-D 530

to tell me before I'm going to waste the Court's

time --

                  THE WITNESS:  All right.

                  THE COURT:  -- on an area that's not

relevant.  I need you to tell me how it relates to the

property division that is properly in front of the 9 Court?

                  THE WITNESS:  Well, there -- in terms of

the --

                  THE COURT:  -- the spousal

                  support -- both -- since both are (indiscernible).

                  THE WITNESS:  Well, the property

                  division back in, I think it was either October or

                  February -- I'm not sure which one -- when we talked

                  about it, you didn't want to hear any more about the

                  pile of wood, and you said it wasn't worth the Court's

                  time to deal with this.  You had asked us to do

                  mediation.  Perhaps you remember that, maybe you don't.

                  And -- but neither my attorney nor Mr. Shipley wrote up

                  the order for you to sign to do mediation.

                  Instead, we tried to do mediation

                  several times with Portland Mediators, but they -- THE COURT:

                  How is the 2017 ploy that

July 26, 2022                                    David White-D 531

1

2

you're talking about that you believe your wife and your son conjured up relevant to me

making the decision

3                    regarding --

4                    THE WITNESS:  All right.

5                    THE COURT:  -- property division or

6          spousal support?  It's just a very simple question.

7          How does it --

8                    THE WITNESS:  Okay.  All right.

9                    THE COURT:  How is it relevant?

10                    THE WITNESS:  I talked to a psychologist

11          about this, told him what happened, and they figured it

12          out.  I didn't know it.  But they planned this whole

13          thing.  They planned to put me in a mental --

14                    THE COURT:  How -- even if it were to be

15          true, assuming it was true, how is it relevant?

16          Because there -- you realize, people have a right to

17          get divorces in the State of Oregon for whatever

18          reason --

19                    MR. WHITE:  Yes.

20                    THE COURT:  -- they want to get the

21          divorce.  Whether they think a person has done them

25

July 26, 2022                                              David White-D 532

1

2

22    wrong, whether they think a person has just changed

23    from who they were, whether they just don't want to go

24    on or want to live with that person anymore, it doesn't matter why people get divorced.

Does that make -- does

that part make sense to you?

THE WITNESS:  Yes.  I understand.  Um3 hum.

4                              THE COURT:  So I'm trying to figure

5                              out -- these are things in which you're telling me is

6                              the reasons why she's getting a divorce.  Your belief

7                              why she's --

8                              THE WITNESS:  Yes.  Um-hum.

9                              THE COURT:  -- getting a divorce, right?

10                             THE WITNESS:  Yes.

11                             THE COURT:  And/or maybe this

12                             psychologist spoke as to why you're getting a divorce.

13                             THE WITNESS:  Um-hum.

14                             THE COURT:  The law doesn't care.  So

15                             what the law cares about is information related to

16                             properly dividing the marital assets and/or making any

17                             decisions regarding a request for spousal support.

25

July 26, 2022                                     David White-D 533

1

2

18          THE WITNESS:  Right.

19          THE COURT:  So how is it related to

20          either one of those two?

21          THE WITNESS:  It's related because their

22          goal was to put me in a mental institution so that she

23          could take our house, which was paid off, and the IRA

24          for herself.  And -- and it's all greed.  And she doesn't deserve

            anything.  And --

            THE COURT:  She doesn't deserve

anything?

3           THE WITNESS:  She doesn't -- no, not for
4            what they did to me.

5            THE COURT:  So she deserves nothing for

6            all the time in which you guys were married and lived

7            together, all the time that she raised the children

8            with you, and all the time that she put in, I think,

9            earlier testimony of having three jobs while you were

10           in school --

11           THE WITNESS:  Um-hum.  Um-hum.

12           THE COURT:  -- if I remember correctly.

25

July 26, 2022                                             David White-D 534

1

2

13          All of that, she deserves nothing.

14                THE WITNESS:  She deserves nothing -- 15   THE COURT:  Okay.

16          MR. WHITE:  -- because of what they've

17          been doing to me.

18          THE COURT:  Well, that --

19          THE WITNESS:  And what they've been 20 doing to me.

21          THE COURT:  -- gets back to that

22          narcissistic part again, doesn't it?

23          THE WITNESS:  And what they continue to

24          do to me.

            THE COURT:  That gets back to that narcissistic part, doesn't it?

            THE WITNESS:  But -- 3               THE

COURT:  Do you see how

4                those -- that's a narcissistic thought?

5                THE WITNESS:  Yes.  Yes.

6                THE COURT:  Okay.

7                THE WITNESS:  And this is why -- 8               THE

            COURT:  Do you think legally that's

9                why I should do?  Do you -- if your position is -- and

10               I can -- because, like, we could short-circuit this

25

1

2

11          whole thing.

12          THE WITNESS:  Yeah.

13          THE COURT:  If your position is she

14          should get nothing, just tell me that.  And I will

15          consider your thought process on why she should get 16 nothing.

            But as to the reason that led up to divorce,

17          it's just not relevant.

18          THE WITNESS:  All right.

19          THE COURT:  But?

20          THE WITNESS:  There's -- well, there's

21          two reasons legally why she won't get spousal

22          support  -- in the law -- in Oregon law -- and that's

23          what I put in today's -- the Oregon law has several 24 tests

            whether you can impute spousal support.

                              One is, can you pay it?  And I can't pay

it.  You know, I've -- I had a CPA testify.  I put in my expenses for last month.  I teach at a

school, so I

3           don't do anything else, so I don't have time to do

4           anything else.  I don't do RV electric or anything else

5           anymore.  I have applied for 35 jobs to try to get some

25

July 26, 2022                                        David White-D 536

1

2

6          money where I could pay spousal support.  But I don't

7          even get a phone screen.

8          THE COURT:  All right.

9          MR. WHITE:  I've uploaded my resume

10         and --

11         THE COURT:  Let me ask you a question on

12         that.

13         MR. WHITE:  Yes, um-hum.

14         THE COURT:  Excuse me.  You testified

15         yesterday there's only two people in this world that

16         can do consulting --

17         MR. WHITE:  Right.

18         THE COURT:  Right.  And you're telling

19         me that being one of only two people in the world that 20 can do
           that, you can't get hired on?

21         THE WITNESS:  I can't get hired on at a

22  company.

23         THE COURT:  Why?

24         THE WITNESS:  I don't -- well, they

don't contact me to get hired on.

           THE COURT:  Have you applied to any

companies that do that work?

25

July 26, 2022                                          David White-D 537

3   THE WITNESS:  Thirty-five.  Yes. 4   THE COURT:  (Indiscernible) but do that

5   specifically?

6   MR. WHITE:  Yes.

7   THE COURT:  So there's only two people

8   in the world that could do what it is you do --

9   MR. WHITE:  That's -- well, what -- the 10 consulting part.

11                    THE COURT:  -- and so nobody wants you.

12                    THE WITNESS:  The consulting part.

13                    There's litho jobs out there.

14                    THE COURT:  No, no, no, no, no.  I'm not

15                    asking (indiscernible) -- I mean, going to work for 16 one.

17                    THE WITNESS:  Well, the going to

18                    work -- I've applied for those jobs, 35 times.  My

19                    resume is in there.  They don't like what's in my

20                    resume, I guess.  But I'm not going to tell them 21 that -- that I've

                    just been sitting on my thumbs for 22 the last seven years and

                    doing nothing.

23                    THE COURT:  You know, I appreciate that.

24                    Nobody would want to tell them that.  That's probably not going

                    to get you hired.

July 26, 2022                                                     David White-D 538

1

2

THE WITNESS:  Right.

THE COURT:  But I just want to make sure

3          I got it right.

4          THE WITNESS:  Yes.

5          THE COURT:  -- to see if I understand.

6          Okay.  And then how much money comes through Climate

7          Truth that you use for -- I'm trying to use the words

8          that you used yesterday -- uhm -- to keep you happy.

9          Is not the word you used?

10         THE WITNESS:  All right.

11         THE COURT:  You know what I mean.  You

12         talked about how, for example, skiing.  It paid for

13         your yearly pass to ski.

14         THE WITNESS:  Um-hum.

15         THE COURT:  What was the bylaw -- do you

16         remember what the -- the language in the bylaw was?

17         THE WITNESS:  I have the bylaws over 18 there.

19     THE COURT:  Give me the best of what you 20 remember it being.

21         THE WITNESS:  Something like the health

22         of the Board of Directors --

25

July 26, 2022                                              David White-D 539

1

2

23                    THE COURT:  Health.  All right.

24                    THE WITNESS:  -- is important to the

corporation to continuing --

                                    THE COURT:  So -- how much money do you

                    use every month from Climate Truth for the health of

3     you?

4     THE WITNESS:  I guess averaged

5     throughout the last year?

6     THE COURT:  Yeah, every month.

7     THE WITNESS:  Maybe, including that -- I

8     didn't buy it this year because I -- it didn't have the

9     money and I don't either -- maybe $100 a month or 10 something, including that.

11                    THE COURT:  So all the alcohol, the

12                    food, all the skiing, the camper, the camping, all that

13                    sort of stuff that it paid for is -- if I had to do the 14 math and it

                    averaged a lot more than that -- would that 15 surprise you?

16                    THE WITNESS:  Well, I testified what

17                    some of those things were going down to check sea level

18                    rise --

19    THE COURT:  Um-hum.

20                    THE WITNESS:  -- and then I called last

25

July 26, 2022                                                    David White-D 540

1

2

21                        night -- my friends down there -- and they reminded me

22                        so that Levi store?

23                        THE COURT:  Um-hum.

24                        THE WITNESS:  I had slipped on some wet

grass on the slope, and it cut my pants.  And so I had

to go -- I didn't buy a Levi's pair that would have been 90 bucks.  I just bought their off-

brand --

3                         THE COURT:  Sure.

4                         THE WITNESS:  -- for that.  But all of

5                         those are legitimate --

6                         THE COURT:  That was truly a benefit to 7 you.

8                    THE WITNESS:  But it's a legitimate 9 business expense also.

10                        THE COURT:  I know you think it's a

11                        legitimate business expense.

12                        THE WITNESS:  Well, sure it is.  Just

13                        like --

14                        THE COURT:  But, what my point is, how

15                        much per month are legitimate business expenses that

16                        you used through that company -- to pay for gas, to pay

17                        for alcohol, to pay for food, to pay for skiing, to pay

25

July 26, 2022                                            David White-D 541

1

2

18          for camping -- how much per month does Climate Truth 19 help

you with?

20          THE WITNESS:  There hasn't been any

21          camping in the last year, so none for that.  Probably

22          about a 100 bucks a month because that's includes the

23          skiing -- the ski pass last year was four something.  24 Like I said, I

haven't bought it this year.

THE COURT:  And so how much money does Climate Truth basically spend per month?

THE WITNESS:  Per --

3          THE COURT:  How much did it spend in 4 June of this year?

5          THE WITNESS:  I applied for a couple of

6          conferences, maybe 300 bucks or something like that. 7

THE COURT:  Okay.  And how much money is 8 currently in its

accounts?

9          THE WITNESS:  1,500 -- well, I'll add a

10          1,000 for John Elder that I testified in the deposition 11 about.

12          THE COURT:  Um-hum.  And how much in May 13 did it spend?

25

July 26, 2022                                      David White-D 542

1

2

14                          THE WITNESS:  Well, a thousand for him

15   and --

16                               THE COURT:  A thousand for him for what?

17                          THE WITNESS:  He keeps -- people don't

18  like cctruth.org, so they report it as a -- as a porno 19 site or other garbage.  And so it gets

blacklisted.  So 20 he keeps it from being blacklisted.

21                          THE COURT:  So he's your IT sort of guy?

22                          THE WITNESS: Yeah.  Um-hum.

23                          THE COURT:  So how much money did

24                          Climate Truth help you out with in June, as far as your personal

                            expenses?

                                        THE WITNESS:  I'd have to look at it,

     but I don't think --

3                           THE COURT:  And I think that includes

4                               liquor stores, that includes anything else.

5                               THE WITNESS:  Yeah, I don't think

6                               anything in June that I remember, but I'd have to look

7                               at the --

8                               THE COURT:  Mr. Shipley, what exhibit

9                               was it that you had that had all the --

25

July 26, 2022                                          David White-D 543

1

2

10                          MR. SHIPLEY:  Well, the statements I

11                    already went through.  It was Exhibit 34.  It only went

12                    through February is what --

13                    THE COURT: 34. THE WITNESS: Okay.  And that's what he

14

15    asked for.          THE COURT:  Yep.  Yep.

16                          THE WITNESS:  I don't -- yeah, I'd have

17

18                    to bring it another time, I guess.

19                          THE COURT:  Right.  So would it surprise

20                    you that in February, there were nearly $10,000 in 21 deposits?

22                    THE WITNESS:  No.

23                          THE COURT:  And then would it surprise

24 you that there were nearly $9,000 in withdrawals?

                          THE WITNESS:  No.

                                THE COURT:  Okay.  And how many of those

                    $9,000 withdrawals were used to -- for your expenses?

3                          THE WITNESS:  Well --

4                          THE COURT:  Whether they're legitimate

5                    business expenses or not but can --

6                          THE WITNESS:  I don't -- I don't -- I

7                    don't remember.  And I don't have it.  So I don't know.

25

July 26, 2022                                          David White-D 544

1

2

8                      I'd have to look it up.

9                      THE COURT:  Okay.  Restaurants in

10                     Hillsboro?  Any -- any reason that that would be 11 anything

                       other than -- I think you said you basically 12 had full control of

                       this.

13                     THE WITNESS:  I think I took -- Randy

14                     and I went to dinner and talked about it.

15                     THE COURT:  Okay.

16                     THE WITNESS:  That would be the only 17 restaurant in Hillsboro.

18                     THE COURT:  Turbopark G, JHL,

19     California.

20                     THE WITNESS:  Turbopark G?  I think that

21     was --

22                     THE COURT:  $1,349.

23                     THE WITNESS:  Yeah.  I think

24 that -- I -- I don't remember off the top of my head.

                           THE COURT:  What is it?

                                   THE WITNESS:  I don't -- I don't know

       off the top of my head.

3                  THE COURT:  You spent $1,349 and you're 4 not sure what it is?

5                      THE WITNESS:  Yeah.  I don't remember.

6                      I'd have to look at it.

25

July 26, 2022                                          David White-D 545

1

2

7                          THE COURT:  (Indiscernible).

8                          THE WITNESS:  You know, I don't -- I

9                          don't know what it was.  But most of --

10                         THE COURT:  AutoZones?

11                          THE WITNESS:  Something for my car, I'm 12 sure.

13                         THE COURT:  So the company pays for your

14                         car?

15                         THE WITNESS:  Yes, because of the

16                         experiment -- the experiment I did for two years

17                         with  -- with a ODOT permit.

18                          THE COURT:  Director of withdrawal, for 19 PayPal, 135 bucks?

20                      THE WITNESS:  It was probably a climate 21 change conference.

22                      THE COURT:  In-N-Out Burger, Keizer, 23 Oregon?

24                               THE WITNESS:  Yeah.  Maybe coming back

from Depoe Bay.  I don't know.

                               THE COURT:  Ereleases.com.

                      THE WITNESS:  That was a press release I 3 did for the publication of our

equilibrium manuscript,

4                          the only one in the world ever published.

5                          THE COURT:  It cost 600 bucks.

25

1

2

6          THE WITNESS:  Um-hum. 7  THE COURT:  A direct withdrawal to 8

Synchrony Bank?

9       THE WITNESS:  Yeah.  That was to pay

10      Amazon for some things I bought for the corporation.

11      THE COURT:  What did you buy? 12  THE WITNESS:  I don't

remember.  But

13       I  -- but I know what Synchrony is.

14       THE COURT:  Okay.  Sunset Auto PA,

15       Ola  --

16       THE WITNESS:  Yeah.

17       THE COURT: -- $150.60?

18       THE WITNESS:  Yeah.  Something -- 19                    THE

COURT:  Black AutoZone?  These are

20      different ones.

21       THE WITNESS:  Yeah.

22       THE COURT:  You spent a lot -- so if I

23       could tell one month alone you spent about three to

24       four hundred bucks, and there's a couple more on here --

THE WITNESS:  Um-hum.

THE COURT:  -- regarding the car.

25

July 26, 2022                                    David White-D 547

1

2

3    THE WITNESS: Yeah.

4    THE WITNESS: Okay. And you don't think

5    that as a result of -- those should be

6    considered -- because you talked about the law --

7    THE WITNESS: Yeah.

8    THE COURT: -- and would it surprise you

9    to hear that the Court should consider anything that is 10 a benefit to somebody as income?

11    THE WITNESS: I had -- well, those are 12 business expenses.

13                          THE COURT: Sure not -- I think they may

14                          be business expenses --

15                          THE WITNESS: They're not personal

16                          because --

17                          THE COURT: -- but they're business

18                          expenses that you used for personal purposes. 19

20                           THE WITNESS: No. I used it for the

20                          experiment on U.S. 26 for two years.

21                          THE COURT: Does it benefit you to be

22                          able to go to an AutoZone store and buy parts for your 23 car?

24                                    THE WITNESS: It benefits the company to

25

July 26, 2022                                    David White-D 548

1

2

be able to use that car.

          THE COURT:  Why are you refusing to

answer my question?

3          THE WITNESS:  I'm not refusing.

4          THE COURT:  You did.  Yes or no?  Does

5          it help you by being able to -- something goes wrong

6          with your car -- to go to the AutoZone store, or

7          wherever store, and buy parts for your car and the 8 business

          pays for it.  Is that a benefit to you?  Yes

9          or no?

10          THE WITNESS:  I suppose, yes.

11          THE COURT:  Go ahead, Mr. White.  What

12          else do you want to tell me that will be helpful in me

13          figuring out how to distribute the assets of this and 14 whether to

          determine spousal support for Ms. White?

15          THE WITNESS:  Okay.  So I -- I explained

16          what the law says that --

17          THE COURT:  I'm familiar with the law.

18          THE WITNESS:  And you're familiar with

19          the law and that I can't pay spousal support.  And

25

July 26, 2022                                    David White-D 549

1

2

20          also, I have a medical issue; that is why I can't get

21          another job.  And I do have a job.  Unfortunately we 22 don't

            have very many students, so I don't get paid very

23          much.

24                  And -- but in terms of the

photolithography consulting, until there's an economic downturn, I won't get any more of

that.  And if I'm teaching at this school, I might not do it because I

3           don't have time.  I testified it takes 80 percent of my

4           week to make a PowerPoint and then teach it slowly and

5           then send them a link to the -- to the video of the 6 class when I teach it.  So I don't really

have time to 7 do anything else.

8                   THE COURT:  Well -- there's -- you know

9           the theory of economic opportunity laws, correct?

10          THE WITNESS:  Um-hum.

11          THE COURT:  So if there's an opportunity

12          to make more money doing something else and not

13          teaching when you're only making $200 for four months,

14          don't you agree you're losing money because of economic

15          opportunity loss?  That you should do something else 16 and not

            teach?

25

July 26, 2022                                                David White-D 550

1

2

17          THE WITNESS:  Yes.  But it's important

18     to me for these children to be able to get a college

19     degree with their high school degree.  And I never 20 thought I

       would like teaching, but actually, it's very

21     rewarding.

22          THE COURT:  So that's a conscious

23     decision.  That's a --

24          THE WITNESS:  Yes.

               THE COURT:  That's a -- but you agree?

          THE WITNESS:  Yes.  It's not --

                THE COURT:  You've chosen to do what

3      you're doing at an economic loss.

4      THE WITNESS:  I guess, yeah.

5      THE COURT:  You may continue.

6      THE WITNESS:  Okay.  I wanted to explain

7      a couple of things.  One is about what was said about

8      the taxes I filed.  Vince Bernabei sent emails of the

9      filings I made to Mr. Shipley.  And so his client 10 should have got those.

11          MR. SHIPLEY:  Your Honor, I object.  I

25

July 26, 2022                                        David White-D 551

1

2

12          mean, there's no evidence.  He's not presenting any 13

            evidence that what he just said is even true. 14

            THE COURT:  You'll be able to cross-

15          examine him on that.

16          MR. SHIPLEY:  Okay, will do.

17          THE COURT:  You may continue.

18          THE WITNESS:  Okay.  Another thing I

19          want to -- what everybody -- my family and my wife,

20          everyone else -- to realize what happened the first

21          meeting with Dr. David Douglas.  I was in his office,

22          and -- sitting in his office -- and he wanted to call

23          Ms. White to corroborate what I had said what happened

24          on Christmas Eve.  So he did that, and then he asked her if she

            had anything else, and she said, "What about

the gun?"

                        She's the one who brought up the guns.

3           He did not.  And then he looked at me.  I shrugged my

4           shoulders and nodded yes because I wanted to keep peace

5           in the family.  And then he talked to her some more,

6           and she asked again.  And he said -- he looked at me

25

July 26, 2022                                      David White-D 552

1

2

7         again and again I shrugged and nodded forward -- and

8         then he said, "Yeah, let's remove the guns for now."

9         After nine months or so of meeting with

10        him, when he finally said that I was fine, I asked him,

11        you know, can I get the guns back now?  And his words

12        to me -- and it's in the documents I have at my 13 house -- that I

          could have got the guns back at any 14 time.

15        And I came home and told Julie that, and

16        she's, well, he kept bugging me.  That's why I was

17        bugging you because he said that I could have got the

18        guns back at any time.  I am not a danger to anyone,

19        having a gun or not.  That is a complete and utter lie,

20        and there is no doctor who's told me that I can't have

21        guns.

22        As a matter of fact, I went to a

23        people's rights conference to get some students for our

24        school in Redmond, and there was a guy there selling used

          magazines.  I told him what happened --

          MR. SHIPLEY:  Objection, relevance.

                    THE WITNESS:  No, I'm -- I'm going to

25

July 26, 2022                                             David White-D 553

3          explain this.

4          THE COURT: Sustained. No. The

5          whole -- if you want to talk to me more about why you

6          believe she's in contempt for removal of the weapons or

7          destruction of the weapons, that's part of it -- what's

8          in contempt.

9          THE WITNESS: Um-hum.

10         THE COURT: But what somebody else may

11         have told you or why you went to a conference is just

12         not relevant to that. What is it specifically you

13         want -- you think is important for the contempt part of

14         this -- regarding the weapons, and why the Court should 15 hold

           her in contempt?

16         THE WITNESS: Because -- well, I was

17         getting to that. So this person, I told him what

18         happened, he gave me a --

19         THE COURT: You can't go into what he 20 said because it's

           hearsay.

21         THE WITNESS: Well, no, but he gave me a

22         magazine for my .30-06. Cleaning up the upstairs, I

25

July 26, 2022                                      David White-D 554

1

2

23          found two boxes of .30-06 bullets that they missed.  So

24          I loaded that magazine, and it's in the .30-06.  But I haven't gone

            out.  I didn't -- gone to Brian's with it.

I haven't gone anywhere to any place to try to shoot somebody with it because that's not

the right -- I

3  don't do those kinds of things.

4  And they know this well, that I've never

5  done anything like that.  And I won't do anything like

6  that.  And right now, it's at home.  It's sitting

7  there.  It's not -- it doesn't have a bullet in the

8  chamber, but it has the magazine it.  But I'm not doing

9  anything with it.  So I -- that's what I wanted to say 10 that there is no reason to keep me

from having guns.

11          There is no doctor that ever said I can't have

12          it -- have them.  So that's what I wanted to say.

13          THE COURT:  Um-hum.  Anything else

14          before I let Mr. Shipley ask you questions?

15          THE WITNESS:  That's it. 16        THE COURT:  Mr. Shipley.

17                CROSS-EXAMINATION

18          BY MR. SHIPLEY:

25

July 26, 2022                                    David White-D 555

1

2

19          Q      And you got the guns back, didn't you?

20          A      Yes.

21          Q      Okay.  You testified in front of Judge Fun

22   that you used to make 5 to $7,000 a year from RV

23   electrical; isn't that true?

24          A      Yes.

     Q          And isn't it also true that, in front of

25

July 26, 2022                                              David White-X 556

1

2

Judge Fun, you told the Court -- you told Judge Fun that you normally received $6,500 a year from

3          driving --

4          A        Um-hum.  Um-hum.

5          Q        -- like for Lyft.  And then after that, you

6    didn't want to go over a threshold.

7          A        Um-hum.

8          Q        Is that correct?

9          A        Yes.

10         Q        Okay.

11         A        At that time, yes.

12         Q        Well, you still have a driver's license,

13    right?

14         A        Yes.

15         Q        Okay.  Now, you testified that you couldn't

16    afford any business cards.

17         A        Um-hum.

18         Q        Do you think if, like, maybe you bought a

19    little less liquor, you might be able to buy some 20 business cards?

25

July 26, 2022                                        David White-X 557

1

2

21    A        Not from photo -- not from Climate Change 22 Truth?  It's not a business expense for them.

23          Q        Yeah, but you also testified that you put all

24          of the proceeds from the home refinance into Climate Change Truth?

              A            Right.  Um-hum.

          Q        Are you aware that you made $25,000 in 3 deposits into Climate Change Truth from November 1

4          through to February 28?

5          A        Um-hum.

6          Q        Is that a yes?

7          A        Um-hum.

8          Q        Okay.  And then there was, like, deposits in 9 there from Lyft into the Climate Change Truth that you

10         get for driving.

11         A        Um-hum.

12         Q        So you couldn't have used any of that 13 money  -- that you put in there of your own money -- to

14  buy some business cards to take out to the RV place?

25

July 26, 2022                                          David White-X 558

1

2

15    A        No.  It's not a business expense. 16      Q       But it was your personal

money that you put 17 into the Climate Change Truth account.

18    A        Yeah.  It's a donation to the corporation.  19 Then -- then it's not personal

money after that.

20            Q       There wasn't -- so the money that -- you're

21            saying the money that you received from your

22            refinance --

23    A        Um-hum.

24            Q       -- was a charitable donation?

       A        Um-hum.

       Q        It's not on your tax return as a charitable donation?

3     A        I don't need it for a deduction.  Why 4 did -- why did -- you don't put

things in your tax 5 return (indiscernible).

6                    Q       So you're saying that you're so broke, but

7                    then when you refinanced this property and took extra

8                    money out --

9                    A       Right.

10                   Q       -- you just decided to give that to Climate

11                   Change Truth?

12                   A       Um-hum.

25

July 26, 2022                                           David White-X 559

1

2

13          Q       For altruistic reasons?

14          A       I don't know what altruistic means, but --

15          THE COURT:  I don't know about all

16          altruistic.  It's money spent on himself anyways.

17          MR. SHIPLEY:  Well, I'm just asking if

18          that's --

19          THE COURT:  Yeah, I know.  I get it. 20                MR.

            SHIPLEY:  -- was his testimony.

21          THE WITNESS:  It wasn't -- it wasn't

22          spent on myself.  Those are legitimate business 23 expenses.

            You can say differently, but it's simply not

24 true.

            BY MR. SHIPLEY:

            Q       Did you go to your son's house and pick up the wood splitter?

3           A       Yes.

4           Q       Okay.  So you entered his property and went

5           into his barn?

6           A       No.  Took a friend.

25

July 26, 2022                                          David White-X 560

1

2

7                    THE COURT:  Did you direct the friend to

8    do it?

9                    THE WITNESS:  Yes.

10                   THE COURT:  Okay.

11                   BY MR. SHIPLEY:

12                   Q        So the friend went in, you directed the

13                   friend to go into his barn --

14                   A        Um-hum.

15                   Q        -- enter his barn --

16                   A        Um-hum.

17                   Q        -- and take the wood splitter, correct?

18                   A        Yes.

19                   Q        Do you know what a criminal conspiracy is?

20                   A        I do not.

21                   THE COURT:  Hold on, Mr. Shipley.  I'm

22                   going to -- and I -- the Court was probably derelict in

23                   its duties.  I want to make sure before we go any

24                   further with this that you understand you have a Fifth

Amendment right to remain silent.

                     THE WITNESS:  Okay.

                                    THE COURT:  You've called yourself as a

25

July 26, 2022                                                David White-X 561

3    witness -- and to some degree -- you've opened yourself

4    up for these questions.  But I still want to make

5    sure -- it's my obligation to warn you that what you

6    say here is under oath and could be used against you in

7    further proceedings, including proceeding of a criminal

8    conspiracy to trespass and take a woodcutter that was

9    not properly yours legally, depending on how people

10   might perceive any and all that.  And I appreciate that

11   you believe it was.  But certainly, you had been given

12   a warning by the Court.  And I want to be clear, don't

13   say anything.  I want to make sure you understand your

14   rights as I've given them to you.

15   THE WITNESS:  Yes.

16   THE COURT:  And did you want to continue

17   to answer these questions and be subject to this?

18   Because if you don't, that's fine.  I'm just going to

19   sort of strike some things from the record, and the

20   Court will make certain considerations because of your 21 right

     to remain silent.  Did you want to exercise your

22   right to remain silent?

25

July 26, 2022                                    David White-X 562

1

2

23                    THE WITNESS:  Yes.

24                    THE COURT:  Do you -- okay.  We're not

going to ask any more questions regarding the

woodcutter.

                      MR. SHIPLEY:  What was that?

                      THE COURT:  We're not going to ask

3

any --

4

5                     MR. SHIPLEY:  Okay.

6                     THE COURT:  -- more questions regarding

7                     the woodcutter.

8                     MR. SHIPLEY:  All right.

9                     BY MR. SHIPLEY:

10                    Q        Mr. White, you had text -- sent text messages 11 to

                      your daughter in April of this year, correct? 12    A        Yeah if

                      what's in the -- what I saw the other 13 day, right, or yesterday.

14                    Q        All right.  And you've -- told her that if my

15                    client, Ms. White, didn't stop this divorce and go

16                    with, you know, do what you wished her to do -- that

17                    you were going to charge Brian White, your son, with

18                    two felonies; is that correct?

19                    A        Um-hum.

25

1

2

20          Q        Okay.  So when you made those comments to

21    your daughter you were intending to intimidate your

22    wife into taking action; is that correct?

23    THE WITNESS:  No.

24    THE COURT:  Hold on.

          THE WITNESS:  No.

      THE COURT:  This is in regards to the

contempt?

3          MR. SHIPLEY:  Yes.

4     THE COURT:  Is that why you're asking

5     these questions?  You may answer the question.

6     THE WITNESS:  No, I wasn't doing that.

7     I was making -- I don't make threats or anything or

8     intimidation.  I was telling her what's -- what I'm

9     planning to do.  But I still wanted this divorce

10    stopped.  I wanted to get back together with my wife at

11    that time.  But I wasn't able to talk to her, to 12 apologize or

      anything like that.

13    THE COURT:  I want to make sure I got

14    this right.  You knew then by sending that message or

25

July 26, 2022                                         David White-X 564

1

2

15          contemplated by sending that message that she would 16 then

talk to your wife because only your wife can make

17          the decision to dismiss the divorce proceedings.

18          THE WITNESS:  Um-hum.

19          THE COURT:  And you didn't think that

20          that violated Judge Fun's order?

21          THE WITNESS:  No, I didn't think so. 22                THE

COURT:  You didn't think that that

23          violated the no contact provisional?

24          THE WITNESS:  Well, what date was that?

                    THE COURT:  In April --

MR. SHIPLEY:  April 9 of this year.

THE WITNESS:  Oh, April 9 of this year.

THE COURT:  Yeah.  Long after Judge

3

4     Fun's --

                    THE WITNESS:  Yeah.  Yeah.  No, I

5

6 contacted my daughter.  I don't know how -- well, I was 7 told I can't talk to her directly?

8     THE COURT:  How would the message get

9     from you -- the message you gave your daughter -- how 10 is that going to get your

wife?

25

July 26, 2022                                    David White-X 565

1

2

11   THE WITNESS:  She's going to tell her, I 12 suppose.

13                        THE COURT:  And you didn't think that

14                        violated Judge Fun's order of no contact? 15

                          THE WITNESS:  I didn't think so because

16                        I was contacting my daughter, not her.

17                        THE COURT:  Telling her, instructing her

18                        to contact your wife?

19                        THE WITNESS: Yes.

20                        THE COURT:  Yes.

21                        THE WITNESS:  I guess I don't

22                        understand --

23                        THE COURT:  No, I get it.  No different

24                        than, you know, coming on -- when you tell somebody else to

                          go along on your son's property and trespass.

     That could potentially be a conspiracy to commit a crime?

3                    THE WITNESS:  Um-hum. 4                THE COURT:

Yeah.  I get it.  Any

5                        additional questions, Mr. Shipley?

6                        BY MR. SHIPLEY:

25

July 26, 2022                                         David White-X 566

1

2

7      Q        Yeah.  I mean, are you aware that the order

8      from Judge Fun said, "The parties shall not communicate

9      in any form with one another during the pendency of

10     this case.  And all necessary communications between 11 the parties will go

       through the parties' attorneys."

12     Were you aware of that?

13     A        Yes.

14     Q        Okay.  And then your daughter actually asked

15     you not to contact her anymore, correct?

16     A        Right.  Um-hum.

17     Q        And then you actually emailed her again two

18     days later with the same --

19     A        Probably.

20     Q        -- the same threat.

21     A        Yeah.

22     Q        Yeah.  Okay.

23     MR. SHIPLEY:  No more questions, Your 24 Honor.

                              THE COURT:  Anything else you think it's

25

July 26, 2022                                                        567

1

2

David White-ReD

important for me to know based on the questions Mr.

Shipley asked you?

3    REDIRECT TESTIMONY

4    THE WITNESS:  Yes, there is one thing.

5    I have over there the purchase for the wood splitter

6    where I bought it.  So I can't go get something that I

7    already own or own most of.  And I texted that picture

8    to the officer who called me, and he -- he didn't go 9 any further with Brian about it.

Furthermore, Brian 10 says he has no-trespassing signs on his property.  He

11   should go look up the law.  They're not legally posted.

12   The other thing is in that parking on the street in

13   front of anybody's house is not going on their 14 property.

15                THE COURT:  I just want to make

16                sure -- I gave you -- I'm going to let Mr. Shipley ask

17                you questions now regarding the wood splitter because

18                you just gave up your right to remain silent because

19                you continue to talk about the wood splitter.

20                THE WITNESS:  Okay.  All right.

21                THE COURT:  Yeah.  I'll strike that from

25

July 26, 2022                                      Leland Jossy-D 568

1

2

22          the record and not let Mr. Shipley ask any questions,

23          and I won't consider what you just said or if you want

24          me to know that stuff, that's fine.  But you've opened up for Mr.

            Shipley to ask you questions regarding the

wood splitter.

            THE WITNESS:  No, it's okay.  We'll move 3 on.

4           THE COURT:  All right.  All that is

5           stricken from the record.  Do you have anything else 6 that -- for

            question that Mr. Shipley asked you that's

7            important for me to know?

8            THE WITNESS:  No.

9            THE COURT:  You may step down.

10           THE WITNESS:  Okay.

11           THE COURT:  You may call your next 12 witness.

13          MR. WHITE:  I call Leland Jossy.

14          THE COURT:  All right.  I want to make

15          sure going forward Mr. Jossy wasn't in here while you

16          were testifying and what witnesses should be excluded 17 so that

            -- I'll let him testify this time.

18                  Mr. Jossy, raise your hand to be sworn.

25

1

2

19                              LELAND JOSSY

20                              called as a witness for the Respondent, having been

                                duly 21 sworn, testified as follows:

22              THE COURT:  Go have a seat.  Once you're

23      seated, if you could tell -- watch your step up

24      there  -- if you're seated, why don't you tell us your full name and

        spell your last name for us, please.

                                THE WITNESS:  Leland Jossy, Jr.,

J-O-S-S-Y.

3                               THE COURT:  You may inquire.

4               DIRECT EXAMINATION

5               BY MR. WHITE:

6               Q        Leland, were you in my home prior to all this

7       happening?

8               A        Yeah.

9               Q        So you --

10              THE COURT:  Prior to all what? 11

                MR. WHITE:  To all -- to the divorce and

12      removing assets and all this.

13      THE COURT:  Go ahead.

25

1

2

14          MR. WHITE:  Okay.

15          BY MR. WHITE:

16          Q        And then you've been in my home in the last

17          few months --

18          A        Yes.

19          Q        -- including the other day, right?

20          A        Yes.

21          Q        Now what is the --

22          MR. SHIPLEY:  Objection, very -- that's

23          like -- I don't -- there's like a -- I don't know if

24          there is a timeframe, but there's no specificity or -- to that

            question.

            THE COURT:  We'll let him.

            Mr. WHITE:  Well --

3           THE COURT:  -- we'll give him a little

4           Leeway to get there.

5           MR. SHIPLEY:  Okay. 6 THE COURT:  You may ask your next

7           question.

8           MR. WHITE:  Yeah.

9           BY MR. WHITE:

25

1

2

10          Q          So what is the condition or the amount of 11 furnishings

and things like that now compared to what 12 it was before?

13     A          Well, when I went in it before, it was the

14     home of a long-time married couple, very nicely

15     decorated and -- as if two people live there in

16     harmony.  And later it was things had been moved out.

17     There was less stuff the second time, a lot of things

18     have been taken.  I  -- I would say -- I don't -- I

19     don't know the value or quantity but it was different.

20     Before was all the furnishings of a couple, and after

21     would be say all the furnishings of half a couple,

22     maybe.

23     Q          Um-hum.

24     A          To put it -- and before and after being --

MR. SHIPLEY:  Objection.  That's nonresponsive.

THE COURT:  Yeah.  Wait for your next

3      question, Mr. Jossy.  Thank you.

4      Ask your next question.

5      BY MR. WHITE:

6          Q          So in terms of after, what would you say

25

July 26, 2022                                          Leland Jossy-D 572

1

2

7            percentage wise is, in terms of number of items, 8 compared to

what it was before?

9            MR. SHIPLEY:  Objection, asked and

10           answered.  He just said half.

11           THE COURT:  I think he said he doesn't

12           really know.  So other than the half -- can I ask you,

13           Mr. Jossy, you know what's going on here, right?  The

14           house is getting -- it's getting prepared to sell and

15           all that, right?

16           THE WITNESS:  Let's see, yeah.

17           (Indiscernible).  Correct me if I'm wrong, but  -- 18

THE COURT:  The reason why I ask, have

19           you ever staged a home for sale?  Have you ever staged

20           a home --

21           THE WITNESS:  No.

22           THE COURT:  -- for sale of the home?

23           THE WITNESS:  No.

24           THE COURT:  Have you ever looked at

homes online?

THE WITNESS:  No.  I have no knowledge.

25

July 26, 2022                                                  Leland Jossy-D 573

1

2

I've been a renter all my life.

3                          THE COURT:  Okay.  So would it make

4            sense that in order to sell a home, you don't want the

5            clutter.  You want people to think there's a lot of

6            room --
7            THE WITNESS:  Absolutely.

8                          THE COURT:  -- and to have just a few
9            items that makes it look spacious.

10                         THE WITNESS:  I would think so.

11                         THE COURT:  Okay.  And do you know

12           specifically what items were there when you were in it

13           before and then what items are now not in it?

14           THE WITNESS:  No.  No.

15           THE COURT:  Any idea what was in it.

16           THE WITNESS:  No.  No.  I just know it

17           was a, you know, it was a nicely decorated place.  And

18           now, you know, it's like the walls are more barren and 19 there's

             less furniture.

20           THE COURT:  It looks more spacious?

21           THE WITNESS: Yeah.  Yeah. 22  THE COURT:  Okay.  Mr.

             White, do you

25

July 26, 2022                                               Leland Jossy-D 574

1

2

23          have any questions?  Any additional questions?

24          MR. WHITE:  Nope.  I guess that's it.

            THE COURT:  Mr. Shipley, any questions

25

July 26, 2022                                                    Leland Jossy 575

1

2

                                                                          -X

for the witness?

CROSS-EXAMINATION

3    BY MR. SHIPLEY:

4    Q        Mr. Jossy, did you look in the garage and see

5    all the property that was stored and contained in the

6    garage?

7    A        Prior to?

8    Q        At the -- all right.  Let me -- let me fix 9 that question.  After or after Mr.

     White returned to

10   the property --

11   A        Yep.

12   Q        -- in approximately June, late May, early

13   June --

14   A        Yes.

15   Q        -- did you happen to look into -- go into the

16   garage, and look at all the property that was stored 17 and organized and that --

     in the garage?

18   A        Yes.  Yes.  I've been in that garage since.

19   Q        Okay.  And did you go in there as of -- well,
25

July 26, 2022                                              Leland Jossy 576

1

2

20        actually, let us go back -- forward to September.  Have 21 you been in there in

September?

22        A        Yes.  Since -- since Dave returned back to

23        the house --

24        Q        Okay.

A                        -- I've been in there several times.

                                                            -X

Q Okay.  And was their property stored in that garage?

3                        A        Yes.

4                        THE COURT:  Mr. White, any questions

5                        based on those that I asked or that Mr. Shipley asked?
6                        MR. WHITE:  No.

7                        THE COURT:  You may step down, Mr.

8        Jossy.

9                        You may call your next witness.

10                        MR. WHITE:  I need to tell him to get on

11        now.  These two witnesses by remote were originally set

12        for 1:30, but I didn't know how long this would take 13 this morning.

14                        THE COURT:  Okay.  Just so long as -- I

15                        only want one witness at a time and I want the other

16                        person --

25

July 26, 2022                                    Leland Jossy 577

1

2

17          MR. WHITE:  Right.

18          THE COURT:  -- to log on at the same

19          time.

20          MR. WHITE:  Right.

21          THE COURT:  Okay.  Who is it that you're 22 calling first?

23          MR. WHITE:  The -- Hedrick -- I'm not

24          sure of his last name, the appraiser for the stuff that remained

in the house.

          MR. SHIPLEY:  Your Honor, I don't know what the relevance of that is

because we've already 3 decided that -- the Court's already decided we're going

4          through this auction process.

5          THE COURT:  How is it relevant?

6          MR. WHITE:  It's relevant to show that I

7          that -- she, well, she has 19,000, and I have 1,285

8          left in the house.  The other thing I put -- well,

9          THE COURT:  No, no, no.  Let's go back

10          to -- I don't know.  I can't remember the last name,

11          but this Hedrick --

12          MR. WHITE:  Um-hum.

13          THE COURT:  -- is indicated for -- I
25

July 26, 2022                                              Leland Jossy 578

1

2

14          don't care what the values of the home, of the items

15          are.  I care about what you guys think the values are

16          and what -- that's what the auction is all about is for

17          the -- you guys to determine how valuable this stuff is 18 to you

            or not valuable it is to you.  So what's this 19 witness going to

            be testifying about that's going to be

20          relevant?

21          MR. WHITE:  He's -- he's going to

22          testify to the true value of what is there.

23          (Indiscernible)

24          THE COURT:  It doesn't matter.  My point

is --

25

July 26, 2022                                      Leland Jossy 579

MR. WHITE:  Well --

THE COURT:  -- it doesn't matter because

whether -- whether he thinks it's worth $10,000, if you

bid 12 for it, 12 is what it's going to cost you.

MR. WHITE:  Yeah.  6                    THE COURT:  Right.  And it --

MR. WHITE:  Right.

THE COURT: -- she bids 15, 15 is what

it's going to cost her.  So it's not relevant as to

what it's actually -- what the actual value is.  It's

no different than the Kelly Book.  You use them

sometimes, right?

MR. WHITE:  Yeah.

THE COURT:  Really, if you said I want

it for $20,000 over value, then I'm going to give it to

you --

MR. WHITE:  Yeah.

THE COURT: -- $20,000 over value, and

you're going to get credited with that amount of money,

and there'll be an offset somewhere.  So is this person

have anything other than value of the home or value of

the property -- personal property -- that's subject to 23 the Court's

original auction.

July 26, 2022                                        Leland Jossy 580

MR. WHITE:  He has the value of this property, but you're -- the auction is totally unfair to me.  I have no money to bid with.  So how am I going to bid anything?

THE COURT:  That's a whole different thing.  We're not going to have Hedrick then testify.  So do you have your other -- who's your other witness?

MR. WHITE:  The auto appraiser who did 7 the correct auto appraiser.

THE COURT:  That's fine.  The auto appraiser's appropriate.

MR. SHIPLEY:  Did he print -- was there 11 a report that that fella did?

MR. WHITE:  Yes.  It's in what I've submitted to the Court today also.  And it was in the previous one --

MR. SHIPLEY:  Is it in this -- 16                THE COURT:  Is it something that when Mr. Bernabei was your attorney, that he would have --

MR. WHITE:  Yes.

THE COURT:  Okay.

MR. WHITE:  So I asked the auto appraiser to get on now, so we'll see.  Hopefully, he

July 26, 2022                                              Leland Jossy 581

1

2

22          gets on soon.

23                    THE COURT:  Do you have any other

24          witnesses while you're waiting to see if he gets on?

Any other witnesses?

                 MR. WHITE:  I would like to ask my wife a couple more questions that I

remembered.

3                    THE COURT:  Nope.

4                    MR. WHITE:  I can't call her?

5                    THE COURT:  Yeah.

6                    MR. WHITE:  I can't call her? 7  THE COURT:  What is it that you

           want to 8 ask her?

9                    MR. WHITE:  There was two very expensive

10          pictures on the wall in our family room.  I wanted to

11          know where those went?  Because they're not on the 12 list.

13                    THE COURT:  They're not on the list in

14          the auction?

15                    MR. WHITE:  Nuh-uh.

16                    THE COURT:  That's fair, then.

17                    MR. SHIPLEY:  Well, in regards to the

18          list, Your Honor --

19                    THE COURT:  Yeah.

20                    MR. SHIPLEY:  -- we exchanged, Mr.

25

July 26, 2022                                    Leland Jossy 582

1

2

21     Bernabei and I, what was supposed to be the final list.

22     THE COURT:  I get that.

23     MR. SHIPLEY:  It was agreed upon.  It 24 was stipulated.

THE COURT:  I think it's fair.  I'll let him ask the question.

MR. SHIPLEY:  Okay.

3      THE COURT:  But he can do it from right

4      there.  I'll remind you, you're still under oath, Ms.

5      White.  Go ahead.  Ask the question.

6      MR. WHITE:  Where, you know, those

7      pictures that were on the wall behind my chair in the 8 family

room?  Where did those go?

9      MS. WHITE:  They're hanging on the wall 10 where I'm living now.

11     MR. WHITE:  Okay.  So you took those

12     too.  Okay.  And what was the value of those?  13

MS. WHITE:  I don't know.  They were

14     pictures that my sister brought for me.

15     MR. WHITE:  Yeah.  Okay.

16     THE COURT:  Any other questions? 17                    MR.

WHITE:  No.  But they should be

18     added to the list.

19     THE COURT:  Any other witnesses that you

25

have?

MR. WHITE:  This Ken Nicks.

THE COURT:  Okay.  Where is --

MR. WHITE:  Hopefully, he's --

THE COURT:  Is he next or available or?

MR. WHITE:  Hopefully, he gets on right now.

THE COURT:  Okay.  Is that the auto appraiser or --

MR. WHITE:  Yes.  The auto -- 5           THE COURT:  Okay.  No.  But I mean, other than Mr. Nicks, as we're waiting for Mr. Nicks --

MR. WHITE:  Yes.  We're waiting for Mr. Nicks.

THE COURT:  No.  I get that.  Other than Mr. Nicks, is there any other witnesses that you intend to call?

MR. WHITE:  Not at -- not that I have prepared for at this time.

THE COURT:  Okay.  Are you going to have any rebuttal witnesses, Mr. Shipley?

MR. SHIPLEY:  I doubt it.

THE COURT:  Okay.  Well, we'll wait for Mr. Nicks to jump on.  Did we have information from Mr. Nicks so -- or did you send him the link?

July 26, 2022                                      Leland Jossy 584

1

2

20          MR. WHITE:  I sent him the link this

21   morning.

22          THE COURT:  Good, so.

23          MR. WHITE:  And I called him and let him

24   know that it was there.  Then I texted him also.  And he texted me a little bit ago, so he should be

hopefully getting on.

          MR. SHIPLEY:  Your Honor, I don't see 3 that there's -- within this exhibit list -- that

4          there's any report from an auto appraiser?  And then

5          there was, like, a memorandum that just had stuff in

6          it.  But I didn't --

7          THE COURT:  Do you have in all of the

8          box of paperwork there, do you have Mr. Nicks's report?

9          MR. WHITE:  Should be.

10          THE COURT:  And/or do you know if it was

11          marked as an exhibit by Mr. Bernabei previously? 12   MR.

          WHITE:  Probably.  In this book, 13 Exhibits 126 to 140.

14   MR. SHIPLEY:  Oh, I've got -- I only got

15   135.  Okay.  If you have that one there.

16   MR. WHITE:  You don't have this one?  I

17   don't know why Vince didn't send -- I'm 99 percent sure

25

July 26, 2022                                                    Leland Jossy 585

1

2

18          when I sent this to him, I saw him send it to you by

19          email.  Because --

20          MR. SHIPLEY:  Well, I have his exhibit

21          book right here, but that only goes up to 135. 22

            MR. WHITE:  No, but I mean you would've

            got this by email around the 6th of March.

23

24          MR. SHIPLEY:  Well, that would have been

after our first trial date.

            MR. WHITE:  Yeah.

            MR. SHIPLEY:  Our first hearing date. 3          THE COURT:  Can

you --

4           MR. WHITE:  I'll give you a chance to

5           look at that.

6           MR. SHIPLEY:  Thank you.

7           MR. WHITE:  Ken Nicks came with actual

8           tools to measure peak thickness and a reflection board

9           that would show any dents or any scratches that were

10          not visible to the eye.  So he did a professional 11 appraisal.

12          MR. SHIPLEY:  Did he just do the Chevy?

13          MR. WHITE:  No, he did the other one,

14          the Volkswagen.  This one.

15          MR. SHIPLEY:  Which one?

16          MR. WHITE:  The Volkswagen, which is

25

July 26, 2022                                          Leland Jossy 586

1

2

17    right here.  I'll email you both of these later today.

18    That's the Volkswagen one.

19    MR. SHIPLEY:  Thank you.

20    MR. WHITE:  Um-hum. 21   The Court doesn't have these, I'm 22

guessing?

23    THE COURT:  I don't have them, no.

24    MR. WHITE:  No.

THE COURT:  It doesn't seem to be

(indiscernible).

MR. WHITE:  They're not marked as those

3    exhibits --

4    THE COURT:  No.  No.

5    THE WITNESS:  -- previous. 6   THE COURT:  Mr. Nicks is not logging

on

at all.

7    MR. WHITE:  No, not yet.

8    THE COURT:  Did you get a text back from

9

him saying he was going to log in or?

10    MR. WHITE:  Not yet.  It said -- he

11

said, "Are you ready to testify?"

12

And I said, "Soon." 14              And then I said, "Can you

13

get on

25

July 26, 2022                                      Leland Jossy 587

15          now?" -- but I never got a text back.

16          THE COURT:  Let's go -- or let's go on

17   recess until we get Mr. Nicks --

18          MR. WHITE:  Okay.

19          THE COURT: -- online.

20          MR. WHITE:  I'll text him and say to be 21 ready at 1:00 or something?

22          THE COURT:  No.  No.  I want him to get

23   logged on --

24          MR. WHITE: -- to get logged on --

             THE COURT: -- as soon as possible this
     morning.

                    MR. WHITE:  Okay.  All right.  It's our
     last witness, and then we'll do argument, and done.

4    Get you all on the road.  Go to recess.

5    (Court recessed from 11:24 a.m. to 11:37

6    a.m.)

7           THE COURT:  Were we able to get Mr.

8    Nicks?

9           MR. WHITE:  I don't think so.

10          MR. SHIPLEY:  Your Honor, I think we

11   have an agreement regarding Mr. Nicks is that he -- we

12   would stipulate to the submission of or the admission

July 26, 2022                                          Leland Jossy 588

of Mr. Nicks's reports into the evidence record.  And

then it just be up to the Court to then --

THE COURT:  Okay.

MR. SHIPLEY:  -- look at that.  And then

Mr. White wanted to make a statement pertaining to the

independence of Mr. Nicks that he thought would have

been important -- that he would've asked Mr. Nicks.

And we're -- we will agree to Mr. White being able to

just go ahead and say what -- say that --

THE COURT:  Okay.

MR. SHIPLEY:  -- on the record.

THE COURT:  Mr. White, go ahead.

MR. WHITE:  All right.  So when Ken

Nicks did the correct appraisal for these two vehicles, again, using the tools of the trade to

measure paint thickness and all kind, you know -- a 4 reflection board to find these scratches and other

issues -- to get the correct appraisal.  He said he

doesn't do any work for any attorney because 100

percent or all the time -- and I'm not sure, and this

is what he was going to testify about today -- they 9 always ask him to target a value.  And in -- what I put

in yesterday was how the financial document that Mr.

1

2

11          Shipley put in or gave us months ago, that had

12          unsubstantiated vehicle values, and Dave Smith values

13          were exactly 90 percent --

14          THE COURT:  So you're getting a feel

15          from what you were going to tell me about Mr. Nicks.  I

16          don't --

17          MR. WHITE:  Yes.  I want --

18          THE COURT:  And there's a reason why.

19  There is a -- and I want to make sure you know why I

20  don't want you to go into what the other witness

21  said  --

22          MR. WHITE:  Okay.  All right.

23          THE COURT:  It's not fair to Mr.

24  Shipley.  They have their reports and they have their there witness come in.

           MR. WHITE:  Um-hum.

           THE COURT:  The reason is there is an 3 area of law that says where a

witness cannot comment on

4          the credibility of another witness.

5          MR. WHITE:  Okay.

6          THE COURT:  And so Mr. -- if Mr. Nicks

7          was going to get up on the stand or whatever and say,

8          "I'm sorry.  He's wrong."

9          It's not appropriate because I make the

25

July 26, 2022                                    Leland Jossy 590

1

2

10          determination who's credible, who's not, or what

11          credibility to give each witness.

12          MR. WHITE:  Um-hum.

13          THE COURT:  So not the witnesses.  So I

14          don't want to go into anything regarding their folks,

15          their estimates.  Anything else that you think would be

16          important for me to understand about Mr. Nicks and Mr.

17          Nicks' reports?

18          MR. WHITE:  Okay.

19          MR. SHIPLEY:  I think you've said -- he

20          said what --

21          THE COURT:  Yep.  That's why I was

22          asking him if there is anything more that you think is

23          important for me to know about Mr. Nicks or Mr. Nicks'

24          reports, as far as what the courts should view when considering his

            reports.

                         MR. WHITE:  I think we -- well, I think

his reports speak for themselves.

3           THE COURT:  Okay.

4           MR. WHITE:  I think he talks about the

5           years of --

25

July 26, 2022                                    Leland Jossy 591

THE COURT: What -- and I don't know 7 what they're marked as.

MR. SHIPLEY: No. I think -- I think

they're over here. He's got them still.

THE COURT: Okay. So what'd we mark

them as? What --

MR. WHITE: I think it's 36 and --

THE COURT: It can't be 36.

MR. WHITE: -- 136, 136 -- 15                   MR. SHIPLEY: You

don't know.

THE COURT: I know.

MR. WHITE: 138.

THE COURT: 136 and 138. I need copies 19 of them.

MR. WHITE: I will send them to you.

THE COURT: No, no, no, no. I need 22 copies of them now.

MR. WHITE: Copies of them now?

THE COURT: Yep.                   MR. WHITE:

Okay.

THE COURT: If I'm going to be receiving

them, we receive them now.

MR. WHITE: Okay. All right. 4   THE COURT: If you go to gather them in

other places, then you can supplement your records.

July 26, 2022                                          Leland Jossy 592

1

2

6          MR. WHITE:  I can print them out or

7     whatever, yeah.

8          THE COURT:  And you have no objection to 9 136 or 138 coming in?

10         (Respondent's Exhibits 136 and 138 offered

11     into evidence)

12         MR. SHIPLEY:  Nope.

13         THE COURT:  So those are received.

14         (Respondent's Exhibits 136 and 138 received

15     into evidence.)

16         THE COURT: So I think that gets us then

17     to argument.  Mr. White, is that -- my understanding is

18     that you got no other witnesses to call; is that 19 correct?
20         MR. WHITE:  Not today.

21         THE COURT:  Well, we're -- there's not
22 going to be another today.  Today's it.  So do you have 23 any other witnesses to call today?

24                    MR. WHITE:  Why did the petitioner -- a

few times -- they couldn't get a witness in, and

it -- they were given another day.  Why don't I get the same?

3          THE COURT:  Do you have any other

4     witnesses you're going to call today?

5          MR. WHITE:  Not anymore today because --

6          THE COURT:  Argument then, Mr. Shipley.

7          PETITIONER'S CLOSING ARGUMENT

25

July 26, 2022                                    Leland Jossy 593

1

2

8          MR. SHIPLEY:  Your Honor, I'll try to

9          keep this brief.  We had submitted a trial memorandum

10         at the outset of this.  And I think that, for the most

11         part, we've proved -- presented evidence that supports

12         what was in or what we said we would present in that 13

           memorandum.

14         The first issue is spousal support to

15         discuss.  My client has gone ahead, and she's not

16         waiting any longer.  She's gotten employed, and she

17         makes $3,600 a month, but that's pretax.  She testified

18         that tax professionals have told her -- because she'll

19         have to pay her regular federal income tax and that

20         because she's self-employed, she'll have to pay her 21 self-

           employment tax.  And the estimates that she 22 has -- I think she

           testified 24 to 27 percent -- is 23 where that would come out.

24              In regards to Mr. White's testimony

           regarding his income, he states that his income is

           $3,000 or $3,090 per month.  I think there's been ample evidence to show that he's more

than capable of earning 3 in excess of what Ms. White makes.  He put forward in a

4     federal document that, you know, 30 hours of his time

25

July 26, 2022                                    Leland Jossy 594

was worth $2,000.  So clearly, he thinks his time is 6 worth $66.66 per hour, at the minimum.

He has testified in the past that he would do this RV electrical and earn 5 or $6,000 a year.  He's testified that he would make $6,500 a year doing Lyft.  He's also testified that he's one of two people in the world skilled in this photolithography.

Last year, the documents that have been submitted from the IRA documents show that he withdrew $38,500.  That looks like he put in -- put back in 15 about 11.  So he did withdraw 27,000 or so of money 16 from the IRA.  So he also had that income.

My client is living on the floor of her daughter's house.  And, according to Mr. White, that is perfectly fine.  He should just continue to live off of 20 his children, or she should live off of her children.

That isn't what she wants to do.  She's testified here. She's provided evidence regarding potential home loans. And that she would like to own a home so that she could have a place of her own, not -- doesn't need a fourbedroom home like Mr. White has, but she's looking to

July 26, 2022                                    Leland Jossy 595

1

2

have a home of her own.  And she's looking at putting -- of that, I think she testified that she has

got about $250,000 remaining.  I think the figures from

Mr. Psaradelis were that she would be putting in about

a little -- little under 210 to buy a house that is in

that 400 - $500,000 range.  And that's a home that

nowadays, with the property values being what they 8 are -- it's hard to find that, but that's what she can 9 afford.  And that's what she wants to do.

The factors that the Court is supposed

to look at according to 107.105(1)(d)(C) is the

duration for determining spousal support is:

"the duration of marriage; the age of

the parties; the health of the parties; the

standard of living established during the

marriage; the relative income and earning

capacity of the parties, recognizing that

the wage earners continuing income may be a 19        basis for

support distinct from the income

that the supporting spouse may receive from 21 the property distribution; and then a

party's training and employment skills; and

a party's work experience."

July 26, 2022                                          Leland Jossy 596

1

2

24          My client has been very active in

pursuing a job in a -- in the -- in an area that she

does have some experience in rather than just sitting on her laurels waiting for a handout to

come.

3          Where is it appears from Mr. White's

4    testimony that that's exactly what he's doing.  He took

5    a week off to go skiing.  That's not a luxury that my

6    client has.  He took this camper that's their camper.  7 We'll get to

that later.  But he's clearly

8    spending -- he's spending a lot of time driving to and

9    from Depoe Bay and non -- apparently non income-

10   producing activities.

11   As the Court kind of pointed out, you

12   know this idea of -- I was an economic major so I

13   should remember this but -- the other opportunities

14   that he could be pursuing as opposed to pursuing and

15   putting a lot of vigor and act and energy into doing

16   nothing that's producing any income other than 17 apparently

sharing Scotch with your friends and -- and 18 eating at restaurants

on the way down.

19   I had cited a case within the memorandum

20   regard -- that kind of looks at this idea of Social

25

July 26, 2022                                    Leland Jossy 597

1

2

21          Security and how courts have done that.  And what my

22          client is seeking isn't -- is she seeking that the

23          Social Security amounts will be equalized.  Mr. White

24          currently is receiving about $2,000 a month.  If that month --

            money -- if my client's awarded spousal

support on half of that then both of them are on equal footing.  She has $1,000-a-month baseline, and he would

3           have $1,000-a-month baseline.  And then they can both

4           burn money on top of that.  There's also an IRA, which

5           depending upon how the Court distributes that, that

6           money could also then be used to supplement

7           their -- their incomes.

8           I'll move on from the spousal support

9           because I think our memorandum kind of addresses that

10          and the evidence does as well, Your Honor.  When we get

11          to the property division, the Court's -- I'm not going

12          to talk about personal property because the Court's

13          decide that.  But when we come to the other

14          person -- the other personal property that is there, we

15          have  -- where? -- attached to our trial memorandum

16          there, we had provided a -- what did I do with

25

1

2

17                    that? -- there it is, sitting right in front of 18 me -- we had provided a statement of assets and

19                    liabilities.

20                    Some time has expired since the trial

21                    began.  But at that time, there was an Ally IRA that

22                    was valued at $234,000 there, and my client

23                    admitted -- and that was admitted into evidence.  And

24                    then there was a TD Ameritrade Roth IRA that's in my client's name of $1,139.  There was four vehicles that

we discussed at the -- that were in existence at the time of the marriage was the 2010 Pontiac Vibe, which

was my client's vehicle; the Chevy Silverado truck

3    3500, the 2005; the 2014 Volkswagen Jetta; and then the

4    Arctic Fox camper.  Mr. Smith provided evidence 6 regarding the value of those.  And I think I'm not 7 going to pull those up unless the Court wants me to.

5

8                    THE COURT:  Nope.

9                    MR. SHIPLEY:  Okay.  So in regards to

10                   those values, we believe that Mr. Smith's values are

11                   accurate.  I think one of the disputes, I guess, that

12                   Mr. White would potentially be raising is the ownership

13                   of the Arctic Fox camper.  The Arctic Fox camper, I

25

July 26, 2022                                    Leland Jossy 599

1

2

14          believe the copy of the title that was in existence at

15          the time this case started has been submitted.  The or

16          the camper was titled in the name of both parties, Mr.

17          White and Ms. White.

18          According to ORS 803.010 that's -- it

19          says that -- that statute says that:

20          "a certificate -- a certificate of

21          title is a prima facie evidence of

22          ownership of a vehicle of an interest

23          therein in all action, suits, or criminal

24          proceedings when the title to or right of

            possession of any vehicles involve proof of

            ownership or right to possession shall be made by means of the original title,

3   salvage title, or the Department of 4      Records," what they -- records they might

5           have.

6           So the title for that camper was in the 7 name of these parties.

8           In regards to -- I think what the Court

9           had referred to as "potential shell corporations," and

10          how -- how that was owned or the rights to that, you

11          know, camper as far as photolithography -- I think it's

12          well-established that this -- Mr. White had confirmed

25

July 26, 2022                                                    Leland Jossy 600

1

2

13          his testimony from the deposition that all the shares

14          of -- if the Court even wanted to say that it was owned

15          by photolithography -- all the shares of that

16          corporation were owned by Mr. and Ms. White.

17          And there's no evidence that's been

18          presented that Ms. White ever gave up any interest in

19          that corporation.  That's only if the Court were to go

20          to the extent of saying that that camper was owned by 21 the

corporation.  But all the evidence has shown that

22          that camper was owned by the couple.

23          The evidence says -- that was

24          presented -- showed that in the year of 2021, Mr. White had

withdrawn -- and I think we already -- I already

said this, but I want to come back to it -- he had withdrawn $27,000 from the IRA, and that

was -- Ms.

3 White received no money from that IRA during the 2021.  4 In addition to that, Mr. White hasn't paid any of the

5          spousal support that he's been ordered to pay according

6          to the existing judgment, except there was $3,000 that

7          came out when he refinanced the home, and I think that

8          was through September -- no, that would have been for

25

July 26, 2022                                              Leland Jossy 601

9      June, July, and August, I believe, of 2021.  Since 10 then, there's been no payments at all on the spousal 11 support award.

12                              We've also presented evidence regarding

13                              the personal debt that my client incurred in the name 14 of her -- to

the -- that was owed to her children.

15      That was approximately $16,000.  The exhibits have been

16      admitted into evidence.  Those were debts that my

17      client incurred because she didn't have income.  She 18 didn't have spousal support being

paid to her, and

19      those are expenses that she had to incur in order to

20      move forward.  On the other hand, Mr. White was

21      spending money that was in the IRA, as he testified to. 22                              As we

stated in our memorandum, we

23      believe that in order to equalize the property division

24      between the IRA and then the vehicle values and then also what Mr. White took out

unilaterally, it was

our  -- what we stated -- it was $165,166 of his Ally Bank IRA should be transferred to wife.

                              And then, in addition, when we add in

                              the -- actually, that was not including -- that's just

                              based upon the IRA value and the vehicle values -- but

                              when we add in his unilateral distributions that he

25

took from the IRA -- and then also, in that -- my

calculations don't include the months -- the existing

or the -- my calculation of support arrearage -- it

only went through February.  But if we added March,

April, May, and June, and now July that is five more

months, that would be 11,000 in unpaid support.  It's 13 our

position that husband should transfer $191,911 from 14 the Ally

Bank IRA.

THE COURT:  What's that number again?

MR. SHIPLEY:  What's that?

THE COURT:  What the number again?

MR. SHIPLEY:  $191,911 in order to

equalize the property distribution.

Now, that also does take into account

the discount factor of the IRA.  So if the Court didn't

want to impose the "discount factor," meaning as these

people -- as my client takes withdrawals on that IRA,

there's going to be a tax of, I would estimate -- we've estimated

talking with tax professionals that it would

be 20 percent because that's on top of her income that she's already receiving, so.  I could

run the numbers

1

2

3  if the Court wanted it without the discount, right,

4  but --

5  So just to wrap it up and get us out of

6  here shortly is -- our position is that that number in

7  addition to $1000 a month in spousal support until my

8  client -- actually, until my client -- until August

9  2009 -- at that time my client will receive half of the 10 amount of support that r.. White

will receive, so at

11                          that point, those numbers should be equalized.  So that

12                          would approximately be in 2009 -- is that there would

13                          have been -- what's that?

14                          THE COURT:  August of 2029.

15                          MR. SHIPLEY:  Yeah, August of 2029.  Is

16                          that at that point, my client would be receiving about

17                          half, so roughly that would be about 3,000 total.  And

18                          so my client would seek that, at that point, she would

19                          only receive 500 from Mr. White going forward

20                          indefinitely.

21                          And then on top of that, Your Honor, we

22                          are seeking award of attorney fees based upon -- well,

23                          just some of the difficulty that we've had in this case

25

July 26, 2022                                      Leland Jossy 604

1

2

24          in terms of obtaining evidence, and then obviously, we could make

an application for that (indiscernible).

Thank you.

THE COURT:  Thank you.

3    Mr. White.

4    RESPONDENT'S CLOSING ARGUMENT

5    MR. WHITE:  All right.  What you read,

6    803.01 -- 010 refers to a criminal case.  This is not a

7    criminal case; therefore, it is not applicable.  For

8    the supposed spousal support that was awarded by Judge

9    Fun was not spousal support.  It was simply a thousand 10 a month to do a quick sale of the

home so that she

11    could pay the utilities and things like that.  It's in

12    his order.  I could -- I don't have it in front of me,

13    but it's probably in one of these.  I'll have to find 14 it.  It wasn't to continue after the house

was sold.

15          And so that's why the 3,000 was added to what she

16          received from the proceeds of my loan.

17          In terms of the camper, evidence -- she

18          testified in deposition, I testified in deposition,

19          both of us testified -- the camper was owned by 20 photolithography.

25

July 26, 2022                                    Leland Jossy 605

1

2

21          MR. SHIPLEY:  Your Honor, I'm going to

22  object.

23          MR. WHITE:  No.

24          MR. SHIPLEY:  Because that evidence was
         not -- what my client's testimony in deposition was
never brought into this case.

                   THE COURT:  The Court will consider what
            evidence (Indiscernible)

3           MR. SHIPLEY:  Okay.  Thank you.

4           MR. WHITE:  Yeah.  I submitted that to

5           the Court in my memos.  So -- but both of us testified

6           to that, and today's, I put my testimony in deposition 8 about that.

7    Furthermore, in photolithography.net

9    bylaws, only myself, as the president of that

10   corporation, can determine the value of any asset.  The

11   value of the camper is, therefore, 14,000 that I've

12   always said it was for the past year and a half.  It's 14 not 29,000.

13   Heck, we paid 30,000 for it in 2015.  It's 15 not worth $29,000.  That's

     ridiculous.

16      Furthermore, if we -- what Mr. Shipley

17   is saying in terms of splitting up the IRA and for 18 spousal support

     going further, I don't see how this is

25

July 26, 2022                                          Leland Jossy 606

1

2

19    equalizing anything because it would make me destitute.

20    I'd have to sell the house and -- or if I -- if I kept

21    the house, there's no way I'd be able to make the 22 payments.

23                    I testified, and it's true -- and I

24                    submitted by current resume to the Court, and you can look at it

       and see easily why nobody wants to hire me.

       And I have applied for 35 engineering jobs and not one phone screening from any of them.
       So

3                     there's -- there's no way that she could get that kind

4                     of money out of the IRA.  If she -- if I don't get at

5                     least 130,000, I can't take out the 1,000 a month to

6                     pay my bills substanally (sic) -- sustainably.  I mean,

7                     I'd love the IRA was 400,000 like it used to be, but

8                     with the market and everything, it's down.  I don't

9                     even think right now it has as much in it as what

10                    they're requesting.

11                    Furthermore, as I said in my testimony,

12                    there's two -- two tests that fail for 107.105.  One is

13                    simply that I can't pay it.  Christine from Rick Hook

14                    (phonetic) CPA testified to that.  I put what my June

15                    expenses were.  So if any spousal support is awarded,

25

July 26, 2022                                          Leland Jossy 607

I'll be in contempt of Court immediately because I can't pay it.

And that right there is plenty,

according to this law, to keep me from paying it.  But

secondly, I have a medical issue which prevents me from

getting a job.  Nobody will hire me with what's in my

resume.  And sure, if I took some of those things out

possibly, I could get a job.  But as I said, I put in

my resume.  I don't change anything.  I put in there four published

manuscripts on COVID that the media's lying about and a grand jury

investigation of the CDC.  They're crooked.  "Centers of Deliberate

Confusion" is what they are.

And I teach, you know, I teach.  And

that takes a lot of my time, and I love doing it, and

it's very important to the students.  I wish we could

get a lot more students, but I can't guarantee I will.

But in terms of spousal support, if you

want to make it even, right now, if she took the money

that she will get if she gets -- I think it

was -- well, if I get 130, whatever is left is about

July 26, 2022                                                    Leland Jossy 608

60 -- she'll have between the money she has left on 13 the -- from the house and this money. And if she 14 invested, she'll be able to take out $34,000 a year 15 sustainably.

And I can only take out 12,000 a year sustainably. So that's not fair either, but that would, you know, that would be the proper way to split the IRA. If it split less than that, I can't pay my monthly bills, at least not sustainably, and certainly, if they tried to take the number he was taking, I would have no money left in the IRA whatsoever, and that's 23 certainly not fair.

So those are the -- the facts of this case and why I can't pay spousal support. And the evidence of that also is June, July, and August when it was supposed to be for getting the house ready for a quick sale, I didn't have any money at that time either. So that's why I didn't pay it until the house was refinanced. And now, because of what's in my resume, I can't get a job. Because people don't like, you know, I put everything about climate change in it, and the four published manuscripts with the grand jury investigation of the CDC in it. And people look at

July 26, 2022                                           Leland Jossy 609

1

2

10     that and see my experience in litho and see I'm 11 teaching right now, I suppose, and then they decide to 12 move on to another candidate.

13                     But again, I'm not going to change my

14     resume because I -- I don't want to say that I've just

15     been sitting around doing nothing.  I do get food 16 stamps, and I wouldn't get food stamps if I didn't have 17 this low of income.

18     In terms of not doing RV electrical, I

19     haven't done RV electrical now for three years.  Last

20     year, I didn't have the home, so I didn't do it.  And

21     this year, because I'm teaching, I haven't had any 22 time.

23     So -- and I -- and I haven't given any

24     business cards or anything, so like, you know, I'm not going to get that income again.

                        In terms of Lyft, I don't have any time
to drive Lyft.  You know, teaching, I said, takes 80 3 percent of my week.  This summer, I could drive lift

4     some, but the 23 Ph.D.'s who review the

5     intergovernmental panel of climate change

6     reports -- that are deliberate science-fiction -- are

7     writing a college textbook called "Climate Crisis

8     Change."    With  -- the intergovernmental panel of

25

July 26, 2022                                    Leland Jossy 610

9    climate change reports are deliberate science-fiction

10   and then -- it'll be -- if we get it done by September,

11   it'll be accepted by the top journal -- or not journal,

12   but the top college textbook division in the world.

13   And then it will go to university libraries next

14   summer.  But from that, since there's 23 of us and we

15   have to split whatever's coming out of that, I don't 16 expect to get any money out of that.

17              But that's what my time is spent doing

18         this summer other than preparing for this.  So I don't

19         have time to make any other money.  Certainly, if I

20         could get a job -- I did, like, my friend Chris who

21         works at Corvo, he took my resume.  They needed a litho

22         person.  He took my resume and gave it to his boss, and

23         I still -- and even though he was pushing -- I still

24         didn't get a phone screen interview or an in-person interview.

              So it's clear I cannot get a job and

         make any -- I can't even make what she's making.

3         $3,600, that's good.  I don't make $3,600 doing

4         anything.  And I -- I don't see any way I will.  In

5         terms of doing consulting, I have that -- done that in

6         the past.  If the economy crashes coming up, which

July 26, 2022                                                    Leland Jossy 611

1

2

7          would be a much better time to buy a house, then

8          possibly I will.

9          The website's still active:

10         photolithography.net, and, you know, if I get something

11         from that, maybe I will.  But if it happens after

12         September 9th or so, I'll -- unfortunately for the

13         school, I'm only getting one science student so far,

14         but we're hoping some more will sign up between now and

15         September but -- the teaching will be my priority as it

16         should be because it's more important for these younger

17         people to get taught, you know, better science then 18 what the

           schools teach.

19              So in short, I don't have any way to

20              make extra money.  I wish I did.  I wish I could get

21              some funding, but, you know, I put in for funding for 22 the

                experiment on U.S. 26 with the National Science

23         Foundation, and the scientists who reviewed it lied.

24         They said that this has already been done before and things like that.  And even Dr. -- I forget his

           name -- Hamilton of that section has said he knew that they didn't even read the -- read the

           proposal.  So I

25

July 26, 2022                                              Leland Jossy 612

1

2

3    didn't get the funding for that.  That would have been

4    $450,000 for that.  So I'm going to put it back in 5 again, but again, I doubt they will fund it.

6                     But it's true.  We could plant native

7                     shrubs and trees next to roads, and in ten years,

8                     they'll consume all the $CO_2$ from the vehicles because

9                     the trees by the zoo are consuming all the carbon

10                    dioxide from 160,000 vehicles per day.  And that

11                    experiment finished the second year where it went to

12                    scientific law.  And if I get enough money, I'll

13                    publish another manuscript that has that result in it.

14                    So since I don't get any funding or any

15                    big funding for Climate Change Truth, and I can't get a 16 job from

                      anybody, and I can't do these other things

17   because of time constraints, there's -- there's just no

18   way that I can pay spousal support.  And that's about 19 all I wanted to say.

20                    THE COURT:  Mr. Shipley, any rebuttal?

21                    PETITIONER'S FINAL CLOSING ARGUMENT

22                    MR. SHIPLEY:  Just for the Court, I did

23                    revise my numbers without a discount rate.  And then it

24                    would be -- the equalizing number would be 166,500 in that

                      situation.  But I do believe the -- even though

25

July 26, 2022                                      Leland Jossy 613

1

2

this is a little beyond the scope of that -- I do believe a discount rate of some factor is appropriate 3 for discounting the cash compared to the IRA

4                                     withdrawals.

5                                     But in terms of, in many regards, it

6                                     seems to me, or it's our position, that there's a lot

7                                     of self-inflicted wounds in terms of not wanting to

8                                     work as opposed to if we could submit a resume and take

9                                     two things out but still get the job.  You know,

10                                    sometimes, you know, a little bit of humility can again

11                                    go a long way in order to, you know, be able to get a

12                                    job.  Being a nanny at 60 years old wasn't necessarily,

13                                    you know, my client's lifelong desire.  But she finds

14                                    it very fulfilling, and she's done -- she's been 15 industrious in

                                      seeking employment.  And I think the 16 respondent can do the

                                      same.

17                                    THE COURT:  Thank you.  All right.  I

18                                    will try to get a decision to you all within the next

19                                    two to three weeks.  Thank you.

20                                    MR. SHIPLEY:  Your Honor.

21                                    (Proceedings concluded at 12:09 p.m.)

22

23

25

July 26, 2022                                                    Leland Jossy 614

1

2

24

CERTIFICATE

3          I, Jennifer L. Muir, CET-1149, a court-

4          approved transcriber, do hereby certify that the

5          foregoing is a correct transcript from the official

6          electronic sound recording of the proceedings in the 7 above-entitled

           matter, to the best of my professional

8  skills and abilities.

9

10

11

12         JENNIFER L. MUIR, CET          - 1149    November 16, 2022

13         Certified Electronic Transcriber

14

15

16

17

18

19

20

21

22

25

July 26, 2022                                    Leland Jossy 615

1

2

23

24

25